# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### LUBBOCK DIVISION

| | | |
|---|---|---|
| **CENTENNIAL BANK, as the successor-in-interest to HAPPY STATE BANK,** | § § § | |
| **Plaintiff,** | § § | |
| **v.** | § § | |
| **JERRY "BUD" HOLMES, JAY HOUSE, CHANNING BAISLEY, DREW PHILLIPS, ROSS GLENN, WILLIS MCCUTCHEON, MICHAEL JACKSON, JESSICA TERRELL, JASON WEST, SAMUEL "TREY" WEAVER, DEREK DOLLAHITE, DAVID HUTSON, BRIAN MURRY, ISAC OVALLE, GREG HOULETTE, DIANA RICHARTE, and JAMES SIKES,** | § § § § § § § § § § § § § § § | **Civil Action No. 5:23-cv-44** |
| **Defendants.** | § § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Centennial Bank, as the successor-in-interest to Happy State Bank by way of merger ("**Happy Bank**" or the "**Company**"), files its Original Complaint against Defendants Jerry "Bud" Holmes, Jay House, Channing Baisley, Drew Phillips, Ross Glenn, Willis McCutcheon, Michael Jackson, Jessica Terrell, Jason West, Samuel "Trey" Weaver, Derek Dollahite, David Hutson, Brian Murry, Isac Ovalle, Greg Houlette, Diana Richarte, and James Sikes (collectively, "**Defendants**") and alleges as follows:

## TABLE OF CONTENTS

NATURE OF THE ACTION ........................................................................................ 1

PARTIES .................................................................................................................... 3

JURISDICTION AND VENUE ................................................................................... 5

FACTUAL BACKGROUND ....................................................................................... 6

A. Happy State Bank ............................................................................................ 6

B. The Policies and Procedures Applicable to Defendants .................................. 7

 The Handbook ..................................................................................................... 8

 The Ethics Policy ............................................................................................... 8

 The Acceptable Use Policy ............................................................................... 10

 The Network Security Policy ........................................................................... 11

 The Cloud Computing Policy ........................................................................... 11

 The Privacy Policy ........................................................................................... 12

 The Mobile Device Policy ................................................................................ 12

 The Stock Appreciation Rights Award Agreements ......................................... 13

 The Restricted Stock and Stock Appreciation Rights Plan ............................... 13

C. Defendants Acknowledged and Agreed to be Bound by the Policies and Procedures ... 14

D. The Merger Agreement .................................................................................. 14

E. The Mass Resignation from Happy Bank and Mass Hiring by American State Bank .. 15

F. American State Bank Quickly Begins Servicing Former Happy Bank Customers ...... 18

G. Defendants Deleted or Omitted Customer Information from Happy Bank's Systems .. 19

H. Happy Bank's Missing Confidential Information ............................................ 20

Jerry "Bud" Holmes ................................................................................................. 21

A. Background and Summary of Forensic Evidence ............................................ 21

B. October and November 2021 – Steaming Mad and Scheming Revenge .......... 23

C. January 2022 – Compiling his Treasure Trove of Confidential Information and Purging Emails ... 24

D. February 2022 – Copying the Treasure Trove of Confidential Information and Deleting Files ... 27

E. April 2022 – Stealing the Treasure Trove of Confidential Information, Soliciting Customers, and Deleting Files ... 29

**Jay House** ......................................................................................................... **32**

A.  Background and Summary of Forensic Analysis. ....................................... 32

B.  February and March 2022 – Testing Methods to Steal Confidential Information, Purging Emails, and Soliciting Customers. ................................... 34

C.  April 2022 – Soliciting Customers and Stealing Confidential Information. .................. 35

**Channing Baisley** .............................................................................................. **39**

A.  Background and Summary of Forensic Evidence. ...................................... 39

B.  February and March 2022 – Stealing Confidential Information and Soliciting Customers. ............................................................................. 41

C.  January and April 2022 – Soliciting Customers and Deleting Files. ........... 41

**Drew Phillips** .................................................................................................... **43**

A.  Background and Summary of Forensic Analysis. ....................................... 43

B.  January 2022 – Stealing Confidential Information, Deleting Files, and Soliciting Customers. ........................................................................... 44

**Ross Glenn** ........................................................................................................ **46**

A.  Background and Summary of Forensic Evidence. ...................................... 46

B.  January to April 2022 – Purging Emails, Deleting Files, Stealing Confidential Information, and Soliciting Customers. ................................... 47

**Willis McCutcheon** ........................................................................................... **50**

A.  Background and Summary of Forensic Analysis. ....................................... 50

B.  January to April 2022 – Purging Emails. ................................................... 52

C.  February to April 2022 – Stealing Confidential Information and Soliciting Customers. ............................................................................. 53

**Michael Jackson** ............................................................................................... **54**

A.  Background and Summary of Forensic Analysis. ....................................... 54

B.  March and April 2022 – Soliciting Customer, Stealing Confidential Information, and Deleting Files. .............................................................. 55

**Jessica Terrell** ................................................................................................... **57**

A.  Background and Summary of Forensic Analysis. ....................................... 57

B.  December 2021 to April 2022 – Stealing Confidential Information, Deleting Files, and Soliciting Customers. ................................................. 59

**Jason West** ........................................................................................................... **61**

A.       Background and Summary of Forensic Analysis. ......................................... 61

B.       December 2021 to May 2022 – Purging Emails. .......................................... 62

C.       May 2022 - Stealing Confidential Information and Soliciting Customers .................... 63

**Samuel "Trey" Weaver** ........................................................................................... **64**

A.       Background and Summary of Forensic Analysis. ......................................... 64

B.       January to April 2022 – Purging Emails, Stealing Confidential Information, and
          Soliciting Customers. .................................................................................... 65

**Derek Dollahite** ..................................................................................................... **67**

A.       Background and Summary of Forensic Analysis. ......................................... 67

B.       January 2022 – Purging Emails. ................................................................... 69

C.       March and April 2022 – Stealing Confidential Information and Soliciting
          Customers ..................................................................................................... 70

**David Hutson** .......................................................................................................... **71**

A.       Background and Summary of Forensic Analysis. ......................................... 71

B.       January and February 2022 – Purging Emails and Stealing Confidential
          Information. ................................................................................................... 73

C.       March and April 2022 – Stealing More Confidential Information and Soliciting
          Customers ..................................................................................................... 73

**Brian Murry** .......................................................................................................... **74**

A.       Background and Summary of Forensic Analysis. ......................................... 74

B.       January to April 2022 – Purging Emails, Stealing Confidential Information, and
          Soliciting Customers. .................................................................................... 76

**Isac Ovalle** .............................................................................................................. **77**

A.       Background and Summary of Forensic Analysis. ......................................... 77

B.       March and April 2022 – Stealing Confidential Information, Deleting Files, and
          Soliciting Customers. .................................................................................... 79

**Greg Houlette** ......................................................................................................... **80**

A.       Background and Summary of Forensic Analysis. ......................................... 80

B.       March and April 2022 – Purging Emails and Stealing Confidential Information. ........ 81

C.       May and June 2022 – Purging Emails, Deleting Files, Stealing More Confidential
          Information, and Dreaming about American State Bank. ............................. 82

**Diana Richarte** ......................................................................................................... **84**

A.    Background and Summary of Forensic Analysis. ......................................... 84

B.    January and February 2022 – Purging Emails. .............................................. 85

C.    March and April 2022 – Stealing Confidential Information and Soliciting Customers. ........................................................................................................... 86

**James Sikes** .................................................................................................................. **87**

A.    Background and Summary of Forensic Analysis. ......................................... 87

B.    January 2022 – Purging Emails. ....................................................................... 88

C.    April 2022 – Stealing Confidential Information and Soliciting Customers. ................. 88

**CAUSES OF ACTION** ............................................................................................... **89**

**First Cause of Action: Violation of Federal Defend Trade Secrets Act  (18 U.S.C. § 1836)** **89**

**Second Cause of Action: Violation of Computer Fraud and Abuse Act** .............................. **94**

**Third Cause of Action: Breach of Fiduciary Duty** ...................................................... **97**

**Fourth Cause of Action: Breach of Contract** ............................................................. **100**

**Fifth Cause of Action: Tortious Interference with Existing Contract** ....................... **102**

**Sixth Cause of Action: Tortious Interference with Prospective Relations** ................. **103**

**Seventh Cause of Action: Civil Conspiracy** ............................................................... **104**

**Eighth Cause of Action: Knowing and Joint Participation in a Tort** ........................ **105**

**Ninth Cause of Action: Conversion** ........................................................................... **106**

**Tenth Cause of Action: Unfair Competition** ............................................................. **107**

**ATTORNEYS' FEES AND COSTS** ......................................................................... **108**

**CONDITIONS PRECEDENT** ................................................................................... **109**

**PRAYER** ...................................................................................................................... **109**

## NATURE OF THE ACTION

1.    This is an action for misappropriation of Happy Bank's trade secrets and confidential and proprietary information, the unlawful solicitation of Happy Bank's customers and employees, computer fraud and abuse, breach of fiduciary duty, breach of contract, tortious interference with existing contract and prospective relations, civil conspiracy, joint tortfeasor liability, conversion, and unfair competition.

2.    Happy Bank is a Texas financial institution that has serviced the financial needs of its customers for more than 100 years.

3.    Defendants are former officers and/or employees of Happy Bank—the very people entrusted with safeguarding Happy Bank's confidential and customer information—who carried out a premeditated, surreptitious, and deliberate scheme to steal Happy Bank's most valuable confidential information and many of its customers and employees—all while still employed at Happy Bank.  The goal of Defendants' scheme was straightforward: thieve enough confidential information, customers, and employees from Happy Bank to build a pre-packaged bank and leverage it with a new employer.  And that was exactly what Defendants accomplished.

4.    After Defendants secretly ransacked Happy Bank using unauthorized USB devices, personal email accounts, and third-party Internet applications, they resigned en masse and joined one of Happy Bank's competitors—American State Bank—where they presented the spoils of their theft: a ready-to-use "Bank in a Box" that American State Bank could immediately run with to establish competing banking products and services with essentially no upfront costs.

5.    American State Bank is considerably smaller than Happy Bank.  At the time of the mass resignation, American State Bank had approximately $600 million in assets compared to Happy Bank's $6.76 billion in assets.

6.      Yet, within mere months of Defendants' resignation from Happy Bank, American State Bank announced or opened new offices in the same areas as Happy Bank—precisely where Defendants used to work for Happy Bank—and began offering loan and deposit services to former Happy Bank customers.  In October 2022, American State Bank partnered with NFL quarterback Patrick Mahomes as part of its buildout across the state in the markets of Lubbock, Amarillo, and Plainview—the very markets serviced by Happy Bank's former employees before they joined American State Bank.[1]

7.      Defendants' brazen and malicious actions are shocking and particularly jarring in the banking industry where Defendants have been—and continue to be—entrusted with looking after other people's money.

8.      Happy Bank is committed to the integrity of its business and safeguarding its customers' information.  Accordingly, Happy Bank has no choice but to bring this action to halt Defendants' conspiracy, protect its customers and the communities it serves, and recover damages and other relief for the harm Defendants have caused and continue to cause.  Happy Bank seeks economic damages, exemplary damages, attorneys' fees, costs, and related expenses.  Happy Bank also seeks injunctive relief to enjoin Defendants' continued and/or future use and misappropriation of Happy Bank's confidential information and trade secrets, and for the return of the same.

---

[1] *See* BUSINESS WIRE, *American State Bank Partners with Patrick Mahomes to Accelerate National Expansion & Digital Transformation* (Oct. 27, 2022), https://www.businesswire.com/news/home/20221027005210/en/American-State-Bank-Partners-With-Patrick-Mahomes-to-Accelerate-National-Expansion-Digital-Transformation ("With significant investment in technology, employees, and platform, American State Bank competes with much larger institutions while maintaining the personal customer service of a community bank.").

## PARTIES

9.      Plaintiff Centennial Bank, as the successor-in-interest to Happy State Bank, is a community bank organized under the laws of Arkansas with its principal place of business at 620 Chestnut Street, Conway, Arkansas 72032.  Happy State Bank merged into and now operates as a division of Centennial Bank pursuant to a Merger Agreement (defined below) effective April 1, 2022.  Pursuant to the Articles of Merger of Happy State Bank into Centennial Bank effective April 1, 2022, "all the property, rights, privileges, franchises, patents, trademarks, licenses, registrations, and other assets of any and every kind and description" of Happy State Bank were transferred to and vested in Centennial Bank.  Thus, Happy State Bank is now Centennial Bank, and Plaintiff Happy Bank is a citizen of the State of Arkansas.

10.      Defendant Jerry "Bud" Holmes is an individual and a citizen of the State of Texas who resides and works in Texas.  Mr. Holmes may be served at his address, 7804 Woodrow Road, Wolfforth, TX 79382, or wherever he may be found.

11.      Defendant Jay House is an individual and a citizen of the State of Texas who resides and works in Texas.  Mr. House may be served at his address, 4609 86th Street, Lubbock, TX 79424, or wherever he may be found.

12.      Defendant Channing Baisley is an individual and a citizen of the State of Texas who resides and works in Texas.  Ms. Baisley may be served at her address, 3310 32nd Street, Lubbock, TX 79410, or wherever she may be found.

13.      Defendant Drew Phillips is an individual and a citizen of the State of Texas who resides and works in Texas.  Mr. Phillips may be served at his address, 3901 114th Street, Lubbock, TX 79423, or wherever he may be found.

14.     Defendant Ross Glenn is an individual and a citizen of the State of Texas who resides and works in Texas.  Mr. Glenn may be served at his address, 165 Laurel Leaf Lane, Canyon, TX 79015, or wherever he may be found.

15.     Defendant Willis McCutcheon is an individual and a citizen of the State of Texas who resides and works in Texas.  Mr. McCutcheon may be served at his address, 1410 11th Street, Shallowater, TX 79368, or wherever he may be found.

16.     Defendant Michael Jackson is an individual and a citizen of the State of Texas who resides and works in Texas.  Mr. Jackson may be served at his address, 2207 Wayne Avenue, Lubbock, TX 79407, or wherever he may be found.

17.     Defendant Jessica Terrell is an individual and a citizen of the State of Texas who resides and works in Texas.  Ms. Terrell may be served at her address, 5903 75th Street, Lubbock, TX 79424, or wherever she may be found.

18.     Defendant Jason West is an individual and a citizen of the State of Texas who resides and works in Texas.  Mr. West may be served at his address, 2024 S. Travis, Amarillo, TX 79109, or wherever he may be found.

19.     Defendant Samuel "Trey" Weaver is an individual and a citizen of the State of Texas who resides and works in Texas.  Mr. Weaver may be served at his address, 3429 61st Street, Lubbock, TX 79413, or wherever he may be found.

20.     Defendant Derek Dollahite is an individual and a citizen of the State of Texas who resides and works in Texas.  Mr. Dollahite may be served at his address, 6017 103rd Street, Lubbock, TX 79424, or wherever he may be found.

21.     Defendant David Hutson is an individual and a citizen of the State of Texas who resides and works in Texas.  Mr. Hutson may be served at his address, 6803 Baccus Drive, Amarillo, TX 79124, or wherever he may be found.

22.     Defendant Brian Murry is an individual and a citizen of the State of Texas who resides and works in Texas.  Mr. Murry may be served at his address, 10903 Richmond, Lubbock, TX 79424, or wherever he may be found.

23.     Defendant Isac Ovalle is an individual and a citizen of the State of Texas who resides and works in Texas.  Mr. Ovalle may be served at his address, 6620 30th Street, Apartment 2001, Lubbock, TX 79423, or wherever he may be found.

24.     Defendant Greg Houlette is an individual and a citizen of the State of Texas who resides and works in Texas.  Mr. Houlette may be served at his address, 7611 Southwood Drive, Amarillo, TX 79119, or wherever he may be found.

25.     Defendant Diana Richarte is an individual and a citizen of the State of Texas who resides and works in Texas.  Ms. Richarte may be served at her address, 5832 Lehigh Street, Lubbock, TX 79424, or wherever she may be found.

26.     Defendant James Sikes is an individual and a citizen of the State of Texas who resides and works in Texas.  Mr. Sikes may be served at his address, 3607 Ridgely Avenue, Lubbock, TX 79407, or wherever he may be found.

## JURISDICTION AND VENUE

27.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action seeks to enforce rights and remedies secured under the federal Defend Trade Secrets Act ("**DTSA**"), 18 U.S.C. § 1836 *et seq.*, and the federal Computer Fraud and Abuse Act ("**CFAA**"), 18 U.S.C. § 1030(g).  This Court has supplemental jurisdiction over Happy Bank's state-law claims pursuant to 28 U.S.C. § 1367 because such state-law claims are so related to

Happy Bank's claims under the DTSA and CFAA that they form part of the same case or controversy under Article III of the United States Constitution.

28.    This Court also has subject matter jurisdiction over Happy Bank's claims pursuant to 28 U.S.C. § 1332 because Happy Bank and Defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interests and costs.

29.    This Court has personal jurisdiction over Defendants because they all reside in the State of Texas and have sufficient minimum contacts with Texas.

30.    Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims described in this Original Complaint occurred in this District.  Venue is also proper in this Court under 28 U.S.C. § 1391(b)(1) because at least one defendant resides in this District, and all Defendants are residents of the State of Texas.

## FACTUAL BACKGROUND

**A.    Happy State Bank.**

31.    Happy State Bank was founded on January 1, 1908 and has served the financial needs of its customers for more than 115 years.  It currently operates more than 60 branches physically located in the State of Texas and offers products and services intended for and used by customers located across the United States.

32.    Happy Bank provides a full range of commercial and consumer banking services to its customers, including checking and savings accounts, consumer loans, residential mortgage loans, real estate loans, commercial and business loans, business checking accounts, time deposits, and money market accounts.  Lending is Happy Bank's primary business and the key driver of its revenue and profits.

33.    As of June 30, 2021, Happy Bank had total assets of more than $6 billion, total deposits of more than $5 billion, and total stockholders' equity of nearly $700 million.

34.    Happy Bank owns confidential and proprietary information (collectively, "**Confidential Information**") that is critical to the success of its business and provides a competitive advantage over competitors that do not have access to such information, including but not limited to its commercial advantage in pricing, closing, and servicing complex and higher-risk loans. Happy Bank has expended substantial time, money, and effort to develop its Confidential Information, and it has taken significant efforts to guard the secrecy of the same.

35.    Happy Bank's Confidential Information at issue in this action includes, but is not limited to, sensitive and proprietary information about Happy Bank's: (1) loans and financial services; (2) customers, including personal identifiable information and financial data related to those customers and their businesses; (3) historical and projected financial performance, profitability, and budgets; (4) employees, including their compensation, financial performance, customers, and pipelines; (5) shareholders; and (6) processes, analyses, templates, presentations, reports, and forecasts used in the course of its business to analyze, price, approve, close, and service all the different types of loans that Happy Bank provides.

36.    Happy Bank's Confidential Information not only gives the Company a competitive edge over its competitors, but it is also subject to strict confidentiality and ethical requirements imposed by Company policies and procedures as well as federal and state banking laws, rules, and regulations.

**B.    The Policies and Procedures Applicable to Defendants.**

37.    During Defendants' employment, Happy Bank maintained a robust set of policies and procedures to protect its Confidential Information and ensure that its employees observed the highest ethical standards of business conduct. In addition to all applicable laws and regulations, these policies and procedures imposed a duty of loyalty on each employee to Happy Bank by requiring strict protection of Happy Bank's Confidential Information and mandating that all

business decisions be based solely on what is in the best interest of the Company—without regard to any conflicting interest an employee may have or that interferes in any way with the interests of the Company.

### *The Handbook.*

38.    Among other things, the Happy Bank employee handbook (the "**Handbook**") contained policies regarding an employee's use of email, Internet access, Happy Bank's ownership of all Company assets and property, and the return of all Happy Bank assets and property upon an employee's separation from the Company.    The Handbook's email access policy required employees to use Happy Bank email services only for business purposes, and it prohibited any disruption or alteration (*e.g.*, deletion) of electronic communications.

39.    The Handbook's Internet access policy prohibited employees from using any third-party email services (*e.g.*, Hotmail, Gmail, or personal Microsoft Outlook accounts) on Happy Bank computers or revealing any Confidential Information using the Internet at any time.    The Handbook also expressly stated that any ***files downloaded*** onto a Company system were the property of Happy Bank and that employees were accountable for any breaches of security or confidentiality.    The Handbook required that any Company property issued to an employee—such as software, computer equipment, databases, and ***files***—must be returned upon an employee's separation from Happy Bank.

### *The Ethics Policy.*

40.    Happy Bank's Code of Ethics Policy (the "**Ethics Policy**") required all employees to act in good faith, responsibly, with due care, competence, and diligence, without misrepresenting material facts or allowing the employee's independent judgment to be subordinated.    The Ethics Policy further required all employees to act solely in the best interest of

Happy Bank, and it prohibited employees from personally taking or usurping any opportunities discovered through the use of the Company's property or information.

41.    The Ethics Policy likewise required all employees to use Happy Bank assets only for legitimate business purposes and not for personal benefit, and it prohibited any unauthorized use or distribution of such assets.  The Ethics Policy defined "assets" to include all work product, computers and software, customer lists, customer financial records, employee information, unpublished financial data and reports, and other similar matters.  The Ethics Policy also expressly prohibited employees from using any Company property, information, or position for their personal gain or to compete with Happy Bank.

42.    The Ethics Policy contained a confidentiality policy that required all employees to maintain the confidentiality of any confidential information entrusted to them by Happy Bank or by those with whom the Company does business.  "Confidential information" is defined in the Ethics Policy as all non-public information that might be of use to competitors of, or harmful to, Happy Bank or persons with whom the Company does business.

43.    The Ethics Policy further required all employees to comply with all applicable governmental laws, rules, and regulations.  In addition to numerous regulations requiring the preservation and maintenance of information and records related to loan and banking transactions,[2] the laws applicable to employees include 18 U.S.C. § 1005, which prohibits a person from making any false entry in any book, report, or statement of a bank with the intent to injure or defraud such bank, or to deceive any officer of such bank, the Federal Deposit Insurance Corporation, or any agent or examiner appointed to examine the affairs of such bank.

---

[2] *See, e.g.*, 31 C.F.R. § 1020.410(a); Truth in Lending Act Revised Regulation Z, 12 C.F.R. § 226.25(a); Equal Credit Opportunity Act Regulation B, 12 C.F.R. § 202.12(b); Home Mortgage Disclosure Act Regulation C, 12 C.F.R. § 203.5(a); Fair Housing Act, 42 U.S.C. §§ 3617;0, 3612, 261; Electronic Fund Transfer Act, Regulation E, 12 C.F.R. § 205.13(c).

### *The Acceptable Use Policy.*

44.     Defendants were also subject to the Company's Acceptable Use Policy during their employment with Happy Bank, which governed the use of Happy Bank's information resources such as computer systems, emails, the network, and the corporate Internet connection.  Among other things, the Acceptable Use Policy *expressly prohibited*: (1) sharing or disclosing any confidential or restricted data in any manner to anyone that does not have a business reason to have such information; and (2) transferring any confidential or restricted data in an insecure manner.

