# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# LUBBOCK DIVISION

| | | |
|---|---|---|
| CENTENNIAL BANK, as the successor-in-interest to HAPPY STATE BANK, | § § § § | |
| Plaintiff, | § § | |
| v. | § § | |
| JERRY "BUD" HOLMES, JAY HOUSE, CHANNING BAISLEY, DREW PHILLIPS, ROSS GLENN, WILLIS MCCUTCHEON, MICHAEL JACKSON, JESSICA TERRELL, JASON WEST, SAMUEL "TREY" WEAVER, DEREK DOLLAHITE, DAVID HUTSON, BRIAN MURRY, ISAC OVALLE, GREG HOULETTE, DIANA RICHARTE, and JAMES SIKES, | § § § § § § § § § § § § § § | Civil Action No. 5:23-cv-00044-H |
| Defendants. | § § | |

## DEFENDANTS' MOTION FOR SPECIAL CASE MANAGEMENT PROCEDURES AND BRIEF IN SUPPORT

Pursuant to Federal Rule of Civil Procedure 16(c)(2)(L), all Defendants[1] move for the adoption of special case management procedures in this complex case. Specifically, Defendants seek an order directing the pre-discovery disclosure of core information related to Plaintiff's claims – namely, the data reports, log files, and system related information Plaintiff collected during its forensic investigation.[2] Good cause exists for such an order as described below.

---

[1] This includes Jerry "Bud" Holmes, Jay House, Channing Baisley, Drew Phillips, Ross Glenn, Willis McCutcheon, Michael Jackson, Jessica Terrell, Jason West, Samuel "Trey" Weaver, Derek Dollahite, David Hutson, Brian Murry, Greg Houlette, Diana Richarte, and James Sikes.

[2] Although Defendants have simultaneously filed motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), the motions are partial and would not dispose of the entire case. Thus, because some claims will survive, this motion concerning case management is ripe for consideration.

## I. Introduction

By any measure, this is a complex case. Plaintiff has sued 16 different Defendants[3] and pleaded 10 separate counts under both federal and state law. Accounting for the need for individualized facts to be proven in support of each type of claim brought against each Defendant, Plaintiff has pleaded 143 different claims. It is not unreasonable to expect that this case could feature over 100 witnesses.

The basic facts are as follows: On April 1, 2022, Plaintiff Centennial Bank merged with Happy State Bank. Shortly after the merger closed, 15 of the Defendants chose to leave Centennial to join a different bank. (The sixteenth Defendant had his employment terminated by Centennial a couple of months later). Centennial now accuses Defendants of stealing trade secrets and committing related computer fraud on their way out the door. According to Centennial, these staffers delivered this information to the benefit their new (shared) employer, American State Bank. *See, e.g.*, Compl. (Doc. 1) ¶ 4 (alleging Defendants "secretly ransacked Happy Bank using unauthorized USB devices, personal email accounts, and third-party Internet applications"), *id.* ¶ 67 (alleging Defendants "rob[bed] Happy Bank of its most sensitive documents").

In response, Defendants will argue they did not take any confidential or proprietary information. Rather, in the face of their locally owned employer (Happy) being swallowed by a much larger out-of-state publicly traded bank (Centennial), they exercised their right under Texas law to work elsewhere for the employer of their choice alongside many former colleagues. Far from an indicium of nefarious conduct, the fact that many clients chose to follow them to a new bank is simply a testament to the power of long-term, personal relationships in the community

---

[3] A seventeenth Defendant, Isac Ovalle, was initially named in the lawsuit, but Centennial voluntarily dismissed its claims against him. Notice of Dismissal (Doc. 21).

banking world. The resulting lawsuit is nothing more than a vehicle for retribution brought by a jilted multi-billion-dollar business with unlimited resources. Such a view recently gained support through public remarks made by John Allison, President and CEO of Centennial's parent company, when he was asked about the exodus. Mr. Allison exclaimed, "I kind of take this stuff personally."[4]

Like most cases, someone will be proven right, and someone will be proven wrong. But according to Plaintiff, it already has the goods. As Mr. Allison has emphasized to investors, "[W]e had a forensics team, and we spent millions of dollars with this forensic team on what happened to us in Texas."[5] Later, during the same earnings call, the CFO and Treasurer of Centennial's parent company explained that the forensic investigation cost "about $5 million."[6] Mr. Allison has even described the forensic investigation as the basis for the lawsuit: "We filed a lawsuit against 17 individuals March 3 of '23 that we derived through our forensic investigators had improperly transferred Happy data."[7]

The investigation is specifically referenced in Plaintiff's Complaint:

