UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

CENTENNIAL BANK, as the successor-
in-interest to HAPPY STATE BANK,

     Plaintiff,

v.

JERRY "BUD" HOLMES, et al.,

     Defendants.

No. 5:23-CV-044-H

## MEMORANDUM OPINION AND ORDER

Before the Court are eight motions to dismiss filed by the 15 remaining defendants. Dkt. Nos. 32; 37; 40; 45; 62; 66; 68; 72. After the first four motions (Dkt. Nos. 32; 37; 40; 45) were filed, Centennial amended its complaint, *see* Dkt. No. 52, and the defendants filed new motions to dismiss based on the amended complaint's allegations. Accordingly, the Court denies the first group of motions (Dkt. Nos. 32; 37; 40; 45) as moot.

As for the second group of motions (Dkt. Nos. 62; 66; 68; 72), the Court grants them in part and denies them in part. The Court grants the motions as to (1) the trade-secret claims against Jackson and Richarte; (2) the knowing and joint participation claims as to McCutcheon, Jackson, Terrell, West, Weaver, Dollahite, Murry, Houlette, Richarte, and Sikes; (3) the breach of contract claim as to Sikes and the breach of the non-compete provision as to all defendants against whom the claim is asserted; and (4) the tortious interference with prospective relations claim as to Richarte and Sikes. It denies the motions in all other respects. Centennial is granted leave to amend its complaint within 14 days of this Order.

To further elaborate, regarding the trade-secret claims, the Court grants the motions to dismiss as to Jackson and Richarte and denies as to Holmes, House, Baisley, Phillips, Glenn, McCutcheon, Terrell, West, Weaver, Dollahite, Murry, and Houlette.  Centennial sufficiently identifies trade secrets as to all the relevant defendants except Jackson through the combination of its categories—and specific identification—of files, documents, templates, and similar information at issue.  Further, it plausibly alleges that the defendants except Richarte misappropriated those trade secrets by using their personal emails, cloud-based sharing programs, external hard drives, or physical copying of those documents in violation of Happy State Bank's policies.

For the Computer Fraud and Abuse Act claims, the Court denies the defendants' motions.  Centennial's complaint alleges that the defendants deleted customer and loan information from its systems that they lacked authorization to remove.  In addition, Centennial provides sufficient factual allegations to infer that these deletions caused a loss exceeding $5,000 in a one-year period.

For the breach of fiduciary duty claims, the Court denies the motions to dismiss as to all defendants.  Centennial plausibly alleges that they each breached fiduciary duties by deleting customer and loan information, usurping corporate opportunities, or soliciting customers.  However, the Court grants the motions to dismiss the knowing and joint participation claims as to defendants McCutcheon, Jackson, Terrell, West, Weaver, Dollahite, Murry, Houlette, Richarte, and Sikes and denies as to defendants Holmes, House, Baisley, Phillips, and Glenn.  For that first group of defendants, the amended complaint fails to show how they took an action that furthered another defendant's breach of a fiduciary duty.

– 2 –

Regarding the breach of contract claims at issue in these motions,[1] the Court grants the motions to dismiss as to the non-competition provisions because the non-competition provision at issue in the amended complaint expired prior to any defendant's resignation from Happy State Bank and employment at American State Bank.  As for the non-disclosure provision, the Court grants the motion as to Sikes and denies as to Holmes, House, Glenn, McCutcheon, Jackson, West, Weaver, Dollahite, and Houlette.  While Sikes is not alleged to have disclosed any confidential information, the others either allegedly obtained confidential information that was provided as part of the "Bank in a Box" to American State Bank or are directly alleged to have disclosed confidential information to customers.

As to the tortious interference with existing contract claim, the Court denies Holmes's motion.  Centennial's complaint plausibly asserts that Holmes recruited the defendants to participate in his "Bank in a Box" scheme and encouraged them to collect and disclose confidential information, thereby breaching their contracts with Happy State Bank.

Regarding the alleged tortious interference with prospective relations, the Court grants the motions to dismiss that claim as to Richarte and Sikes and denies as to Holmes, House, Baisley, Phillips, Glenn, McCutcheon, Jackson, Terrell, West, Weaver, Dollahite, and Murry.  The amended complaint fails to identify prospective relations connected to any actions by Richarte and Sikes, but Centennial has plausibly alleged that the other defendants solicited customers to take their business to American State Bank, thereby interfering with

---

[1] While Centennial's amended complaint has a single cause of action for breach of contract, there are four different types of contracts included within this claim: (1) the award contracts; (2) the confidentiality agreement; (3) the "Glenn contracts"; and (4) the bonus agreement.  Dkt. No. 52 ¶¶ 346–61.  The only contracts addressed in the defendants' motions and supporting memoranda are the award contracts.  *See* Dkt. Nos. 62; 64; 66; 67; 68; 69; 72; 73.

ongoing, existing business relationships and the future business that would have resulted absent this interference.

Regarding civil conspiracy, the Court denies the motions to dismiss. Centennial has alleged underlying torts for each defendant through its breach of fiduciary duties and tortious-interference claims. In addition, it has plausibly claimed a meeting of the minds through the parallel actions taken by the defendants along with the allegations of Holmes's recruitment of the defendants and their partaking of the benefits of their actions through their subsequent employment at American State Bank.

Finally, for the unfair-competition claim, the Court denies the motions to dismiss because Centennial has alleged an underlying tort for all defendants. While the amended complaint focuses on the tortious-interference claim in the relevant section, which applies only to some defendants, the allegations are not limited to that claim. Considering the complaint as a whole, there is a sufficient basis to infer that every defendant committed a tort that impeded Centennial's ability to conduct its business.

## 1.    Factual and Procedural Background[2]

For over 100 years, Happy State Bank has operated as a financial institution in Texas. Dkt. No. 52 ¶ 2, 30. However, on April 1, 2022, it merged with and became a division of Centennial Bank. *Id.* ¶ 63. After this merger, a significant number of Happy State Bank's officers and employees in its Lubbock, Amarillo, and Plainview branches left the bank to join a competitor, American State Bank. *E.g., id.* ¶¶ 3–6, 69–70. At that time, American State Bank was substantially smaller than Happy State Bank. *Id.* ¶ 5. However,

---

[2] These allegations are taken from Centennial's amended complaint, which the Court accepts as true when resolving a motion to dismiss. *Villarreal v. Wells Fargo Bank, N.A.*, 814 F.3d 763, 766 (5th Cir. 2016).

within a few months of the mass resignations from Happy State Bank, American State Bank had opened new offices in Lubbock, Amarillo, and Plainview, employing these former Happy State Bank officers and employees and serving Happy State Bank's customers. *E.g.*, *id.* ¶¶ 6, 74–84. Centennial asserts that American State Bank's rapid rise in West Texas, with the help of its former employees and customers, was the result of an organized scheme by the defendants, helmed by Bud Holmes, to sabotage Happy State Bank as revenge for their discontent with the merger. *Id.* ¶¶ 63–88. Centennial alleges that this plan involved deleting various customer and loan information from Happy State Bank's systems and stealing its trade secrets, confidential information, customers, and employees to deliver a "Bank in a Box" to American State Bank so that it could quickly begin its operations in West Texas. *Id.*

Based on this alleged scheme, Centennial brings a variety of claims against fifteen defendants, most of whom were officers at Happy State Bank before they departed for American State Bank. *See generally id.* These claims are: (1) violations of the Federal Defend Trade Secrets Act, 18 U.S.C. § 1836; (2) violations of the Texas Uniform Trade Secrets Act, Texas Civil Practice and Remedies Code § 134A; (3) violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(5)(A); (4) breach of fiduciary duties; (5) breach of contract; (6) tortious interference with existing contract; (7) tortious interference with prospective relations; (8) civil conspiracy; (9) knowing and joint participation in a breach of fiduciary duty; and (10) unfair competition. *Id.* at ¶¶ 300–88.

### A.    The Allegations

According to the amended complaint, in October 2021, after learning of the merger and expected compensation for officers post-merger, Jerry "Bud" Holmes "became angry" and "crafted a plan for revenge." *Id.* ¶¶ 65–66.  He then spent the next five months

> organiz[ing] and carr[ying] out a covert scheme to rob Happy Bank of its most sensitive documents and Confidential Information, steal its customers, and solicit dozens of employees to join him at one of Happy Bank's competitors where they could exploit the spoils of their theft for their personal benefit—and intentionally damage Happy Bank in the process.

*Id.* ¶ 67.

This plan allegedly began with Holmes accessing various spreadsheets containing Happy State Bank's "most valuable and sensitive" confidential information, such as its loan volumes, operations, revenues, profits, losses, employee compensation, customer information, and loan and deposit trends. *Id.* ¶ 98.  He then compiled various spreadsheets with employee information to decide whom he would recruit to join him. *Id.* ¶¶ 101, 104.  Almost all the employees named or prioritized in the spreadsheets left Happy State Bank for American State Bank within days of Holmes's departure. *Id.* ¶ 104.

The employees targeted by Holmes include the other defendants: Jay House, Channing Baisley, Drew Phillips, Ross Glenn, Willis McCutcheon, Michael Jackson, Jessica Terrell, Jason West, Samuel "Trey" Weaver, Derek Dollahite, Brian Murry, Greg Houlette, Diana Richarte, and James Sikes. *See id.* ¶¶ 70–71, 101–04, 364–66.  Many of these defendants had contracts with Happy State Bank preventing them from, among other things, competing with the bank or disclosing confidential information. *See id.* ¶¶ 347–58.

Once recruited, Holmes and most of the other defendants similarly accessed a variety of confidential information detailing customer and loan information and used a variety of

methods to copy this information to their personal devices.  They did so by printing these documents and using external hard drives, emails, or cloud-based software, in violation of Happy State Bank's policies.  *E.g.*, *id.* ¶¶ 103, 108, 113 (Holmes); *id.* ¶¶ 128–31 (House); *id.* ¶¶ 154–55 (Baisley); *id.* ¶ 165 (Phillips); *id.* ¶ 179 (Glenn); *id.* ¶¶ 190, 192 (McCutcheon); *id.* ¶¶ 208–11 (Terrell); *id.* ¶¶ 222–23 (West); *id.* ¶ 232 (Weaver); *id.* ¶¶ 240, 243 (Dollahite); *id.* ¶¶ 262–64 (Murry); *id.* ¶¶ 276, 279 (Houlette); *id.* ¶¶ 288–90 (Richarte).

With this information, they allegedly targeted Happy State Bank's customers to encourage them to move their business to American State Bank.  *E.g.*, *id.* ¶¶ 177–78, 190–91, 199–200, 208, 222, 240, 264.  In addition, they mass-deleted customer and loan information, damaging the bank's records.  *E.g.*, *id.* ¶¶ 105–06, 109, 118, 132–33, 136, 143, 147, 157–58, 166–67, 174, 178, 187–88, 211–12, 220–21, 230, 261, 271, 275, 286–87, 297–98.  Finally, they compiled the information taken from Happy State Bank to form the "Bank in a Box" to deliver to American State Bank.  *Id.* ¶¶ 67–71, 77–78, 82.

The resignations began with Weaver on April 7, 2022.  *Id.* ¶ 234.  Then, Holmes quit on April 22, 2022, and began working for American State Bank on April 25, 2022, one business day later.  *Id.* ¶¶ 120, 122.  Most of the defendants—House, Baisley, Phillips, Glenn, Jackson, Terrell, Dollahite, Richarte, and Sikes—resigned on April 25, 2022, and started at American State Bank the following day.  *Id.* ¶¶ 145, 148, 159, 168, 180, 202, 214, 244, 291, 299.  Murry resigned on April 26, 2022, and McCutcheon resigned on April 29, 2022.  *Id.* ¶¶ 193, 265.  West resigned about a month later.  *Id.* ¶ 224.  Houlette was terminated from Happy State Bank on June 10, 2022.  *Id.* ¶ 280.

In the wake of these actions, Centennial asserts that it began receiving questions from customers about some loans that they were in the process of obtaining at Happy State Bank

that had been serviced by the defendants, but none of the information for these loans could be found in its systems.  *Id.* ¶¶ 83–84.  To try to maintain these customers' business, the bank "had to offer significant concessions" and "had to start the loan process from scratch," costing itself time and money.  *Id.* ¶ 84.  The bank then began a forensic analysis of its former employees' devices to "determine the extent of any improper or unlawful activity." *Id.* ¶ 86.  Many of the above actions were allegedly uncovered through this investigation. *E.g.*, *id.* ¶¶ 86–87.

Centennial further claims that several of its former customers were solicited to American State Bank and have now obtained loans or other services from that bank rather than Happy State Bank.  *E.g.*, *id.* ¶¶ 177–78, 190–91, 199–200, 208, 222, 236, 240, 264.  In all, Centennial claims that the bank

> suffered substantial harm, including (i) loss of business and customers, (ii) loss of employees, (iii) costs and fees incurred to analyze and determine compliance with regulations and action needed; (iv) costs incurred to replace employees; (v) costs incurred to identify, recover and/or replace missing and/or altered data and records; and (vi) loss of reputation and goodwill.

*E.g.*, *id.* ¶ 342.