45.     The Acceptable Use Policy further required Defendants to take reasonable efforts to avoid accessing network data, files, and information that were not directly related to their job functions.  The Acceptable Use Policy made clear that the mere capability to access certain data did not imply permission to use that access.  Employees could use non-bank owned devices (*e.g.*, personal phones) to receive email and use other approved applications *only if* they were approved by the Company and access to those applications was obtained through the Company's Microsoft Mobile Application Manager.[3]

46.     With respect to software, the Acceptable Use Policy prohibited employees from installing any non-Company-supplied software on any of Happy Bank's information resources (*e.g.*, computer systems, email, the network, and the corporate Internet connection).

47.     The Acceptable Use Policy outlined a non-exhaustive list of actions that constituted an unacceptable use of the Company's corporate network.  Defendants were *forbidden* from using the Company's corporate network and/or systems to: (1) engage in activity that was illegal under local, state, federal, or international law; (2) engage in any activity that may cause embarrassment,

---

[3] Microsoft's Mobile Application Manager/Management is a program that allows companies to manage and protect their data by controlling which applications utilizing such data can be installed and used on their employees' mobile devices.  *See* https://learn.microsoft.com/en-us/mem/intune/apps/mam-faq.

loss of reputation, or other harm to Happy Bank; (3) engage in any activities that caused an invasion of privacy; (4) access customer and/or employee account(s) for a purpose that was not required or requested for business; or (5) disclose customer or employee account information that was not used for business purposes.

48.     Finally, the Acceptable Use Policy prohibited any peer-to-peer networking or file sharing unless it was on the Company's corporate network and for business use.  The Acceptable Use Policy ***expressly prohibited*** the use of any personal storage media (*i.e.*, USB devices) or the transfer of any data using Bluetooth.

### *The Network Security Policy.*

49.     Happy Bank established and enforced a Network Security Policy for all of its information technology ("**IT**") systems, devices, and accounts—which collectively comprise the Company's corporate network—to ensure the security of Happy Bank's network infrastructure.

50.     Among other things, the Network Security Policy required employees to use: (1) complex and confidential passwords to access computers and user network accounts, which were required to be changed every 90 days and could not be re-used for 10 cycles; (2) dual factor authentication for any remote access to the network; and (3) screen locks, encrypted hard drives, and valid domain user credentials for all work computers.  The Network Security Policy also described five different types of firewalls that Happy Bank deployed to protect the security of its corporate network.

### *The Cloud Computing Policy.*

51.     Happy Bank's Cloud Computing Policy (the "**Cloud Policy**") was designed to ensure that employees used any cloud computer services in a safe and secure manner.

52.     The Cloud Policy required that all cloud computer services on public servers or information technology services that were not hosted by Happy Bank (*e.g.*, Box, Dropbox, Gmail,

Yahoo mail, and personal non-Company Microsoft OneDrive accounts) must be reviewed and approved by Happy Bank's IT Architecture Review Committee *before* they were purchased or utilized. If an employee used any cloud computing service to handle restricted or confidential data, additional layers of protection were required—including ensuring the data was encrypted in flight and at rest.

53.     In addition, all cloud computer services were to be used by Happy Bank's employees only to access and review information uploaded by customers. Employees were not to use cloud computer services to transmit or disclose such information.

### *The Privacy Policy.*

54.     Happy Bank's Privacy Policy outlined the Company's practices regarding the protection of personally identifiable financial information of its customers. Among other things, the Privacy Policy expressly stated that Happy Bank did not disclose any personal financial information of its customers to any nonaffiliated or affiliated third parties. The Privacy Policy also made clear that the Company protected consumer privacy by granting access to such information only to those employees who have a business reason for doing so.

### *The Mobile Device Policy.*

55.     Happy Bank's Mobile Device Policy set forth the Company's standards for securing mobile devices, which included Company-approved laptops, smart phones, USB devices, flash drives, memory sticks, and other personal data storage media. The Mobile Device Policy required encryption for all mobile devices and *expressly prohibited* employees from storing bank data on non-bank-provided mobile equipment—including USB devices. The only exception to this prohibition was simple contact information, such as phone numbers and email addresses, stored in an address book on a personal phone.

PLAINTIFF'S ORIGINAL COMPLAINT                                                    Page 12

*The Stock Appreciation Rights Award Agreements.*

56.     During their employment with Happy Bank, most Defendants (identified more specifically below) also signed one or more Stock Appreciation Rights Award Agreements (the "**Awards**") in which they agreed to additional policies and procedures in exchange for an award of Company stock.  The stock granted to employees under the Awards was a form of additional compensation given to certain employees in recognition of their hard work for—and dedication to—Happy Bank.

57.     Defendants who signed the Awards expressly agreed not to use, make available, sell, disclose, or otherwise communicate any of Happy Bank's Confidential Information to any person during their employment—other than in the course of the employee's assigned duties and for the benefit of Happy Bank—or at any time thereafter.  Defendants who signed the Awards also acknowledged that this nondisclosure agreement was: (1) ancillary to an otherwise enforceable agreement; (2) supported by independent valuable consideration as required by the Texas Business and Commerce Code; and (3) essential to protect the relationships and goodwill of Happy Bank.

58.     The Awards expressly provided that if Happy Bank determined an employee had violated the nondisclosure restrictions, then Happy Bank may declare any shares or amounts delivered or paid pursuant to the Awards forfeited without payment or compensation.

*The Restricted Stock and Stock Appreciation Rights Plan.*

59.     The Awards were also subject to the Happy Bancshares, Inc. Restricted Stock and Stock Appreciation Rights Plan (the "**Plan**"), the terms of which were incorporated by reference into the Awards.  Among other things, to further protect the Company and its Confidential Information, customers, and goodwill, the Plan included a nondisclosure provision that prohibited an employee from, directly or indirectly, either during employment or at any time thereafter, using, making available, selling, disclosing, or otherwise communicating any of Happy Bank's

Confidential Information to any person other than in the course of the employee's assigned duties and for the benefit of the Company. The Plan also included a noncompetition provision that prohibited an employee from competing with Happy Bank (including by working for any lending or depository institution) for a period of 12 months following the end of their employment with Happy Bank.

60.    Just like the Awards, the Plan expressly provided that if Happy Bank determined an employee had violated the nondisclosure or noncompetition provisions, then Happy Bank may declare any shares or amounts delivered or paid pursuant to the Awards forfeited without payment or compensation.

## C.    Defendants Acknowledged and Agreed to be Bound by the Policies and Procedures.

61.    Each Defendant acknowledged and agreed to be bound by, and received annual training for, the aforementioned policies and procedures.[4]

62.    However, as shown below, the Defendants who were in charge of policing and ensuring compliance with Happy Bank's policies and procedures would be the very people who disregarded them—and actively encouraged others to do the same.

## D.    The Merger Agreement.

63.    Pursuant to an Agreement and Plan of Merger (the "**Merger Agreement**"), Happy State Bank merged with and now operates as a division of Centennial Bank. The Merger Agreement was closed on April 1, 2022, which resulted in "all the property, rights, privileges, franchises, patents, trademarks, licenses, registrations, and other assets of any and every kind and description" of Happy State Bank being transferred to and vested in Centennial Bank.

---

[4] As noted below, the merger closed on April 1, 2022. However, Happy State Bank's policies and procedures remained in force until June 2022 when it completed the conversion process with Centennial Bank. Accordingly, all of Happy State Bank's policies and procedures were applicable to Defendants at all relevant times.

64.     On October 22, 2021—prior to the closing of the Merger Agreement—Centennial's parent company filed a Form S-4 with the United States Securities Exchange Commission regarding the Merger Agreement in which it described salaries paid to certain executives following the merger.[5]

65.     Defendant Jerry "Bud" Holmes—who was at the time a Regional President of Happy Bank—became angry after reading about the merger and the compensation disclosed in the S-4.  Shortly thereafter, Mr. Holmes met with a member of Happy Bank's board of directors and complained about not receiving additional compensation for himself.

66.     Happy Bank offered Mr. Holmes significant additional compensation after the merger was announced, but he was still unsatisfied.  He then crafted a plan for revenge.

67.     Over the next five months—while still employed at Happy Bank—Mr. Holmes organized and carried out a covert scheme to rob Happy Bank of its most sensitive documents and Confidential Information, steal its customers, and solicit dozens of employees to join him at one of Happy Bank's competitors where they could exploit the spoils of their theft for their personal benefit—and intentionally damage Happy Bank in the process.

68.     After he had packaged his ready-to-use "Bank in a Box" with Happy Bank's Confidential Information, customers, and employees, Mr. Holmes was ready to present it to his new employer—American State Bank.

### E.     The Mass Resignation from Happy Bank and Mass Hiring by American State Bank.

69.     On Friday, April 22, 2022—three weeks after the Merger Agreement closed—Mr. Holmes submitted his resignation and departed Happy Bank immediately.  One business day later, Mr. Holmes began working out of an office as an American State Bank employee.  Notably, that

---

[5] Centennial Bank's parent company was required to file an SEC Form S-4 in order to register shares of stock to be issued in connection with the Merger Agreement.  *See* https://www.sec.gov/files/forms-4.pdf.

office was precisely the same office that Happy Bank had used many years earlier, and it ultimately would become American State Bank's Lubbock loan production office ("**LPO**") / deposit production office ("**DPO**").[6]

70.     That same day (Monday, April 25, 2022), fourteen additional Happy Bank employees—almost all of whom worked directly for or at the same location as Mr. Holmes—resigned from Happy Bank.  Every one of these former employees was immediately hired by American State Bank, a new entrant into the West Texas market, and began working in the same office space as Mr. Holmes.  In the weeks that followed, numerous other employees submitted their resignation and also joined American State Bank.  *In total, more than 70 former Happy Bank employees went to work for American State Bank*.

71.     The speed with which Mr. Holmes and many of the other Defendants began working for American State Bank reveals the coordinated nature of their scheme.

72.     On May 2, 2022—exactly one week after Mr. Holmes resigned from Happy Bank—American State Bank notified the Texas Department of Banking ("**TDB**") of its intent to establish an LPO/DPO in Lubbock, Texas at the exact location where Mr. Holmes began working for American State Bank one business day after his resignation.  Upon information and belief, Mr. Holmes signed a lease for that location while he was still employed with Happy Bank.

---

[6] An LPO is a type of banking facility that conducts loan activities, including origination (assembling credit information, soliciting or processing applications, etc.), approval, and closing.  A DPO is a type of banking facility that may solicit deposits, provide information about deposit products, and assist persons in completing application forms and related documents to open or maintain a deposit account.  Although LPOs and DPOs are not considered bank branches, they are often used as a steppingstone to eventually open bank branches.  *See, e.g.*, Angel Coker, *Banks capitalize on new deposit office option* (July 18, 2019), BIRMINGHAM BUSINESS JOURNAL, https://www.bizjournals.com/birmingham/news/2019/07/18/banks-capitalize-on-new-deposit-office-option.html ("In addition to the convenience for customers of being able to make deposits and take out loans all in one place, Hill said allowing banks to open DPOs gives them the opportunity to see if there is enough business in that market to justify a full-service branch.").

73.     In June 2022, American State Bank formally announced that it had opened the Lubbock LPO/DPO to be led by Mr. Holmes, its new Regional President of the Lubbock area—the same position Mr. Holmes had with Happy Bank and in proximity to where he used to work at Happy Bank.

74.     But that is not all.  Around the same time, American State Bank announced or opened additional offices in the same areas as Happy Bank—and former Happy Bank employees worked at all of them.

75.     First, American State Bank opened an LPO/DPO in Plainview, Texas led by Defendant Willis McCutcheon and Nancy Stukey, two former Happy Bank employees who worked for Happy Bank in Plainview in the same roles as they now do with American State Bank. American State Bank's Plainview LPO/DPO is located *at the same intersection* as Happy Bank's Plainview branch.  In fact, Mr. McCutcheon signed a lease for that office on behalf of American State Bank as its "President" on May 3, 2022—*less than a week after he resigned from Happy Bank*.  On May 12, 2022, American State Bank notified the TDB of its intent to establish an LPO/DPO in Plainview, Texas to be managed by Mr. McCutcheon as its "Plainview Market President."  Within three months, American State Bank would apply to convert the Amarillo LPO/DPO to a new branch.

76.     Second, American State Bank opened an LPO/DPO in Amarillo, Texas led by Defendant Ross Glenn, a former Happy Bank employee who worked for Happy Bank as an Executive Vice President in Amarillo.  American State Bank's Amarillo LPO/DPO is located *just one street away* from Happy Bank's Amarillo branch.  Mr. Glenn signed a lease for that office on behalf of American State Bank as its "Regional President – Amarillo" on May 18, 2022—*less than a month after he resigned from Happy Bank*.  He also signed a personal guaranty for that lease.

Less than a week later, American State Bank notified the TDB of its intent to establish an LPO/DPO in Amarillo, Texas to be managed by Mr. Glenn as its "Amarillo Market President."

77.    Before the mass resignation in April 2022, American State Bank had no presence in Lubbock, Plainview, or Amarillo, Texas.

78.    But Defendants changed all that by exploiting the Confidential Information they stole from Happy Bank, which provided Defendants with a perfect template and roadmap for American State Bank to establish LPOs, DPOs, and/or branches.  American State Bank merely needed to unwrap the "Bank in a Box."

**F.    American State Bank Quickly Begins Servicing Former Happy Bank Customers.**

79.    Not only did American State Bank hire more than 70 Happy Bank employees, it also began offering deposit services and loans to numerous Happy Bank customers.[7]  As just one example, American State Bank is listed as the grantee on several deeds of trust related to properties for a then-Happy Bank customer who was in the process of obtaining loans from Happy Bank for these same properties.  These deeds were filed within two months of the mass resignation.

80.    As another example, within a week of the mass resignation, a customer asked Happy Bank for a copy of an appraisal that the Company had paid for in connection with a potential loan request.  Upon information and belief, that customer now one or more loans with American State Bank, including a loan related to the property for which Happy Bank paid for the appraisal.

81.    The speed at which the aforementioned loans were closed and deeds of trust were filed shows that Mr. Holmes' misappropriated "Bank in a Box" proved quite effective.

---

[7] *See* George Waldon, *Despite Challenges, Home BancShares Still Happy with Foray Into Texas* (Feb. 20, 2023), ARKANSAS BUSINESS, https://www.arkansasbusiness.com/article/143378/home-bancshares-still-happy-with-foray-into-texas (noting that during the first three quarters of 2022—which included the mass resignation at the start of the second quarter—American State Bank's deposits grew from $536 million to $645 million to $874 million, and its staff expanded from 128 employees to 170 to 217).  Notably, the growth of American State Bank's staff by 89 employees was almost exclusively former Happy Bank employees.

82.    Defendants utilized Happy Bank's Confidential Information—including its proprietary templates and forms—to usurp Happy Bank's clients and rob it of the opportunity to close and/or receive revenue from these loans while leaving Happy Bank in many instances with the costs related to the already-executed appraisals and title work.  Defendants further weaponized the stolen Confidential Information by using Happy Bank's proprietary templates containing loan terms and rates to undercut its profits.  Indeed, American State Bank solicited customers for whom Happy Bank had already completed detailed credit memoranda as part of the loan approval process.  As just one example, after one customer received offers from American State Bank that improved upon Happy Bank's lending terms—which American State Bank was only aware of due to Defendants' theft—Happy Bank was forced to cut its already-competitive rates to retain the customer, a substantial concession in the current environment of rising interest rates.

## G.    Defendants Deleted or Omitted Customer Information from Happy Bank's Systems.

83.    But stealing and exploiting Happy Bank's Confidential Information to unfairly compete with the Company was not enough.  Defendants also took steps to sabotage and destroy Happy Bank.  Shortly after the mass resignation, Happy Bank encountered several instances where customers asked the Company about loan requests that were in process and had been serviced by one or more of the Defendants—yet no such information could be found on Happy Bank's systems.

84.    For example, one customer inquired about the closing status of a multi-million-dollar loan for which he had already submitted all the supporting documents, but Happy Bank could not find any of these documents on its systems.  Happy Bank also could not find any information regarding a second customer who confirmed they had provided several files and documents directly to one of the Defendants.  Once again, Happy Bank had to offer significant concessions to this second customer to retain its business and had to start the loan process from scratch—losing valuable time and money in the process.

**PLAINTIFF'S ORIGINAL COMPLAINT**                                                                Page 19

H.      **Happy Bank's Missing Confidential Information.**

85.      After the mass resignation of its former employees and inquiries from its customers about loan status and other matters, Happy Bank realized that the former employees had improperly copied, transferred, used, deleted, and/or disclosed its Confidential Information.

86.      To that end, Happy Bank retained a certified computer forensics firm to analyze its former employees' laptops/computers and determine the extent of any improper or unlawful activity.  Happy Bank and its computer forensics firm also analyzed: (1) emails on the former employees' Happy Bank email accounts; (2) logs of documents printed on Happy Bank printers; (3) video recordings from cameras at various Happy Bank offices; and (4) the former employees' activity on Happy Bank's internal networks and drives to determine if any data, information, and/or files had been deleted or altered.

87.      As discussed below, Happy Bank found significant evidence that Defendants planned and took overt and covert actions to steal and/or delete Happy Bank's Confidential Information, steal its customers, and solicit away its employees—all while still employed with Happy Bank.  The evidence gathered to date leaves no doubt that Defendants' conspiracy was premeditated, carried out surreptitiously over many months, and deliberately designed to damage Happy Bank.

88.      The forensic analysis is still ongoing with respect to all of Happy Bank's former employees.

# Jerry "Bud" Holmes
## *The Ringleader*

**A.    Background and Summary of Forensic Evidence.**

89.    Mr. Holmes is a former officer and Regional President, Central West, at Happy Bank, which is the second-highest position in Happy Bank's Lubbock lending business.  During his 10-year employment with the Company, Mr. Holmes officed out of a Happy Bank branch located on 98th Street in Lubbock, Texas, but he served as the Regional President for seven branches in total—including four in Lubbock and one each in Abilene, Slaton, and Tahoka, Texas.

90.    Happy Bank's Regional President, Central West, is responsible for the development and performance of the Company's Lubbock regional market as well as perpetuating the culture and values of Happy Bank.  Mr. Holmes' duties included managing and overseeing all lending functions within the Lubbock regional market, such as loan approvals, loan quality, past due monitoring and collections, exception monitoring and management, loan pricing, and loan growth. Mr. Holmes also was responsible for all new business development activities for Happy Bank's products, including lending, deposits, treasury management, mortgage lending, investments, and trust products.  As an officer and Regional President, Mr. Holmes owed numerous fiduciary duties to Happy Bank.

91.    During his employment with Happy Bank, Mr. Holmes signed several Awards and agreed to be bound by the provisions of the Awards and the Plan, which was incorporated in full into the Awards.  Mr. Holmes also signed at least one Confidentiality Agreement that included a nondisclosure provision prohibiting him from communicating, revealing, or disclosing Happy Bank's Confidential Information at any time for any purpose other than the proper performance of his job duties at Happy Bank.  Mr. Holmes further agreed in his Confidentiality Agreement that Happy Bank would be entitled to its attorneys' fees and costs in addition to damages if it filed a

lawsuit to enforce its rights under the Confidentiality Agreement. Finally, Mr. Holmes acknowledged and agreed to be bound by all of the provisions in the Handbook and Ethics Policy, and he received annual training on the other Company policies and procedures described above.[8]

92.     Mr. Holmes had no express or implied authorization or consent to copy, transfer, delete, and/or take any of Happy Bank's Confidential Information from Happy Bank's computers, systems, or premises. Based on his role and the policies, procedures, and provisions he agreed to be bound by, Mr. Holmes knew that Happy Bank's Confidential Information was owned solely by the Company and would be highly useful to Happy Bank's competitors, as it would enable them to unlawfully compete with the Company and effectively target and recruit Happy Bank's current and future customers and employees.

93.     Based on the forensic data summarized below, there is significant evidence that Mr. Holmes orchestrated a conspiracy with former Happy Bank employees to: (1) unlawfully obtain, remove, use, and/or disclose Happy Bank's Confidential Information without authorization; (2) delete or destroy data and information from Happy Bank's computers and networks; (3) tortiously interfere with Happy Bank's existing contracts and prospective relations by soliciting Happy Bank customers and potential customers to move their business to American State Bank; and (4) ultimately exploit all of these misdeeds to procure a job with a competitor, American State Bank, and presumably obtain favorable compensation. Mr. Holmes' unlawful actions also constitute breaches of his fiduciary duties to Happy Bank, breach of contract, conversion, unfair competition, and unsafe and unsound banking practices.

---

[8] Mr. Holmes completed his most-recent training on Happy Bank's cybersecurity and internet security policies on February 28, 2022, his most-recent training on Happy Bank's Code of Ethics on December 27, 2021, and his most-recent training on Happy Bank's information security policies on October 27, 2021.

**B.**    <u>October and November 2021</u> **– Steaming Mad and Scheming Revenge.**

94.    Mr. Holmes made little effort to hide his anger after learning about the merger and the compensation disclosed in the S-4 filed on October 22, 2021.  Happy Bank offered him significant additional compensation, but Mr. Holmes rejected the offer—and printed out copies of the S-4 for his entire lending team at Happy Bank, ostensibly to sow division within the employees.

95.    Within a few weeks of the merger being executed and learning information contained in the S-4, Mr. Holmes *modified his personal resume* on his Happy Bank computer— *for the first time since July 2019*.

96.    Upon information and belief, it was around this time that Mr. Holmes concocted his scheme to steal Happy Bank's Confidential Information, customers, and employees.  Mr. Holmes knew that Happy Bank's Confidential Information would be highly useful to a Happy Bank competitor and that such information would enable him to hit the ground running, hiring employees and snagging customers on behalf of American State Bank, which was looking for a way to boost its presence in the same markets as Happy Bank.  And by stealing Happy Bank's Confidential Information, Mr. Holmes and American State Bank would not have to expend time, effort, and resources creating and/or developing the proprietary templates, analyses, pipelines, and other data necessary to open and operate new LPOs and DPOs.  Indeed, his "Bank in a Box" would allow American State Bank to simply waltz into the shoes of Happy Bank and open a competing bank right down the street.

97.    But first, Mr. Holmes had to decide what to steal.

98.    In the hours before and after he modified his resume, Mr. Holmes accessed and/or modified numerous Excel spreadsheets that contained some of Happy Bank's most valuable and sensitive Confidential Information, including:

a. "Loan Officer Volumes" – a spreadsheet created by Mr. Holmes with numerous tabs containing detailed financial information regarding loan volumes by Happy Bank officer and by month, from October 2012 to December 2021;

b. "Lubbock Operations – P and L – 2021" – a spreadsheet created by Mr. Holmes with detailed financial information about Happy Bank's operations, revenues, profits, and losses from 2012 to 2021;

c. "Lending Group Comp Breakdown – 11-21" – a spreadsheet created by Mr. Holmes with the annual base salary for 24 then-Happy Bank employees, half of whom would ultimately join Mr. Holmes at American State Bank;

d. "Lubbock Loan Data – 2022 Budget" – a spreadsheet created by Mr. Holmes with: (i) a maturity summary of Happy Bank loans from October 2021 through December 2022; and (ii) a detailed data list of more than 2,500 Happy Bank loans, including account numbers, customer names, interest types and rates, average and current balances, and maturity dates;

e. "Lubbock Budget 2021" – a spreadsheet modified by Mr. Holmes with detailed financial information regarding Happy Bank's balance sheet, loans, deposits, loan fees, and full-time employees; and,

f. "2021 Loan & Deposit Forecast – West Texas" – a spreadsheet created by Mr. Holmes with summary loan and deposit forecasts broken down by Happy Bank employee, many of whom would ultimately join Mr. Holmes at American State Bank.