> 85.   After the mass resignation of its former employees and inquiries from its customers about loan status and other matters, Happy Bank realized that the former employees had improperly copied, transferred, used, deleted, and/or disclosed its Confidential Information.
>
> 86.   To that end, Happy Bank retained a certified computer forensics firm to analyze its former employees' laptops/computers and determine the extent of any improper or unlawful activity. Happy Bank and its computer forensics firm also analyzed: (1) emails on the former employees' Happy Bank email accounts; (2) logs of documents printed on Happy Bank printers; (3) video recordings from cameras at various Happy Bank offices; and (4) the former employees' activity on

---

[4] App at 0021 (Home Bancshares, Inc.'s Q4: 2023-01-19 Earnings Call).

[5] App at 0020 (Home Bancshares, Inc.'s Q4: 2023-01-19 Earnings Call).

[6] App at 0020 (Home Bancshares, Inc.'s Q4: 2023-01-19 Earnings Call).

[7] App at 0033 (Home Bancshares, Inc.'s Q1: 2023-04-20 Earnings Call).

> Happy Bank's internal networks and drives to determine if any data, information, and/or files had been deleted or altered.
>
> 87.    As discussed below, Happy Bank found significant evidence that Defendants planned and took overt actions to steal and/or delete Happy Bank's Confidential Information, steal its customers, and solicit away its employees—all while still employed with Happy Bank . . .

Pl.'s Compl. (Doc. 1) ¶¶ 85-86.  All told, Plaintiff's Complaint references the terms "forensic analysis," "forensic evidence," and "forensic data," more than three dozen times.  *Id*. ¶¶ 1-408.

Unsurprisingly, many of the questions that will be posed in this case are tech centric.  Were Defendants in fact copying files to USB drives or iPhones?  What files, if any, were Defendants sending via external email accounts (*e.g.*, Gmail or Yahoo) or cloud servers (*e.g.*, Google Drive or Dropbox)?  Only after answering "who did what to whom" can the parties move towards analyzing the second part of the equation:  Does the content of each file qualify as a trade secret or other protected form of information (*i.e.*, is the content specific and concrete with independent economic value)?

According to Plaintiff, it has already collected a significant volume of data as part of its $5 million forensic investigation.  This would necessarily include the data reports, log files, and system related information needed to analyze and assess both computer activity (*e.g.*, the use of email, printers, internal networks, and computer drives) as well as file access (*e.g.*, the copying, transfer, use, deletion, or disclosure of certain files).[8]

---

[8] The data collected during this type of forensic investigation can be expected to include: (1) Digital Guardian Logs for relevant custodians, computers, network locations, and USB devices (which will reflect if and when a given user copied, transferred, or deleted a file); (2) IT ticketing system information, logs, and notes for any activities with relevant custodians and their computers, USB devices, or other locations; and (3) computer log artifacts from relevant custodian computers or from back up locations such as shadow volume copy or other backup solutions.

4

It makes no sense for the parties to wander into discovery in darkness (at the cost of significant time and money).  **Plaintiff should be ordered to disclose this core information (*i.e.*, the objective information and data collected as part of its investigation) at the outset of the case** – prior to the parties' Federal Rule of Civil Procedure 26(f) planning conference.  This will afford the parties (and, as a result, the Court) an opportunity to make better informed choices concerning an effective discovery plan and overall case management. And in turn, disclosure will help ensure "the just, speedy, and inexpensive" determination of the action.  *See* Fed. R. Civ. P. 1.

In short, Plaintiff says it already has collected the relevant computer data.  This objective information is at the heart of Plaintiff's claims.  Plaintiff should be required to show its hand now rather than later.

## II. Argument & Authorities

### A. The Court has broad discretion under Rule 16.

Under Federal Rule of Civil Procedure 16, the Court has broad discretion to regulate pretrial practice in a manner that will: (1) expedite disposition of the action, (2) establish early and continuing control so that the case will not be protracted, and (3) discourage wasteful pretrial activities. Fed. R. Civ. P. 16(a)(1), 16(a)(2), 16(a)(3). Federal Rule of Civil Procedure 16(c)(2)(L) specifically authorizes judges to adopt "special procedures for managing potentially difficult or protracted actions that may involve complex issues, multiple parties, difficult legal questions, or unusual proof problems." Fed. R. Civ. P. 16(c)(2)(L).  Notably, at least two other district courts in Texas have relied on Rule 16(c)(2)(L) in ordering pre-discovery disclosures of core information from a trade-secret plaintiff.  *See UOP LLC v. Exterran Energy Sols., L.P.*, 2021 WL 8016712, at *2 (S.D. Tex. Sept. 28, 2021); *United Services Auto. Ass'n v. Mitek Sys., Inc.*, 289 F.R.D. 244, 248 (W.D. Tex. 2013), *aff'd*, 2013 WL 1867417 (W.D. Tex. Apr. 24, 2013).  In another example,

Magistrate Judge Horan of this district followed *Mitek Systems* and ordered pre-discovery disclosure of core information from a trade-secret plaintiff because, *inter alia*, doing so will avoid unnecessary, wasteful discovery. *StoneEagle Services, Inc. v. Valentine*, 2013 WL 9554563, at *5 (N.D. Tex. June 5, 2013).