### B.    Procedural History

Centennial filed its initial complaint in this Court in March 2023, naming as defendants Holmes, House, Baisley, Phillips, Glenn, McCutcheon, Jackson, Terrell, West, Weaver, Dollahite, Murry, Houlette, Richarte, Sikes, David Hutson, and Isac Ovalle.  Dkt. No. 1.  Centennial has since dismissed its claims against Hutson and Ovalle.  Dkt. Nos. 21; 77; 78.

The other defendants filed motions to dismiss this original complaint.  Dkt. Nos. 32; 37; 40; 45.  Rather than responding to these motions, Centennial amended its complaint.

Dkt. No. 52. The defendants then filed motions to dismiss the amended complaint. Dkt. Nos. 62; 66; 68; 72. Specifically, House, Baisley, Phillips, McCutcheon, Jackson, Terrell, West, Weaver, Dollahite, Murry, Richarte, and Sikes (the Group Defendants) filed a joint motion to dismiss all claims against them except for the breach of contract claim against Baisley. Dkt. No. 62. These defendants also filed an appendix containing various Award Contracts and the Stock Appreciation Rights Award Plan. Dkt. Nos. 65. Holmes, Glenn, and Houlette have each filed individual motions to dismiss. Dkt. Nos. 66; 68; 72. These motions also seek dismissal of almost every claim.

Holmes's and Glenn's motions do not address the specific breach of contract claims that are levied against only them. *See* Dkt. Nos. 66; 67; 72; 73. Houlette's motion does not address the Computer Fraud and Abuse Act claim. *See* Dkt. Nos. 68; 69. Both Holmes and Houlette also provided the Stock Appreciation Rights Award Plan with their motions. Dkt. Nos. 69-1; 74. Centennial has filed responses to these motions and the defendants have replied. Dkt. Nos. 81; 82; 83; 84; 85; 86; 87; 88. These motions are all ripe for the Court's review.

## 2.    Motion to Dismiss Standard

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). Therefore, a plaintiff must allege sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it

asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* If a complaint pleads facts that are "'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

Defendants can challenge the sufficiency of a complaint through a motion to dismiss under Rule 12(b)(6).  In resolving a motion to dismiss, a court must "accept all well-pleaded facts as true and view those facts in the light most favorable to the plaintiff." *Richardson v. Axion Logistics, L.L.C.*, 780 F.3d 304, 306 (5th Cir. 2015) (quoting *Bustos v. Martini Club, Inc.*, 599 F.3d 458, 461 (5th Cir. 2010)) (cleaned up).  However, this tenet does not extend to legal conclusions.  *Iqbal*, 556 U.S. at 678.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*  But motions to dismiss under 12(b)(6) are viewed with disfavor and are rarely granted.  *IberiaBank Corp. v. Ill. Union Ins. Co.*, 953 F.3d 339, 345 (5th Cir. 2020).

When considering a motion to dismiss, the Court "must limit itself to the contents of the pleadings, including the attachments thereto" and to documents attached to a motion to dismiss that "are referred to in the plaintiff's complaint and are central to [its] claim." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000) (quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993)).  A court must be careful not to go beyond the pleadings and consider a document to be "central" to a plaintiff's claims merely because it is noted in the complaint, particularly where the plaintiff "rel[ies] on substantial, other evidence to support [its] claims." *See Scanlan v. Tex. A&M Univ.*, 343 F.3d 533, 537 (5th Cir. 2003).

3.    **Analysis**

The Court grants the motions to dismiss (Dkt. Nos. 62; 66; 68; 72) as to (1) the trade-secret claims against Jackson and Richarte; (2) the knowing and joint participation claims as to defendants McCutcheon, Jackson, Terrell, West, Weaver, Dollahite, Murry, Houlette, Richarte, and Sikes; (3) the breach of contract claim as to Sikes and the breach of the non-competition provision as to all defendants; and (4) the tortious interference with prospective relations claim as to Richarte and Sikes.  It denies the motions in all other respects and denies as moot the first set of motions to dismiss (Dkt. Nos. 33; 37; 40; 45).  The Court grants Centennial leave to amend its amended complaint within 14 days of this Order if it would like to attempt to remedy the deficiencies identified here.

A.    **Federal Defend Trade Secrets Act & Texas Uniform Trade Secrets Act**

The defendants first move to dismiss Centennial's misappropriation of trade secrets claims.  Dkt. Nos. 64 at 12–17; 67 at 4–6; 69 at 10–13; 73 at 5–8.  Centennial asserts claims under both the federal Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836, and the Texas Uniform Trade Secrets Act (TUTSA), Tex. Civ. Prac. & Rem. Code § 134A, against defendants Holmes, House, Baisley, Phillips, Glenn, McCutcheon, Jackson, Terrell, West, Weaver, Dollahite, Murry, Houlette, and Richarte.  Dkt. No. 52 ¶¶ 300–28.

The defendants assert that Centennial's misappropriation claims should be dismissed because (1) Centennial's amended complaint does not provide enough specificity as to the trade secrets at issue; (2) some of the information at issue is required to be publicly disclosed and therefore cannot be a trade secret; (3) some of the information does not provide any economic value to Centennial; and (4) Centennial's allegations as to misappropriation are too speculative.  Dkt. Nos. 64 at 12–17; 67 at 4–6; 69 at 10–13; 73 at 5–8.

The Court denies in part the defendants' motions to dismiss as to the misappropriation claims.  Centennial provides sufficient specificity as to its trade secrets by defining the category of information at issue and specifying the documents at issue for all defendants against whom these claims are raised except for Jackson.  Further, at this stage, Centennial has plausibly alleged that the defendants, excluding Richarte, misappropriated these trade secrets by copying them onto external drives or to cloud storage, sending them by personal email, or by taking physical copies.  Accordingly, the trade-secrets claims are dismissed as to Richarte and Jackson, but dismissal is denied as to Holmes, House, Baisley, Phillips, Glenn, McCutcheon, Terrell, West, Weaver, Dollahite, Murry, and Houlette.

### i.   Legal Standard

The DTSA and TUTSA provide nearly identical causes of action for trade secret misappropriation.  *See* 18 U.S.C. §§ 1836(b)(1), 1839(3), (5), (6); Tex. Civ. Prac. & Rem. Code § 134A.002(2), (3), (6).  While the DTSA additionally requires that the trade secret relates to a product or service used in interstate commerce, both require a plaintiff to allege that a trade secret exists and that the defendant misappropriated it.[3]  18 U.S.C. §§ 1836(b)(1); Tex. Civ. Prac. & Rem. Code §§ 134A.002, 134A.004; *Pro Mineral, LLC v. Marietta*, No. 3:21-CV-2773-E, 2023 WL 2410884, at *2–3 (N.D. Tex. Mar. 8, 2023); *Phazr, Inc. v. Ramakrishna*, No. 3:19-CV-01188-X, 2020 WL 5526554, at *3 (N.D. Tex. Sept. 14, 2020).  Likewise, the statutes share nearly identical definitions of "misappropriation" and "trade secret."  18 U.S.C. §§ 1839(3), (5); Tex. Civ. Prac. & Rem. Code § 134A.002(3), (6).  Due to these commonalities, courts often discuss the claims jointly, as did the parties in

---

[3] No party disputes that Centennial has sufficiently alleged use in interstate commerce.  *See* Dkt. Nos. 64; 67; 69; 73; 81.

their briefings.  *See CAE Integrated, L.L.C. v. Moov Techs., Inc.*, 44 F.4th 257, 261–62 (5th Cir. 2022); *Pro Mineral, LLC*, 2023 WL 2410084, at *2; Dkt. Nos. 64 at 12–17; 67 at 4–6; 69 at 10–13; 73 at 5–8; 81 at 16–20.  The Court will do the same.[4]

Trade secrets include "all forms and types of financial, business, scientific, technical, economic, or engineering information," including compilations, that the owner has taken reasonable measures to keep secret and that "derive[] independent economic value, actual or potential, from not being generally known."  18 U.S.C. § 1839(3); *see also* Tex. Civ. Prac. & Rem. Code § 134A.002(6).  Whether a trade secret exists is a question of fact.  *CAE Integrated, L.L.C.*, 44 F.4th at 262.  Courts look to six factors when determining whether a trade secret exists:

> (1) the extent to which the information is known outside of [the plaintiff's] business; (2) the extent to which it is known by employees and others involved in [its] business; (3) the extent of the measures taken by [it] to guard the secrecy of the information; (4) the value of the information to [it] and to [its] competitors; (5) the amount of effort or money expended by [it] in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 875 (5th Cir. 2013) (quoting *In re Bass*, 113 S.W.3d 735, 739–40 (Tex. 2003)).

The DTSA and TUTSA provide that "misappropriation" includes "disclosure or use of a trade secret of another without express or implied consent by a person who used

---

[4] The TUTSA also preempts other state remedies based on trade secret misappropriation.  Tex. Civ. Prac. & Rem. Code § 134.007.  Thus, "if the factual basis of the common law claim, as pleaded, would not exist without the use of alleged trade secrets," it is superseded by TUTSA.  *Baylor Scott & White v. Proj. Rose MSO, LLC*, 633 S.W.3d 263, 287 n.14 (Tex. App.—Tyler 2021, no pet.).  However, contract claims, even if based on misappropriation, are not barred.  Tex. Civ. Prac. & Rem. Code § 134.007.  Neither are tort claims that "address[] harm separate from the trade secret appropriation."  *Baylor Scott & White*, 633 S.W.3d at 287 n.14; Tex. Civ. Prac. & Rem. Code § 134.007.

improper means to acquire knowledge of the trade secret" and "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means."  18 U.S.C. § 1839(5); Tex. Civ. Prac. & Rem. Code § 134A.002(3)(A). "[I]mproper means" includes "breach or inducement of a breach of a duty to maintain secrecy."  18 U.S.C. § 1839(6); Tex. Civ. Prac. & Rem. Code § 134A.002(2).  In other words, misappropriation occurs when "the trade secret was acquired through a breach of a confidential relationship or discovered by improper means" and "the trade secret was used without authorization."  *Snowhite Textile & Furnishings, Inc. v. Innvision Hosp., Inc.*, No. 5-18-01447-CV, 2020 WL 7332677, at *4 (Tex. App.—Dallas Dec. 14, 2020, no pet.).

ii.      **Existence of a Trade Secret**

The defendants assert that Centennial has failed to allege the existence of a trade secret because its trade secrets are not sufficiently defined.  Dkt. Nos. 64 at 12–17; 67 at 4–6; 69 at 10–13; 73 at 5–8.  In addition, they contend some of the cited information fails to satisfy the definition of a trade secret because it was not private or Centennial did not derive economic value from it.

A "plaintiff's definition of a trade secret cannot be too vague or inclusive."  *Utex Indus., Inc. v. Wiegand*, No. H-18-1254, 2020 WL 873985, at *10 (S.D. Tex. Feb. 21, 2020). Nevertheless, a plaintiff does not need to provide a specific description of the trade secret. *GlobeRanger Corp. v. Software AG USA, Inc.*, 836 F.3d 477, 493 (5th Cir. 2016).  It is sufficient if the allegations demonstrate "that at least some aspects" of the information at issue constitute a trade secret.  *Id.* at 492–93.  Consequently, courts routinely find a plaintiff's allegations to be sufficient if they "identify specific groupings of information that contain trade secrets, identify the types of trade secrets contained in the groupings, and explain how

– 14 –

the alleged trade secrets were maintained and treated as trade secrets." *Vianet Grp. PLC v. Tap Acquisition, Inc.*, No. 3:14-CV-3601-B, 2016 WL 4368302, at *20 (N.D. Tex. Aug. 16, 2016); *Utex Indus., Inc.*, 2020 WL 873985, at *10. For example, in *Vianet Group*, the district court found that identification of specific documents along with a summary that the "documents contain[ed] trade secrets related to[] 'customer information [and] financial data'" was sufficient. 2016 WL 4368302, at *19–20.

Centennial's trade-secret allegations consist of eight categories of information along with a table that specifies each category of information that each defendant is alleged to have misappropriated and cross-references various paragraphs of the complaint that specify the information at issue. Dkt. No. 52 ¶¶ 304–09; *see also id.* ¶¶ 99–101. The eight categories are:

a. <u>Category 1:</u> Historical loan volumes, funding percentages, fee incomes, and bid information;

b. <u>Category 2:</u> Financial conditions and performance by branch and overall, and year-by-year comparisons of the same;

c. <u>Category 3:</u> Current loans, including data concerning customer names, account numbers, balances, interest rates, maturity dates, and/or contract expiration dates;

d. <u>Category 4:</u> Budgets, loan balance trends, and loan and revenue projections;

e. <u>Category 5:</u> Loan and deposit trends and forecasts, including funding percentages, fee incomes, and growth percentages related to the same;

f. <u>Category 6:</u> Employees' base salaries, incentive compensation, and recommended compensation increases;

g. <u>Category 7:</u> Customers, including their risk ratings, credit scores, financial performance and projections, collateral, guarantors, contact information, and analyses and reports related to all of the same; and

h. <u>Category 8:</u> Templates, forms, legal documents, and analyses necessary to analyze, underwrite, close, and service loans and deposits by customers.