99.     Yet this trove of Confidential Information was just a starting point for Mr. Holmes.

## C.    January 2022 – Compiling his Treasure Trove of Confidential Information and Purging Emails.

100.    Just after the new year, Mr. Holmes modified and printed an Excel spreadsheet from Happy Bank's internal system titled "Trends – 2021."[9]  This spreadsheet contained detailed financial information and other Confidential Information about Happy Bank's loans, deposits, customers, income, and expenses—a perfect roadmap for starting LPOs, DPOs, and branches to compete with Happy Bank.  Indeed, the Trends spreadsheet contained the information one would need to prepare a business plan and profit and loss statement for a potential office or branch, including deposit fee income, loan fee income, other income sources, building expenses, loan and

---

[9] Mr. Holmes also accessed this same document locally on his work computer on December 6, 2021, and made changes to that document within one hour of him modifying his personal resume for the second time.

collection expenses, dues and entertainment expenses, postage and supplies expenses, salaries and employee benefits, and numerous other types of expenses.

101.    Throughout January 2022, Mr. Holmes continued to compile more of Happy Bank's Confidential Information.  He created, populated, and printed a spreadsheet with Happy Bank's forecasted and historical loan commitments from 2020 and 2021 for a select number of employees (the "**Lender Forecasts**").[10]  Nearly all of the employees Mr. Holmes included in the Lender Forecasts resigned from Happy Bank within days of Mr. Holmes' resignation and quickly joined him at American State Bank.

102.    Mr. Holmes also accessed and updated two consolidated loan pipeline spreadsheets (the "**Loan Pipelines**") for Happy Bank's Lubbock and Abilene markets—two areas where American State Bank would open a new LPO/DPO shortly after the mass resignation.  The Loan Pipelines included detailed financial information regarding current, closed, and prospective loans attributed to numerous then-Happy Bank employees.  Nearly every one of the employees in these spreadsheets resigned from Happy Bank within days of Mr. Holmes' resignation and quickly joined him at American State Bank.

103.    Mr. Holmes updated two other spreadsheets with Happy Bank's Confidential Information: (1) a list of then-Happy Bank officers and employees, including their roles, compensation, total loan commitments, and recommended/approved compensation increases— from 2017 to 2021—and the total loan commitments, fees, and weighted rates for each employee (the "**Employee Listing**"); and (2) a detailed profit and loss statement for Happy Bank's operations from November 2020 to December 2021, including the same information broken down by Happy Bank branch with a year-versus-year comparison of Happy Bank's profits and losses

---

[10] Mr. Holmes again accessed and edited the Lender Forecasts document on January 24, 2022.

dating back to 2012 (the "**P&L**").[11]  Mr. Holmes also printed hard copies of the Employee Listing and P&L three times in the month before his resignation, on March 8, 11, and 16, 2022—including one instance when he printed his updated resume within ten minutes of printing hard copies of the Employee Listing and P&L spreadsheets.

104.    The order of the employees listed in one of the tabs of the Employee Listing spreadsheet as edited by Mr. Holmes is revealing—it is nearly identical to the names and roles of the employees currently working with him at American State Bank's Lubbock office.  In fact, all but one of the 18 employees Mr. Holmes sorted at the top of the Employee Listing spreadsheet now works for American State Bank.  The Employee Listing and other Confidential Information compiled by Mr. Holmes provided him with the perfect roadmap to determine exactly what to offer the employees to solicit them away from Happy Bank.  This information coupled with the timing of the mass resignation leaves no doubt that Mr. Holmes solicited these employees to leave Happy Bank while he was still employed with the Company—an egregious breach of his fiduciary duties as an officer of Happy Bank.

105.    As Mr. Holmes continued to compile his treasure trove of Happy Bank's Confidential Information, he also manually and permanently deleted numerous emails from his Happy Bank Outlook account and his "Deleted Items" folder.  According to the forensic data, there is no record of Mr. Holmes deleting any emails—or permanently deleting his "Deleted Items" folder—prior to January 2022.

106.    Based on his role, Happy Bank's policies and procedures, and his experience in the banking industry, Mr. Holmes knew that information related to customers and loans were required to be retained and archived.  By permanently deleting emails from his Happy Bank Outlook

---

[11] This document is the same "Lubbock Operations – P and L – 2021" Excel file that Mr. Holmes accessed and edited on November 4, 2021.  *See supra* ¶ 98.

account that contained information not otherwise stored in Happy Bank's systems or archives, Mr. Holmes ensured that Happy Bank could not find such information and put the Company at risk of violating the strict retention regulations imposed by banking regulators. Mr. Holmes' deletions not only constituted unsafe and unsound banking practices that created an abnormally high risk of financial loss or damage to Happy Bank but also created false entries in banking records—which Mr. Holmes did with the intent to injure or defraud Happy Bank.

107.    On January 26, 2022, Mr. Holmes accessed more than 400 Final Credit Memos from his downloads folder on his Happy Bank computer. Final Credit Memos contain significant Confidential Information, including but not limited to proprietary information regarding Happy Bank's risk ratings for each customer and analyses related to the customer's credit capacity. There is no legitimate business reason for Mr. Holmes to have accessed hundreds of Final Credit Memos on a single day. To provide some perspective, over the last six months of 2021, Mr. Holmes accessed only about 100 Final Credit Memos from his downloads folder on his Happy Bank computer. The most plausible explanation for Mr. Holmes' actions to access over 400 Final Credit Memos on a single day in January 2022 was to continue compiling his treasure trove of Confidential Information to steal from Happy Bank.

**D.    February 2022 – Copying the Treasure Trove of Confidential Information and Deleting Files.**

108.    On February 3, 2022, Mr. Holmes edited his personal resume again. Around the same time, he continued interacting with the Employee Listing and P&L spreadsheets, and he copied approximately ***300 documents and files*** containing Happy Bank's Confidential Information to his personal "bholmes" folder on his computer's desktop, including the following:

    a. All of the spreadsheets previously referenced herein;[12]

    b. Projected loan volumes dating back to June 2013;

    c. Loan pipeline reports dating back to April 2012;

    d. Detailed profit and loss data from Happy Bank's Lubbock branch for every year from 2013 to 2018;

    e. Monthly operating performance and budget data for the Lubbock branch;

    f. Salary and bonus information for Happy Bank employees;

    g. Lists of Happy Bank shareholders from 2019 and 2021;

    h. Reports and presentations provided to Happy Bank's Advisory Board; and,

    i. Documents related to then-Happy Bank customers.

109.   One of the customers in the documents accessed by Mr. Holmes had a loan designated by Happy Bank as a special asset because it was non-performing and had financial difficulties.[13] Just before his resignation, Mr. Holmes took steps to remove this customer from the special asset designation by purporting to have financials showing the customer was now profitable. Notably, the head of Happy Bank's loan review—and the decision-makers for determining whether a customer could be removed from the special asset designation—was Mr. Holmes' sister and Defendant Ross Glenn, both of whom resigned and joined American State Bank.

110.   Happy Bank has been unable to find any financials related to this customer that demonstrate profitability. Rather, the only financials related to this customer in Happy Bank's systems show definitively that the customer should be designated as a special asset. Accordingly, Mr. Holmes either lied about having financials showing the customer's profitability or deleted

---

[12] *See supra* ¶¶ 98-104.
[13] One of the other customers referenced in these documents was hired by Mr. Holmes as an employee at American State Bank.

those financials from Happy Bank's systems before his resignation.[14]  Upon information and belief, Mr. Holmes caused information related to this customer to be deleted or omitted from Happy Bank's systems, which constitutes a false entry in banking records with the intent to injure or defraud Happy Bank and another example of unsafe and unsound banking practices.

111.    In addition to the documents listed above (and many others), Mr. Holmes also copied a Confidentiality Agreement to his "bholmes" folder, one of the very agreements in which he agreed that he was prohibited from disclosing or using Happy Bank's Confidential Information in any way other than in the proper performance of his job duties with the Company.

112.    Finally, with respect to the list of Happy Bank's shareholders that Mr. Holmes copied, numerous shareholders on that list cashed out some of their Happy Bank stock following Mr. Holmes' resignation.  Upon information and belief, at least some of those same shareholders purchased stock in American State Bank at the solicitation of Mr. Holmes.

**E.    April 2022 – Stealing the Treasure Trove of Confidential Information, Soliciting Customers, and Deleting Files.**

113.    Mr. Holmes' next move leaves no doubt about his true intentions.

114.    On April 18, 2022—four days before resigning from Happy Bank, and in violation of Happy Bank's policies and procedures—Mr. Holmes connected a SanDisk Cruzer Glide USB Device to his work computer and stole nearly every document he had copied to his "bholmes" desktop folder.  Practically every document in that folder shows a last access date and time only minutes before Mr. Holmes connected the USB device to his computer—meaning Mr. Holmes accessed all of these documents just moments before he copied them to his USB device.

---

[14] An analysis of Mr. Holmes' forensic data also reveals that he accessed several documents related to this customer on March 21, 2022—some of which (based on the title of the document) date back to 2016.

115.    The templates and analyses that Mr. Holmes stole from Happy Bank contained Confidential Information and provided American State Bank with significant competitive advantages it otherwise lacked, including precise information to: (1) target Happy Bank customers based on their loan maturity dates and current interest rates with Happy Bank; (2) target Happy Bank employees based on their compensation and incentives with Happy Bank; (3) service larger and higher risk customers using Happy Bank's proprietary information; (4) significantly reduce the time and effort needed to close loans; and (5) prepare business plans and pro formas necessary for LPOs/DPOs and branch applications.

116.    On April 20, 2022, Mr. Holmes downloaded a loan application template that he appears to have created using "test" names for the borrower and guarantor and listing fake real estate collateral at "123 Main Street."  The application was a template and form created by Happy Bank that could be used as a "starter kit" to expedite the process of designing loan applications at a competing financial institution—precisely what Mr. Holmes and American State Bank would do shortly after the mass resignation.

117.    But Mr. Holmes was not done with his scheme.

118.    Just before 7:00 a.m. on the day of his resignation, Mr. Holmes accessed five Final Credit Memos that contained significant Confidential Information about then-Happy Bank customers, including but not limited to proprietary information regarding Happy Bank's risk ratings for each customer and analyses related to the customer's credit capacity.  As such, the information contained in the Final Credit Memos could be exploited by Happy Bank's competitors to accelerate the process to open and approve loans or to make firm offers to customers for such loans.  Indeed, upon information and belief, this is precisely what American State Bank did within weeks of the mass resignation.  Some of the customers in these Final Credit memos paid off their

loans with Happy Bank and now have loans with American State Bank.  In addition, four of these credit memos reflect a 90-day extension granted in mid-February or March 2022—which deferred payment obligations until after Mr. Holmes and the other Defendants had joined American State Bank.[15]

119.     Information related to at least one of these five customers was also missing from Happy Bank's systems after Mr. Holmes' resignation, which required Happy Bank to offer significant concessions to the customer (who was irate at having to resupply the information again to Happy Bank).  Upon information and belief, Mr. Holmes caused the information related to these customers to be deleted or omitted from Happy Bank's systems, which constitutes a false entry in banking records with the intent to injure or defraud Happy Bank and another example of unsafe and unsound banking practices.

120.     Mr. Holmes was also involved in keeping a potential loan secret from Happy Bank while he was still employed at the Company.  While this potential loan was started using Happy Bank resources, it was ultimately closed at American State Bank.[16]

121.     Mr. Holmes resigned from Happy Bank on April 22, 2022.

122.     The next day—a Saturday—video footage shows Mr. Holmes removing boxes from Happy Bank's premises, including boxes that appear to contain loose documents and binders of documents.  It is extremely unlikely that an employee, even a Regional President like Mr. Holmes, would create and maintain binders of personal information—as opposed to Happy Bank's Confidential Information—at their office.  Accordingly, upon information and belief, Mr. Holmes

---

[15] As noted below, Mr. Jackson did the exact same thing for a different set of then-Happy Bank customers.
[16] See infra ¶¶ 136-143, 160-161, 169-170 (discussion regarding Customer X (defined below) in the sections related to Defendants House, Baisley, and Phillips).

stole even more of Happy Bank's Confidential Information when he removed boxes from Happy Bank's premises.

123.    Mr. Holmes currently works as the Regional President for American State Bank and holds himself out as the Chairman of American State Bank.  Upon information and belief, Mr. Holmes began working for American State Bank on April 25, 2022—one business day after he resigned from Happy Bank—at an office in Lubbock.  Less than a week later, American State Bank notified TDB of its intent to open an LPO/DPO at the same office to be run by Mr. Holmes.

## Jay House
### The First Lieutenant

**A.    Background and Summary of Forensic Analysis.**

124.    Mr. House is a former officer, Senior Vice President, and Commercial Lender at Happy Bank.  During his nine-year employment with the Company, Mr. House officed out of a Happy Bank branch located on 98th Street in Lubbock, Texas—the same branch where Mr. Holmes had his office—and he reported directly to Mr. Holmes.

125.    Happy Bank's Commercial Lenders are responsible for analyzing loan applications, making loans, generating interest income, monitoring and servicing existing loan customers, making credit decisions, collecting on loans, and marketing the Company's services and products. As an officer and Senior Vice President, Mr. House owed numerous fiduciary duties to Happy Bank.

126.    During his employment with Happy Bank, Mr. House signed several Awards and agreed to be bound by the provisions of the Awards and the Plan, which was incorporated in full into the Awards.  Mr. House also acknowledged and agreed to be bound by all of the provisions

in the Handbook and Ethics Policy, and he received annual training on the other Company policies and procedures described above.[17]

127.     Mr. House had no express or implied authorization or consent to copy, transfer, delete, and/or take any of Happy Bank's Confidential Information from Happy Bank's computers, systems, or premises.  Based on his role and the policies, procedures, and provisions he agreed to, Mr. House knew that Happy Bank's Confidential Information was owned solely by the Company and would be highly useful to Happy Bank's competitors, as it would enable them to unlawfully compete with the Company and effectively target and recruit Happy Bank's current and future customers and employees.

128.     Based on forensic data summarized below, there is significant evidence that Mr. House willingly joined Mr. Holmes' conspiracy and: (1) unlawfully obtained, removed, used, and/or disclosed Happy Bank's Confidential Information; (2) deleted or destroyed data and information from Happy Bank's computers and networks; (3) tortiously interfered with Happy Bank's existing contracts and prospective relations by soliciting Happy Bank customers and potential customers to move their business to American State Bank; and (4) ultimately exploited all of these misdeeds to procure a job with a competitor, American State Bank.  Mr. House's unlawful actions also constitute breaches of his fiduciary duties to Happy Bank, breach of contract, joint tortfeasor liability, conversion, unfair competition, and unsafe and unsound banking practices.

---

[17] Mr. House completed his most-recent training on Happy Bank's cybersecurity and internet security policies on February 2, 2022, his most-recent training on Happy Bank's Code of Ethics and Happy Bank's information security policies on October 4, 2021.

**B.**    **February and March 2022** – **Testing Methods to Steal Confidential Information, Purging Emails, and Soliciting Customers.**

129.    On February 3, 2022—the same day that Mr. Holmes copied more than 300 documents to his "bholmes" desktop folder, and in violation of Happy Bank's policies and procedures—Mr. House connected a Kingston DataTraveler 3.0 USB Device to his work computer and copied a small batch of documents related to then-Happy Bank customers and containing Happy Bank's Confidential Information.  Upon information and belief, some if not all of these customers now have loans with American State Bank.  The next day, Mr. House accessed his personal resume—one he had not edited since mid-2019.

130.    About a week later, Mr. House accessed Google Drive[18] from his work computer while interacting with documents and folders related to then-Happy Bank customers that contained Confidential Information.  Upon information and belief, some if not all of these customers now have loans with American State Bank, and Mr. House used Google Drive to steal Happy Bank's Confidential Information.

131.    Data from Mr. House's hard drive shows that he accessed (for the last time) numerous agreements, templates, and other files related to Happy Bank's loan closing process within minutes of him accessing Google Drive—all of which contained Happy Bank's Confidential Information.  He also accessed a personal Microsoft OneDrive[19] account and Dropbox throughout February 2022.  Google Drive, OneDrive, and Dropbox are all capable of transmitting information over the Internet.  Upon information and belief, Mr. House used Google Drive, OneDrive, and/or Dropbox to steal Happy Bank's Confidential Information.

---

[18] Google Drive is a third-party application that allows the transfer of documents and files similar to Dropbox.  *See* https://www.google.com/drive/.

[19] Microsoft OneDrive advertises as a personal cloud storage application where a person can save photos and files "and access them from any device, anywhere."  *See* https://www.microsoft.com/en-us/microsoft-365/onedrive/online-cloud-storage.

132.    Mr. House's actions suggest that he was probing Happy Bank's systems to evaluate the most effective—and least visible—method to steal Happy Bank's Confidential Information and customers.

133.    Indeed, nearly every other Defendant would follow this exact same roadmap.

134.    In March 2022, Mr. House began manually and permanently deleting emails from his Happy Bank Outlook account—just like Mr. Holmes.  Based on his role, Happy Bank's policies and procedures, and his experience in the banking industry, Mr. House knew that information related to customers and loans were required to be retained and archived.

135.    By permanently deleting emails from his Happy Bank Outlook account that contained information not otherwise stored in Happy Bank's systems or archives, Mr. House not only ensured that Happy Bank could not find such information but also put the Company at risk of violating the strict retention regulations imposed by banking regulators.  Mr. House's deletions constituted unsafe and unsound banking practices that created an abnormally high risk of financial loss or damage to Happy Bank and created false entries in banking records—which Mr. House did with the intent to injure or defraud Happy Bank.

**C.    April 2022 – Soliciting Customers and Stealing Confidential Information.**

136.    In early April 2022, Mr. House emailed Defendant Channing Baisley and asked her to add a customer deal ("**Customer X**") to a tracking spreadsheet that they were apparently maintaining in private.  Customer X owned a large office complex that had numerous tenant leases, yet no information about this deal has been found on Happy Bank's systems.

137.    But Happy Bank did find information on Mr. House's hard drive.

138.     On April 13, 2022, Mr. House downloaded a zip file[20] from Dropbox that contained leases and related documents for the tenants of the same office complex associated with Customer X.  Mr. House also received due diligence information regarding Customer X via Dropbox and email, and he instructed others, including Ms. Baisley, to upload that information to Happy Bank's systems.  Yet no such information could be found on Happy Bank's systems after Mr. House's resignation.  Upon information and belief, Mr. House intentionally caused information related to Customer X to be deleted or omitted from Happy Bank's systems—and thereby caused a false entry in banking records with the intent to injure or defraud Happy Bank.

139.     Mr. House took additional steps to keep Happy Bank in the dark about the deal with Customer X.  On April 18, 2022, he failed to mention the deal during a weekly pipeline meeting where Happy Bank employees were supposed to discuss all potential and pending deals.  Notably, this was the same day that Mr. Holmes copied more than 300 files containing Happy Bank's Confidential Information to a USB device.

140.     Despite keeping the deal secret at the weekly pipeline meeting, Mr. House continued to discuss the deal with Defendants Holmes, Phillips, and Baisley.[21]  For example, on April 20, 2022, Mr. Phillips emailed Mr. House a spreadsheet described as an "Updated Model."  The spreadsheet is a proprietary template created by Happy Bank that contains detailed financial information related to Customer X, including pricing for two "HSB Proposed Loan[s]."

141.     These events show that Mr. House took deliberate steps to lure Customer X away from Happy Bank while he was still employed by, and using the resources of, Happy Bank.

---

[20] Zip or zipped (compressed) files take up less storage space and can be transferred to other computers, including by email, more quickly than uncompressed files.

[21] According to emails, Messrs. House and Phillips and Ms. Baisley also performed a site visit of the office complex on April 7, 2022—while still employed with Happy Bank.

142.    On April 27, 2022—two days after Mr. House resigned from Happy Bank—Customer X emailed an attorney and several people at an engineering firm and directed them to start sending information to Mr. House at his personal email address.  For some reason, Customer X copied the email to Mr. House at his Happy Bank email address.[22]

143.    Within just two months of the mass resignation, two deeds of trust were filed in the county records related to the office complex with Customer X listed as the grantor—and American State Bank as the grantee.  The two deeds of trust directly relate to the deal Mr. House was keeping secret from Happy Bank because the deeds were filed in Lubbock County (where the office was located) and reference the same entity that Mr. House kept secret from Happy Bank.  No records of this potential deal have been found in Happy Bank's archive or retention systems.

144.    Mr. House also diverted other customers away from Happy Bank while still employed at the Company.

145.    On April 21, 2022—four days before Mr. House's resignation—Happy Bank received a survey for a property related to a loan request serviced by Mr. House, and he ordered an appraisal for the same property later that day.  Yet after Mr. House resigned from Happy Bank, there were no records of this customer or deal in Happy Bank's systems.  Happy Bank has since discovered there are even more loan requests that Mr. House began servicing while at Happy Bank for which there is no information in the Company's systems.  All of these instances reflect unsafe and unsound banking practices as well as false entries in banking records with the intent to injure or defraud Happy Bank.

146.    Over two weekends *before* his resignation, video footage shows Mr. House removing boxes of unknown contents from Happy Bank premises—just like Mr. Holmes.  It is

---

[22] Happy Bank has found at least one other instance where information regarding a customer's loan was emailed to Mr. House's personal email address.

extremely unlikely that an employee, even a Senior Vice President like Mr. House, would create and maintain binders of personal information—as opposed to Happy Bank's Confidential Information—at his office. Accordingly, upon information and belief, Mr. House stole even more of Happy Bank's Confidential Information when he removed numerous boxes from Happy Bank's premises.

147. Notably, Mr. House was copied on an email that same Saturday (April 22, 2022) in which Happy Bank employees were discussing a Happy Bank shared computer drive, one of whom noted: "This is the drive that Jay House is needing to keep, how can we ensure this gets carried over to the new bank?"

148. Mr. House resigned from Happy Bank on April 25, 2022—but not before he accessed numerous documents related to then-Happy Bank customers. One of these customers later told Happy Bank that he understood from one of the Defendants that his loan requests were much closer to being closed than they actually were. Happy Bank was also unable to find documents or information in its systems related to loans and loan requests for some of these other customers, which reflects yet another false entry in banking records caused by Mr. House with the intent to injure and defraud Happy Bank. Upon information and belief, at least some of the customers related to the documents accessed by Mr. House on April 25, 2022, now have loans with American State Bank.