Drawing upon the teachings of Federal Rule of Civil Procedure 1, the Federal Judicial Center's Manual for Complex Litigation, Fourth emphasizes that in planning and implementing case management, the procedures in complex cases should be tailored "to the needs of the particular litigation and to the resources available from the parties . . ." Manual for Complex Litigation § 10.1 (4th ed. 2004) ("Fair and efficient resolution of complex litigation requires at least that . . . the court exercise early and effective supervision (and, where necessary, control) . . . ."). A tailored approach can "lead to earlier dispositions, less wasteful activity, shorter trials, and, in the long run, economies of judicial time and fewer judicial burdens." *Id*.

An order requiring the pre-discovery provision of certain information falls squarely within these guidelines. The Manual for Complex Litigation suggests that, in some cases, the Court can impose a requirement that "information helpful or necessary in formulating a discovery plan" be provided at the outset, prior to initial disclosures. *See* Manual for Complex Litigation § 11.13 (4th ed. 2004). This specifically includes "directing disclosure of core information where appropriate to avoid the cost and delay of formal discovery." *Id*. §§ 11.421, 11.423 (recommending a requirement that parties share and review "information from other litigation and sources" before proceeding to discovery).

The Manual also emphasizes that this type of approach early in a case can play a key role in "identifying and narrowing issues of fact and law." *Id.* § 11.211; *see id.* § 11.33. This is because the "materiality of facts and the scope of discovery cannot be determined without identification

6

and definition of the controverted issues." *Id*. § 11.31 ("The pleadings, however, will often fail to define the issues clearly, and the parties may lack sufficient information at the outset of the case to arrive at definitions with certainty."); *id*. (describing the "most important function in the early stages of litigation management" as "press[ing] the parties to identify, define, and narrow the issues"), *id.* § 11.41 ("Early identification and clarification of issues is essential to discovery control.").

### B. Fifth Circuit authority and other federal cases support the requested relief.

The type of order requested here (requiring disclosure of core information at the outset) falls well within this Court's discretion. The Fifth Circuit has endorsed case management orders that go much further – including orders that require a plaintiff to furnish fundamental evidence to substantiate key aspects of a claim prior to discovery. *See Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 604 n.2 (5th Cir. 2006).

For example, in *Acuna, et al. v. Brown & Root, et al.*, 200 F.3d 335 (5th Cir. 2000), the Fifth Circuit expressly approved the use of a pre-discovery order that required each plaintiff to provide an affidavit "specify[ing], for each plaintiff, the injuries or illnesses suffered by the plaintiff that were caused by the alleged toxic exposure, the materials or substances causing the injury and the facility thought to be their source, the dates or circumstances and means of exposure to the injurious materials, and the scientific and medical bases for the expert's opinions." *Acuna* at 337-38.

On appeal, the plaintiffs argued that the pre-discovery order requiring expert support for the details of each plaintiff's claim imposed too high a burden for the early stages of the litigation. The Fifth Circuit rejected that argument and affirmed the trial court's dismissal of the case for plaintiffs' noncompliance. *Id*. at 339 (holding that the district court did not commit a clear error

or an abuse of discretion "in refusing to allow discovery to proceed without [a] better definition of plaintiff's claims"). In so doing, the Fifth Circuit made clear that these types of pre-discovery case management orders are well-founded in "the wide discretion afforded district judges over the management of discovery under Fed. R. Civ. P. 16." *Id.* at 339 ("It was within the court's discretion to take steps to manage the complex and potentially very burdensome discovery that the cases would require. . . . The scheduling orders issued below essentially required that information which plaintiffs should have had before filing their claims pursuant to Fed. R. Civ. P. 11(b)(3).").