*Id.* ¶ 304.  In addition, Centennial specifies certain documents, folders, devices, or boxes that contained this information separately and individually as to each relevant defendant. *See id.* ¶¶ 98, 100–03, 108, 111, 113–117, 121 (Holmes); *id.* ¶¶ 128–31, 136, 138, 140, 145 (House); *id.* ¶ 155 (Baisley); *id.* ¶ 165–66 (Phillips); *id.* ¶¶ 177–79 (Glenn); *id.* ¶¶ 189–92 (McCutcheon); *id.* ¶ 211, 213 (Terrell); *id.* ¶¶ 222–23 (West); *id.* ¶ 232 (Weaver); *id.* ¶¶ 240–41, 243 (Dollahite); *id.* ¶ 262–64 (Murry); *id.* ¶¶ 272–74, 276–79 (Houlette); *id.* ¶¶ 288–90 (Richarte).

These allegations are sufficient to identify the trade secrets at issue.  Centennial "identif[ies] specific groupings of information that contain trade secrets, identif[ies] the types of trade secrets contained in the groupings, and explain[s] how the alleged trade secrets were maintained and treated as trade secrets."  *See Vianet Grp. PLC v. Tap Acquisition, Inc.*, 2016 WL 4368302, at *20; Dkt. No. 52 ¶¶ 37–61, 98, 100–03, 108, 111, 113–17, 121 128–31, 136, 138, 140, 145, 155, 165–66, 177–79, 189–92, 211, 213, 222–23, 232, 240–41, 243, 262–64, 272–74, 276–79, 288–90, 304, 306.  Its categories of trade secrets along with its specific files, folders, and other objects containing this information are sufficient to identify trade secrets. *Vianet Grp. PLC*, 2016 WL 4368302, at *20; *Brock Servs., LLC v. Rogillio*, No. 18-867-JWD-EWD, 2019 WL 9096410, at *6–7 (M.D. La. June 17, 2019).

Centennial explains that the documents at issue included customer data, loan information, and templates that it had compiled to provide the bank with a "commercial advantage in pricing, closing, and servicing complex and higher-risk loan" against competitors lacking such information.  Dkt. No. 52 ¶¶ 304–05.  Such customer lists, strategies, contacts, and business information are commonly recognized as trade secrets. *See, e.g., Sharma v. Vinmar Int'l, Ltd.*, 231 S.W.3d 405, 424 (Tex. App.—Houston [14th Dist.]

2007, no pet.); *Vianet Grp. PLC*, 2016 WL 4368302, at *20; *see also* Tex. Civ. Prac. & Rem. Code § 134A.002(6); 18 U.S.C. § 1839(3).

Further, Centennial explains its efforts to keep this information secret, such as "requiring employees like [the d]efendants to sign contracts with confidentiality and nondisclosure provisions, training them on their confidentiality and nondisclosure obligations, and/or imposing confidentiality and nondisclosure obligations as part of its policies and procedures." Dkt. No. 52 ¶ 306. It also alleges that it imposes various restrictions on the use of software and devices that would allow trade secrets to be shared or stolen. *Id.*

Finally, it asserts that these secrets "give it a competitive advantage over other banks" and "provide it substantial economic value that is impaired by their disclosure outside of Happy Bank." *Id.* ¶¶ 305, 307. At the motion to dismiss stage, these allegations suffice to show that this information qualifies as trade secrets. *Brown & Root Indus. Servs., LLC v. Brown*, No. 21-291-JWD-SDJ, 2022 WL 4492087, at *10–12 (M.D. La. Sept. 9, 2022), *report and recommendation adopted by* 2022 WL 4490136 (Sept. 27, 2022); *CGC Royalty Invs. I, LLC v. Order Simplicity, LLC*, No. 3:18-CV-711-N, 2018 WL 3589085, at *3 (N.D. Tex. June 4, 2018).

While the defendants claim that some of the information was available publicly, *see* Dkt. Nos. 64 at 14 n.6; 69 at 12, "even readily available information can be protected as a trade secret 'given the difficulty and expense of compiling the information.'" *Brock Servs., LLC*, 2019 WL 9096410, at *7 (quoting *Complete Logistical Servs., LLC v. Rulh*, 350 F. Supp. 3d 512, 518–19 (E.D. La. 2018)); *see also Tewari De-Ox Sys., Inc. v. Mountain States/Rosen, L.L.C.*, 637 F.3d 604, 613 (5th Cir. 2011). Moreover, at this stage, the Court cannot

consider information outside of the pleadings, their attachments, or documents to which the complaint refers that are central to the claim attached to a defendant's motion.  *See Collins*, 224 F.3d at 498–99.  The defendants have not provided the Court with these reports asserted to contain the alleged trade secrets, and even if they had, these reports are not central to Centennial's claims.  Accordingly, this argument by the defendants is premature.[5]

Nevertheless, as to Jackson, Centennial's allegations lack sufficient facts to reasonably infer that the information at issue included trade secrets.  Centennial's sole allegation of specific misappropriated information by Jackson pertains to "boxes of unknown contents" that were removed from Happy State Bank's property on a Saturday. Dkt. No. 52 ¶ 201.  In support of its contention that these boxes had trade secrets, Centennial states that "[i]t is extremely unlikely that an employee, even a Senior Vice President like Mr. Jackson would create and maintain binders of personal information—as opposed Happy Bank's Confidential Information—at his office."  *Id.*  But even so, Centennial does not allege that these boxes contained binders or documents.  *See id.* Instead, it asserts that the contents of the boxes are completely "unknown."  *Id.*

In contrast, for Holmes, who is also alleged to have removed boxes of trade secrets, Centennial specifically notes that the boxes "appear[red] to contain loose documents and binders of documents."  *Id.* ¶ 121.  When connected with the other allegations against Holmes that he printed various spreadsheets with Happy State Bank's loans, deposits,

---

[5] Even if the Court could take judicial notice of such reports and consider them at this stage, it is under no obligation to do so.  *See Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011); Fed. R. Evid. 201(b), (c).  Moreover, had the defendants provided these reports, the Court would still lack the specific documents at issue to verify that the particular information claimed to be a trade secret had in fact been publicly released.  Under these circumstances, the Court is bound by Centennial's assertions that these documents have compiled information and are not publicly available at this stage.

customers, and income trends, one can reasonably infer that these documents likely included trade secrets. *See id.* ¶¶ 100–01, 121.  However, without specific factual allegations as to the contents of the boxes Jackson took, the Court cannot reasonably infer that Jackson removed trade secrets in those boxes.[6]

In sum, taking these allegations as true, Centennial has sufficiently alleged the existence of trade secrets as to defendants Holmes, House, Baisley, Phillips, Glenn, McCutcheon, Terrell, West, Weaver, Dollahite, Murry, Houlette, and Richarte.  However, its allegations regarding Jackson are too speculative and the trade-secret claims are dismissed as to him.

### iii.    Misappropriation

The defendants next argue that Centennial has failed to properly allege that they misappropriated any alleged trade secret.  Specifically, they take issue with Centennial's argument that misappropriation can be inferred because they accessed the trade secrets around the same time that they accessed their personal emails or cloud-based software that allowed them to transmit the information.  In essence, the defendants assert that Centennial's allegations are merely consistent with liability and do not cross the plausibility line and should therefore be disregarded because they are based on information and belief.

Courts commonly find that a plaintiff sufficiently alleges misappropriation by asserting that the defendants copied trade secrets onto external drives or emailed such files using a personal email when the defendants are subject to confidentiality agreements or other privacy policies. *E.g.*, *Frank Surveying Co. v. Harp*, No. 3:22-CV-2837-B, 2023 WL

---

[6] Centennial's allegations as to the boxes taken by House share the same deficiencies. *See id.* ¶ 144. However, Centennial includes numerous other examples of specific documents or devices alleged to contain trade secrets that House misappropriated. *See id.* ¶¶ 128–31, 136, 138, 140, 144.

172034, at *3–4 (N.D. Tex. Jan. 11, 2023); *Source Prod. & Equip. Co. v. Schehr*, No. 16-17528, 2017 WL 3721543, at *5 (E.D. La. Aug. 29, 2017); *Brown & Root Indus. Servs., LLC*, 2022 WL 4492087, at *12.  For example, the plaintiff "presented adequate evidence of misappropriation" based on claims that the defendant "took materials he knew were trade secrets and improperly copied them to a personal USB drive prior to his departure despite his obligations under various agreements." *Frank Surveying Co.*, 2023 WL 172034, at *4.

Further, circumstantial evidence such as a defendant's motivation and leaving the plaintiff to work for a competitor doing substantially similar work also often indicates misappropriation.  *See TFC Partners, Inc. v. Stratton Amenities, LLC*, No. 1:19-CV-58-RP, 2019 WL 369152, at *4 (W.D. Tex. Jan. 30, 2019); *Cotiviti, Inc. v. HMS Holdings Corp.*, No. 3:19-CV-3035-M, 2020 WL 13430177, at *5–6 (N.D. Tex. Sept. 8, 2020).

Here, Centennial asserts that the defendants, helmed by Holmes, collectively decided to steal its confidential information to provide a competitor with a "Bank in a Box" to open and operate new loan production and deposit production offices in West Texas.  Dkt. No. 52 ¶¶ 65–87.  Centennial alleges that they misappropriated the trade secrets by copying the files onto external hard drives or cloud-based sharing software such as Google Drive, by emailing the files using a personal email account, or by taking physical copies.  *E.g.*, *id.* ¶¶ 103, 108, 113 (Holmes); *id.* ¶¶ 128–31 (House); *id.* ¶¶ 154–55 (Baisley); *id.* ¶ 165 (Phillips); *id.* ¶ 179 (Glenn); *id.* ¶¶ 190, 192 (McCutcheon); *id.* ¶¶ 208–11 (Terrell); *id.* ¶¶ 222–23 (West); *id.* ¶ 232 (Weaver); *id.* ¶¶ 240, 243 (Dollahite); *id.* ¶¶ 262–64 (Murry); *id.* ¶¶ 276, 279 (Houlette); *id.* ¶¶ 288–90 (Richarte).  More specifically, for most defendants, Centennial states that the defendants accessed the various documents while using personal emails or the sharing software or while an external hard drive was attached despite knowing that the use

of such emails, software, and external hard drives was forbidden by company policies so that trade secrets would not be shared. *E.g.*, *id.* ¶¶ 38–39, 44–48, 53, 55 (policies prohibiting use of personal email, cloud sharing software, and external hard drives); *id.* ¶¶ 91–92, 108, 113 (Holmes); *id.* ¶¶ 125–26, 128–31 (House); *id.* ¶¶ 151–52, 154–55 (Baisley); *id.* ¶¶ 171–72, 179 (Glenn); *id.* ¶¶ 184–85, 190, 192 (McCutcheon); *id.* ¶¶ 205–06, 208–10 (Terrell); *id.* ¶¶ 217–18, 222–23 (West); *id.* ¶¶ 227–28, 232 (Weaver); *id.* ¶¶ 237–38, 240 (Dollahite); *id.* ¶¶ 258–59, 262–64 (Murry); *id.* ¶¶ 268–69, 279 (Houlette). As for Phillips, Centennial asserts that he copied or physically took the documents at issue. *Id.* ¶ 165.

The defendants contend that Centennial's allegations that they stole the information using personal email, external hard drives, cloud-based software, or printing should be discredited because they were made "upon information and belief." *See, e.g.*, Dkt. No. 52 ¶¶ 113, 121, 128–130, 154–55, 165, 179, 190, 192, 210, 213, 262, 264. The Court rejects this argument as a basis for dismissal. Pleadings based on information and belief "are generally deemed permissible under the Federal Rules, especially in cases in which the information is more accessible to the defendant." *Johnson v. Johnson*, 385 F.3d 503, 531 n.19 (5th Cir. 2004). Often "permitting allegations on information and belief is a practical necessity" and should be allowed "when matters that are necessary to complete the statement of a claim are not within the knowledge of the plaintiff but [it] has sufficient data to justify interposing an allegation on the subject." Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1224 (4th ed. Apr. 2023 Update). Accordingly, "the *Twombly* plausibility standard does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible."

– 21 –

*Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of Ga., Inc.*, 892 F.3d 719, 730 (5th Cir. 2018) (cleaned up) (quoting *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010)).

Here, whether the defendants were actually copying the documents to steal trade secrets or were instead using their emails, drives, and software for innocuous reasons, albeit in violation of Happy State Bank's policies, is information within the possession of the defendants. Misappropriation is typically carried out stealthily and therefore often depends on inferences from the facts rather than direct evidence. In addition, for those allegations based on information and belief, Centennial includes additional facts to justify its belief. Typically, it cites the tight temporal connection between the access of these documents and the use of the unauthorized sharing mechanisms. Moreover, for most of these allegations, Centennial provides a motivation for taking these documents, such as their connection to particular customers who are alleged to have taken at least some of their business to American State Bank after the defendants left Happy State Bank to work in similar roles at American State Bank. Centennial further alleges that American State Bank "had no presence in Lubbock, Plainview, or Amarillo, Texas" prior to the defendants' resignations but quickly made several loans to former Happy State Bank customers for better terms based upon the information acquired from the defendants. *See* Dkt. No. 52 ¶¶ 77, 79, 81–82.