149. The wake of Mr. House's misdeeds continued to surface after his resignation.

150. On May 16, 2022, Happy Bank received an invoice for legal work from March and April 2022 related to a loan request that Mr. House was supposed to be handling. Yet the loan request was never documented in Happy Bank's system, and it appears Mr. House made no effort to close the loan he started using Happy Bank resources—until *after* his resignation. Upon

information and belief, that loan is now serviced by American State Bank. The missing documentation for this customer reflects yet another false entry in Happy Bank's banking records caused by Mr. House with the intent to injure and defraud Happy Bank.

151.    Mr. House currently works as the Senior Vice President, Commercial Lending, with American State Bank. Upon information and belief, Mr. House began working for American State Bank on April 26, 2022—one business day after he resigned from Happy Bank

## Channing Baisley
### *Mr. House's Deputy*

**A.    Background and Summary of Forensic Evidence.**

152.    Ms. Baisley is a former officer and Portfolio Manager at Happy Bank. During her three-plus-year employment with the Company, Ms. Baisley officed out of a Happy Bank branch located on 98th Street in Lubbock, Texas—the same branch where Mr. Holmes had his office—and she reported directly to Mr. Holmes.

153.    Happy Bank's Portfolio Managers are responsible for supporting commercial lenders and servicing, monitoring, and developing customer relationships. Ms. Baisley's duties included facilitating the preparation of credit underwriting, analyzing loan requests, assigning loan renewals or new loans to analysts for preparation of loan packages, and assisting commercial lenders in developing and prospecting new business. As an officer and Portfolio Manager, Ms. Baisley owed numerous fiduciary duties to Happy Bank.

154.    During her employment with Happy Bank, Ms. Baisley signed a Bonus Agreement dated July 15, 2021, in which she received a bonus contingent upon her employment with Happy Bank continuing until July 26, 2022. Ms. Baisley promised to repay the bonus should her employment terminate for any reason prior to July 26, 2022. Ms. Baisley also acknowledged and

agreed to be bound by all of the provisions in the Handbook and Ethics Policy, and she received annual training on the other policies and procedures described above.[23]

155.    Ms. Baisley had no express or implied authorization or consent to copy, transfer, delete, and/or take any of Happy Bank's Confidential Information from Happy Bank's computers, systems, or premises.  Based on her role and the policies, procedures, and provisions she agreed to, Ms. Baisley knew that Happy Bank's Confidential Information was owned solely by the Company and would be highly useful to Happy Bank's competitors, as it would enable them to unlawfully compete with the Company and effectively target and recruit Happy Bank's current and future customers and employees.

156.    Based on forensic data summarized below, there is significant evidence that Ms. Baisley willingly joined Mr. Holmes' conspiracy and: (1) unlawfully removed, obtained, used, and/or disclosed Happy Bank's Confidential Information; (2) deleted or destroyed data and information from Happy Bank's computers and networks; (3) tortiously interfered with Happy Bank's existing contracts and prospective relations by soliciting Happy Bank customers and potential customers to move their business to American State Bank; and (4) ultimately exploited all of these misdeeds to procure a job with a competitor, American State Bank.  Ms. Baisley's unlawful actions also constitute breaches of her fiduciary duties to Happy Bank, breach of contract, joint tortfeasor liability, conversion, unfair competition, and unsafe and unsound banking practices.

---

[23] Ms. Baisley completed her most-recent training on Happy Bank's cybersecurity and internet security policies on February 14, 2022, her most-recent training on Happy Bank's Code of Ethics on January 5, 2022, and her most-recent training on Happy Bank's information security policies on October 25, 2021.

**B.**    **February and March 2022** – **Stealing Confidential Information and Soliciting Customers.**

157.    In early February and mid-March 2022, Ms. Baisley accessed Dropbox around the same time she accessed documents related to a then-Happy Bank customer—the exact same method that Mr. House used a few weeks earlier via Dropbox and Google Drive.  Upon information and belief, that customer now has loans with American State Bank, and Ms. Baisley used Dropbox to steal Happy Bank's Confidential Information.

158.    Also in mid-March 2022, Ms. Baisley accessed her personal Gmail account[24] on three separate occasions and downloaded an Excel spreadsheet containing Happy Bank's analysis for all properties related to a then-Happy Bank customer, including detailed projections and financial analyses—all of which constituted Happy Bank's Confidential Information.  Upon information and belief, that customer now has loans with American State Bank, and Ms. Baisley used her personal Gmail account to steal Happy Bank's Confidential Information.  In fact, a financing statement was filed in county records that lists this customer as grantor—and American State Bank as the grantee—within a few months of the mass resignation.

**C.**    **January and April 2022** – **Soliciting Customers and Deleting Files.**

159.    On January 26, 2022, Ms. Baisley modified a document titled "Deal Tracker" that she created on October 25, 2021—just days after the S-4 was filed and Mr. Holmes began crafting his scheme.  The "Deal Tracker" was an Excel spreadsheet with two tabs: "Jay" [House] and "Channing" [Baisley].  The spreadsheet includes a list of borrowers and guarantors with a column indicating each deal's "Priority" and "Date First Discussed."  Upon information and belief, some

---

[24] Notably, Ms. Baisley sent two emails from her Happy Bank Outlook account to her personal Gmail account with the subject line "Test."  The forensic data also shows that Ms. Baisley was interacting with the drafts folder for her personal Gmail account, and there have been several famous instances of people using draft emails in Gmail to secretly communicate.  *See, e.g.*, Donna Leinwand Leger & Yamiche Alcindor, *Patraeus and Broadwell used common e-mail trick* (Nov. 13, 2012), USA TODAY, https://www.usatoday.com/story/tech/2012/11/13/petraeus-broadwell-email/1702057/.

if not all of those customers now have loans with American State Bank.  In fact, one of those customers is listed in two deeds of trust as grantor—while American State Bank is listed as the grantee.

160.    Ms. Baisley also aided Mr. House and others in keeping the Customer X deal a secret from Happy Bank.  In early April 2022, Ms. Baisley discussed via email a tracking spreadsheet regarding Customer X that she and Mr. House were apparently maintaining in private. That customer is listed as a grantor on two deeds of trust with American State Bank as the grantee, both of which were filed within two months of the mass resignation.[25]  After her resignation, there were no records in Happy Bank's systems related to loan requests for Customer X.  Upon information and belief, Ms. Baisley caused the information related to Customer X to be deleted or omitted from Happy Bank's systems.

161.    Based on her role, Happy Bank's policies and procedures, and her experience in the banking industry, Ms. Baisley knew that information related to customers and loans were required to be retained and archived.  By omitting and/or permanently deleting records from Happy Bank's systems, Ms. Baisley ensured that Happy Bank could not find such information and put the Company at risk of violating the strict retention regulations imposed by banking regulators.  Ms. Baisley's deletions not only constituted unsafe and unsound banking practices that created an abnormally high risk of financial loss or damage to Happy Bank but also created false entries in banking records—which Ms. Baisley did with the intent to injure or defraud Happy Bank.

162.    Ms. Baisley resigned from Happy Bank on April 25, 2022, and has failed to repay the contingent bonus she received under the Bonus Agreement.  She currently works as an Assistant Vice President, Portfolio Manager, at American State Bank.  Upon information and

---

[25] This customer (Customer X) is different than the customer referenced in the previous paragraph, who also is listed in deeds of trusts as a grantor with American State Bank listed as a grantee.

belief, Ms. Baisley began working for American State Bank on April 26, 2022—one business day after she resigned from Happy Bank.

# Drew Phillips
## *Mr. House's Deputy*

**A.  Background and Summary of Forensic Analysis.**

163.    Mr. Phillips is a former officer and Senior Credit Analyst at Happy Bank.  During his employment with the Company, Mr. Phillips officed out of a Happy Bank branch located at 98th Street in Lubbock, Texas—the same branch where Mr. Holmes had his office—and he reported directly to Mr. Holmes.

164.    Happy Bank's Senior Credit Analysts support Portfolio Managers and Commercial Loan Officers in the origination of new loans and management of the existing loan portfolio by analyzing credit data (*i.e.*, a loan applicant's financial information, potential collateral, and other information salient to credit decisions) to determine degrees of risk in extending credit or lending money to individual or entity customers.  Mr. Phillips' duties also included managing the workflow of junior credit analysts and reviewing the analyses prepared by those credit analysts, including financial statements, in-house spreadsheets designed to quantify a customer's debt service abilities, and narrative analyses of findings and recommendations for Happy Bank's lenders.  As an officer and Senior Credit Analyst, Mr. Phillips owed numerous fiduciary duties to Happy Bank.

165.    Mr. Phillips acknowledged and agreed to be bound by all of the provisions in the Handbook and Ethics Policy, and he received annual training on the other Company policies and procedures described above.[26]

---

[26] Mr. Phillips completed his most-recent training on Happy Bank's cybersecurity and internet security policies on February 1, 2022, his most-recent training on Happy Bank's Code of Ethics on December 27, 2021, and his most-recent training on Happy Bank's information security policies on October 28, 2021.

166.    Mr. Phillips had no express or implied authorization or consent to copy, transfer, delete, and/or take any of Happy Bank's Confidential Information from Happy Bank's computers, systems, or premises.  Based on his role and the policies, procedures, and provisions he agreed to, Mr. Phillips knew that Happy Bank's Confidential Information was owned solely by the Company and would be highly useful to Happy Bank's competitors, as it would enable them to effectively target and recruit Happy Bank's current and future customers and employees.

167.    Based on forensic data summarized below, there is significant evidence that Mr. Phillips willingly joined Mr. Holmes' conspiracy and: (1) unlawfully obtained, removed, used, and/or disclosed Happy Bank's Confidential Information; (2) deleted or destroyed data and information from Happy Bank's computers and networks; (3) tortiously interfered with Happy Bank's existing contracts and prospective relations by soliciting Happy Bank customers and potential customers to move their business to American State Bank; and (4) ultimately exploited all of these misdeeds to procure a job with a competitor, American State Bank.  Mr. Phillips' unlawful actions also constitute breaches of his fiduciary duties to Happy Bank, breach of contract, joint tortfeasor liability, conversion, unfair competition, and unsafe and unsound banking practices.

**B.**    **January 2022 – Stealing Confidential Information, Deleting Files, and Soliciting Customers.**

168.    In mid-January 2022, Mr. Phillips connected an iPhone to his work computer.[27] Throughout the same day, Mr. Phillips accessed numerous documents containing Happy Bank's Confidential Information, including Loan Committee Reports, an Excel file titled "Copy of Pipeline Report Template," and customer-related documents.  Upon information and belief, at least

---

[27] According to the forensic data, this is the only instance where Mr. Phillips connected an iPhone to his work computer.

one of those customers now has loans with American State Bank as reflected in deeds of trust listing this customer as grantor—and American State Bank as the grantee.  Mr. Phillips was following the same pattern as Messrs. Holmes and House: accessing internal documents at the same time as using external devices capable of copying and transmitting Happy Bank's Confidential Information.  Upon information and belief, Mr. Phillips stole Happy Bank's Confidential Information using the iPhone connected to his work computer.

169.     Mr. Phillips also aided Mr. House and others in keeping the deal with Customer X a secret from Happy Bank, a deal that started at Happy Bank but was not closed until Defendants started working at American State Bank.  On April 20, 2022—less than a week before Messrs. Phillips and House resigned—Mr. Phillips emailed Mr. House a spreadsheet described as an "Updated Model," which was a proprietary template created by Happy Bank that contained detailed financial information related to Customer X, including pricing for two "HSB Proposed Loan[s]"—two loans that American State Bank ultimately closed.  After his resignation, there were no records in Happy Bank's systems related to prospective loans for Customer X.  Upon information and belief, Mr. Phillips caused the information related to Customer X to be deleted or omitted from Happy Bank's systems.

170.     Based on his role, Happy Bank's policies and procedures, and his experience in the banking industry, Mr. Phillips knew that information related to customers and loans were required to be retained and archived.  By omitting and/or permanently deleting records from his Happy Bank's systems, Mr. Phillips ensured that Happy Bank could not find such information and put the Company at risk of violating the strict retention regulations imposed by banking regulators.  Mr. Phillips' deletions not only constituted unsafe and unsound banking practices that created an

abnormally high risk of financial loss or damage to Happy Bank but also created false entries in banking records—which Mr. Phillips did with the intent to injure or defraud Happy Bank.

171.    Mr. Phillips resigned from Happy Bank on April 25, 2022.  He currently works as a Senior Credit Analyst at American State Bank.  Upon information and belief, Mr. Phillips began working for American State Bank on April 26, 2022—one business day after his resignation.

### Ross Glenn
***The Cleaner***

**A.    Background and Summary of Forensic Evidence.**

172.    Mr. Glenn is a former officer and Executive Vice President, Head of Special Assets, at Happy Bank.  During his nineteen-year employment with the Company, Mr. Glenn officed out of a Happy Bank branch located on S. Taylor Street in Amarillo, Texas.

173.    Head of Special Assets is a commercial lending role, and Happy Bank's commercial lenders are responsible for analyzing loan applications, making loans, generating interest income, monitoring and servicing existing loan customers, making credit decisions, collecting on loans, and marketing the Company's services and products.  As a member of Happy Bank's Executive Team, Mr. Glenn also had access to additional Confidential Information that the other Defendants were not privy to.  As an officer and Executive Vice President, Mr. Glenn owed numerous fiduciary duties to Happy Bank.

174.    During his employment with Happy Bank, Mr. Glenn signed several Awards and agreed to be bound by the provisions of the Awards and the Plan, which was incorporated in full into the Awards.  Mr. Glenn also signed an Executive Nonstatutory Option, a Restricted Stock Award Agreement, and a Retention Bonus Agreement—which contained nondisclosure, noncompetition, and/or nonsolicitation provisions.  Finally, Mr. Glenn acknowledged and agreed

to be bound by all of the provisions in the Handbook and Ethics Policy, and he received annual training on the other Company policies and procedures described above.[28]

175.    Mr. Glenn had no express or implied authorization or consent to copy, transfer, delete, and/or take any of Happy Bank's Confidential Information from Happy Bank's computers, systems, or premises.  Based on his role and the policies, procedures, and provisions he agreed to, Mr. Glenn knew that Happy Bank's Confidential Information was owned solely by the Company and would be highly useful to Happy Bank's competitors, as it would enable them to unlawfully compete with the Company and effectively target and recruit Happy Bank's current and future customers and employees.

176.    Based on forensic data summarized below, there is significant evidence that Mr. Glenn willingly joined Mr. Holmes' conspiracy and: (1) unlawfully obtained, removed, used, and/or disclosed Happy Bank's Confidential Information; (2) deleted or destroyed data and information from Happy Bank's computers and networks; (3) tortiously interfered with Happy Bank's existing contracts by soliciting Happy Bank customers to move their business to American State Bank; and (4) ultimately exploited all of these misdeeds to procure a job with a competitor, American State Bank.  Mr. Glenn's unlawful actions also constitute breaches of his fiduciary duties to Happy Bank, breach of contract, joint tortfeasor liability, conversion, unfair competition, and unsafe and unsound banking practices.

**B.    January to April 2022 – Purging Emails, Deleting Files, Stealing Confidential Information, and Soliciting Customers.**

177.    Mr. Glenn quickly started following the same pattern as Messrs. Holmes and House.  Throughout January and February 2022, he manually and permanently deleted numerous

---

[28] Mr. Glenn completed his most-recent training on Happy Bank's cybersecurity and internet security policies on February 7, 2022, his most-recent training on Happy Bank's Code of Ethics on February 22, 2021, and his most-recent training on Happy Bank's information security policies on October 4, 2021.

emails and email folders from his Happy Bank email account, including 20 separate instances of email deletions on January 5 alone.[29]   In early February 2022, Mr. Glenn manually and permanently deleted emails and his "Deleted Items" folder—just like Mr. Holmes.

178.   On March 8, 2022, Mr. Glenn performed the following Google search: "how do you destroy/get rid of a medallion stamp."  Happy Bank is a participant in the Securities Transfer Agents Medallion Program (STAMP), which is a verification system that authenticates and guarantees the signatures applied to various documents.  In other words, a medallion signature provides a guarantee that a signatory is the legal owner of securities and thus possesses the power to initiate a transfer of ownership.  If a signature turns out to be forged, the financial institution that guaranteed the medallion signature will have to accept liability.

179.   Mr. Glenn also continued his deletion spree throughout March 2022, including 14 separate instances on March 27 and 12 separate instances on March 28.  In early April 2022, he again manually and permanently deleted his "Deleted Items" folder.  According to the forensic data, there is no record of Mr. Glenn permanently deleting any emails or his "Deleted Items" folder prior to January 2022.

180.   Based on his role, Happy Bank's policies and procedures, and his experience in the banking industry, Mr. Glenn knew that information related to customers and loans were required to be retained and archived.  By permanently deleting emails from his Happy Bank email account that contained information not otherwise stored in Happy Bank's systems or archives, Mr. Glenn ensured that Happy Bank could not find such information and put the Company at risk of violating the strict retention regulations imposed by banking regulators.  Mr. Glenn's deletions not only constituted unsafe and unsound banking practices that created an abnormally high risk of financial

---

[29] Notably, on the same day, Mr. Glenn sent a copy of his Retention Bonus Agreement from his Happy Bank email to his personal Gmail account.

loss or damage to Happy Bank but also created false entries in banking records—which Mr. Glenn did with the intent to injure or defraud Happy Bank.

181.    Mr. Glenn's prolific deletions have made forensic analysis of his actions more difficult, and such analysis is still ongoing.  However, based on the evidence to date and the coordinated actions among Defendants, Happy Bank believes Mr. Glenn stole Happy Bank's Confidential Information and solicited Happy Bank's customers to move their business to American State Bank by following the same pattern as the other Defendants.

182.    For example, an analysis of Mr. Glenn's hard drive reveals that he added dozens of documents to a folder on his work computer desktop on April 18, 2022—the day before he submitted notice of his resignation from Happy Bank.  Some of these documents related to the same then-Happy Bank customer who Mr. Holmes schemed to have removed from Happy Bank's special asset designation.  Happy Bank has been unable to find any financials related to this customer that demonstrate profitability.  Rather, the only financials related to this customer show definitively that the customer should be designated as a special asset.  Upon information and belief, Mr. Glenn aided Mr. House and others in deceiving Happy Bank about this customer's profitability and/or in causing such information to be deleted or omitted from Happy Bank's systems, which constitutes another example of unsafe and unsound banking practices and false entries in banking records with the intent to injure or defraud Happy Bank.

183.    Mr. Glenn submitted his resignation on April 19, 2022, but did not depart Happy bank until six days later.  In the interim, on April 20 and 22, Mr. Glenn accessed a personal Microsoft OneDrive account that was capable of transmitting Happy Bank's Confidential Information.  On April 25, 2022—the day he departed Happy Bank—Mr. Glenn performed a Google search for "treev" and then visited several websites regarding "treev software."  Treev is

a Gmail plugin that allows users to share cloud files from Dropbox, Box, OneDrive, and Google Drive.[30] Upon information and belief, Mr. Glenn used his personal OneDrive account and/or Treev to steal Happy Bank's Confidential Information. Upon further information and belief, Mr. Glenn encouraged then-Happy Bank employees to leave the Company and begin working for a Happy Bank competitor—American State Bank.

184. Mr. Glenn departed Happy Bank on April 25, 2022. He currently works as the Regional President of Amarillo/Canyon at American State Bank. Upon information and belief, Mr. Glenn began working for American State Bank on April 26, 2022—one business day after he resigned from Happy Bank.

185. Less than a month after his resignation, Mr. Glenn signed a lease on behalf of American State Bank and a personal guaranty for the same. Days later, American State Bank notified the TDB of its intent to open an LPO/DPO in Amarillo, Texas at that same location to be managed by Mr. Glenn as its Amarillo Market President.

## **Willis McCutcheon**
### *The Second Lieutenant*

**A.    Background and Summary of Forensic Analysis.**

186. Mr. McCutcheon is a former officer and Regional President of Southern Lending at Happy Bank, the highest position for Happy Bank's Southern lending business other than the Senior Lending Officer. During his fifteen-year employment with the Company, Mr. McCutcheon officed out of a Happy Bank branch located on Olton Road in Plainview, Texas, but served as the Regional President for nine branches in total—including branches in Dimmitt, Floydada/Lockney, Hart, Muleshoe, Olton, Plainview, Silverton, and Tulia, Texas.

---

[30] *See* CROZDESK, Software – Treev, https://crozdesk.com/software/treev.

187.    Happy Bank's Regional President of Southern Lending is responsible for the development and performance of the Company's southern regional market as well as perpetuating the culture and values of Happy Bank.  Mr. McCutcheon's duties included managing and overseeing all lending functions with the southern regional market, such as loan approvals, loan quality, past due monitoring and collections, exception monitoring and management, loan pricing, and loan growth.  Mr. McCutcheon also was responsible for all new business development activities for all bank products, including lending, deposits, treasury management, mortgage lending, investments, and trust products.  As an officer and Regional President, Mr. McCutcheon owed numerous fiduciary duties to Happy Bank.

188.    During his employment with Happy Bank, Mr. McCutcheon signed several Awards and agreed to be bound by the provisions of the Awards and the Plan, which was incorporated in full into the Awards.  Mr. McCutcheon also acknowledged and agreed to be bound by all of the provisions in the Handbook and Ethics Policy, and he received annual training on the other Company policies and procedures described above.[31]

189.    Mr. McCutcheon had no express or implied authorization or consent to copy, transfer, delete, and/or take any of Happy Bank's Confidential Information from Happy Bank's computers, systems, or premises.  Based on his role and the policies, procedures, and provisions he agreed to, Mr. McCutcheon knew that Happy Bank's Confidential Information was owned solely by the Company and would be highly useful to Happy Bank's competitors, as it would enable them to unlawfully compete with the Company and effectively target and recruit Happy Bank's current and future customers and employees.

---

[31] Mr. McCutcheon completed his most-recent training on Happy Bank's cybersecurity and internet security policies on February 28, 2022, his most-recent training on Happy Bank's Code of Ethics on December 24, 2021, and his most-recent training on Happy Bank's information security policies on October 1, 2021.

190.    Based on forensic data summarized below, there is significant evidence that Mr. McCutcheon willingly joined Mr. Holmes' conspiracy and: (1) unlawfully obtained, removed, used, and/or disclosed Happy Bank's Confidential Information; (2) deleted or destroyed data and information from Happy Bank's computers and networks; (3) tortiously interfered with Happy Bank's existing contracts by soliciting Happy Bank customers to move their business to American State Bank; and (4) ultimately exploited all of these misdeeds to procure a job with a competitor, American State Bank.   Mr. McCutcheon's unlawful actions also constitute breaches of his fiduciary duties to Happy Bank, breach of contract, joint tortfeasor liability, conversion, unfair competition, and unsafe and unsound banking practices.

**B.    <u>January to April 2022</u> – Purging Emails.**

191.    Just like Messrs. Holmes and Glenn, Mr. McCutcheon began manually and permanently deleting emails from his Happy Bank Outlook account in the months prior to his resignation.  He continued his deletion spree throughout April 2022.