In the trade-secret context, federal courts across the country have repeatedly required plaintiffs to make disclosures regarding their alleged trade secrets prior to discovery (beyond the initial disclosures required under Federal Rule of Civil Procedure 26(a)). *See, e.g., M/A-COM Tech. Sols., Inc. v. Litrinium, Inc.*, 2019 WL 4284523, at *5 (C.D. Cal. June 11, 2019). These cases reason that "[a] true trade secret plaintiff ought to be able to identify, up front, and with specificity the particulars of the trade secrets without any discovery." *See Jobscience, Inc. v. CVPartners, Inc.*, 2014 WL 1724763, at *2 (N.D. Cal. 2014) ("Experience has shown that it is easy to allege theft of trade secrets with vagueness, then take discovery into the defendant's files, and then cleverly specify whatever happens to be there as having been trade secrets stolen from plaintiff."). This is why some courts have noted that, "[r]equiring Plaintiff to make pre-discovery disclosures of its alleged misappropriated trade secrets is supported by strong practical and policy reasons" including "assisting [the] Court in determining relevancy and the scope of discovery." *See Vesta Corp. v. Amdocs Mgmt. Ltd.*, 2016 WL 8732371, at *2 (D. Or. Apr. 1, 2016).

### C. Good cause exists for the requested relief.

Here, Defendants simply ask that Centennial provide what it claims it already has. The requested order will allow the parties to go into discovery eyes-wide-open and streamline their

8

discovery accordingly. It also will help elucidate what is and is not at issue in this case at its beginning – thereby reducing superfluous motions practice, unneeded discovery, and ancillary disputes.

In terms of burden, the order would require Plaintiff to provide nothing more than what it already has in its possession. Little to no additional financial cost would be imposed. And rather than probing Plaintiff's subjective analysis of the data at this early stage of the proceeding, the order would be limited to the objective data collected and any report already written. The benefit of this type of approach far exceeds the burden.

The equities also favor an order requiring Plaintiff to disclose this core information (*i.e.*, the objective information and data collected as part of its investigation) at the beginning of the litigation. In this type of case where ex-employees are sued by a former employer, sometimes the real penalty has nothing to do with the findings of a judge or jury – it is the significant cost (financial and otherwise) of being kept as a defendant in a lawsuit. In terms of financial resources, the uneven playing field between a multi-billion-dollar business and 16 former staffers is obvious.

To this end, it is curious that Plaintiff, who claims it was damaged by Defendants' misappropriation of trade secrets, chose to wait nearly a year to file suit, did not to seek a temporary restraining order (if, as alleged, its business was being pillaged by these 16 persons), did not seek other prompt relief to protect its purported secrets, and chose not to sue American State Bank (the party that would stand to be the primary beneficiary of the alleged misdeeds). Typically, in a case involving individuals as defendants, a plaintiff is happy to plead an employer with deeper pockets and possible insurance coverage if they are actually trying to recover their alleged damages. It is rare to see the opposite. But the opposite is exactly what Centennial is doing here. Despite telling its investors that it intends to recover millions of dollars through this case, it has only chosen to

sue individuals. In these circumstances, the risk of litigation itself being used as a weapon is high. Regardless of Plaintiff's motivations, a strong approach to case management will help ensure that this lawsuit does not become misused as a tool for punishment.

### III. Conclusion

For all the foregoing reasons, good cause exists for the requested relief. Pursuant to Federal Rule of Civil Procedure 16(c)(2)(L), the Court should issue a case management order that requires Plaintiff to disclose the objective information and data collected as part of its forensic investigation to Defendants within thirty days of the date of the order.

Dated: May 1, 2023

                                        Respectfully submitted,

                                        /s/ *Andrew S. Hicks*
                                        Andrew S. Hicks
                                        State Bar No. 24032419
                                        Adam M. Dinnell
                                        State Bar No. 24055405
                                        Marc S. Tabolsky
                                        State Bar No. 24037576
                                        Katherine D. Ring
                                        State Bar No. 00786005
                                        SCHIFFER HICKS JOHNSON PLLC
                                        700 Louisiana Street, Suite 2650
                                        Houston, Texas 77002
                                        Phone: 713-357-5150
                                        Fax: 713-357-5160
                                        ahicks@shjlawfirm.com
                                        adinnell@shjlawfirm.com
                                        mtabolsky@shjlawfirm.com
                                        kring@shjlawfirm.com

                                        -and-

Andrew R. Seger
State Bar No. 2406815
Key, Terrell, & Seger, L.L.P.
P.O. Box 98433 (Mail)
Lubbock, Texas 79499
4825 50th Street, Suite A
Lubbock, Texas 79408
Phone: 806-793-1906
Fax: 806-792-2135
aseger@thesegerfirm.com