Accordingly, this is not a case where Centennial merely provided a recitation of the elements of a claim without any factual assertions. *Cf. Phazr, Inc.*, 2020 WL 5526554, at *3–4. Altogether these allegations that the defendants took these trade secrets in violation of their agreements with Happy State Bank are sufficient to plausibly state a claim for relief for most of these defendants. At this stage, Centennial's allegations based on information and

– 22 –

belief that these defendants stole its trade secrets are sufficient for the relevant defendants except one.  *See Johnson*, 385 F.3d at 531 n.19; *Intravisual Inc.*, 2011 WL 1004873, at *4–5.

Specifically, the Court finds that Centennial's allegations are too speculative as to Richarte.  Unlike the other defendants, Centennial's assertions as to her misappropriation consist of her downloading two zip files on April 1, 2022, and then three weeks later, accessing a personal email account.  *Id.* ¶¶ 288–89.  While Centennial still provides its "[u]pon information and belief" allegation that she "used her personal email account and/or a Google Drive to steal Happy Bank's Confidential Information," *id.* ¶ 290, this assertion is more attenuated than those for the other defendants.  Viewed in the light most favorable to the plaintiff, the Court cannot reasonably connect the documents Richarte allegedly accessed to her email usage and infer that she stole this information.  In addition, this allegation is not tied to any particular customer alleged to have left Happy State Bank, and Centennial provides no specific reason why Richarte would take these documents or how they benefit American State Bank.  Further, Centennial does not claim that she took any physical copies of trade secrets.  Thus, the Court grants Richarte and Jackson's motion to dismiss the trade-secret claims and denies the motions as to these claims for Holmes, House, Baisley, Phillips, Glenn, McCutcheon, Terrell, West, Weaver, Dollahite, Murry, and Houlette.

B.      **Computer Fraud and Abuse Act**

The defendants next seek dismissal of the claims asserted under the Computer Fraud and Abuse Act (CFAA), 18 U.S.C. § 1030(a)(5)(A).[7]  The amended complaint asserts that Holmes, House, Baisley, Phillips, Glenn, McCutcheon, Terrell, West, Weaver, Murry, Houlette, Richarte, and Sikes deleted files and other information without authorization in violation of the CFAA.  In support of their motions to dismiss, the defendants argue that Centennial has not sufficiently alleged that they acted without authorization and that the statutory loss amount is not satisfied.

The Court denies the motions to dismiss as to these claims.  Centennial alleges that the defendants were not permitted to delete any customer and loan information and that they nevertheless deleted such information.  This is sufficient to plausibly allege that they acted without authorization.  As for the statutory loss amount, the CFAA requires that the plaintiff suffered $5,000 or more in loss in a one-year period.  Centennial's claim that it had incurred $75,000 and more in costs in its forensic investigation that began less than a year before it filed its original complaint satisfies this requirement.

i.      **Legal Standard**

The CFAA prohibits an individual from "knowingly caus[ing] the transmission of a program, information, code, or command" that "intentionally causes damage without authorization to a protected computer."  18 U.S.C. § 1030(a)(5)(A).  Damage includes "any impairment to the integrity or availability of data, a program, a system, or information."  18

---

[7] Neither Houlette nor Holmes address the CFAA claim directly in their briefing.  *See generally* Dkt. Nos. 69; 73.  The Court assumes that Holmes's general adoption of the arguments made by the Group Defendants applies to their argument as to the CFAA claim and will therefore consider the sufficiency of Centennial's allegations as to him.  *See* Dkt. No. 73 at 4–5.

U.S.C. § 1030(e)(8).  Of relevance here, a "protected computer" is one "used in or affecting interstate or foreign commerce or communication" that is either "exclusively for the use of a financial institution" or, if not exclusively for such use, one that is "used by or for a financial institution" if "the conduct the offense affects that use by or for the financial institution."  18 U.S.C. § 1030(e)(2).  No party disputes that Centennial has sufficiently alleged that the computers at issue are protected computers under the statute.  *See* Dkt. No. 52 ¶ 331.

Section 1030(g) permits a civil action by "any person who suffers damage or loss by reason of a violation of this section" if "the conduct involves 1 of the factors set forth in subclauses (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i)."  18 U.S.C. § 1030(g).  Centennial's claim relies on subclause (I), which addresses conduct that results in a "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value."  18 U.S.C. § 1030(c)(4)(A)(i)(I).

### ii.   Without Authorization

The defendants first argue that Centennial has not sufficiently alleged that they acted without authorization.  The Court rejects this challenge.

Whether a defendant "had authorization is a question of fact."  *IberiaBank v. Broussard*, 907 F.3d 826, 837 (5th Cir. 2018).  "[T]he plain meaning of the damage provision" covers conduct that "intentionally impair[s] a computer system without permission."  *United States v. Thomas*, 877 F.3d 591, 595 (5th Cir. 2017).  In other words, "Section 1030(a)(5)(A) prohibits intentionally damaging a computer system when there was no permission to engage in that particular act of damage."  *Id.* at 598.

In determining whether there was permission, the Fifth Circuit instructs courts "to look at the 'expected norms of intended use.'" *Id.* (quoting *United States v. Phillips*, 477 F.3d 215, 219 (5th Cir. 2007)).  Deleting files without permission from a protected computer can support liability under the CFAA.  *IberiaBank*, 907 F.3d at 837–39.  And even if the defendant had permission to access the system and to delete some items, he can still be liable if lacked authority to take the action at issue.  *Thomas*, 877 F.3d at 595–98.

In this case, Centennial sufficiently alleges that the defendants violated the CFAA.  It claims that the defendants lacked authorization to delete customer and loan information and that the defendants nevertheless deleted such information from Happy State Bank's computer systems, thereby impairing its ability to access that information.  Dkt. No. 52 ¶¶ 105–06, 109, 118 (Holmes); *id.* ¶¶ 132–33, 136, 143, 147 (House); *id.* ¶¶ 157–58 (Baisley); *id.* ¶¶ 166–67 (Phillips); *id.* ¶¶ 174, 178 (Glenn); *id.* ¶¶ 187–88 (McCutcheon); *id.* ¶¶ 211–12 (Terrell); *id.* ¶¶ 220–21 (West); *id.* ¶ 230 (Weaver); *id.* ¶ 261 (Murry); *id.* ¶¶ 286–87 (Richarte); *id.* ¶¶ 297–98 (Sikes).  Specifically, the amended complaint alleges that House, Baisley, and Phillips deleted loan requests and due diligence information related to Customer X.  *Id.* ¶¶ 136, 157–58, 166–67.

As for Holmes, Glenn, McCutcheon, West, Weaver, Murry, Richarte, and Sikes, Centennial alleges that, even though they "knew that information related to customers and loans was required to be retained and archived," they deleted emails that "ensured Happy Bank could not find such information."  *Id.* ¶¶ 105–06, 187–88, 211–12, 220–21, 230, 261, 286–87, 297–98.  Regarding Terrell, Centennial claims she deleted various documents, "including memoranda and borrowing-base reports," related to a Happy State Bank customer.  *Id.* ¶ 211.  For Holmes and House, the amended complaint includes additional

– 26 –

examples of loan and customer information that they allegedly deleted. *Id.* ¶¶ 109, 118, 132–33, 143, 147. Based on the foregoing, Centennial has plausibly alleged that the defendants lacked authorization to delete this information because they were not permitted to delete customer and loan data.

### iii.   Loss Amount

The defendants next argue that Centennial's CFAA claims must be dismissed because it has not alleged that each defendant individually caused $5,000 in loss in a one-year period. Centennial's amended complaint states that "[t]he impairment to the integrity and availability of Happy Bank's data, programs, systems, and/or information as a result of [the d]efendants' conduct caused Happy Bank to suffer damages of more than $75,000." *Id.* ¶ 334. The defendants argue that this allegation is insufficient because it "does not advance any specific facts that would establish whether the damage was incurred within the statutory 1-year period or in connection with any specific defendant's acts." Dkt. No. 64 at 20; *see also* Dkt. No. 67 at 6. The Court also finds that this argument does not support dismissal of the CFAA claims.

To bring a civil claim under the CFAA, the plaintiff must assert that the conduct at issue involved one of five categories. 18 U.S.C. § 1030(g). Centennial cites the category covering conduct that results in a "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value." 18 U.S.C. § 1030(c)(4)(A)(i)(I); Dkt. Nos. 52 ¶ 334; 81 at 22. Section 1030 defines "loss" as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service."

– 27 –

18 U.S.C. § 1030(e)(11). Accordingly, "[q]ualifying losses include fees for forensic analysis of relevant computers and other electronic storage devices by outside analysts," as well as "[a] plaintiff's internal investigation costs." *Quantlab Techs. Ltd. (BVI) v. Godlevsky*, No. 4:09-CV-4039, 2015 WL 1651251, at *3 (S.D. Tex. Apr. 14, 2015); *see also Frees, Inc. v. McMillian*, Civil Action No. 05-1979, 2007 WL 2264457, at *1, 3–6 (W.D. La. Aug. 6, 2007); *SuccessFactors, Inc. v. Softscape, Inc.*, 544 F. Supp. 2d 975, 980–81 (N.D. Cal. 2008).

Centennial's amended complaint states that its "damages of more than $75,000 . . . include costs incurred to analyze and respond to [the d]efendants' actions, including the cost of its forensic analysis and the value of employee time expended to investigate [the d]efendants' actions related to Happy Bank's protected computers." Dkt. No. 52 ¶ 334. Centennial asserts that it incurred these losses as the result of the defendants' alleged deletion of customer and loan information. *Id.* These alleged costs fall within the statute's definition of loss and clearly exceed $5,000. *See* 18 U.S.C. § 1030(c)(4)(A)(i)(I), (e)(11); *Quantlab Techs. Ltd. (BVI)*, 2015 WL 1651251, at *3.

Nevertheless, because Centennial's complaint combines the total losses rather than individualizing it to each defendant, the defendants claim that Section 1030(c)(4)(A)(i)(I) is not satisfied. They cite *In re DoubleClick Inc. Privacy Litigation*, where the district court found that the CFAA permits aggregation "across victims and over time" but only for "a single act." 154 F. Supp. 2d 497, 523 (S.D.N.Y. 2011). In contrast, the defendants' deletions are separate acts, and, therefore, they contend that Centennial cannot aggregate and plead that it suffered $75,000 in loss to meet the $5,000 threshold. *See* Dkt. No. 64 at 19–20. However, other courts have rejected *In re DoubleClick*'s single-act approach, holding that

"the $5,000 floor applies to how much damage or loss there is to the victim over a one-year period." *E.g.*, *Creative Computing v. Getloaded.com LLC*, 386 F.3d 930, 934 (9th Cir. 2004).

More importantly for this Court, the Fifth Circuit has approved aggregating losses across defendants. *Fiber Sys. Int'l, Inc. v. Roehrs*, 470 F.3d 1150, 1158 (5th Cir. 2006). In *Fiber Systems*, the plaintiff demonstrated that three defendants had "knowingly and intentionally accessed, deleted, downloaded, copied, took, and stole [its] confidential business and proprietary information and trade secrets, without authorization, from [its] computers," and that their actions "caused [the plaintiff] loss totaling $36,000." *Id.* at 1155, 1158. Without disaggregating or requiring specific numbers as to each defendant, the Fifth Circuit stated that the $36,000 amount "far exceeds the $5,000 loss requirement." *Id.* at 1158. While *Fiber Systems* involved an earlier version of the CFAA, the statutory language at issue is identical.[8] *See id.* at 1157; 18 U.S.C. § 1030(c)(4)(A)(i)(I). Following *Fiber Systems*, at least one other court in the Fifth Circuit has also approved of aggregating losses from various defendants. *Quantlab Techs. Ltd (BVI)*, 2015 WL 1651251, at *3. Accordingly, Centennial's aggregation of its losses is permitted under the CFAA.

As for the one-year requirement, the defendants correctly point out that Centennial's specific allegation of its loss does not directly state that it incurred this $75,000 in one year. *See* Dkt. No. 52 ¶ 334. Nevertheless, other factual allegations permit the Court to reasonably infer that these losses satisfy the one-year limitation. Centennial asserts that it

---

[8] The particular numbering of the provision at issue has changed between the versions of the CFAA, but both *Fiber Systems* and this case involve the category of "loss to 1 or more persons during any 1–year period (and, for purposes of an investigation, prosecution, or other proceeding brought by the United States only, loss resulting from a related course of conduct affecting 1 or more other protected computers) aggregating at least $5,000 in value." *See Fiber Sys.*, 470 F.3d at 1157; 18 U.S.C. § 1030(c)(4)(A)(i)(I).

began its forensic examination at some point after the mass resignation on April 25, 2022, and it instigated this litigation on March 3, 2023, less than a year after the mass resignation. *See* Dkt. Nos. 1 ¶¶ 334–44; 52 ¶¶ 70, 85–86.  Accordingly, the Court can plausibly infer that at least $5,000 of this alleged loss was incurred within a one-year period,[9] and the defendants' motions to dismiss the CFAA claims are denied.

### C.   Breach of Fiduciary Duty

The defendants also challenge Centennial's breach of fiduciary duty claim and knowing and joint participation in a breach of a fiduciary duty claim, which are asserted against all defendants.  They argue that Centennial's allegations engage in group pleading that fail to provide fair notice to each defendant and are conclusory as to breach and causation.  *See, e.g.*, Dkt. Nos. 64 at 20–22; 73 at 8–9.  As for the knowing-participation claim, the defendants argue that it fails because it depends on the flawed breach of fiduciary duty claim and that there are insufficient allegations to show that they knowingly participated in another defendant's breach.  *E.g.*, Dkt. Nos. 64 at 32–33; 69 at 19.