192.    Based on his role, Happy Bank's policies and procedures, and his experience in the banking industry, Mr. McCutcheon knew that information related to customers and loans were required to be retained and archived.  By permanently deleting emails and files that contained information not otherwise stored in Happy Bank's systems or archives, Mr. McCutcheon ensured that Happy Bank could not find such information and put the Company at risk of violating the strict retention regulations imposed by banking regulators.  Mr. McCutcheon's deletions not only constituted unsafe and unsound banking practices that created an abnormally high risk of financial loss or damage to Happy Bank but also created false entries in banking records—which Mr. McCutcheon did with the intent to injure or defraud Happy Bank.

**C.**    **February to April 2022** – **Stealing Confidential Information and Soliciting Customers.**

193.    On February 3, 2022, Mr. McCutcheon downloaded and saved several documents to his computer desktop, including a list of Happy Bank shareholders and a document titled "Potential Stockholders Template."  This is the same day that Mr. Holmes compiled more than 300 documents that he would later steal using a USB device, and the same day Mr. House used a USB device to steal a small batch of Confidential Information.

194.    On March 31, 2022—just like Messrs. Holmes and House, and in violation of Happy Bank's policies and procedures—Mr. McCutcheon connected a SanDisk 3.2Gen1 USB Device to his work computer during which time he accessed numerous documents related to a then-Happy Bank customer and containing Confidential Information.  Upon information and belief, that customer now has loans with American State Bank, and Mr. McCutcheon used this USB device to steal Happy Bank's Confidential Information.

195.    In early April 2022, Mr. McCutcheon accessed numerous documents related to another then-Happy Bank customer.  Upon information and belief, that customer now has loans with American State Bank.  In fact, that customer is listed as the grantor in a deed of trust that also lists American State Bank as the grantee.

196.    The day before he resigned from Happy Bank, Mr. McCutcheon downloaded Happy Bank's loans and deposit rates for different types of consumers.  This document contained Happy Bank's Confidential Information and expressly stated that it was "For Internal Use Only."  Upon information and belief, Mr. McCutcheon copied the Confidential Information from this document and removed it from Happy Bank's premises.

197.    Mr. McCutcheon resigned on April 29, 2022.  He currently works as the Regional President, Southern Region, at American State Bank.  Upon information and belief, Mr.

McCutcheon began working for American State Bank one business day after his resignation. In fact, less than a week after his resignation, Mr. McCutcheon signed a lease on behalf of American State Bank as its "President." American State Bank notified the TDB of its intent to open an LPO/DPO at that same location less than two weeks later. Upon information and belief, Mr. McCutcheon also participated in capital raises on behalf of American State Bank almost immediately after he resigned from Happy Bank.

## Michael Jackson
### The Third Lieutenant

**A.    Background and Summary of Forensic Analysis.**

198.    Mr. Jackson is a former officer, Senior Vice President, and Commercial Lender at Happy Bank. During his nine-year employment with the Company, Mr. Jackson officed out of a Happy Bank branch located on 98th Street in Lubbock, Texas—the same branch where Mr. Holmes had his office—and he reported directly to Mr. Holmes.

199.    Happy Bank's Commercial Lenders are responsible for analyzing loan applications, making loans, generating interest income, monitoring and servicing existing loan customers, making credit decisions, collecting on loans, and marketing the Company's services and products. As an officer and Senior Vice President, Mr. Jackson owed numerous fiduciary duties to Happy Bank.

200.    During his employment with Happy Bank, Mr. Jackson signed several Awards and agreed to be bound by the provisions of the Awards and the Plan, which was incorporated in full into the Awards. Mr. Jackson also acknowledged and agreed to be bound by all of the provisions

in the Handbook and Ethics Policy, and he received annual training on the other Company policies and procedures described above.[32]

201.    Mr. Jackson had no express or implied authorization or consent to copy, transfer, delete, and/or take any of Happy Bank's Confidential Information from Happy Bank's computers, systems, or premises.  Based on his role and the policies, procedures, and provisions he agreed to, Mr. Jackson knew that Happy Bank's Confidential Information was owned solely by the Company and would be highly useful to Happy Bank's competitors, as it would enable them to unlawfully compete with the Company and effectively target and recruit Happy Bank's current and future customers and employees.

202.    Based on forensic data summarized below, there is significant evidence that Mr. Jackson willingly joined Mr. Holmes' conspiracy and: (1) unlawfully obtained, removed, used, and/or disclosed Happy Bank's Confidential Information; (2) deleted or destroyed data and information from Happy Bank's computers and networks; (3) tortiously interfered with Happy Bank's existing contracts by soliciting Happy Bank customers to move their business to American State Bank; and (4) ultimately exploited all of these misdeeds to procure a job with a competitor, American State Bank.  Mr. Jackson's unlawful actions also constitute breaches of his fiduciary duties to Happy Bank, breach of contract, joint tortfeasor liability, conversion, unfair competition, and unsafe and unsound banking practices.

**B.    <u>March and April 2022</u> – Soliciting Customer, Stealing Confidential Information, and Deleting Files.**

203.    In late March 2022, Mr. Jackson emailed a then-Happy Bank customer regarding a potential bid on a project and, in response to whether Happy Bank had any debt related to the

---

[32] Mr. Jackson completed his most-recent training on Happy Bank's cybersecurity and internet security policies on February 22, 2022, his most-recent training on Happy Bank's information security policies on October 25, 2021, and his most-recent training on Happy Bank's Code of Ethics on September 28, 2021.

property, stated: "No debt with me. I did it as ASB and didn't pick on them to refinance it over here, for this very reason." Mr. Jackson's statements constitute a violation of his nondisclosure obligations because he disclosed confidential information about one customer to another customer without authorization. Upon information and belief, the customer to whom this Confidential Information was disclosed now has loans at American State Bank.

204. A few weeks later, in April 2022, Mr. Jackson emailed three Happy Bank colleagues (all of whom now work for American State Bank) regarding a 90-day extension for three loans related to that same customer. Ninety-day extensions are often used to allow for additional time needed to gather financial information or for the customer's benefit. Here, Mr. Jackson's extension requests allowed him to delay action on these loans until after his resignation—and provided him the opportunity to queue up these loan modifications as part of the "Bank in a Box" he helped deliver to American State Bank. Indeed, upon information and belief, at least two of those loans are now with American State Bank as reflected by deeds of trusts listing this customer as grantor—and American State Bank as the grantee.

205. On April 16, 2022—a Saturday—video footage shows Mr. Jackson removing boxes of unknown contents from Happy Bank premises, just like Messrs. Holmes and House. It is extremely unlikely that an employee, even a Senior Vice President like Mr. Jackson, would create and maintain binders of personal information—as opposed to Happy Bank's Confidential Information—at his office. Accordingly, upon information and belief, Mr. Jackson stole Happy Bank's Confidential Information when he removed numerous boxes from Happy Bank's premises.

206. Mr. Jackson resigned on April 25, 2022. He currently works as a commercial lender at American State Bank. Upon information and belief, Mr. Jackson began working for American State Bank on April 26, 2022—one business day after he resigned from Happy Bank.

207.    A review of Mr. Jackson's hard drive data also revealed that there were practically zero documents saved to his work computer related to Happy Bank or its customers—a sharp contrast to the other hard drives forensically analyzed.  Upon information and belief, Mr. Jackson deleted documents and files from his computer and Happy Bank's systems that contained information related to customers and/or loans.  Based on his role, Happy Bank's policies and procedures, and his experience in the banking industry, Mr. Jackson knew that information related to customers and loans were required to be retained and archived.  By omitting and/or permanently deleting records, Mr. Jackson ensured that Happy Bank could not find such information and put the Company at risk of violating the strict retention regulations imposed by banking regulators.  Mr. Jackson's deletions not only constituted unsafe and unsound banking practices that created an abnormally high risk of financial loss or damage to Happy Bank but also created false entries in banking records—which Mr. Jackson did with the intent to injure or defraud Happy Bank.

## <u>Jessica Terrell</u>
### *Co-Conspirator*

A.    **Background and Summary of Forensic Analysis.**

208.    Ms. Terrell is a former officer, Vice President, and Commercial Lender at Happy Bank.  During her ten-year employment with the Company, Ms. Terrell officed out of a Happy Bank branch located on 98th Street in Lubbock, Texas—the same branch where Mr. Holmes had his office—and she reported directly to Mr. Holmes.

209.    Happy Bank's Commercial Lenders are responsible for analyzing loan applications, making loans, generating interest income, monitoring and servicing existing loan customers, making credit decisions, collecting on loans, and marketing the Company's services and products.  As an officer and Vice President, Ms. Terrell owed numerous fiduciary duties to Happy Bank.

210.    During her employment with Happy Bank, Ms. Terrell acknowledged and agreed to be bound by all of the provisions in the Handbook and Ethics Policy, and she received annual training on the other Company policies and procedures described above.[33]

211.    Ms. Terrell had no express or implied authorization or consent to copy, transfer, delete, and/or take any of Happy Bank's Confidential Information from Happy Bank's computers, systems, or premises.  Based on her role and the policies, procedures, and provisions she agreed to, Ms. Terrell knew that Happy Bank's Confidential Information was owned solely by the Company and would be highly useful to Happy Bank's competitors, as it would enable them to unlawfully compete with the Company and effectively target and recruit Happy Bank's current and future customers and employees.

212.    Based on forensic data summarized below, there is significant evidence that Ms. Terrell willingly joined Mr. Holmes' conspiracy and: (1) unlawfully obtained, removed, used, and/or disclosed Happy Bank's Confidential Information; (2) deleted or destroyed data and information from Happy Bank's computers and networks; (3) tortiously interfered with Happy Bank's existing contracts by soliciting Happy Bank customers to move their business to American State Bank; and (4) ultimately exploited all of these misdeeds to procure a job with a competitor, American State Bank.  Ms. Terrell's unlawful actions also constitute breaches of her fiduciary duties to Happy Bank, breach of contract, joint tortfeasor liability, conversion, unfair competition, and unsafe and unsound banking practices.

---

[33] Ms. Terrell completed her most-recent training on Happy Bank's cybersecurity and internet security policies on February 23, 2022, her most-recent training on Happy Bank's Code of Ethics on December 29, 2021, and her most-recent training on Happy Bank's information security policies on October 26, 2021.

**B.**     **December 2021 to April 2022 – Stealing Confidential Information, Deleting Files, and Soliciting Customers.**

213.     In late December 2021, Ms. Terrell accessed a personal Outlook account from her work computer around the same time she accessed files related to then-Happy Bank customers. Upon information and belief, at least some of those customers now have loans at American State Bank. This is the same pattern as Messrs. House and Glenn and Ms. Baisley—using an external file transfer program while accessing Confidential Information related to a customer who ultimately joined Defendants at American State Bank. In fact, one of these customers later admitted to Happy Bank that American State Bank was trying to obtain their business, and the customer tried to leverage that fact against Happy Bank to obtain concessions.

214.     Ms. Terrell followed the same pattern from January to March 2022. She also accessed Skype numerous times in violation of Happy Bank's policies and procedures. Skype is a messaging and file sharing program that Microsoft advertises can be used "to send large files to multiple contacts during a voice, video, or group call or [to] send a small document to someone in an instant message."[34]

215.     Upon information and belief, Ms. Terrell used Skype and/or a personal Outlook account to steal Happy Bank's Confidential Information.

216.     In April 2022—less than two weeks before her resignation—Ms. Terrell printed numerous documents related to a then-Happy Bank customer, including memoranda and borrowing base reports containing Happy Bank's Confidential Information. After Ms. Terrell's resignation, Happy Bank was unable to find any files related to this customer in its systems— despite the fact that the customer later told Happy Bank that they had emailed information to one

---

[34] *See* Skype, *File Sharing*, https://www.skype.com/en/features/send-files/#:~:text=With%20Skype%20file%20 sharing%20is,it's%20all%20up%20to%20you.

of the Defendants—and Happy Bank ultimately had to reduce the customer's interest rate to keep the loan, a significant concession in the current environment of rising interest rates.  Upon information and belief, Ms. Terrell caused the information related to this customer to be deleted or omitted from Happy Bank's systems—and she stole the same in hard copy form.

217.    Based on her role, Happy Bank's policies and procedures, and her experience in the banking industry, Ms. Terrell knew that information related to customers and loans were required to be retained and archived.  By permanently deleting records from Happy Bank's systems or archives, Ms. Terrell ensured that Happy Bank could not find such information and put the Company at risk of violating the strict retention regulations imposed by banking regulators.  Ms. Terrell's deletions not only constituted unsafe and unsound banking practices that created an abnormally high risk of financial loss or damage to Happy Bank but also created false entries in banking records—which Ms. Terrell did with the intent to injure or defraud Happy Bank.

218.    On the day before her resignation, Ms. Terrell accessed her personal Outlook account and Skype from her work computer for the last time.  Once again, this was around the same time she accessed files related to a then-Happy Bank customer and containing Happy Bank's Confidential Information.  Upon information and belief, that customer now has loans with American State Bank, and Ms. Baisley stole Happy Bank's Confidential Information using her personal Outlook account and/or Skype.

219.    Ms. Terrell resigned on April 25, 2022.  She currently works as a Senior Vice President, Commercial Lending, at American State Bank.  Upon information and belief, Ms. Terrell began working for American State Bank on April 26, 2022—one business day after she resigned from Happy Bank.

# Jason West
## *Co-Conspirator*

**A.    Background and Summary of Forensic Analysis.**

220.    Mr. West is a former officer and Credit Analyst III at Happy Bank.  During his five-year employment with the Company, Mr. West officed out of a Happy Bank branch located on S. Taylor Street in Amarillo, Texas—which was overseen by Mr. Holmes.

221.    Happy Bank's Credit Analysts III are responsible for analyzing credit data to determine degrees of risk in extending credit or lending money to individual or entity customers. Mr. West's duties included preparing financial statements, in-house spreadsheets to quantify a borrower's debt service abilities, and narrative analyses of findings and recommendations for Happy Bank's lenders.  As an officer and Credit Analyst III, Mr. West owed numerous fiduciary duties to Happy Bank.

222.    During his employment with Happy Bank, Mr. West signed at least one Award and agreed to be bound by the provisions of the Award and the Plan, which was incorporated in full into the Award.  Mr. West also acknowledged and agreed to be bound by all of the provisions in the Handbook and Ethics Policy, and he received annual training on the other Company policies and procedures described above.[35]

223.    Mr. West had no express or implied authorization or consent to copy, transfer, delete, and/or take any of Happy Bank's Confidential Information from Happy Bank's computers, systems, or premises.  Based on his role and the policies, procedures, and provisions he agreed to, Mr. West knew that Happy Bank's Confidential Information was owned solely by the Company and would be highly useful to Happy Bank's competitors, as it would enable them to unlawfully

---

[35] Mr. West completed his most-recent training on Happy Bank's cybersecurity and internet security policies on February 2, 2022, his most-recent training on Happy Bank's Code of Ethics on December 10, 2021, and his most-recent training on Happy Bank's information security policies on October 1, 2021.

compete with the Company and effectively target and recruit Happy Bank's current and future customers and employees.

224.     Based on forensic data summarized below, there is significant evidence that Mr. West willingly joined Mr. Holmes' conspiracy and: (1) unlawfully obtained, removed, used, and/or disclosed Happy Bank's Confidential Information; (2) deleted or destroyed data and information from Happy Bank's computers and networks; (3) tortiously interfered with Happy Bank's existing contracts by soliciting Happy Bank customers to move their business to American State Bank; and (4) ultimately exploited all of these misdeeds to procure a job with a competitor, American State Bank.  Mr. West's unlawful actions also constitute breaches of his fiduciary duties to Happy Bank, breach of contract, joint tortfeasor liability, conversion, unfair competition, and unsafe and unsound banking practices.

**B.     December 2021 to May 2022 – Purging Emails.**

225.     From December 2021 through May 2022, Mr. West manually and permanently deleted emails from his Happy Bank Outlook account—just like Messrs. Holmes, House, Glenn, and McCutcheon.  In fact, based on the forensic data, Mr. West manually and permanently deleted emails on more than 400 occasions before his resignation—yet the forensic data reflects no similar instances of any deletions by Mr. West before mid-December 2021.

226.     Based on his role, Happy Bank's policies and procedures, and his experience in the banking industry, Mr. West knew that information related to customers and loans were required to be retained and archived.  By permanently deleting emails from his Happy Bank email account that contained information not otherwise stored in Happy Bank's systems or archives, Mr. West ensured that Happy Bank could not find such information and put the Company at risk of violating the strict retention regulations imposed by banking regulators.  Mr. West's deletions not only constituted unsafe and unsound banking practices that created an abnormally high risk of financial

loss or damage to Happy Bank but also created false entries in banking records—which Mr. West did with the intent to injure or defraud Happy Bank.

**C.    May 2022 - Stealing Confidential Information and Soliciting Customers.**

227.    On May 17, 2022, Mr. West followed the same roadmap established by Messrs. House, Glenn, McCutcheon, and Ms. Terrell: he accessed a personal Outlook account around the same time he accessed documents related to then-Happy Bank customers and containing Happy Bank's Confidential Information.  Upon information and belief, at least some of those customers now have loans with American State Bank, and Mr. West stole Happy Bank's Confidential Information using his personal Outlook account.

228.    At the same time (and while still accessing his personal Outlook account), Mr. West also accessed a zip file titled "Underwriting Templates," which contained five documents—including Happy Bank's business banking rate sheet with terms for various types of loans and an Excel spreadsheet template with numerous tabs for sources and uses of collateral, line of credit charts, cash conversion cycle and ratios, and financial calculations for loans related to apartments and hotels.  All of this information constituted Happy Bank's Confidential Information and could be used to jump start the underwriting process for different types of loans—all in direct competition with Happy Bank.  Upon information and belief, Mr. West stole this information using his personal Outlook account.

229.    Mr. West resigned on May 25, 2022.  He currently works as an Assistant Vice President, Portfolio Manager, at American State Bank.

## Samuel "Trev" Weaver
### *Co-Conspirator*

**A.    Background and Summary of Forensic Analysis.**

230.    Mr. Weaver is a former officer, Senior Vice President, and Commercial Lender at Happy Bank.  During his ten-year employment with the Company, Mr. Weaver officed out of a Happy Bank branch located on 98th Street in Lubbock, Texas—the same branch where Mr. Holmes had his office—and he reported directly to Mr. Holmes.

231.    Happy Bank's Commercial Lenders are responsible for developing a network of clients and establishing full-service banking relationships with eligible clients.  Mr. Weaver's duties also included serving the Company's best interests by continually increasing profitability through growth in loan and deposit balances while mitigating risk.  As an officer and Senior Vice President, Mr. Weaver owed numerous fiduciary duties to Happy Bank.

232.    During his employment with Happy Bank, Mr. Weaver signed several Awards and agreed to be bound by the provisions of the Awards and the Plan, which was incorporated in full into the Awards.  Mr. Weaver also acknowledged and agreed to be bound by all of the provisions in the Handbook and Ethics Policy, and he received annual training on the other Company policies and procedures described above.[36]

233.    Mr. Weaver had no express or implied authorization or consent to copy, transfer, delete, and/or take any of Happy Bank's Confidential Information from Happy Bank's computers, systems, or premises.  Based on his role and the policies, procedures, and provisions he agreed to, Mr. Weaver knew that Happy Bank's Confidential Information was owned solely by the Company and would be highly useful to Happy Bank's competitors, as it would enable them to unlawfully

---

[36] Mr. Weaver completed his most-recent training on Happy Bank's cybersecurity and internet security policies on February 24, 2022, his most-recent training on Happy Bank's Code of Ethics on December 23, 2021, and his most-recent training on Happy Bank's information security policies on October 29, 2021.

compete with the Company and effectively target and recruit Happy Bank's current and future customers and employees.

234.    Based on forensic data summarized below, there is significant evidence that Mr. Weaver willingly joined Mr. Holmes' conspiracy and: (1) unlawfully obtained, removed, used, and/or disclosed Happy Bank's Confidential Information; (2) deleted or destroyed data and information from Happy Bank's computers and networks; (3) tortiously interfered with Happy Bank's existing contracts by soliciting Happy Bank customers to move their business to American State Bank; and (4) ultimately exploited all of these misdeeds to procure a job with a competitor, American State Bank.  Mr. Weaver's unlawful actions also constitute breaches of his fiduciary duties to Happy Bank, breach of contract, joint tortfeasor liability, conversion, unfair competition, and unsafe and unsound banking practices.

**B.    <u>January to April 2022</u> – Purging Emails, Stealing Confidential Information, and Soliciting Customers.**

235.    In January and February 2022, Mr. Weaver manually and permanently deleted numerous emails from his Happy Bank Outlook account—just like Messrs. Holmes, Glenn, McCutcheon, and West.  Based on his role, Happy Bank's policies and procedures, and his experience in the banking industry, Mr. Weaver knew that information related to customers and loans were required to be retained and archived.  By permanently deleting emails from his Happy Bank email account that contained information not otherwise stored in Happy Bank's systems or archives, Mr. Weaver ensured that Happy Bank could not find such information and put the Company at risk of violating the strict retention regulations imposed by banking regulators.  Mr. Weaver's deletions not only constituted unsafe and unsound banking practices that created an abnormally high risk of financial loss or damage to Happy Bank but also created false entries in banking records—which Mr. Weaver did with the intent to injure or defraud Happy Bank.

236.    In February and March 2022, Mr. Weaver accessed numerous documents related to a then-Happy Bank customer who later admitted to Happy Bank that he had moved more than $8 million in loans from Happy Bank to American State Bank following the mass resignation.  In fact, this customer is listed as grantor in numerous deeds of trust that also list American State Bank as the grantee.  Upon information and belief, Mr. Weaver solicited this customer to move millions of dollars' worth of loans from Happy Bank to American State Bank while he was still employed at Happy Bank.

237.    On March 28, 2022, Mr. Weaver accessed and downloaded numerous templates and other analyses from Happy Bank's system that contained Happy Bank's Confidential Information.  Shortly thereafter, Mr. Weaver created an account on Zoho.com, a website that provides cloud-based business services, including email platforms and cloud-based file transfers similar to Dropbox.[37]  These actions followed the exact same pattern as the other Defendants—accessing Happy Bank's Confidential Information at the same time as accessing external programs capable of transmitting such Confidential Information.  Upon information and belief, Mr. Weaver stole Happy Bank's Confidential Information using Zoho.

238.    Notably, some of the templates downloaded by Mr. Weaver took Happy Bank—a financial institution with over $5 billion in assets—***a full year to develop***.  These templates contain sophisticated proprietary information related to the management of complex construction loans, which was a significant part of Happy Bank's business.  By stealing these templates, Mr. Weaver added to the "Bank in the Box" that he helped deliver to American State Bank, enabling it to immediately reduce the risk of its loan portfolio.

---

[37] *See* ZOHO, https://www.zoho.com/index1.html.

239.     Mr. Weaver also continued to manually and permanently delete emails from his Happy Bank Outlook account during March 2022 and up through the day before his resignation.

240.     In early April 2022, Mr. Weaver was already thinking about his new gig.  He performed Google searches specifically related to American State Bank, including: "Brandon Steele Tyler Tx American State Bank" and "American State Bank Tyler Tx."  Mr. Steele is the owner of American State Bank.