**ATTORNEYS FOR DEFENDANTS JAY HOUSE, CHANNING BAISLEY, DREW PHILLIPS, WILLIS MCCUTCHEON, MICHAEL JACKSON, JESSICA TERRELL, JASON WEST, SAMUEL "TREY" WEAVER, DEREK DOLLAHITE, BRIAN MURRY, DIANA RICHARTE, and JAMES SIKES**

*/s/ Mark Torian  (with permission)*
Mark Torian
State Bar No. 24028051
Theresa Melia
State Bar No. 24099719
CHAMPION LLP
2200 Ross Avenue, Suite 4500W
Dallas, TX 75201
Phone: 214-225-8880
Fax: 214-225-8881
mark.torian@championllp.com
theresa.melia@championllp.com

**ATTORNEYS FOR DEFENDANT JERRY "BUD" HOLMES**

11

*/s/ David C. Mullin  (with permission)*
David C. Mullin
State Bar No. 14651600
Mark S. Logsdon
State Bar No. 00795486
MULLIN HOARD & BROWN, L.L.P.
500 South Taylor, Suite 800
P.O. Box 31656
Amarillo, Texas 79120-1656
Phone:  806-372-5050
Fax:  806-372-5086
dmullin@mhba.com
mlogsdon@mhba.com

-and-

Molly Manning
State Bar No. 24012646
MULLIN HOARD & BROWN, L.L.P.
1500 Broadway, Suite 700
P.O. Box 2585
Lubbock, Texas 79408-2585
Phone:  806-765-7491
Fax:  806-765-0553
mmanning@mhba.com

**ATTORNEYS FOR DEFENDANT ROSS GLENN**

*/s/ Brian Heinrich  (with permission)*
Brian Heinrich
State Bar No. 09382320
MAYFIELD, HEINRICH, RAHLFS, WEABER AND PARSONS, LLP
320 S. Polk St., Suite 1000
Amarillo, TX 79101-1429
Phone: 806-242-0152
Fax: 806-242-0159
brian@mhrwp.com

-and-

Angelique Weaver
State Bar No. 24008247
MAYFIELD, HEINRICH, RAHLFS, WEABER
AND PARSONS, LLP
1001 Main Street, Suite 504
Lubbock, Tx 79401
Phone:  806-722-1616
Fax:  808-722-1614
aweaver@mhrwp.com

**ATTORNEYS FOR DEFENDANT DAVID HUTSON**


*/s/ Zachary S. Brady  (with permission)*
Zachary S. Brady
State Bar No. 24012320
BRADY & HAMILTON, LLP
1602 13 St., Lubbock, TX 79401
Phone:  806-771-1850
Fax:  806-771-3750
zach@bhlawgroup.com

**ATTORNEYS FOR DEFENDANT JAY HOUSE**


*/s/ Benjamin D. Doyle (with permission)*
Benjamin D. Doyle
State Bar No. 24080865
STOCKARD, JOHNSTON,
BROWN, NETARDUS, & DOYLE, P.C.
P.O. Box 3280
Amarillo, Texas 79116-3280
Phone:  806-372-2202
Fax:  806-379-7799
bdoyle@sjblawfirm.com

**ATTORNEYS FOR DEFENDANT  GREG HOULETTE**

13

## CERTIFICATE OF CONFERENCE

Pursuant to L.R. 71(b), the undersigned counsel (Andrew S. Hicks) conferred with counsel for Plaintiff, Melissa Goodman, concerning the requested relief. Mr. Hicks contacted Ms. Goodman by phone on Wednesday, April 26, 2023, and left a voice message explaining that Defendants intended to file the foregoing pleading. On Thursday, April 26, 2023, Mr. Hicks spoke with Ms. Goodman by phone regarding Defendants' filing and provided Ms. Goodman a copy of Defendants' proposed filing that same day. By email on Friday, April 27, 2023, Ms. Goodman indicated that Plaintiff opposed the relief requested by Defendants in their motion, but provided a counter-proposal, offering to agree to relief that differed from what Defendants seek in this filing. Mr. Hicks conferred with counsel for all other Defendants regarding Ms. Goodman's proposal, and on Monday, May 1, 2023, Mr. Hicks communicated to Ms. Goodman by email that the Defendants could not agree to Ms. Goodman's proposal. Accordingly, counsel for Defendants understands that Plaintiff opposes the motion.

/s/ *Andrew S. Hicks*
Andrew S. Hicks

## CERTIFICATE OF SERVICE

I hereby certify that on May 1, 2023, the foregoing pleading was served by e-mail and/or by electronic filing service on all counsel of record.

/s/ *Andrew S. Hicks*
Andrew S. Hicks