The Court denies the motion to dismiss the breach of fiduciary duty claim and grants in part and denies in part as to the knowing-participation claim.  Centennial provides fair notice and plausibly alleges that the defendants each breached fiduciary duties owed to the bank by deleting files, usurping corporate opportunities, or soliciting customers.  However, the amended complaint does not sufficiently allege how some defendants aided or advanced another fiduciary's breach.  Holmes, House, Baisley, Phillips, and Glenn are all alleged to have played some role in the breach of another.  However, although McCutcheon, Jackson,

---

[9] Moreover, the Group Defendants' own memorandum acknowledges that Centennial's forensic investigation far exceeded $5,000 in less than a year.  *See* Dkt. No. 64 at 10 & n.3.

Terrell, West, Weaver, Dollahite, Murry, Houlette, Richarte, and Sikes allegedly took coordinated actions that resulted in breaches of their fiduciary duties, it is unclear how those actions contributed to a breach by another fiduciary.

### i.    Legal Standard

Under Texas law, "[t]o prevail in a breach-of-fiduciary-duty claim, a plaintiff must prove that (1) there is a fiduciary relationship between the plaintiff and defendant, (2) the defendant breached his fiduciary duty to the plaintiff, and (3) the breach resulted in an injury to the plaintiff or benefit to the defendant." *Zhu v. Lam*, 426 S.W.3d 333, 339 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (citing *Lundy v. Masson*, 260 S.W.3d 482, 501 (Tex. App.—Houston [14th Dist.] 2008, pet. denied)).[10]   Directors and officers of a bank owe fiduciary duties to the bank.  *Brazoport Bank of Tex. v. Oak Park Townhouses*, 889 S.W.2d 676, 684 (Tex. App.—Houston [14th Dist.] 1994), *rev'd and remanded on other grounds sub nom. Brazoport Bank of Tex. v. Flournoy*, 985 S.W.2d 281 (Tex. App.—Tyler 1999); *see also FDIC v. Wheat*, 970 F.2d 124, 130 & n.13, 131 (5th Cir. 1992).  Their fiduciary status "give[s] rise to three broad duties: the duty of due care, loyalty, and obedience." *Engenium Sols. Inc. v. Symphonic Techs., Inc.*, 924 F. Supp. 2d 757, 793 (S.D. Tex. 2013) (quotation omitted).  An officer breaches the duty of loyalty by "misappropriat[ing] a business opportunity that properly belongs to the corporation." *Id.* (quoting *Landon v. S & H Mktg. Grp., Inc.*, 82 S.W.3d 666, 672 (Tex. App.—Eastland 2002, no pet.).

Similarly, employees owe a fiduciary duty to their employer to act primarily for their employer's benefit. *Nat'l Plan Adm'rs Inc. v. Nat'l Health Ins. Co.*, 235 S.W.3d 695, 700 (Tex.

---

[10] Because a court sitting in diversity must apply the substantive law of the forum state, Texas law governs Centennial's various tort and contract claims. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).

2007).  As a result, "[a]n employee may not, without breaching his fiduciary duties, '(1)
appropriate the company's trade secrets[;] (2) solicit the former employer's customers while
still working for his employer[;] (3) solicit the departure of other employees while still
working for his employer; or (4) carry away confidential information.'"  *Orbison v. Ma-Tex
Rope Co.*, 553 S.W.3d 17, 30 (Tex. App.—Texarkana 2018, pet. denied) (quoting *Wooters v.
Unitech Int'l Inc.*, 513 S.W.3d 754, 762–63 (Tex. App.—Houston [1st Dist.] 2017, pet.
denied)).  While "an at-will employee 'may properly plan to go into competition with his
employer and may take active steps to do so while still employed,'" he cannot "act for his
future interests at the expense of his employer by using the employer's funds or employees
for personal gain or by a course of conduct designed to hurt the employer."  *Navigant
Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 284 (5th Cir. 2007) (quoting *Johnson v. Brewer &
Pritchard, P.C.*, 73 S.W.3d 193, 201–02 (Tex. 2002)).

### ii.   Fair Notice and Group Pleading

The defendants first take issue with Centennial's combination of the defendants
altogether in the causes-of-action section of its complaint.  *See* Dkt. Nos. 52 ¶¶ 335–45; 64 at
20–21; 69 at 13–14; 73 at 8–9.  They assert that Centennial fails to state which duty each
individual defendant breached and that the collective reference that the "[d]efendants
breached fiduciary duties to Happy Bank" by usurping corporate opportunities, soliciting
customers, and causing false entries into Happy Bank's records by deleting or removing
records fails to identify what they are alleged to have each done.  Dkt. No. 52 ¶ 339.

The Court disagrees.  Centennial's allegations provide fair notice of its claims against
the defendants.  While "[g]eneral allegations lumping all defendants together and failing to
identify specific actions of individual defendants will not suffice to raise an inference of

– 32 –

plausible liability against any individual defendant," Centennial's amended complaint does not rely on general allegations. *See Callier v. Nat'l United Grp., LLC*, No. EP-21-CV-71-DB, 2021 WL 5393829, at *4 (W.D. Tex. Nov. 17, 2021). The amended complaint includes almost 50 pages of specific factual allegations as to each defendant. *See* Dkt. No. 52 ¶¶ 89– 299. Only after providing these individualized allegations does Centennial group the defendants together in its causes-of-action section. *See id.* ¶¶ 336–40. The clear purpose of its collective reference that the "[d]efendants breached fiduciary duties to Happy Bank" is to assert that all of the defendants breached their fiduciary duties based on the specific actions that each individually is alleged to have taken. *See id.* Such assertions against all defendants are proper when accompanied, as here, by individualized factual allegations. *See Callier*, 2021 WL 5393829, at *4. The defendants can clearly determine what Centennial claims that each of them did based on those allegations. Accordingly, Centennial's breach of fiduciary duty claims satisfy the notice requirement.

### iii.    Breach and Causation

The defendants next assert that Centennial's allegations are too conclusory as to breach and causation. Centennial provides three ways that the defendants allegedly breached their fiduciary duties: usurping corporate opportunities, soliciting customers, and causing false entries into Happy State Bank's records by deleting or removing records. Dkt. No. 52 ¶ 339. Because the deletion of records portion relies on the same factual bases as the CFAA claims already discussed, the Court begins with it before addressing the alleged usurpation of corporate opportunities and solicitation of clients.

a.     **Deleting Records**

As previously discussed, Centennial asserts that Holmes, House, Baisley, Phillips, Glenn, McCutcheon, Terrell, West, Weaver, Murry, Houlette, Richarte, and Sikes deleted files and other information without authorization.  *See supra* Section 3.B.  In addition to violating the CFAA, Centennial claims that these deletions constitute false entries in the bank's records in violation of 18 U.S.C. § 1005 and are therefore unsafe or unsound banking practices that endangered Happy State Bank's FDIC insurance.  *See, e.g.*, Dkt. No. 52 ¶¶ 93 n.9, 340.  As a result of these deletions, Centennial asserts that it has suffered harm including "costs incurred to identify, recover and/or replace missing and/or altered data and records," such as through its forensic investigation previously discussed.  *Id.* ¶¶ 85–88, 342.

As the Court has already explained, Centennial has sufficiently alleged that these defendants improperly deleted customer and loan information.  *See supra* Section 3.B.; *see also* Dkt. No. 52 ¶¶ 271, 275 (Houlette).  Moreover, under Section 1005's prohibition on "mak[ing] any false entry in any book, report, or statement of such bank, company, branch, agency, or organization with intent to injure or defraud . . . or to deceive," omitting "material information qualifies as a false entry."  18 U.S.C. § 1005; *United States v. Cordell*, 912 F.2d 769, 773 (5th Cir. 1990) (citing *United States v. Jackson*, 621 F.2d 216, 219 (5th Cir. 1980)).  Without this customer and loan information, Centennial has plausibly claimed that material information was omitted from its records due to these deletions.  Because these actions are alleged to have been taken in order to harm the bank and hide the defendants' efforts to aid their prospective employer to Centennial's detriment, they are sufficient to state a breach of fiduciary duty claim.  *See Navigant Consulting, Inc.*, 508 F.3d at 284.

### b.   Soliciting Customers and Usurping Business Opportunities

An employee also breaches his fiduciary duties by soliciting customers from his employer using his employer's resources or by usurping business opportunities. *Orbison*, 553 S.W.3d at 30; *Landon*, 82 S.W.3d at 681.  To show a usurpation of a corporate opportunity, Centennial must allege that the defendants "misappropriated a business opportunity that properly belongs to the corporation." *Landon*, 82 S.W.3d at 681.  A "business opportunity arises where a corporation has a legitimate interest or expectancy in and the financial resources to take advantage of a particular business opportunity." *Id.*  The existence of a corporate opportunity "depends upon the facts and circumstances of the particular case." *Alexander v. Sturkie*, 909 S.W.2d 166, 170 (Tex. App.—Houston [14th Dist.] 1995, pet. denied).  Courts apply the "line of business" test to determine whether the corporation had a legitimate interest in the business opportunity. *Icom Sys., Inc. v. Davies*, 990 S.W.2d 408, 410 (Tex. App.—Texarkana 1999, no pet.).

Centennial asserts that several defendants solicited customers to follow them to American State Bank and usurped corporate opportunities.  The amended complaint includes numerous instances of such actions—including for Jackson and Dollahite, the two defendants whom Centennial does not claim improperly deleted information.  As one example of the alleged solicitation and usurpation, Centennial claims that Jackson provided confidential information and granted an extension request for loan modifications to Customer E, who now has loans with American State Bank, in order to encourage Customer E to join American State Bank and to deliver these opportunities to the competitor.  Dkt. No. 52 ¶¶ 199–200.  Centennial also claims that Dollahite used financial information related to Customer H and others to solicit them to move loans to American

State Bank, and that Customer H "admitted to moving over $8 million in loans to American State Bank." *Id.* ¶ 240.  Centennial makes similar allegations regarding Glenn, McCutcheon, Terrell, West, Weaver, Murry.  *Id.* ¶¶ 177–78, 190–91, 208, 222, 231, 264.  Dollahite also allegedly fully advanced funds for a loan for an uninspected home to encourage a customer to move to American State Bank, and deeds of trust reflect that the customer did obtain a loan from American State Bank.  *Id.* ¶ 242.

The amended complaint also details allegations that House, Baisley, and Phillips began collecting loan information for Customer X, an existing customer of Happy State Bank, while still employed at Happy State Bank and that such loans were ultimately closed at American State Bank.  *Id.* ¶¶ 134–41, 157, 166.  Finally, Centennial alleges that Glenn and Holmes provided benefits to a customer by removing an adverse designation in Happy State Bank's systems in order to persuade the customer to follow them to American State Bank.  *Id.* ¶¶ 109, 178.

These alleged instances involved loan and other banking arrangements, opportunities clearly within Happy State Bank's line of business, and deprived it of additional business and customers.  Accordingly, the amended complaint provides sufficient factual allegations to state a plausible claim that each defendant breached at least one fiduciary duty owed to Centennial by usurping corporate opportunities, soliciting customers, and causing false entries into Happy State Bank's records by deleting or removing records.[11]

---

[11] Accordingly, the Court does not individually address all asserted instances of breaches of fiduciary duties.

### iv.    Knowing and Joint Participation in Breach of Fiduciary Duty

Centennial also asserts a claim of knowing and joint participation in a breach of fiduciary duty against all defendants.  Under Texas law, "[w]hen a third party knowingly participates in the breach of a fiduciary duty, the third party becomes a joint tortfeasor and is liable as such."  *Kastner v. Jenkens & Gilchirst, P.C.*, 231 S.W.3d 571, 580 (Tex. App.—Dallas 2007, no pet.).  To state a knowing-participation claim, a plaintiff must show: "(1) the existence of a fiduciary relationship; (2) that the third party knew of the fiduciary relationship; and (3) that the third party was aware that it was participating in the breach of a fiduciary relationship."  *D'Onofrio v. Vacation Pubs., Inc.*, 888 F.3d 197, 216 (5th Cir. 2018) (quoting *Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634, 639 (5th Cir. 2007)); *Cox Tex. Newspapers, L.P. v. Wootten*, 59 S.W.3d 717, 721–22 (Tex. App.—Austin 2001, pet. denied).

The defendants seek dismissal of Centennial's knowing and joint participation in a breach of fiduciary duty, arguing that Centennial did not allege a breach of fiduciary duty or that each defendant knowingly participated in a breach of a fiduciary relationship.  But, as the Court has already discussed, Centennial has plausibly alleged that they all breached their fiduciary relationship to Happy State Bank.