241.     On April 6, 2022, Mr. Weaver accessed a website for A3Cloud Solutions, which advertises itself as a company proficient in cloud-based services.[38]  Within minutes, Mr. Weaver again accessed American State Bank's website.  Upon information and belief, Mr. Weaver used the A3Cloud Solutions website to steal Happy Bank's Confidential Information.

242.     Mr. Weaver evidently could not stand the wait.  He resigned on April 7, 2022—weeks before the mass resignation—and currently works as a commercial lender at American State Bank.

## Derek Dollahite
### *Co-Conspirator*

**A.     Background and Summary of Forensic Analysis.**

243.     Mr. Dollahite is a former officer and Senior Credit Analyst at Happy Bank.  During his seven-plus-year employment with the Company, Mr. Dollahite officed out of Happy Bank branch located on 98th Street in Lubbock, Texas—the same branch where Mr. Holmes had his office—and he reported directly to Mr. Holmes.

244.     Happy Bank's Senior Credit Analysts support Portfolio Managers and Commercial Loan Officers in the origination of new loans and management of the existing loan portfolio by

---

[38] *See* A3CLOUD SOLUTIONS, https://a3cloud.org/.

analyzing credit data (*i.e.*, a loan applicant's financial information, potential collateral, and other information salient to credit decisions) to determine degrees of risk in extending credit or lending money to individual or entity customers. Mr. Dollahite's duties also included managing the workflow of junior credit analysts and reviewing the analyses prepared by those credit analysts, including financial statements, in-house spreadsheets designed to quantify a customer's debt service abilities, and narrative analyses of findings and recommendations for Happy Bank's lenders. In addition, Mr. Dollahite supervised and managed Happy Bank's builder loan group, which was responsible for analyzing and managing loans for residential and commercial construction. As an officer and Senior Credit Analyst, Mr. Dollahite owed numerous fiduciary duties to Happy Bank.

245.    During his employment with Happy Bank, Mr. Dollahite signed at least one Award and agreed to be bound by the provisions of the Award and the Plan, which was incorporated in full into the Award. Mr. Dollahite also acknowledged and agreed to be bound by all of the provisions in the Handbook and Ethics Policy, and he received annual training on the other Company policies and procedures described above.[39]

246.    Mr. Dollahite had no express or implied authorization or consent to copy, transfer, delete, and/or take any of Happy Bank's Confidential Information from Happy Bank's computers, systems, or premises. Based on his role and the policies, procedures, and provisions he agreed to, Mr. Dollahite knew that Happy Bank's Confidential Information was owned solely by the Company and would be highly useful to Happy Bank's competitors, as it would enable them to

---

[39] Mr. Dollahite completed his most-recent training on Happy Bank's cybersecurity and internet security policies on February 17, 2022, his most-recent training on Happy Bank's Code of Ethics on November 26, 2021, and his most-recent training on Happy Bank's information security policies on October 17, 2021.

unlawfully compete with the Company and effectively target and recruit Happy Bank's current and future customers and employees.

247.    Based on forensic data summarized below, there is significant evidence that Mr. Dollahite willingly joined Mr. Holmes' conspiracy and: (1) unlawfully obtained, removed, used, and/or disclosed Happy Bank's Confidential Information; (2) improperly advanced Happy Bank funds; (3) tortiously interfered with Happy Bank's existing contracts by soliciting Happy Bank customers to move their business to American State Bank; and (4) ultimately exploited all of these misdeeds to procure a job with a competitor, American State Bank.  Mr. Dollahite's unlawful actions also constitute breaches of his fiduciary duties to Happy Bank, breach of contract, joint tortfeasor liability, conversion, unfair competition, and unsafe and unsound banking practices.

**B.    <u>January 2022</u> – Purging Emails.**

248.    Just after the new year, Mr. Dollahite manually and permanently deleted emails from his Happy Bank Outlook account—just like Messrs. Holmes, Glenn, McCutcheon, West, and Weaver.

249.    Based on his role, Happy Bank's policies and procedures, and his experience in the banking industry, Mr. Dollahite knew that information related to customers and loans were required to be retained and archived.  By permanently deleting emails from his Happy Bank email account that contained information not otherwise stored in Happy Bank's systems or archives, Mr. Dollahite ensured that Happy Bank could not find such information and put the Company at risk of violating the strict retention regulations imposed by banking regulators.  Mr. Dollahite's deletions not only constituted unsafe and unsound banking practices that created an abnormally high risk of financial loss or damage to Happy Bank but also created false entries in banking records—which Mr. Dollahite did with the intent to injure or defraud Happy Bank.

C.    **March and April 2022** – Stealing Confidential Information and Soliciting Customers.

250.    In late March 2022, Mr. Dollahite accessed a folder on Happy Bank's systems described as "NEW TEMPLATES 7-8-2020" from which he downloaded a master spreadsheet template containing Confidential Information and related to the same then-Happy Bank customer who later admitted to moving over $8 million in loans to American State Bank and is listed as the grantor in numerous deeds of trust that reflect American State Bank as the grantee.  Mr. Dollahite also accessed documents from Happy Bank's systems concerning other customers and, consistent with the pattern set by other Defendants, then logged into a personal Gmail account—which he had synced to his work computer.  Upon information and belief, at least some of those customers now have loans with American State Bank, and Mr. Dollahite stole some or all of these documents containing Happy Bank's Confidential Information using his personal Gmail account.

251.    It is notable that Mr. Dollahite downloaded the master spreadsheet template referenced above in an older Excel format because the current version of this information is now in a web-based format on Happy Bank's system.  By downloading it in Excel, it was easier for Mr. Dollahite to steal this information using his personal email synced to his work computer.  These proprietary templates also provided Mr. Dollahite—and American State Bank—a significant head start in servicing complex construction loans, which Happy Bank had devoted substantial time and money into developing as part of its Confidential Information.

252.    The next day, Mr. Dollahite accessed numerous documents related to a loan for a then-Happy Bank customer constructing residential homes.[40]  Despite the fact that the homes were never inspected and one home was being built at a different lot than the loan documents referenced, Mr. Dollahite fully advanced all (or nearly all) of the funds for that loan.  Upon information and

---

[40] Before March 2022, Mr. Dollahite's hard drive data demonstrates that he had not opened or accessed any files from Happy's internal system related to this customer since December 2021.

belief, that customer now has loans with American State Bank as reflected in deeds of trust listing this customer as grantor—and American State Bank as the grantee.

253.    A week before his resignation, Mr. Dollahite accessed and downloaded three video recordings of Executive Loan Committee meetings from 2021 that contained Confidential Information, none of which he had any legitimate business reason to access and view on this date. Upon information and belief, Mr. Dollahite stole this information using his personal Gmail account synced to his work computer.

254.    Mr. Dollahite resigned on April 25, 2022.  He currently works as an Assistant Vice President, Senior Credit Analyst, at American State Bank.  Upon information and belief, Mr. Dollahite began working for American State Bank on April 26, 2022—one business day after he resigned from Happy Bank.

## David Hutson
### Co-Conspirator

**A.    Background and Summary of Forensic Analysis.**

255.    Mr. Hutson is a former officer, Senior Vice President, and Private Banking Commercial Lender at Happy Bank.  During his seventeen-year employment with the Company, Mr. Hutson officed out of Happy Bank branch located on S. Taylor Street in Amarillo, Texas— which was overseen by Mr. Holmes.

256.    Happy Bank's Private Banking Commercial Lenders are responsible for developing a network of clients and establishing full-service banking relationships with eligible clients.  Mr. Hutson's duties also included serving Happy Bank's best interests by continually increasing profitability through growth in loan and deposit balances while mitigating risk.  As an officer and Senior Vice President, Mr. Hutson owed numerous fiduciary duties to Happy Bank.

257.    During his employment with Happy Bank, Mr. Hutson signed at least one Award and agreed to be bound by the provisions of the Award and the Plan, which was incorporated in full into the Award.  Mr. Hutson also acknowledged and agreed to be bound by all of the provisions in the Handbook and Ethics Policy, and he received annual training on the other Company policies and procedures described above.[41]

258.    Mr. Hutson had no express or implied authorization or consent to copy, transfer, delete, and/or take any of Happy Bank's Confidential Information from Happy Bank's computers, systems, or premises.  Based on his role and the policies, procedures, and provisions he agreed to, Mr. Hutson knew that Happy Bank's Confidential Information was owned solely by the Company and would be highly useful to Happy Bank's competitors, as it would enable them to unlawfully compete with the Company and effectively target and recruit Happy Bank's current and future customers and employees.

259.    Based on forensic data summarized below, there is significant evidence that Mr. Hutson willingly joined Mr. Holmes' conspiracy and: (1) unlawfully obtained, removed, used, and/or disclosed Happy Bank's Confidential Information; (2) deleted or destroyed data and information from Happy Bank's computers and networks; (3) tortiously interfered with Happy Bank's existing contracts by soliciting Happy Bank customers to move their business to American State Bank; and (4) ultimately exploited all of these misdeeds to procure a job with a competitor, American State Bank.  Mr. Hutson's unlawful actions also constitute breaches of his fiduciary duties to Happy Bank, breach of contract, joint tortfeasor liability, conversion, unfair competition, and unsafe and unsound banking practices.

---

[41] Mr. Hutson completed his most-recent training on Happy Bank's cybersecurity and internet security policies on February 1, 2022, his most-recent training on Happy Bank's Code of Ethics on December 24, 2021, and his most-recent training on Happy Bank's information security policies on October 12, 2021.

**B.**    <u>**January and February 2022**</u> **– Purging Emails and Stealing Confidential Information.**

260.    In January and February 2022, Mr. Hutson manually and permanently deleted emails from his Happy Bank Outlook account—just like Messrs. Holmes, House, Glenn, McCutcheon, West, and Weaver.  Based on his role, Happy Bank's policies and procedures, and his experience in the banking industry, Mr. Hutson knew that information related to customers and loans were required to be retained and archived.  By permanently deleting emails from his Happy Bank email account that contained information not otherwise stored in Happy Bank's systems or archives, Mr. Hutson ensured that Happy Bank could not find such information and put the Company at risk of violating the strict retention regulations imposed by banking regulators.  Mr. Hutson's deletions not only constituted unsafe and unsound banking practices that created an abnormally high risk of financial loss or damage to Happy Bank but also created false entries in banking records—which Mr. Hutson did with the intent to injure or defraud Happy Bank.

261.    On February 3, 2022—the same day that Mr. Holmes copied more than 300 documents to a folder on his computer desktop—Mr. Hutson did virtually the same thing.  He created several new directories and folders on his work computer, including one titled "Dave's Personal Files."  This was a misnomer because, within minutes, Mr. Hutson accessed a personal OneDrive account and proceeded to download numerous documents from Happy Bank's shared drive, including templates, customer-related files, and other documents containing Happy Bank's Confidential Information.  Upon information and belief, Mr. Hutson stole Happy Bank's Confidential Information using his personal OneDrive account.

**C.**    <u>**March and April 2022**</u> **– Stealing More Confidential Information and Soliciting Customers.**

262.    On three separate days in mid-March 2022, Mr. Hutson accessed Dropbox and/or Google Drive around the same time he accessed documents related to then-Happy Bank

customers—again following the pattern set by Mr. House.  Upon information and belief, at least some of these customers now have loans with American State Bank.

263.    On April 22, 2022—the same day as Mr. Holmes' resignation, and in violation of Happy Bank's policies and procedures—Mr. Hutson connected a Samsung PSSD T7 Touch, an external portable storage device, to his work computer during which time he accessed several files related to then-Happy Bank customers and containing Confidential Information.  Upon information and belief, at least some of these customers now have loans with American State Bank, and Mr. Hutson used the portable storage device to steal more of Happy Bank's Confidential Information.  Once again, these actions follow the same pattern set by Messrs. Holmes, House, and McCutcheon.

264.    Mr. Hutson resigned on May 23, 2022.  He currently works as a Senior Vice President, Commercial Lending, at American State Bank.

## Brian Murry
### *Co-Conspirator*

A.    **Background and Summary of Forensic Analysis.**

265.    Mr. Murry is a former officer, Vice President, and Commercial Lender at Happy Bank.  During his employment with the Company, Mr. Murry officed out of a Happy Bank branch located on 66th Street in Lubbock, Texas—and he reported directly to Mr. Holmes.

266.    Happy Bank's Commercial Lenders are responsible for analyzing loan applications, making loans, generating interest and fee income, monitoring and servicing existing loan customers, making credit decisions, collecting on loans, and marketing the Company's services and products.  As an officer and Vice President, Mr. Murry owed numerous fiduciary duties to Happy Bank.

267.     During his employment with Happy Bank, Mr. Murry acknowledged and agreed to be bound by all of the provisions in the Handbook and Ethics Policy, and he received annual training on the other Company policies and procedures described above.[42]

268.     Mr. Murry had no express or implied authorization or consent to copy, transfer, delete, and/or take any of Happy Bank's Confidential Information from Happy Bank's computers, systems, or premises.  Based on his role and the policies, procedures, and provisions he agreed to, Mr. Murry knew that Happy Bank's Confidential Information was owned solely by the Company and would be highly useful to Happy Bank's competitors, as it would enable them to unlawfully compete with the Company and effectively target and recruit Happy Bank's current and future customers and employees.

269.     Based on forensic data summarized below, there is significant evidence that Mr. Murry willingly joined Mr. Holmes' conspiracy and: (1) unlawfully obtained, removed, used, and/or disclosed Happy Bank's Confidential Information; (2) deleted or destroyed data and information from Happy Bank's computers and networks; (3) tortiously interfered with Happy Bank's existing contracts by soliciting Happy Bank customers to move their business to American State Bank; and (4) ultimately exploited all of these misdeeds to procure a job with a competitor, American State Bank.  Mr. Murry's unlawful actions also constitute breaches of his fiduciary duties to Happy Bank, breach of contract, joint tortfeasor liability, conversion, unfair competition, and unsafe and unsound banking practices.

---

[42] Mr. Murry completed his most-recent training on Happy Bank's cybersecurity and internet security policies on February 25, 2022, and his most-recent training on Happy Bank's Code of Ethics and information security policies on October 25, 2021.

**B.     January to April 2022 – Purging Emails, Stealing Confidential Information, and Soliciting Customers.**

270.    On January 12, 2022, Mr. Murry manually and permanently deleted emails from his Happy Bank Outlook account—following the same timeframe and pattern as Messrs. Holmes, House, Glenn, McCutcheon, Weaver, and Hutson.  Based on his role, Happy Bank's policies and procedures, and his experience in the banking industry, Mr. Murry knew that information related to customers and loans were required to be retained and archived.  By permanently deleting emails from his Happy Bank email account that contained information not otherwise stored in Happy Bank's systems or archives, Mr. Murry ensured that Happy Bank could not find such information and put the Company at risk of violating the strict retention regulations imposed by banking regulators.  Mr. Murry's deletions not only constituted unsafe and unsound banking practices that created an abnormally high risk of financial loss or damage to Happy Bank but also created false entries in banking records—which Mr. Murry did with the intent to injure or defraud Happy Bank.

271.    In early February 2022, Mr. Murry accessed a Google Drive account around the same time that he accessed a document titled "Happy State Additional Funds Application" and customer-related documents containing Confidential Information.  Upon information and belief, Mr. Murry stole Happy Bank's Confidential Information using the Google Drive account.

272.    Throughout March 2022, Mr. Murry accessed numerous client-related documents for which he had no legitimate business reason to view or access.  On March 30, Mr. Murry created a new folder on his computer desktop (titled "New Folder") around the same time he accessed a zip file titled "Supporting Documents," which contained Confidential Information related to then-Happy Bank customers.  Upon information and belief, at least some of those customers now have loans with American State Bank.

273.     On April 8, 2022, Mr. Murry accessed additional client-related documents containing Confidential Information for which he had no legitimate business reason to view or access and—around the same time—accessed Google Drive from his work computer following the same pattern as many of the other Defendants.  Upon information and belief, this customer now has loans with American State Bank, and Mr. Murry stole Happy Bank's Confidential Information using Google Drive.

274.     Mr. Murry resigned on April 26, 2022.  He currently works as a commercial lender at American State Bank.  Upon information and belief, Mr. Murry began working for American State Bank on April 27, 2022—one business day after he resigned from Happy Bank.

## Isac Ovalle
### *Co-Conspirator*

A.     **Background and Summary of Forensic Analysis.**

275.     Mr. Ovalle is a former Credit Analyst at Happy Bank.  During his employment with the Company, Mr. Ovalle officed out of Happy Bank branch located on 98th Street in Lubbock, Texas—the same branch where Mr. Holmes had his office—and he reported directly to Mr. Holmes.

276.     Happy Bank's Credit Analysts are responsible for analyzing credit data to determine the degrees of risk involved in extending credit or lending money to individual and entity customers.   Mr. Ovalle's duties included preparing financial statements, in-house spreadsheets designed to quantify a customer's debt service abilities, and narrative analyses of findings and recommendations for Happy Bank's lenders.  As a Credit Analyst, Mr. Ovalle owed numerous fiduciary duties to Happy Bank.

277.    During his employment with Happy Bank, Mr. Ovalle acknowledged and agreed to be bound by all of the provisions in the Handbook and Ethics Policy, and he also received annual training on the other Company policies and procedures described above.[43]

278.    Mr. Ovalle had no express or implied authorization or consent to copy, transfer, delete, and/or take any of Happy Bank's Confidential Information from Happy Bank's computers, systems, or premises.  Based on his role and the policies, procedures, and provisions he agreed to, Mr. Ovalle knew that Happy Bank's Confidential Information was owned solely by the Company and would be highly useful to Happy Bank's competitors, as it would enable them to unlawfully compete with the Company and effectively target and recruit Happy Bank's current and future customers and employees.

279.    Based on forensic data summarized below, there is significant evidence that Mr. Ovalle willingly joined Mr. Holmes' conspiracy and: (1) unlawfully obtained, removed, used, and/or disclosed Happy Bank's Confidential Information; (2) deleted or destroyed data and information from Happy Bank's computers and networks; (3) tortiously interfered with Happy Bank's existing contracts by soliciting Happy Bank customers to move their business to American State Bank; and (4) ultimately exploited all of these misdeeds to procure a job with a competitor, American State Bank.  Mr. Ovalle's unlawful actions also constitute breaches of his fiduciary duties to Happy Bank, breach of contract, joint tortfeasor liability, conversion, unfair competition, and unsafe and unsound banking practices.

---

[43] Mr. Ovalle completed his most-recent training on Happy Bank's cybersecurity and internet security policies on February 27, 2022, his most-recent training on Happy Bank's Code of Ethics on December 10, 2021, and his most-recent training on Happy Bank's information security policies on October 21, 2021.

**B.** <u>**March and April 2022**</u> **– Stealing Confidential Information, Deleting Files, and Soliciting Customers.**

280.    In early March 2022, Mr. Ovalle accessed numerous documents containing Confidential Information and related to the same then-Happy Bank customer who later admitted to moving more than $8 million in loans to American State Bank and is listed as the grantor in numerous deeds of trust that reflect American State Bank as the grantee. Upon information and belief, Mr. Ovalle participated in soliciting this customer to move its business to American State Bank.

281.    Three days later, Mr. Ovalle accessed and then manually and permanently deleted an Excel file titled "Active Deals" that related to that same customer. Based on his role, Happy Bank's policies and procedures, and his experience in the banking industry, Mr. Ovalle knew that information related to customers and loans were required to be retained and archived. By permanently deleting files from his computer, Mr. Murry ensured that Happy Bank could not find such information and put the Company at risk of violating the strict retention regulations imposed by banking regulators. Mr. Ovalle's deletions not only constituted unsafe and unsound banking practices that created an abnormally high risk of financial loss or damage to Happy Bank but also created false entries in banking records—which Mr. Ovalle did with the intent to injure or defraud Happy Bank.

282.    In mid-April 2022—less than two weeks before his resignation—Mr. Ovalle logged into a personal Google account. Upon information and belief, Mr. Ovalle used his personal Google account to steal Happy Bank's Confidential Information.

283.    Mr. Ovalle resigned on April 25, 2022. He currently works as a credit analyst at American State Bank. Upon information and belief, Mr. Ovalle began working for American State Bank on April 26, 2022—one business day after he resigned from Happy Bank.

<u>PLAINTIFF'S ORIGINAL COMPLAINT</u>                                                                            Page 79

# Greg Houlette
## *Co-Conspirator*

**A.    Background and Summary of Forensic Analysis.**

284.    Mr. Houlette is a former officer and Senior Vice President, Special Projects, at Happy Bank who worked remotely.

285.    Happy Bank's employees in Special Projects are responsible for development of large corporate, public fund, Insured Cash Sweep and Certificate of Deposit Registry Service deposit relationships.  Mr. Houlette worked primarily with public funds where he managed deposit relationships with government and public funds in Texas.  As an officer and Senior Vice President, Mr. Houlette owed numerous fiduciary duties to Happy Bank.

286.    During his employment with Happy Bank, Mr. Houlette signed at least three Awards and agreed to be bound by the provisions of the Awards and the Plan, which was incorporated in full into the Awards.    Mr. Houlette also acknowledged and agreed to be bound by all of the provisions in the Handbook and Ethics Policy, and he received annual training on the other Company policies and procedures described above.[44]

287.    Mr. Houlette had no express or implied authorization or consent to copy, transfer, delete, and/or take any of Happy Bank's Confidential Information from Happy Bank's computers, systems, or premises.  Based on his role with Happy Bank and the policies, procedures, and obligations he agreed to follow, Mr. Houlette knew that Happy Bank's Confidential Information was owned solely by the Company and would be highly useful to Happy Bank's competitors, as it would enable them to unlawfully compete with the Company and effectively target and recruit Happy Bank's current and future customers and employees.

---

[44] Mr. Houlette completed his most-recent training on Happy Bank's cybersecurity and internet security policies on February 1, 2022, his most-recent training on Happy Bank's Code of Ethics on February 1, 2021, and his most-recent training on Happy Bank's information security policies on October 1, 2021.

288.    Based on forensic data summarized below, there is significant evidence that Mr. Houlette willingly joined Mr. Holmes' conspiracy and: (1) unlawfully obtained, removed, used, and/or disclosed Happy Bank's Confidential Information; (2) deleted or destroyed data and information from Happy Bank's computers and networks; and (3) ultimately exploited all of these misdeeds to procure a job with a competitor, American State Bank.  Mr. Houlette's unlawful actions also constitute breaches of his fiduciary duties to Happy Bank, breach of contract, joint tortfeasor liability, conversion, unfair competition, and unsafe and unsound banking practices.

**B.    March and April 2022 – Purging Emails and Stealing Confidential Information.**

289.    In mid-March 2022, Mr. Houlette manually and permanently deleted numerous emails and folders from his Happy Bank Outlook account.  Based on his role, Happy Bank's policies and procedures, and his experience in the banking industry, Mr. Houlette knew that information related to customers and loans were required to be retained and archived.  By permanently deleting emails from his Happy Bank email account that contained information not otherwise stored in Happy Bank's systems or archives, Mr. Houlette ensured that Happy Bank could not find such information and put the Company at risk of violating the strict retention regulations imposed by banking regulators.  Mr. Houlette's deletions not only constituted unsafe and unsound banking practices that created an abnormally high risk of financial loss or damage to Happy Bank but also created false entries in banking records—which Mr. Houlette did with the intent to injure or defraud Happy Bank.