As for knowing participation, Centennial plausibly alleges that these defendants worked together and were overseen by Holmes.  Accordingly, they each knew that the others were officers and employees of Happy State Bank and therefore owed fiduciary duties to the bank.  The closer question is whether the complaint plausibly alleges that they participated in each other's breaches.  For some defendants, the amended complaint clearly satisfies this hurdle.  House, Baisley, and Phillips allegedly partnered together to solicit Customer X and usurp the loan opportunity.  Dkt. No. 52 ¶¶ 134–41, 157, 166.  Similarly,

the amended complaint asserts that Glenn and Holmes aided each other in providing

benefits and hiding information related to the special asset designation customer so that the

customer would follow them to American State Bank.  *Id.* ¶¶ 109 & n.14, 178.

But, as for the other defendants, the central allegations turn on coordinated—yet

individually taken—actions.  *See, e.g.*, *id.* ¶¶ 67–68, 70–71, 211–12, 220–21, 230, 261, 271,

275, 286–87, 297–98.  Centennial alleges that the defendants "willingly joined in Mr.

Holmes's plan" and "conspired with other [d]efendants to undermine Happy Bank's

operations."  *See, e.g.*, *id.* ¶¶ 127, 153, 164, 173, 186, 198, 207, 219, 229, 239, 260, 270, 285,

296.  It claims that the defendants did so through "a coordinated plan to delete information,

solicit customers, keep corporate opportunities secret, resign from Happy Bank, and then

take these customers and opportunities to [American State Bank]."  Dkt. No. 82 at 15.

Nevertheless, these actions involved the defendants' alleged individual breaches of their

fiduciary duties and do not show how their separate actions helped carry out those breaches,

rather than advancing a general scheme.

Centennial's allegations are distinguishable from the standard knowing-participation

case where a defendant takes a specific action that aids the breach itself.  *See Stress Eng'g*

*Servs., Inc. v. Olson*, No. H-21-3210, 2022 WL 4086574, at *8 (S.D. Tex. Aug. 4, 2022), *report*

*and recommendation adopted by* 2022 WL 4084433 (Sept. 6, 2022); *Young Innovations, Inc. v.*

*Dental Health Prods., Inc.*, No. 4:18-01726, 2019 WL 13211665, at *6 (S.D. Tex. Aug. 8,

2019).  For example, in *Stress Engineering*, the plaintiff plausibly alleged knowing

participation by claiming that the defendant offered employment and encouraged the

fiduciary to divert the plaintiff's customers to the defendant.  2022 WL 4086574, at *8.

Similarly, in *Young Innovations*, the third party allegedly recruited the fiduciary, knowing it

would violate his duty to not compete, and encouraged him to transfer confidential information.  2019 WL 13211665, at *6.  And in *Duke Energy International, L.L.C. v. Napoli*, the defendants knowingly participated by providing financing for the fiduciaries' usurpation of a corporate opportunity despite receiving communications regarding the deal that they were insiders and were taking an opportunity from their employer.  748 F. Supp. 2d 656, 664, 672–73 (S.D. Tex. 2010).  In all of these cases, the actions of the defendant contributed to, induced, or facilitated the other party's breach of its fiduciary duty.

But here, while Holmes allegedly concocted the scheme and encouraged others to join him, Dkt. No. 52 ¶¶ 93, 96, 104, there are insufficient factual allegations to show that McCutcheon, Jackson, Terrell, West, Weaver, Dollahite, Murry, Houlette, Richarte, and Sikes plausibly advanced another defendant's breach of a fiduciary duty.  Joint participation is a vicarious-liability structure, and therefore a defendant's breach of his own fiduciary duty is typically insufficient to state a knowing and joint participation claim.  *JSC Neftegas-Impex v. Citibank, N.A.*, 365 S.W.3d 387, 413 (Tex. App. Houston [1st. Dist.] 2011, pet. denied).  A plaintiff must show that the defendant aided a breach by someone else.  *Id.* at 419; *see also In re TOCFHBI, Inc.*, 413 B.R. 523, 534–35 (N.D. Tex. Bankr. 2009).  After all, a knowing-participation claim is premised on the defendant's "contribution to a breach of fiduciary duty" and "must involve the knowing participation in such a breach."  *Kastner*, 231 S.W.3d at 580.

As a result, the allegations of these defendants' actions that breached their own duties unaccompanied by claims that they actually participated someone else's breach are insufficient to state a knowing-participation claim.  For example, for Sikes and Richarte, Centennial asserts that they deleted customer and loan information contained in their

Happy State Bank email accounts without any accompanying facts as to how this deletion aided or facilitated another defendant's breach. *See* Dkt. No. 52 ¶¶ 286–90, 297–98. Similarly, for McCutcheon, Centennial claims he deleted information and solicited a Happy State Bank customer, but again there are no allegations as to how his deletion and solicitation helped another fiduciary to breach that fiduciary's duties. *See id.* ¶¶ 187–93. While these allegations are sufficient to state a claim that these defendants breached their own fiduciary duties, they do not allow the court to reasonably infer that these defendants' actions contributed to another's breach as required to survive a motion to dismiss for a knowing-participation claim. *See Iqbal*, 556 U.S. at 678; *JSC Neftegas-Impex*, 365 S.W.3d at 413; *Kastner*, 231 S.W.3d at 580.

Accordingly, the Court grants the motions to dismiss the knowing and joint participation claims as to defendants McCutcheon, Jackson, Terrell, West, Weaver, Dollahite, Murry, Houlette, Richarte, and Sikes and denies as to defendants Holmes, House, Baisley, Phillips, and Glenn.

### D.  Breach of Contract

Centennial also has brought breach of contract claims against Holmes, House, Baisley, Glenn, McCutcheon, Jackson, West, Weaver, Dollahite, Houlette, and Sikes. Dkt. No. 52 ¶¶ 346–61. These claims concern four different types of contracts: the "Award Contracts," the "Confidentiality Agreement," the "Glenn Contracts," and the "Bonus Agreement." *Id.* The only contracts at issue in the motions to dismiss are the Award Contracts,[12] which Centennial claims Holmes, House, Glenn, McCutcheon, Jackson, West,

---

[12] The defendants alternatively refer to these contracts as the Stock Appreciation Rights Award Plan and Agreements or SAR Awards. *See* Dkt. No. 64 at 22–23.

Weaver, Dollahite, Houlette, and Sikes breached. *Id.* ¶ 347; Dkt. Nos. 64 at 22–26, 23 n.15; 67 at 7; 69 at 15–16; 73 at 4–5. The defendants argue that the claims as to the Award Contracts should be dismissed. In their view, they did not breach either of the two provisions at issue because (1) the non-compete provision expired when the merger between Happy State Bank and Centennial occurred, and (2) the non-disclosure provision prohibits using or disclosing confidential information, but Centennial only alleged that they took the information.

The Court grants the motions to dismiss as to the non-competition provisions because the non-competition provision at issue in the complaint expired prior to any resignation from Happy State Bank and employment at American State Bank. As for the non-disclosure provision, the Court grants the motion as to Sikes and denies as to Holmes, House, Glenn, McCutcheon, Jackson, West, Weaver, Dollahite, and Houlette. While Sikes is not alleged to have disclosed any confidential information, the others either obtained confidential information that was allegedly provided as part of the "Bank in a Box" to American State Bank or are directly alleged to have told customers confidential information.

### i.    Legal Standard

Under Texas law, a breach of contract claim has four elements: "[(1)] the existence of a valid contract; [(2)] performance or tendered performance by the plaintiff; [(3)] breach of the contract by the defendant; and [(4)] damages to the plaintiff resulting from that breach." *Abraxas Petroleum Corp. v. Hornburg*, 20 S.W.3d 741, 758 (Tex. App.—El Paso 2000, no pet.). The parties do not dispute that the Award Contracts are valid contracts and that Centennial has sufficiently alleged its performance under the contract.

– 41 –

Interpreting an unambiguous contract is a question of law.  *Kartsotis v. Bloch*, 503 S.W.3d 506, 515 (Tex. App.—Dallas 2016, pet. denied).  A court must aim to "ascertain the true intentions of the parties as expressed in the instrument."  *J.M Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003).  "Objective, not subjective, intent controls, so the focus is on the words the parties chose to memorialize their agreement."  *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 757 (Tex. 2018) (cleaned up) (quoting *Matagorda Cnty. Hosp. Dist. v. Burwell*, 189 S.W.3d 738, 740 (Tex. 2006)).  Determining the intent of the written agreement requires "examin[ing] and consider[ing] the entire writing in an effort to harmonize and give effect to all provisions of the contract so that none will be rendered meaningless."  *J.M Davidson, Inc.*, 128 S.W.3d at 299.  If a contract incorporates another document by express reference, that document becomes part of the contract, and "both instruments must be read and construed together."  *Kartsotis*, 503 S.W.3d at 516.

If a contract is ambiguous, "interpretation of the instrument becomes a fact issue." *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983).  Ambiguity exists when a contract's "meaning is uncertain and doubtful or it is reasonably susceptible to more than one meaning."  *Id.* at 393.  "A contract is not ambiguous simply because the parties advance conflicting interpretations" or because "some sections arguably conflict."  *NuStar Energy, L.P. v. Diamond Offshore Co.*, 402 S.W.3d 461, 466 (Tex. App.—Houston [14th Dist.] 2013, no pet.).  Instead, when faced with a conflict, courts apply rules of construction, including "(1) specific provisions control over general provisions; (2) provisions stated earlier in an agreement are favored over subsequent provisions; and (3) the interpretation of an agreement should not render any material terms meaningless."  *Sefzik v. Mady Dev., L.P.*, 231 S.W.3d 456, 462 (Tex. App.—Dallas 2007, no pet.).

– 42 –

### ii.     Non-Competition Provision

The amended complaint alleges that "[t]he Award Contracts (through incorporation of the Plan)" contain non-competition provisions that prohibited the relevant defendants from competing with the bank for 12 months following the end of their employment. Dkt. No. 52 ¶ 353. It further asserts that these defendants breached this provision by working for American State Bank within 12 months after resigning from Happy State Bank. *See id.* ¶¶ 122, 148, 180, 193, 202, 224, 234, 244, 280, 299, 356.

In response, the defendants contend that the non-competition provision terminated on April 1, 2022, the effective date of the merger between Happy State Bank and Centennial, which was prior to all defendants' resignations. *Id.* ¶ 8; Dkt. No. 64 at 24. In support of their argument, the defendants have filed various Award Contracts and the Stock Appreciation Rights Award Plan. *See* Dkt. Nos. 65; 69-1; 74-1. Specifically, defendants House, McCutcheon, Jackson, West, Weaver, Dollahite, and Sikes have provided one or more Award Contracts between them and Happy State Bank and the Plan. *See* Dkt. No. 65. Defendants Holmes and Houlette have only provided the Court with the Plan. Dkt. Nos. 69-1; 74-1. The Court can consider these documents because they are central to Centennial's contract claims. *See Villarreal*, 814 F.3d at 766.

In relevant part, provision 9.1(a) of the Plan prohibits

engag[ing] in competition with the Company or any Subsidiary, by working for any depository institution or depository institution holding company or subsidiary as an agent, consultant, partner, employee, officer, shareholder, or independent contractor, in any location and/or geographic area within a fifty (50) mile radius of any office of the Company or any Subsidiary to which the Grantee was assigned or at or from which he performed his duties during the 12 month period ending before his termination of employment.

Dkt. No. 65 at 12.  Following this non-competition provision, the Plan prohibits

solicitation.  *Id.*  It is undisputed that the defendants' actions as alleged would violate the

non-competition provision if it were in effect.  But the Plan also states that "the agreements

set forth in this paragraph shall not be effective if [the] termination of employment . . .

occurs after a Change in Control."  *Id.*  Centennial does not dispute that "this paragraph"

covers the non-competition provision.  *See* Dkt. No. 81 at 28.  Further, the Plan's definition

of "Change in Control" covers the merger between Happy State Bank and Centennial.  *See*

Dkt. No. 65 at 5.  Accordingly, under the Plan's terms, which are incorporated in the

Award Contracts, the non-competition provision expired before any defendant resigned and

began working for American State Bank.  *See, e.g.*, Dkt. Nos. 52 ¶ 353; 65 at 5, 12, 17.

However, Centennial notes that the Award Contracts themselves contained a non-

competition provision and the termination upon Change in Control was limited to the

"agreements set forth in this subparagraph" as compared to the "paragraph" reference in the

Plan.  *See* Dkt. Nos. 65 at 18–19, 23–24, 28–29, 34–35, 39–40, 45–46, 51–52, 58–59, 63–64,

70–71; 81 at 28.  Centennial asserts that this "subparagraph" reference "leaves the status of

the non-competition obligation unaffected or at least unclear."  Dkt. No. 81 at 28.  Some of

these contracts—those for West, Weaver, Dollahite, Sikes, and the two for Jackson—specify

that the subparagraph refers to the noncompetition provision through their definition of the

"subparagraph" at issue.  *See* Dkt. No. 65 at 39–40, 45–46, 51–52, 58–59, 63–64, 70–71.  But

others—the Award Contracts for House, McCutcheon, and one for Jackson—use only

"subparagraph" without further specification, creating the possibility that the termination

upon Change in Control applies only to the non-solicitation provision that follows the non-

competition provision rather than both provisions.  *Id.* at 18–19, 23–24, 28–29, 34–35.