290.    Throughout April 2022, Mr. Houlette accessed numerous documents and folders related to Happy Bank's public funds customers dating back to 2015 and created several spreadsheets summarizing bid results and bids lost—all of which contained Happy Bank's Confidential Information.  Mr. Houlette had no legitimate business reason to access or view these

documents and folders at the time he compiled this information into the spreadsheets he created. During this time, Mr. Houlette also logged into his personal Gmail account on multiple occasions.

291.    In addition, just after midnight on April 25, 2022, Mr. Houlette created a spreadsheet titled "Public Funds 12-31-2021" that contained a detailed list of more than 150 Happy Bank's public funds customers of December 31, 2021, including: (1) the amount of funds each customer held at Happy Bank; (2) the total amount of funds attributable to each customer; (3) the contract expiration date for each customer; and (4) the number of and amount of deposits attributable to each customer.  Mr. Houlette continued to modify this spreadsheet throughout the day—the same day as the first wave of mass resignations from Happy Bank.

292.    On April 28, 2022, Mr. Houlette accessed a personal Outlook email account and a personal OneDrive account from his work computer.  Upon information and belief, Mr. Houlette stole the spreadsheets, documents, and information referenced herein using his personal email accounts and/or OneDrive account.

## C.    May and June 2022 – Purging Emails, Deleting Files, Stealing More Confidential Information, and Dreaming about American State Bank.

293.    On May 3, 2022, Mr. Houlette manually and permanently deleted Excel files and emails from his Happy Bank Outlook account ensuring they were purged from Happy Bank's computers and systems, all of which reflected additional violations of the strict retention regulations imposed on financial institutions like Happy Bank.  Throughout mid-May 2022, Mr. Houlette continued to access and download numerous documents related to Happy Bank's public funds customers, including documents dating back to 2017—all of which contained Happy Bank's Confidential Information, and none of which Mr. Houlette had any legitimate business reason to access or view at this time.

294.    On May 15, 2022, Mr. Houlette created an Excel file titled "2022-05-09 Public Funds Report" in which he compiled detailed information about Happy Bank's public funds customers, average deposits, and other Confidential Information.

295.    On June 1, 2022, Mr. Houlette performed a Google search for "american state bank arp tx" and searched for "American State Bank" in Google Maps.  Two days later, Mr. Houlette created several contact lists on his work computer, which contained the names, titles, and contact information for the "contact person" related to numerous public funds serviced by Happy Bank.  Mr. Houlette manually deleted at least one of those contacts lists the same day.  Mr. Houlette also accessed a document titled "Attachment A," which is a template prepared by Happy Bank for new public fund deals and contains Confidential Information regarding Happy Bank's historical interest rates for different types of accounts.  There was no legitimate business reason for Mr. Houlette to access this template on this date.  The information in Attachment A contains all the questions and information one would need to obtain public funds customers and deals, which provided Mr. Houlette and American State Bank a head start in providing financial services for public funds in competition with Happy Bank—but only by exploiting Happy Bank's Confidential Information.

296.    On June 8, 2022, Mr. Houlette edited and saved a new version of the Excel file "2022-05-09 Public Funds Report."  Around the same time, Mr. Houlette also accessed Microsoft OneDrive, Microsoft Teams,[45] and Cisco Jabber[46] from his work computer—all of which, upon information and belief, Mr. Houlette used to steal Happy Bank's Confidential Information.

297.    Mr. Houlette was terminated on June 10, 2022.  He currently works as a Senior Vice President, Public Funds and Development, at American State Bank.

---

[45] Microsoft Teams is a virtual conference platform similar to Zoom that allows users to share screens and files.
[46] Cisco Jabber is a communication platform that allows users to instant message and share files and desktops, and conference over voice or video calls.

## Diana Richarte
### *Co-Conspirator*

**A.**  **Background and Summary of Forensic Analysis.**

298.    Ms. Richarte is a former Commercial Lending Assistant at Happy Bank.  During her nine-year employment with the Company, Ms. Richarte officed out of a Happy Bank branch located on 66th Street in Lubbock, Texas—and she reported directly to Mr. Holmes.

299.    Happy Bank's Commercial Lending Assistants are responsible for suggesting possible services, answering loan related questions, and assisting Loan Officers by pre-qualifying and screening loan customers.  Ms. Richarte was also responsible for facilitating loan applications, coordinating loan closing, and assisting lenders with processing and collection of overdrafts and past-due loans.  As a Commercial Lending Assistant, Ms. Richarte owed numerous fiduciary duties to Happy Bank.

300.    Ms. Richarte acknowledged and agreed to be bound by all of the provisions in the Handbook and Ethics Policy, and she also received annual training on the other Company policies and procedures described above.[47]

301.    Ms. Richarte had no express or implied authorization or consent to copy, transfer, delete, and/or take any of Happy Bank's Confidential Information from Happy Bank's computers, systems, or premises.  Based on her role and the policies, procedures, and provisions she agreed to, Ms. Richarte knew that Happy Bank's Confidential Information was owned solely by the Company and would be highly useful to Happy Bank's competitors, as it would enable them to unlawfully compete with the Company and effectively target and recruit Happy Bank's current and future customers and employees.

---

[47] Ms. Richarte completed her most-recent training on Happy Bank's cybersecurity and internet security policies on February 1, 2022, her most-recent training on Happy Bank's information security policies on October 4, 2021, and her most-recent training on Happy Bank's Code of Ethics on June 9, 2021.

302.    Based on forensic data summarized below, there is significant evidence that Ms. Richarte willingly joined Mr. Holmes' conspiracy and: (1) unlawfully obtained, removed, used, and/or disclosed Happy Bank's Confidential Information; (2) deleted or destroyed data and information from Happy Bank's computers and networks; and (3) ultimately exploited all of these misdeeds to procure a job with a competitor, American State Bank.  Ms. Richarte's unlawful actions also constitute breaches of her fiduciary duties to Happy Bank, breach of contract, joint tortfeasor liability, conversion, unfair competition, and unsafe and unsound banking practices.

**B.    <u>January and February 2022</u> – Purging Emails.**

303.    Beginning in mid-January 2022, Ms. Richarte manually and permanently deleted emails from her Happy Bank Outlook account, including 80 separate instances of permanent deletions from January 12 to 13, 2022.   Ms. Richarte also manually and permanently deleted numerous folders from her Happy Bank Outlook account, including two folders titled "2020" and "2021."  According to the forensic data, there is no record of Ms. Richarte manually deleting any emails or folders from her Happy Bank Outlook account before mid-January 2022.

304.    Ms. Richarte's email purges follow the same timeframe and pattern as Messrs. Holmes, House, Glenn, McCutcheon, Weaver, Hutson, and Murry.  Based on her role, Happy Bank's policies and procedures, and her experience in the banking industry, Ms. Richarte knew that information related to customers and loans were required to be retained and archived.  By permanently deleting emails from her Happy Bank email account that contained information not otherwise stored in Happy Bank's systems or archives, Ms. Richarte ensured that Happy Bank could not find such information and put the Company at risk of violating the strict retention regulations imposed by banking regulators.  Ms. Richarte's deletions not only constituted unsafe and unsound banking practices that created an abnormally high risk of financial loss or damage to

Happy Bank but also created false entries in banking records—which Ms. Richarte did with the intent to injure or defraud Happy Bank.

## C.    <u>March and April 2022</u> – **Stealing Confidential Information and Soliciting Customers.**

305.    On March 9, 2022, Ms. Richarte accessed a Google Drive account around the same time she accessed documents related to then-Happy Bank customers.  Upon information and belief, at least some of these customers now have loans with American State Bank.

306.    On April 1, 2022, Ms. Richarte downloaded two zip files from Happy Bank's systems titled "C and I Form Loan Docs" and "CRE Form Loan Docs" and saved the same to her computer's desktop.  These zip files contained proprietary legal documents owned by Happy Bank and created by Happy Bank's in-house counsel to prepare, close, and service a loan—as well as numerous other loan-related documents.

307.    In the week before her resignation, Ms. Richarte accessed a personal Microsoft email account and Gmail account from her work computer—the latter of which she had synced to her work computer.

308.    Upon information and belief, Ms. Richarte used one or both of her personal email accounts and/or a Google Drive to steal Happy Bank's Confidential Information, including but not limited to the documents and zip drives referenced herein.

309.    Ms. Richarte resigned on April 25, 2022.  She currently works as a commercial lending assistant at American State Bank.  Upon information and belief, Ms. Richarte began working for American State Bank on April 26, 2022—one business day after her resignation from Happy Bank.

## James Sikes
### *Co-Conspirator*

**A.    Background and Summary of Forensic Analysis.**

310.    Mr. Sikes is a former officer, Vice President, and Commercial Lender of Happy Bank.  During his nearly six-year employment with the Company, Mr. Sikes officed out of a Happy Bank branch located on 66th Street in Lubbock, Texas—and he reported directly to Mr. Holmes.

311.    Happy Bank's Commercial Lenders are responsible for analyzing loan applications, making loans, generating interest income, monitoring and servicing existing loan customers, making credit decisions, collecting on loans, and marketing the Company's services and products. As an officer and Vice President, Mr. Sikes owed numerous fiduciary duties to Happy Bank.

312.    During his employment with Happy Bank, Mr. Sikes signed at least one Award and agreed to be bound by the provisions of the Award and the Plan, which was incorporated in full into the Award.  Mr. Sikes also acknowledged and agreed to be bound by all of the provisions in the Handbook and Ethics Policy, and he received annual training on the other Company policies and procedures described above.[48]

313.    Mr. Sikes had no express or implied consent or authorization to copy, transfer, delete, and/or take any of Happy Bank's Confidential Information from Happy Bank's computers, systems, or premises.  Based on his role and the policies, procedures, and provisions he agreed to, Mr. Sikes knew that Happy Bank's Confidential Information was owned solely by the Company and would be highly useful to Happy Bank's competitors, as it would enable them to unlawfully compete with the Company and effectively target and recruit Happy Bank's current and future customers and employees.

---

[48] Mr. Sikes completed his most-recent training on Happy Bank's cybersecurity and internet security policies on February 24, 2022, his most-recent training on Happy Bank's Code of Ethics on December 24, 2021, and his most-recent training on Happy Bank's information security policies on October 29, 2021.

314.    Based on forensic data summarized below, there is significant evidence that Mr. Sikes willingly joined Mr. Holmes' conspiracy and: (1) unlawfully obtained, removed, used, and/or disclosed Happy Bank's Confidential Information; (2) deleted or destroyed data and information from Happy Bank's computers and networks; and (3) ultimately exploited these misdeeds to procure a job with a competitor, American State Bank.  Mr. Sikes' unlawful actions also constitute breaches of his fiduciary duties to Happy Bank, breach of contract, joint tortfeasor liability, conversion, unfair competition, and unsafe and unsound banking practices.

**B.    <u>January 2022</u> – Purging Emails.**

315.    Just after the new year, Mr. Sikes manually and permanently deleted emails from his Happy Bank Outlook account—just like Messrs. Holmes, House, Glenn, McCutcheon, Weaver, Hutson, Murry, and Dollahite.  Mr. Sikes manually and permanently deleted even more emails from his Happy Bank Outlook account in mid-January 2022.

316.    Based on his role, Happy Bank's policies and procedures, and his experience in the banking industry, Mr. Sikes knew that information related to customers and loans were required to be retained and archived.  By permanently deleting emails from his Happy Bank email account that contained information not otherwise stored in Happy Bank's systems or archives, Mr. Sikes ensured that Happy Bank could not find such information and put the Company at risk of violating the strict retention regulations imposed by banking regulators.  Mr. Sikes' deletions not only constituted unsafe and unsound banking practices that created an abnormally high risk of financial loss or damage to Happy Bank but also created false entries in banking records—which Mr. Sikes did with the intent to injure or defraud Happy Bank.

**C.    <u>April 2022</u> – Stealing Confidential Information and Soliciting Customers.**

317.    In early April 2022, Mr. Sikes followed the same roadmap designed by Messrs. Holmes and House.  He accessed a personal Yahoo and Google account around the same time he

accessed and downloaded numerous daily and loan committee reports from Happy Bank's computers and systems. These documents contain some of Happy Bank's most valuable Confidential Information, including details about Happy Bank's loans, customer names, account numbers, and current balances. Upon information and belief, Mr. Sikes stole this information using one or more of his personal email accounts and used such information to solicit then-Happy Bank customers to move their business to American State Bank.

318.   In mid-April 2022, Mr. Sikes also connected an iPhone to his Happy Bank computer—the only instance reflected in the forensic data for the year 2022—around the time he interacted with documents related to then-Happy Bank customers. Upon information and belief, at least some of these customers now have loans with American State Bank, and Mr. Sikes stole Happy Bank's Confidential Information using the iPhone he connected to his Happy Bank computer.

319.   Mr. Sikes resigned from Happy Bank on April 25, 2022. He currently works as a commercial lender at American State Bank. Upon information and belief, Mr. Sikes began working for American State Bank on April 26, 2022—one business day after his resignation from Happy Bank

## CAUSES OF ACTION

### First Cause of Action: Violation of Federal Defend Trade Secrets Act
### (18 U.S.C. § 1836)
### Against all Defendants

320.   Happy Bank repeats, re-alleges, and incorporates by reference the foregoing paragraphs as if set forth fully herein.

321.   The Federal Defend Trade Secrets Act allows "[a]n owner of a trade secret that is misappropriated" to "bring a civil action . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1).

322.    Under the Defend Trade Secrets Act, a "trade secret" includes "all forms and types of *financial*, *business*, scientific, technical, *economic*, or engineering information" that "(A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."  18 U.S.C. § 1839(3) (emphasis added).

323.    The Defend Trade Secrets Act defines "misappropriation" expansively, with three broad categories of conduct falling within the statutory definition:

> [T]he term "misappropriation" means—
> (A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
> (B) disclosure or use of a trade secret of another without express or implied consent by a person who—
>> (i) used improper means to acquire knowledge of the trade secret;
>> (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—
>>> (I) derived from or through a person who had used improper means to acquire the trade secret;
>>> (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or
>>> (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or
>> (iii) before a material change of the position of the person, knew or had reason to know that—
>>> (I) the trade secret was a trade secret; and
>>> (II) knowledge of the trade secret had been acquired by accident or mistake[.]

18 U.S.C. § 1839(5).

324.    Happy Bank owns various trade secrets within the meaning of the Defend Trade Secrets Act, 18 U.S.C. § 1839(3), that are critical to the success of its business and related to

financial products and services intended for use in and used in interstate commerce.  These trade secrets include non-public financial, business, and economic information about Happy Bank's: (1) historical loan volumes, funding percentages, and fee incomes; (2) financial condition and performance overall and by branch, and year-by-year comparison of the same; (3) current loans, including data concerning customer names, account numbers, balances, interest rates, maturity dates, and/or contract expiration dates; (4) budgets, loan balance trends, and loan and revenue projections; (5) loan and deposit trends and forecasts, including funding percentages, fee incomes, and growth percentages related to the same; (6) employees' base salaries, incentive compensation, and recommended compensation increases; (7) customers, including their risk ratings, credit scores, financial performance and projections, collateral, guarantors, contact information, and analyses and reports related to all of the same; and (8) templates, forms, legal documents, and analyses necessary to analyze, underwrite, close, and service loans and deposits by customers— all of which have been developed over time using Happy Bank resources.

325.    Happy Bank's trade secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of such information.  Happy Bank's trade secrets give it a competitive advantage over other banks and financial institutions that do not have access to those trade secrets, including but not limited to its commercial advantage in pricing, closing, and servicing complex and higher-risk loans.  Happy Bank's trade secrets are valuable and critical to its business functions and competitive position as a financial institution.

326.    Happy Bank has made and continues to make reasonable efforts to maintain the secrecy of its trade secrets, such as requiring employees like Defendants to sign contracts with confidentiality and nondisclosure provisions, training them on their confidentiality and

nondisclosure obligations, and/or imposing confidentiality and nondisclosure obligations as part of its policies and procedures. Happy Bank also has taken reasonable efforts to maintain the secrecy of its trade secrets by: (1) maintaining those trade secrets on secure computers and networks with limited access; (2) prohibiting employees from using external communication and messaging services; (3) prohibiting employees from storing any bank data, including trade secrets, on non-bank-provided mobile devices, such as USB devices and external hard drives; (4) requiring employees to routinely review and verify compliance with Company policies and procedures related to its trade secrets; (5) auditing compliance by its employees; (6) otherwise restricting employees' use of any trade secrets in any unsecure or unencrypted way; and (7) maintaining written policies and procedures containing confidentiality, access, and security restrictions.

327. Happy Bank's trade secrets also provide it substantial economic value that is impaired by their disclosure outside of Happy Bank, such as the dissemination of information related to Happy Bank's internal finances, business analyses, financial templates, employees, customers, and loan details.

328. Defendants used, received, had access to, and had knowledge of Happy Bank's trade secrets while employed at Happy Bank and under circumstances giving rise to a duty to maintain the secrecy of such trade secrets. Defendants also knew from their training and employment practices that Happy Bank considered its trade secrets to be confidential, and they knew—and previously acknowledged in writing—that they had a duty to preserve Happy Bank's trade secrets and protect the same from dissemination or use outside of Happy Bank.

329. Defendants misappropriated Happy Bank's trade secrets under the Defend Trade Secrets Act. Among other things, Defendants misappropriated Happy Bank's trade secrets by: (1) copying Happy Bank's trade secrets to USB devices or an iPhone (applicable to at least

Defendants Holmes, House, McCutcheon, Hutson, and Phillips); (2) disseminating and disclosing Happy Bank's trade secrets using external email accounts, such as Gmail, Yahoo, and/or personal Outlook accounts (applicable to at least Defendants Terrell, West, Dollahite, Ovalle, Houlette, Richarte, and Sikes); (3) disseminating and disclosing Happy Bank's trade secrets using external third-party cloud transfer programs, such as Google Drive, Dropbox, Skype, Zoho, Microsoft Teams, Cisco Jabber, Treev, A3Cloud Solutions, and/or personal OneDrive accounts (applicable to at least Defendants House, Baisley, Glenn, Terrell, Weaver, Hutson, Murry, and Houlette); and/or (4) printing/copying and physically taking Happy Bank's trade secrets from its premises (applicable to at least Defendants Holmes, House, McCutcheon, Jackson, and Terrell).

330.    None of the Defendants had any express or implied authorization or consent to copy, disclose, disseminate, and/or physically take Happy Bank's trade secrets.  Defendants all knew or had reason to know that they had acquired Happy Bank's trade secrets under circumstances giving rise to a duty to maintain the secrecy and limit the use of those trade secrets. Yet, upon information and belief, Defendants have used and disclosed—and continue to use and disclose—Happy Bank's trade secrets as part of their employment with, and for the benefit of, a competitor of the Company—American State Bank.

331.    As a direct and proximate result of Defendants' conduct, Happy Bank suffered and continues to suffer substantial harm, including: (i) the loss of business and customers; (ii) the loss of employees; (iii) the costs and fees to analyze and determine compliance with regulations and action needed; (iv) costs to replace employees and missing and/or altered data and records; and (v) loss of reputation and goodwill.  Accordingly, Happy Bank is entitled to an award of actual damages and damages for the unjust enrichment that Defendants obtained as a result of their conduct—including disgorgement of all compensation or other value that Defendants have

received, in any form, as a result of their unfair competition in misappropriating trade secrets—of more than $75,000 and an amount to be proved at trial. 18 U.S.C. § 1836(b)(3)(B).

332.    Happy Bank is also entitled to exemplary damages and attorneys' fees because Defendants misappropriated Happy Bank's trade secrets willfully and maliciously. 18 U.S.C. §§ 1836(b)(3)(C)-(D). Defendants knew that they owed numerous duties to Happy Bank, including confidentiality and nondisclosure obligations and to preserve Happy Bank's trade secrets—both as a matter of contract and given their positions of trust within Happy Bank. Defendants nonetheless misappropriated various documents and files containing Happy Bank's trade secrets without express or implied authorization or consent and did so using covert and secretive methods to avoid detection, including secretly copying those trade secrets via USB devices, personal email accounts, and un-approved third-party Internet applications. Defendants' course of conduct demonstrates a premeditated and coordinated decision to steal Happy Bank's trade secrets in conscious disregard of Happy Bank's rights, with the deliberate intent to harm Happy Bank by using that information as part of their employment at American State Bank.

333.    Finally, Happy Bank seeks injunctive relief to enjoin Defendants' continued and/or future use and misappropriation of Happy Bank's trade secrets, and for the return of the same.

### Second Cause of Action: Violation of Computer Fraud and Abuse Act
**(18 U.S.C. § 1030)**
**Against all Defendants**

334.    Happy Bank repeats, re-alleges, and incorporates by reference the foregoing paragraphs as if set forth fully herein.

335.    The Computer Fraud and Abuse Act ("**CFAA**"), 18 U.S.C. § 1030, provides that "[a]ny person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other

equitable relief." 18 U.S.C. § 1030(g). "Damage" is defined by the CFAA to mean "any impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8).

336. First, a person violates the CFAA by knowingly causing the transmission of a program, information, code, or command, and, as a result of such conduct, intentionally causes damages without authorization to a protected computer. 18 U.S.C. § 1030(a)(5)(A).

337. Second, a person violates the CFAA by causing damage to or obtaining certain information from a protected computer either: (i) without authorization to access the protected computer; or (ii) with authorization to access the protected computer but then exceeding that authorized access. *See, e.g.*, 18 U.S.C. §§ 1030(a)(2), (a)(4), (a)(5)(B)-(C).

338. Happy Bank's computers and computer systems are "protected computers" as that term is defined in 18 U.S.C. § 1030(e)(2)(B) because they connect to the Internet and are used in interstate commerce and communication in the course of Happy Bank's business. Happy Bank's computers and computer systems are also "protected computers" as that term is defined in Section 1030(e)(2)(A) because they are exclusively for the use of a financial institution and Defendants' actions affected that use.

339. Defendants all acknowledged that under the terms of their employment—including the Ethics Policy, Handbook, and other policies and procedures—all work product, computers, software, and files downloaded were the property of Happy Bank. Defendants were also aware of banking regulations that required certain information related to customers and/or customer loans to be preserved and retained for several years. Finally, with respect to permitted use of Company network data and files, the Acceptable Use Policy specifically forbid employees from engaging in

illegal conduct, causing harm to Happy Bank, and accessing data and files that were not directly related to proper job functions.

340.    As shown herein, Defendants knowingly and intentionally impaired the integrity and availability of data, programs, systems, and/or information from Happy Bank's protected computers by manually and permanently deleting emails and/or loan files, records, and supporting documents.  As a result, Happy Bank has incurred actual financial losses to try and recover and/or recreate such information.