– 44 –

Nevertheless, the Court dismisses the breach of contract claims based on the non-competition provision.  Centennial's complaint cites the Plan's non-competition provision for this breach, not the separate one from the Award Contracts.  Dkt. No. 52 ¶ 353.  That provision clearly expired prior to any of the resignations and therefore was not breached by the defendants.  *See* Dkt. No. 65 at 12.  Accordingly, the breach of the non-competition agreement as stated in the complaint is disproven by the Plan itself.

And even if Centennial could rely on the Award Contracts despite it not being the basis of the claim in the compliant, the Award Contracts for West, Weaver, Dollahite, Sikes, and the two for Jackson also clearly provide that the non-competition provision no longer applied after the merger was effective.  Dkt. No. 65 at 39–40, 45–46, 51–52, 58–59, 63–64, 70–71.  Accordingly, those defendants did not breach those contracts by working for American State Bank.  As for the other contract for Jackson and those for House and McCutcheon, harmonizing the contracts and the Plan requires construing the meaning of "subparagraph" to cover the non-competition provision.

Under Texas contract law, the Court must construe the contract and the Plan together and "attempt to harmonize and give effect to all the contract's provisions." *Kartsotis*, 503 S.W.3d at 515–16; *accord. J.M Davidson, Inc.*, 128 S.W.3d at 299.  In each of the provided contracts, "subparagraph" reasonably refers to the entire noncompetition provision based on the structure of the provisions rather than applying only to the solicitation provision.  *See* Dkt. No. 65 at 18–19, 23–24, 28–29, 34–35.  Their language and structure mirrors almost identically that of the Plan that undisputedly terminated the non-competition provision upon merger.  *Compare* Dkt. No. 65 at 12, *with id.* at 18–19, 23–24, 28–29, 34–35.

– 45 –

Reading the Plan to eliminate the non-competition provision while construing the contract to maintain the non-competition provision creates conflict, rather than harmony, between contract provision.  This would be an odd result given that the two non-competition provisions are nearly identical except for one using "subparagraph" and the other using "paragraph."  *Compare id.* at 12, *with id.* at 18–19, 23–24, 28–29, 34–35.  It would be unreasonable to adopt an interpretation of "subparagraph" that introduces an inexplicable inconsistency when the contract's terms do not dictate such result.  *See Ogden v. Dickinson State Bank*, 662 S.W.2d 330, 332 (Tex. 1983).  Accordingly, the Court interprets "subparagraph" to refer to the non-competition provision and finds that the non-competition provision had expired before the defendants left Happy State Bank.

### iii.    Non-Disclosure Provision

The amended complaint also asserts that the Award Contracts prohibited Holmes, House, Glenn, McCutcheon, Jackson, West, Weaver, Dollahite, Houlette, and Sikes from "using, making available, selling, disclosing, or otherwise communicating any of Happy Bank's Confidential Information to any person."  Dkt. No. 52 ¶ 352; *see, e.g.*, Dkt. No. 65 at 19.  The defendants assert that Centennial has not plausibly alleged that any of them used or disclosed the confidential information, only that they obtained it.  *See, e.g.*, Dkt. No. 64 at 24–26.

Centennial has plausibly alleged disclosure by Holmes, House, Glenn, McCutcheon, Jackson, West, Weaver, Dollahite, and Houlette.  As previously addressed when discussing Centennial's trade-secrets claims, *see supra* Section 3.A, Centennial's complaint plausibly alleges that Holmes, House, Glenn, McCutcheon, West, Weaver, Dollahite, and Houlette wrongly took confidential information.  *See, e.g.*, Dkt. No. 52 ¶¶ 103, 108, 113 (Holmes); *id.*

¶¶ 128–31 (House); *id.* ¶ 179 (Glenn); *id.* ¶¶ 190, 192 (McCutcheon); *id.* ¶¶ 222–23 (West); *id.* ¶ 232 (Weaver); *id.* ¶¶ 240, 243 (Dollahite); *id.* ¶¶ 276, 279 (Houlette).  In addition, Centennial claims that these defendants obtained this information to provide to Happy State Bank's competitor as part of a "Bank in a Box."  *Id.* ¶¶ 67–71, 77–78, 82.

Centennial further alleges additional circumstantial evidence of use and disclosure based on numerous Happy State Bank customers who quickly obtained loans at American State Bank after the mass exodus.  *E.g.*, *id.* ¶¶ 79–82, 114, 117, 145, 177–78, 190–91. Regarding Jackson, Centennial states that he disclosed confidential information about one customer to another by informing Customer E that another customer had "no debt" with Happy State Bank.  *Id.* ¶ 199.  While Jackson claims, without support, that this information was public, the Court is bound at this stage by Centennial's allegation that the information was confidential.  *See* Dkt. No. 64 at 25 n.20; *Villarreal*, 814 F.3d at 766.

However, Centennial's factual allegations about Sikes pertain only to his deletion of information.  Dkt. No. 52 ¶¶ 297–99.  None of these assertions permit a plausible inference that Sikes disclosed or otherwise communicated any of Happy State Bank's confidential information to another person.  *See id.*  Accordingly, the Court dismisses the breach of contract claim as to Sikes but denies the motions to dismiss regarding the non-disclosure provision as to Holmes, House, Glenn, McCutcheon, Jackson, West, Weaver, Dollahite, and Houlette.

### E.    Tortious Interference with Existing Contract

In Claim Six, Centennial asserts that Holmes tortiously interfered with the Award Contracts, the Glenn Contracts, and the Bonus Agreement "by knowingly soliciting and/or encouraging" various defendants "to breach those contracts' terms, including the

noncompetition and nondisclosure provisions." *Id.* ¶ 364.  Holmes seeks dismissal of this claim on the basis that Centennial has not alleged facts showing that he persuaded the defendants to breach their contracts and did not identify any actual loss or damages.  Dkt. No. 73 at 9–11.  The Court denies this portion of his motion to dismiss.

### i.    Legal Standard

To state a claim for tortious interference with an existing contract, a plaintiff must show "(1) an existing contract subject to interference, (2) a willful and intentional interference with the contract, (3) that proximately caused the plaintiff's injury, and (4) caused actual damages or loss." *Prudential Ins. Co. of Am. v. Fin. Rev. Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000).   To interfere with the contract, a defendant's action must "make the performance of the contract more difficult" or prevent performance.  *Fluor Enters., Inc. v. Conex Int'l Corp.*, 273 S.W.3d 426, 442–43 (Tex. App.—Beaumont 2008, pet. denied). Importantly, the defendant must intend to cause a breach of the contract.  *Id.* at 443. Regarding actual damages or loss, the measure of damages at issue is the amount necessary "to put the plaintiff in the same economic position he would have been in had the contract interfered with been actually performed."  *Am. Nat'l Petroleum Co. v. Transcontinental Gas Pipe Line Corp.*, 798 S.W.2d 274, 278 (Tex. 1990).

### ii.    Willful and Intentional Interference with Contract

Centennial alleges several bases for the intentional interference by Holmes, including that he encouraged the other defendants to violate their non-disclosure agreements.  For the purposes of resolving the motion to dismiss, the Court focuses on this alleged non-disclosure breach because, as previously discussed, Centennial has sufficiently alleged that many of the defendants breached these agreements.  Centennial has plausibly asserted that Holmes

willfully and intentionally encouraged other defendants to collect confidential information to disclose to American State Bank as part of the "Bank in a Box."  Because, as alleged, the ultimate goal of these actions was to provide the information to American State Bank, Holmes intended for these defendants to breach their non-disclosure provisions. Accordingly, the Court finds that Centennial has alleged that Holmes willfully and intentionally interfered with contracts between Happy State Bank and some of the other defendants.

As discussed, Centennial has plausibly alleged that various defendants breached the non-disclosure provisions of the Award Contracts.  *See supra* Section 3.D.iii.  Centennial further claims that Holmes orchestrated these actions as part of his "plan for revenge" by "packag[ing] his ready-to-use 'Bank in a Box' with Happy Bank's Confidential Information, customers, and employees" for his new employer.  Dkt. No. 52 ¶¶ 66–68, 96.  In addition to these claims, Centennial asserts that numerous Happy State Bank employees, including other defendants, "almost all of whom worked directly for or at the same location as Mr. Holmes," left the bank "and began working in the same office space as Mr. Holmes" for American State Bank.  *Id.* ¶ 70.

Holmes allegedly used an employee listing from Happy State Bank that noted "the total loan commitments, fees, and weighted rates for each employee" along with compensation information to determine whom to recruit.  *Id.* ¶ 103.  This listing was sorted by Holmes and "all but one of the 18 employees Mr. Holmes sorted at the top of the Employee Listing spreadsheet now works for American State Bank."  *Id.* ¶ 104.  Holmes then "solicited these employees to leave Happy Bank."  *Id.*  Further, the way that the other defendants collected some of the confidential information paralleled Holmes's actions.  *See,*

*e.g.*, *id.* ¶¶ 108–109, 128, 178.  These allegations that Holmes recruited the defendants to join

his plan to collect confidential information from Happy State Bank to give to American

State Bank, which the defendants then carried out, are sufficient to state a claim for willful

and intentional interference with the non-disclosure provisions.[13]

### iii.    Actual Loss or Damages

Holmes claims that Centennial failed to identify any actual loss or damages from the

interference.  This argument is unavailing.  Centennial's complaint states that "Happy Bank

has been injured as a proximate result of Defendant's Holmes's tortious interference by

more than $75,000."  Dkt. No. 52 ¶ 367.  Moreover, the actual loss is the economic loss

from the contract not being performed.  *See Am. Nat'l Petroleum Co.*, 798 S.W.2d at 278.  In

discussing its contractual losses, Centennial notes that it lost customers and employees and

incurred numerous costs from determining its compliance with regulations, loss of goodwill,

and identifying, recovering, and replacing missing data.  Dkt. No. 52 ¶ 360.  These are costs

Centennial would not have faced in the absence of the contractual breaches at issue.  *Id.*

¶¶ 360, 367.  Accordingly, Centennial has alleged that it suffered actual loss from Holmes's

interference, and the Court denies this portion of Holmes's motion to dismiss.

### F.    Tortious Interference

The defendants also seek dismissal of the tortious interference with prospective

relations claim, which is brought against Holmes, House, Baisley, Phillips, Glenn,

McCutcheon, Jackson, Terrell, West, Weaver, Dollahite, Murry, Richarte, and Sikes.  They

argue that this claim should be dismissed for three reasons: (1) Centennial has not identified

---

[13] Accordingly, the Court need not at this stage address the tortious-interference claim regarding the
Glenn Contracts and the Bonus Agreement.

any prospective business relationship for some of the defendants; (2) Centennial failed to allege an underlying tort; and (3) Centennial has not pled causation.

The Court grants the motions to dismiss the tortious interference with prospective relations claim as to Richarte and Sikes and denies as to Holmes, House, Baisley, Phillips, Glenn, McCutcheon, Jackson, Terrell, West, Weaver, Dollahite, and Murry. The factual allegations as to Sikes and Richarte do not connect their actions to any customers or possible business relations, but the allegations as to the other relevant defendants plausibly state a tortious-interference claim.

### i. Legal Standard

To assert a claim for tortious interference with prospective relations, a plaintiff must demonstrate that:

> (1) there was a reasonable probability that the plaintiff would have entered into a business relationship with a third party; (2) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; (3) the defendant's conduct was independently tortious or unlawful; (4) the interference proximately caused the plaintiff injury; and (5) the plaintiff suffered actual damage or loss as a result.

*Coinmach Corp. v. Aspenwood Apt. Corp.*, 417 S.W.3d 909, 923 (5th Cir. 2013).

While "mere negotiations" are insufficient to show a reasonable probability of a business relationship, a plaintiff need not "prove that the contract would certainly been made but for the interference." *N. Cypress Med. Ctr. Operating Co. v. Gallagher Benefit Servs., Inc.*, No. 4:11-cv-685, 2012 WL 2870639, at *7 (S.D. Tex. July 11, 2012) (quoting *Richardson–Eagle, Inc. v. William M. Mercer, Inc.*, 213 S.W.3d 469, 475–76 (Tex. App.— Houston [1st Dist.] 2006, pet. denied)). Prospective relations covered by this tort include "continuing business relations not amounting to a formal contract." *Faucette v. Chantos*, 322

S.W.3d 901, 915 (Tex. App.—Houston [14th Dist.] 2010, no pet.).  Accordingly, "a pre-existing business relationship can suffice to show a reasonable probability of prospective contractual relations."  *Off. Brands, Inc. v. Roc Nation Sports, LLC*, No. 3:15-CV-2199-B, 2015 WL 8915804, at *5 (N.D. Tex. Dec. 15, 2015).

### ii.    Prospective Relations

The defendants argue that Centennial has failed to allege a reasonable probability that it would have entered into contractual relations with any customers absent the actions of Richarte, Sikes, West, and Murry.  Dkt. No. 64 at 26–27.

The Court grants the motions to dismiss this claim as to defendants Sikes and Richarte.  The factual allegations as to these defendants do not connect their actions to any customers or possible business relations.  *See* Dkt. No. 52 ¶¶ 286–91, 297–99.  While in other places, Centennial identifies an existing or prospective customer at issue or otherwise alleges some solicitation efforts, *see, e.g.*, *id.* ¶¶ 134–41, 157, 166, the only specific allegations as to Sikes are that he deleted information.  *Id.* ¶¶ 297–99.  For Richarte, the allegations focus on deletion of information and taking confidential information.  *Id.* ¶¶ 286–91. Centennial does not detail any prospective relations impacted in any way by these actions.