341.    As shown herein, Defendants also knowingly and intentionally copied and stole Happy Bank's Confidential Information, trade secrets, and/or financial records of a financial institution without Happy Bank's authorization or by exceeding Happy Bank's authorization.  As a result, Happy Bank has suffered damage to the integrity or availability of its data, programs, systems, and information.

342.    The impairment to the integrity and availability of Happy Bank's data, programs, systems, and information as a result of Defendants' conduct has caused Happy Bank to suffer damages of more than $75,000 and an amount to be proved at trial.  Happy Bank's actual damages also include costs incurred to respond to and analyze Defendants' actions—including its aforementioned forensic analysis and the value of employee time to investigate Defendants' actions related to Happy Bank's protected computers—which exceed $5,000 in any one-year period.

343.    Happy Bank has suffered further injury and harm in the loss of its Confidential Information and trade secrets, which were misappropriated by Defendants.  As Happy Bank's data recovery efforts remain ongoing, it is currently unable to state the full extent of the misappropriation and resulting damages and harm.

344.    In addition to the aforementioned damages, Happy Bank also seeks injunctive relief to enjoin Defendants' continued and/or future use and misappropriation of Happy Bank's Confidential Information and trade secrets, and for the return of the same.

**Third Cause of Action: Breach of Fiduciary Duty**
**Against all Defendants**

345.    Happy Bank repeats, re-alleges, and incorporates by reference the foregoing paragraphs as if set forth fully herein.

346.    Defendants had a fiduciary relationship with Happy Bank by virtue of their employment-related contracts and/or their roles as officers and/or employees of a financial institution.

347.    During their employment, employees owe a fiduciary duty to their employer and are obligated to act in their employers' interests.  These fiduciary duties include: (1) the duty of loyalty and utmost good faith; (2) the duty of candor; (3) the duty to refrain from self-dealing; (4) the duty to act with integrity of the strictest kind; (5) the duty of fair, honest dealing; and (6) the duty of full disclosure.  Employees are obligated not to: (1) solicit their employer's customers while still working for the employer; (2) solicit the departure of other employees while still working for their employer; (3) carry away confidential information; or (4) appropriate their employer's trade secrets during or after termination of the employment relationship irrespective of whether the employee is bound by a confidentiality agreement.

348.    Officers of depository institutions, like Happy Bank, have an even stricter fiduciary duty to act in a financial institution's best interests because those officers are charged with looking after other people's money.  All Defendants except Mr. Ovalle and Ms. Richarte were Happy Bank officers during their employment with the Company.

349.    Defendants breached their fiduciary duties to Happy Bank through their covert and coordinated actions to steal Happy Bank's trade secrets and Confidential Information, usurp corporate opportunities that rightfully belonged to Happy Bank, solicit Happy Bank's customers and employees while still working for Happy Bank, delete Happy Bank's Confidential Information and records, and cause false entries to be made in Happy Bank's records with the intent to injure and defraud Happy Bank.  Defendants' conduct reveals a gross lack of integrity and candor, and such conduct is a quintessential example of unsafe and unsound banking practices.

350.    Indeed, it is not consistent with generally accepted standards of prudent operations for bank officers and/or employees to misuse the bank's information and conspire to purposefully hamper the bank's competitive position.  Here, Defendants' actions created an abnormally high risk that Happy Bank would lose business—and associated income and revenue (*e.g.*, interest on loans)—to American State Bank, a competitor, at a pace and in a manner that would not occur under ordinary circumstances.  And the evidence demonstrates that Happy Bank did in fact lose customers and associated income due to Defendants' actions.

351.    Furthermore, the timing and number of Happy Bank employees who chose to follow Mr. Holmes to American State Bank can only be explained by Mr. Holmes—a supervisor, officer, and Regional President—acting as a "corporate pied piper" to lure Happy Bank's personnel away before resigning from the Company.  Mr. Holmes' unlawful solicitation represents yet another egregious breach of fiduciary duty to Happy Bank.

352.    As a direct and proximate result of Defendants' conduct, Happy Bank suffered substantial harm, including: (1) the loss of business and customers; (2) the loss of employees; (3) the costs and fees to analyze and determine compliance with regulations and action needed; (4) costs to replace employees and missing and/or altered data and records; and (5) loss of reputation

and goodwill. Accordingly, Happy Bank is entitled to an award of actual damages and damages for the unjust enrichment that Defendants obtained as a result of their conduct—including disgorgement of all compensation or other value that Defendants have received, in any form, as a result of their unfair competition in misappropriating trade secrets and other Confidential Information—of more than $75,000 and an amount to be proved at trial.

353.    Happy Bank is also entitled to exemplary damages as a result of Defendants' fraudulent and malicious conduct. Defendants concealed their self-dealing conduct and trade-secret misappropriation from Happy Bank even though they had to the duty to disclose their conduct to Happy Bank and to maintain the confidentiality of Happy Bank's trade secrets and Confidential Information. Defendants acted maliciously because the type of trade secrets and Confidential Information misappropriated by them evince a specific intent to harm Happy Bank and benefit themselves and/or a direct competitor of Happy Bank. At minimum, Defendants acted with gross negligence and conscious indifference because: (1) an objective person in Defendants' position would have perceived an extreme degree of risk to Happy Bank from the disclosure of the trade-secret and confidential information removed from Happy Bank and then disclosed by Defendants; and (2) Defendants actually knew of that risk by virtue of their employment contracts with confidentiality and nondisclosure provisions, their training, internal Happy Bank policies procedures, and/or their industry experience.

354.    The exemplary damages to which Happy Bank is entitled are not limited by the cap on such damages imposed by Texas law because Defendants' conduct, as described herein, also constitutes felony "Theft of Trade Secrets" under Texas Penal Code § 31.05 and "Misapplication of Fiduciary Property or Property of [a] Financial Institution" under Texas Penal Code § 32.45. *See* TEX. CIV. PRAC. & REM. CODE §§ 41.008(c)(10), 41.008(c)(13).

**Fourth Cause of Action: Breach of Contract**
**Against Defendants Holmes, House, Glenn, McCutcheon,**
**Jackson, Sikes, West, Weaver, Dollahite, Hutson, Houlette, and Baisley**

355.    Happy Bank repeats, re-alleges, and incorporates by reference the foregoing paragraphs as if set forth fully herein.

356.    Happy Bank has valid, enforceable contracts (the "**Award Contracts**") with Defendants Holmes, House, Glenn, McCutcheon, Jackson, Sikes, West, Weaver, Dollahite, Hutson, and Houlette—namely, the Awards and the Plan.

357.    Happy Bank also has an additional valid, enforceable contract with Defendant Holmes—namely, the **Confidentiality Agreement**.

358.    Happy Bank also has additional valid, enforceable contracts with Defendant Glenn—namely, Executive Nonstatutory Option, Restricted Stock Award Agreement, and Retention Bonus Agreement (the "**Glenn Contracts**").

359.    Finally, Happy Bank has a valid, enforceable contract with Ms. Baisley—namely, the **Bonus Agreement**.

360.    Happy Bank performed, tendered performance, or was excused from performing its contractual obligations under the Awards Contracts, the Confidentiality Agreement, the Glenn Contracts, and the Bonus Agreement.

361.    Among other things, the Awards Contracts, Confidentiality Agreement, and Glenn Contracts contain nondisclosure provisions that prohibit the former employees from, directly or indirectly, either during their employment or at any time thereafter, using, making available, selling, disclosing, or otherwise communicating any of Happy Bank's Confidential Information to any person.

362.    The Awards Contracts (through incorporation of the Plan) and the Glenn Contracts also contain noncompetition provisions prohibiting an employee from competing with Happy Bank (including by working for any lending or depository institution) for 12 months following the end of their employment with Happy Bank.

363.    The Glenn Contracts also contain nonsolicitation provisions prohibiting Mr. Glenn from soliciting Happy Bank customers and employees for 12 months following the end of his employment with Happy Bank.

364.    Defendants Holmes, House, Glenn, McCutcheon, Jackson, Sikes, West, Weaver, Dollahite, Hutson, and Houlette breached their respective contracts by, directly or indirectly, using, making available, selling, disclosing, and/or otherwise communicating Happy Bank's Confidential Information as described herein.

365.    Defendants Holmes, House, Glenn, McCutcheon, Jackson, Sikes, West, Weaver, Dollahite, Hutson, and Houlette also breached their respective contracts by directly competing against Happy Bank by working for American State Bank within 12 months of the end of their employment with Happy Bank.

366.    Defendant Glenn also breached his respective contracts by soliciting Happy Bank customers and employees within 12 months of the end of his employment with Happy Bank.

367.    Defendant Baisley breached her Bonus Agreement by failing to repay the bonus she received, which was contingent upon her continuing employment with Happy Bank through July 26, 2022, upon her termination in April 2022.

368.    Happy Bank will present its claim against Defendants Holmes, House, Glenn, McCutcheon, Jackson, Sikes, West, Weaver, Dollahite, Hutson, Houlette, and Baisley (the "**Contract Defendants**") upon their service of this Original Complaint.

369.    As a direct and proximate result of the Contract Defendants' respective breach of their contracts, Happy Bank suffered substantial harm of more than $75,000 and an amount to be proved at trial, including: (1) the loss of business and customers; (2) the loss of employees; (3) the costs and fees to analyze and determine compliance with regulations and action needed; (4) costs to replace employees and missing and/or altered data and records; and (5) loss of reputation and goodwill.  Happy Bank is further entitled to all stock or other compensation provided pursuant to the Awards to the Contract Defendants.

370.    In addition, as a direct and proximate result of Defendant Baisley's breach of her Bonus Agreement, Happy Bank has also suffered harm of an amount equal to the bonus.

### Fifth Cause of Action: Tortious Interference with Existing Contract
### Against all Defendants except Mr. Houlette

371.    Happy Bank repeats, re-alleges, and incorporates by reference the foregoing paragraphs as if set forth fully herein.

372.    Happy Bank had valid, enforceable contracts with numerous customers (the "**Customer Contracts**") related to loans serviced by Happy Bank—including but not limited to letter loan agreements, promissory notes, guaranty agreements, and security agreements.

373.    Defendants other than Mr. Houlette willfully and intentionally interfered with the Customer Contracts, without justification, by knowingly soliciting and/or encouraging those customers to cease their contractual business with Happy Bank and/or move their business to Happy Bank's competitor, American State Bank.

374.    Happy Bank has been injured as a proximate result of Defendants' (other than Mr. Houlette) tortious interference by more than $75,000 and an amount to be proved at trial, for which Defendants (other than Mr. Houlette) are jointly and severally liable.  Defendants' (other than Mr.

Houlette) actions were unlawful and the result of their fraud, malice, and/or gross negligence for which Happy Bank seeks to recover exemplary damages.

### Sixth Cause of Action: Tortious Interference with Prospective Relations
**Against Defendants Holmes, House, Baisley, and Phillips**

375.    Happy Bank repeats, re-alleges, and incorporates by reference the foregoing paragraphs as if set forth fully herein.

376.    There was a reasonable probability that Happy Bank would have entered into a business relationship with a third person—including Customer X.

377.    Defendants Holmes, House, Baisley, and Phillips intentionally interfered with that relationship by using Happy Bank resources to secretly prepare a loan for Customer X that they intended to close at American State Bank.  These actions constitute independently tortious or unlawful conduct that prevented the relationship from occurring—namely, a breach of their fiduciary duties to Happy Bank.

378.    Defendants Holmes, House, Baisley, and Phillips acted with a conscious desire to prevent the relationship from occurring as evidenced by their deliberate actions to keep the deal with Customer X a secret from Happy Bank.  Defendants Holmes, House, Baisley, and Phillips also knew that their interference was certain or substantially certain to occur as a result of their wrongful conduct.

379.    Defendants Holmes, House, Baisley, and Phillips' interference proximately caused Happy Bank injury in the form of lost revenues related to a potential loan with Customer X, and Happy Bank suffered actual damages and loss as a result.

**Seventh Cause of Action: Civil Conspiracy**
**Against all Defendants**

380.    Happy Bank repeats, re-alleges, and incorporates by reference the foregoing paragraphs as if set forth fully herein.

381.    Defendants, who are two or more persons, were members of a common conspiracy.

382.    The object of the conspiracy was to accomplish unlawful purposes and/or to use unlawful means to accomplish lawful purposes, including misappropriating trade secret information and Confidential Information belonging to Happy Bank, unlawfully competing with Happy Bank based on that information, interfering with Happy Bank's existing contracts by soliciting Happy Bank's customers while still employed by Happy Bank, and inducing employees of Happy Bank to breach their fiduciary duties to Happy Bank.

383.    Defendants collectively had a meeting of the minds on the object of the conspiracy and to engage in the course of action in order to further their own success at Happy Bank's expense. At a minimum, the consistent pattern of the Defendants' course of conduct in advancing the object of their conspiracy demonstrates their meeting of the minds.

384.    Defendants, either directly or through agents acting on their behalf, committed the overt acts in furtherance of the object of the conspiracy, including misappropriation of trade secrets, breaches of fiduciary duties to Happy Bank, and tortious interference with Happy Bank's existing contracts and prospective relations.  For example, Defendants stole Happy Bank's trade secrets and Confidential Information using USB devices, personal email accounts, and/or third-party applications such as Dropbox—none of which Defendants had authorization to do.

385.    Happy Bank has suffered actual damages as a proximate result of Defendants' conduct of more than $75,000 and an amount to be proved at trial.  Accordingly, Happy Bank is

entitled to judgment against Defendants for compensatory damages and such other and further relief to which Happy Bank is entitled at law or in equity.

386.    Defendants are jointly and severally liable for all acts done by them in furtherance of their unlawful conduct.

### Eighth Cause of Action: Knowing and Joint Participation in a Tort
### Against all Defendants

387.    Happy Bank repeats, re-alleges, and incorporates by reference the foregoing paragraphs as if set forth fully herein.

388.    Each Defendant committed torts including breach of fiduciary duties, misappropriation of Happy Bank's trade secrets, tortious interference with existing contracts and/or prospective relations, and conversion.

389.    Based on their roles, contractual agreements, and Happy Bank's policies and procedures, Defendants knew that they each owed fiduciary duties to Happy Bank, were obligated to protect the secrecy of Happy Bank's trade secrets, were prohibited from personally taking or usurping any Company opportunities, and were prohibited from competing with Happy Bank. Yet each Defendant knowingly and jointly participated in conduct of other Defendants that breached these duties and obligations—all of which constitute a tort under Texas law.

390.    Happy Bank has suffered actual damages as a proximate result of the Defendants' conduct of more than $75,000 and an amount to be proved at trial. Accordingly, Happy Bank is entitled to judgment against Defendants for compensatory damages and such other and further relief to which Happy Bank is entitled at law or in equity.

391.    The Defendants are jointly and severally liable for all acts done by them in furtherance of their unlawful, joint tortious conduct.

**<u>Ninth Cause of Action: Conversion</u>**
**Against all Defendants**

392.    Happy Bank repeats, re-alleges, and incorporates by reference the foregoing paragraphs as if set forth fully herein.

393.    Happy Bank had legal ownership and a superior right of possession to all of the files and documents that Defendants stole using USB devices, personal email accounts, third party Internet applications, and/or in hard copy form.

394.    Defendants unlawfully and without authorization exercised dominion over those files and documents that rightfully belonged to Happy Bank.

395.    Defendants' unlawful possession of Happy Bank's files and documents with valuable Confidential Information and trade secrets was to the exclusion of Happy Bank's rights and inconsistent with Happy Bank's private possession.

396.    Defendants have not returned Happy Bank's files and documents, and, as a direct and proximate result of Defendants' unauthorized and unlawful actions, Happy Bank has been and is being harmed—including by loss of business, customers, and employees.  Upon information and belief, Defendants are still in possession of Happy Bank's valuable files and documents containing trade secrets and Confidential Information and are actively using such information for their own personal gain and for the benefit of Happy Bank's competitors, including American State Bank.  Upon further information and belief, Defendants have shared, or plan to share, Happy Bank's files and documents with others who may use—or are actively using—the information to Happy Bank's detriment.

397.    Happy Bank is entitled to damages as a result of Defendants' wrongful conversion of its files and documents of more than $75,000 and an amount to be proved at trial, including loss-of-use, loss-of-value, lost profits, and exemplary damages.

<u>PLAINTIFF'S ORIGINAL COMPLAINT</u>                                                      Page 106

## Tenth Cause of Action: Unfair Competition
### Against All Defendants

398.    Happy Bank repeats, re-alleges, and incorporates by reference the foregoing paragraphs as if set forth fully herein.

399.    Defendants have engaged in dishonest business conduct that has wrongfully interfered with Happy Bank's ability to conduct its business, including but not limited to the following three ways.

400.    First, Happy Bank created templates, memoranda, files, and forms through years of labor, skill, and money.  For example, one template used by Happy Bank to assess loan terms and the formulas therein synthesized information from the previous six years of data and took a full year to complete with the work of numerous Happy Bank employees.  As a further example, forms drafted by Happy Bank's in-house counsel reflect significant legal work, which ensure compliance and accelerate the speed to close loans.

401.    Defendants stole Happy Bank's aforementioned templates, memoranda, files, and forms and used them in competition with Happy Bank.  This provided Defendants with a special competitive advantage because they were not burdened with the time and expense Happy Bank incurred to create the templates, memoranda, files, and forms and the analyses necessary for banking-related services.  Defendants' misappropriation was wrongful and interfered with Happy Bank's ability to conduct its business.

402.    Second, Happy Bank entered into contracts and prospective business relationships with its customers.   Defendants intentionally interfered with those contracts by knowingly soliciting and/or encouraging Happy Bank's customers to cease their contractual business with Happy Bank and/or move their business to Happy Bank's competitor, American State Bank. Defendants Holmes, House, Baisley, and Phillips also intentionally interfered with Happy Bank's

prospective relationship with Customer X by using Happy Bank resources to secretly prepare a loan that they intended to close at American State Bank. Defendant's interference was wrongful and interfered with Happy Bank's ability to conduct its business.

403.    Third, while still employed at Happy Bank, Mr. Holmes intentionally solicited Happy Bank's employees to resign and follow him to American State Bank, a competitor of Happy Bank. Mr. Holmes' solicitation was wrongful and interfered with Happy Bank's ability to conduct its business.

404.    Defendants' actions have directly and proximately caused, and may further cause, significant commercial damage to Happy Bank in the form of business disruption and lost customers, income, and goodwill. In addition to proximately causing Happy Bank to suffer monetary damages of more than $75,000 and an amount to be proved at trial, Defendants' actions have caused Happy Bank to suffer damages for which Happy Bank has no adequate remedy at law. For this reason, Defendants should be enjoined and restrained by order of this Court from unlawfully competing with Happy Bank.

## ATTORNEYS' FEES AND COSTS

405.    Pursuant to Chapter 38 of the Texas Civil Practice and Remedies Code and the DTSA, Happy Bank seeks its reasonable and necessary attorneys' fees and costs, together with conditional awards of attorneys' fees and costs in the event of any and all post-verdict proceedings and appeals, against all Defendants related to its trade secret claims and against the Contract Defendants related to its contract claims.

406.    Pursuant to the terms of Mr. Holmes' Confidentiality Agreement, Happy Bank also seeks its reasonable and necessary attorneys' fees and costs, together with conditional awards of attorneys' fees and costs in the event of any and all post-verdict proceedings and appeals, against Defendant Holmes related to his breach of the Confidentiality Agreement.

407.    Happy Bank also seeks its reasonable and necessary attorneys' fees and costs, together with conditional awards of attorneys' fees and costs in the event of any and all post-verdict proceedings and appeals, against Defendants for any other claims to which it may be entitled to such fees and costs.

## CONDITIONS PRECEDENT

408.    All conditions precedent to Happy Bank's claims for relief have occurred, have been performed, or have been waived.

## PRAYER

WHEREFORE, Happy Bank respectfully requests that this Court enter a judgment:

a.  Ordering that all Defendants are liable for:

    i.  Violating the DTSA;

    ii.  Violating the CFAA;

    iii.  Breaching their fiduciary duties to Happy Bank;

    iv.  Breaching their contracts with Happy Bank;

    v.  Civil conspiracy;

    vi.  Knowing and joint participating in a tort;

    vii.  Conversion; and,

    viii.  Unfair Competition;

b.  Ordering that Defendants Holmes, House, Glenn, McCutcheon, Jackson, Sikes, West, Weaver, Dollahite, Hutson, Houlette, and Baisley are liable for breaching contractual obligations to Happy Bank;

c.  Ordering that all Defendants except Mr. Houlette are liable for tortiously interfering with Happy Bank's existing contracts;

d.  Ordering that Defendants Holmes, House, Baisley, and Phillips are liable for tortiously interfering with Happy Bank's prospective relations;

e.  Declaring that each Defendant acted willfully and maliciously in violating the DTSA, breaching fiduciary duties, tortiously interfering with Happy Bank's existing contracts, engaging in civil conspiracy, converting Happy Bank's property, and/or unfairly competing with Happy Bank;

f.  Declaring that Defendants are jointly and severally liable for the damages owed for civil conspiracy;

g.  Declaring that all Defendants are jointly and severally liable for the damages owed for knowingly and joint participation in a tort;

h.  Awarding actual, compensatory, and/or consequential damages to Happy Bank in an amount to be determined at trial;

i.  Awarding exemplary damages to Happy Bank in an amount to be determined at trial;

j.  Ordering an accounting of all profits, benefits, or other compensation provided to or derived by Defendants through their wrongful conduct;

k.  Ordering disgorgement and/or clawback of all benefits, stock, or other compensation provided to or derived by Defendants due to their breaches of fiduciary duties and other obligations to Happy Bank;

l.  Enjoining Defendants from any further use of Happy Bank's trade secrets, confidential information, and/or property and directing Defendants to return the same to Happy Bank;

m.  Awarding reasonable and necessary attorneys' fees, costs, and related expenses incurred in bringing and prosecuting this action;

n.  Awarding pre-judgment and post-judgment interest at the highest lawful rates; and,

o.  Awarding all such other and further relief that Happy Bank may be entitled to in law or equity.

Dated:  March 3, 2023                          Respectfully submitted,


*/s/ Melissa M. Goodman*
Melissa M. Goodman
State Bar No. 00790648
melissa.goodman@haynesboone.com
Jason N. Jordan
State Bar No. 24078760
jason.jordan@haynesboone.com
Taylor Rex Robertson
State Bar No. 24093050
taylor.robertson@haynesboone.com
Tammie Beassie Banko
State Bar No. 24116066
tammie.banko@haynesboone.com

**HAYNES AND BOONE, LLP**
2323 Victory Ave, Suite 700
Dallas, TX 75219
Telephone: (214) 651-5000
Telecopier: (214) 651-5940

-and-

Fernando M. Bustos
State Bar No. 24001819
fbustos@bustoslawfirm.com
Brandon C. Callahan
State Bar No. 24096175
bcallahan@bustoslawfirm.com

**BUSTOS LAW FIRM, P.C.**
1001 Main Street, Suite 501
Lubbock, TX 79408
Telephone: (806) 780-3976
Telecopier: (806) 780-3800

**ATTORNEYS FOR PLAINTIFF
CENTENNIAL BANK, AS THE
SUCCESSOR-IN-INTEREST TO
HAPPY STATE BANK**