As for Murry and West, Centennial's allegations suffice to satisfy this element. Centennial's amended complaint states that Murry accessed client-related documents for Customer I soon before Murry's departure for American State Bank.  *Id.* ¶ 264.  It further alleges that "he had no legitimate business reason to view or access" this information, that he allegedly took this information, and that Customer I now has loans with American State Bank.  *Id.*  It also asserts that it had an ongoing business relationship with Customer I that would have continued without interference.  *Id.* ¶ 369.  Centennial's claims against West are

similar, but instead reference only "then-Happy Bank customers" who "now have loans with American State Bank." *Id.* ¶ 222.  While lacking much detail, in light of its pre-existing business relationship with Customer I and the other customers, Centennial has asserted a reasonable probability that Customer I and the other customers would have obtained loans with Happy State Bank.  *See Off. Brands, Inc.*, 2015 WL 8915804, at *5.

### iii.    Independently Tortious

A plaintiff must show that "the defendant's conduct was independently tortious or wrongful." *Wal-Mart Stores v. Sturges*, 52 S.W.3d 711, 726 (Tex. 2001).  This requires a plaintiff to "prove that the defendant's conduct would be actionable under a recognized tort." *Id.*  Here, Centennial asserts that the defendants' actions were independently actionable as breaches of fiduciary duty.  As previously discussed, solicitation of customers and usurping business opportunities constitute breaches of fiduciary duties for employees and officers.  *Orbison*, 553 S.W.3d at 30; *Landon*, 82 S.W.3d at 681.  The Court has already found that Centennial has plausibly alleged a breach of fiduciary duty on this basis for Holmes, House, Baisley, Phillips, Glenn, McCutcheon, Jackson, Terrell, West, Weaver, Dollahite, and Murry.  *See supra* Section 3.C.iii.b.  Accordingly, the Court rejects the defendants' argument that Centennial has not alleged that their conduct at issue would be independently actionable.

### iv.    Causation

For similar reasons, the Court concludes that Centennial has sufficiently alleged causation.  The amended complaint plausibly alleges that these defendants solicited the customers or usurped the business opportunities, therefore showing that their actions interfered with Happy State Bank's probable future business relations with these customers.

As a result, Happy State Bank lost the benefits of those relationships.  Centennial has plausibly alleged that they solicited customers to take their business to American State Bank, thereby interfering with the ongoing, existing business relationship and the future business that would have resulted absent this interference.  At the motion to dismiss stage, these allegations are sufficient for causation.  *See CJS Sols. Grp., LLC v. Clowers*, No. 1:21-CV-223-RP, 2022 WL 770122, at *8 (W.D. Tex. Mar. 14, 2022), *report and recommendation adopted by* 2022 WL 7768209 (June 8, 2022).

Accordingly, the Court grants the motions to dismiss the tortious interference with prospective relations claim as to Richarte and Sikes and denies them as to Holmes, House, Baisley, Phillips, Glenn, McCutcheon, Jackson, Terrell, West, Weaver, Dollahite, and Murry.

### G.    Civil Conspiracy

Next, the defendants challenged Centennial's civil-conspiracy claim, which is asserted against all defendants.  They contend that this claim should be dismissed because Centennial failed to plead an underlying tort and has not plausibly alleged a meeting of minds over the object of the conspiracy.  The Court denies the motions to dismiss this claim.

### i.    Legal Standard

To allege a civil conspiracy, a plaintiff must prove five elements: "(1) two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more unlawful, overt acts, and (5) damages."  *Baty v. ProTech Ins. Agency*, 63 S.W.3d 841, 864 (Tex. App.—Houston [14th Dist.] 2001, pet. denied).  Civil conspiracy is a derivative tort: the "unlawful, overt act" of the fourth element "depends on participation in some underlying tort."  *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996).

– 54 –

If the underlying tort claim is successful, courts do not separately analyze the unlawful, overt act prong. *Id.*

   To show a meeting of the minds, "the participants must at least have knowledge of the object and purpose of a conspiracy." *Lesikar v. Rappeport*, 33 S.W.3d 282, 302 (Tex. App.—Texarkana 2000, pet. denied). Such knowledge and agreement "may be established by circumstantial evidence." *Id.* Generally, facts and circumstances that permit a "natural inference . . . that the unlawful, overt acts were committed in furtherance of common design, intention, or purpose of the alleged conspirators" are sufficient. *Id.* (quoting *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d. 567, 581 (Tex. 1963)).

   The plaintiff does not need to show that the conspirators took every action in concert with each other. *Id.* (quoting *Int'l Bankers Life Ins. Co.*, 368 S.W.2d. at 582). Instead, "joint participation in the transactions" and "enjoyment of the fruits of the transactions" allow a court to reasonably infer a conspiracy. *Id.* (quoting *Int'l Bankers Life Ins. Co.*, 368 S.W.2d. at 582). Accordingly, courts have found a meeting of the minds to be plausibly alleged based on claims that the "[d]efendants knowingly acted in unison." *Soto v. Vanderbilt Mortg. & Fin., Inc.*, No. C-10-66, 2010 WL 3363657, at *20 (S.D. Tex. Aug. 23, 2010).

### ii.    Unlawful, Overt Act

   The defendants first argue that Centennial has failed to allege an underlying tort and therefore has not shown an unlawful, overt act. Centennial relies on its separate claims of breach of fiduciary duty and tortious interference as examples of unlawful, overt acts committed by the defendants. Dkt. Nos. 52 ¶ 377; 81 at 31. As previously discussed, Centennial has plausibly alleged that every defendant committed at least one of these torts. *See supra* Sections 3.C, 3.E, and 3.F. If the underlying tort is plausibly alleged, a court

should reject dismissal based on a failure to show an unlawful, overt act.  *Tilton*, 925 S.W.2d at 681.  Accordingly, this provides no basis to dismiss Centennial's conspiracy claim.

### iii.    Meeting of the Minds

The defendants also contend that the amended complaint fails to show a meeting of the minds.  They primarily point to the assertion in the causes-of-action section of the amended complaint that states that they "collectively had a meeting of the minds on the object of the conspiracy and to engage in a course of action to further their own success at Happy Bank's expense."  Dkt. No. 52 ¶ 377.  If this were the only relevant allegation, this would be a threadbare legal conclusion entitled to no assumption of truth.  *See Iqbal*, 556 U.S. at 678.

However, Centennial's complaint is rife with allegations of coordinated activity and their joint enjoyment of the fruit of harming Happy State Bank and building up American State Bank in West Texas with customers lured away from Happy State Bank.  *E.g.*, Dkt. No. 52 ¶¶ 3–7, 67–85, 93, 96, 104, 108–109, 113, 128–31, 134–41, 156–59, 165–68, 174, 178–81, 189–93, 200, 202, 208–14, 222–24, 230–32, 240–44, 261–65, 271–76, 286–91, 297–99.  Centennial asserts that Holmes concocted the plan to leave Happy State Bank post-merger and recruited the other defendants to join him, taking customers and deleting customer and loan information from Happy State Bank's systems along the way.  *Id.* ¶¶ 3–4, 67–85, 93, 96.  Each of the defendants left Happy State Bank for American State Bank, and almost all of them did so on the same days.  They each took similar actions leading up to their departure.  And they did so after Holmes allegedly asked them to join his efforts.  These allegations of their participation in actions constituting breaches of fiduciary duty and tortious interference and their joint receipt of the benefits at American State Bank are

sufficient to plausibly allege that they each knew the object and purpose of this conspiracy and that they chose to join.  In light of these factual claims that the defendants knowingly acted in unison, the Court finds no merit to the defendants' argument that a meeting of the minds has not been pled.  The Court therefore denies the defendants' motions to dismiss the civil conspiracy claim.

### H.    Unfair Competition

Lastly, the defendants seek dismissal of Centennial's unfair-competition claim on the basis that it lacks an underlying tort claim.  Centennial asserts the unfair-competition claim against all defendants.  The Court denies the motions to dismiss as to this claim.

In Texas, the tort of unfair competition covers "conduct that is contrary to honest practice or commercial matters" and "is a derivative tort requiring 'a viable underlying tort or other illegal conduct for liability to exist.'"  *Baylor Scott & White v. Proj. Rose MSO, LLC*, 633 S.W.3d 263, 286 (Tex. App.—Tyler 2021, no pet.) (quotation omitted).  Practices falling under unfair competition include "trademark infringement, dilution of good will, misappropriation of business value, palming off, passing off, and theft of trade secrets."  *Id.*

In addition, a breach of fiduciary duty can constitute an independent tort giving rise to an unfair-competition claim.  *Rail Scale, Inc. v. Balanced Railscale Certification, LLC*, No. 2:15-CV-2117-RSP, 2017 WL 319078, at *2 (E.D. Tex. Jan. 23, 2017).  A plaintiff must show that the defendant engaged in tortious or illegal conduct "that interfered with the plaintiff's ability to conduct its business."  *Rimkus Consulting Grp, Inc. v. Cammarata*, 688 F. Supp. 2d 598, 676 (S.D. Tex. Feb. 19, 2010).  Centennial claims that the defendants' actions caused commercial damage to it "in the form of business disruption and the loss of customers, income, and goodwill."  Dkt. No. 52 ¶ 388.

The defendants argue that Centennial lacks an underlying tort.  As the underlying tort in the complaint, Centennial specifically cites tortious interference with prospective business relationships.  *Id.* ¶ 387.  As discussed earlier, Centennial has plausibly alleged tortious interference with prospective business relations by Holmes, House, Baisley, Phillips, Glenn, McCutcheon, Jackson, Terrell, West, Weaver, Dollahite, and Murry.  *See supra* Section 3.E.  Accordingly, the Court denies the motions to dismiss as to these defendants.

As for the other defendants, the complaint does not allege tortious interference by Houlette, and the allegations against Richarte and Sikes for tortious interference are insufficient.  *See id.*; Dkt. No. 52 ¶¶ 368–74.  Centennial argues that its complaint used tortious interference as one example "[a]mong other things" and that the deletions of customer and loan information constituting breaches of fiduciary duty interfered with its ability to conduct business with customers.  Dkt. Nos. 52 at ¶ 387; 82 at 18–19.  Centennial's amended complaint alleges that "Happy Bank encountered several instances where customers asked about loan requests," but the information was missing due to deletions by the defendants, which forced it "to offer significant concessions" to customers to retain their business and it "had to start the loan process from scratch."  Dkt. No. 52 ¶¶ 83–84.  This plausibly shows an interference with its ability to conduct business tied to the fiduciary breaches from deletion of customer and loan information.  *See also supra* Section 3.C.  Even though Centennial only specifically mentioned tortious interference in the causes-of-action section, the complaint does not limit the unfair-competition claim only to tortious interference.  *See* Dkt. No. 52 ¶ 387.  Considering the complaint as a whole, it has

stated a claim for unfair competition as to Houlette, Richarte, and Sikes as well. Therefore, the Court denies the motions to dismiss regarding these claims.

## I.     Leave to Amend

Centennial requests that the Court grant it leave to amend to address any deficiencies found with its amended complaint. Federal Rule of Civil Procedure 15 governs leave to amend. Fed. R. Civ. P. 15. This rule "requires a trial court to grant leave to amend freely" and "evinces a bias in favor granting leave to amend." *Smith v. EMC Corp.*, 393 F.3d 590, 595 (5th Cir. 2004) (cleaned up) (quoting *Lyn-Lea Travel Corp. v. Am. Airlines*, 283 F.3d 282, 286 (5th Cir. 2002)). Accordingly, a court must have a substantial reason in order to deny leave to amend. *Id.* Substantial reasons include undue delay, bad faith, repeated failures to cure deficiencies, undue prejudice, and futility of amendment. *Id.*

None of these reasons warrant denial of leave to amend here. Centennial has not unduly delayed as the deadline for amending pleadings in this case has not yet passed. *See* Dkt. No. 90 at 1. In addition, there is no evidence of bad faith by Centennial or undue prejudice to the defendants if Centennial files an amended complaint. Moreover, the deficiencies identified in this memorandum may be curable, so amendment is not clearly futile. While Centennial filed its amended complaint after the defendants' first set of motions to dismiss, this would be its first opportunity to correct deficiencies identified by the Court. Accordingly, the Court grants Centennial leave to amend its complaint.

## 4.     Conclusion

In sum, the Court denies the first set of motions to dismiss (Dkt. Nos. 33; 37; 40; 45) as moot. It grants the second set of motions to dismiss (Dkt. Nos. 62; 66; 68; 72) as to (1) the trade-secret claims against Jackson and Richarte; (2) the knowing and joint participation

claims as to defendants McCutcheon, Jackson, Terrell, West, Weaver, Dollahite, Murry, Houlette, Richarte, and Sikes; (3) the breach of contract claim as to Sikes and the breach of the non-competition provision as to all defendants; and (4) the tortious interference with prospective relations claim as to Richarte and Sikes.  The motions are denied in all other respects.  Finally, the Court grants Centennial leave to amend its amended complaint within 14 days of this Order.

So ordered on February 20, 2024.

JAMES WESLEY HENDRIX
UNITED STATES DISTRICT JUDGE