IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| CENTENNIAL BANK, as the successor-in-interest to HAPPY STATE BANK, | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 5:23-cv-00044-H |
| AMERICAN STATE BANK, JERRY "BUD" HOLMES, JAY HOUSE, CHANNING BAISLEY, DREW PHILLIPS, ROSS GLENN, WILLIS MCCUTCHEON, MICHAEL JACKSON, JESSICA TERRELL DEREK DOLLAHITE, and JAMES SIKES, | § § § § § § § § | |
| Defendants. | § § | |

## PLAINTIFF'S THIRD AMENDED COMPLAINT

Plaintiff Centennial Bank, as the successor-in-interest to Happy State Bank by way of merger ("**Happy Bank**"), files its Third Amended Complaint[1] against Defendant American State Bank ("**ASB**") and Defendants Jerry "Bud" Holmes, Jay House, Channing Baisley, Drew Phillips, Ross Glenn, Willis McCutcheon, Michael Jackson, Jessica Terrell, Derek Dollahite, and James Sikes (collectively, the "**Employee Defendants**" and together with ASB, "**Defendants**") and alleges as follows:

---

[1] Pursuant to the Court's scheduling order, Happy Bank is filing this Third Amended Complaint "with the opposing part[ies]' written consent." Dkt. No. 144 ¶ 3. Happy Bank is filing a notice providing these consents concurrently with the Third Amended Complaint. Defendants have provided their consents to the filing of the Third Amended Complaint while noting that each Defendant disputes the allegations and claims asserted therein.

## TABLE OF CONTENTS

NATURE OF THE ACTION .................................................................................................1

PARTIES ..............................................................................................................................3

JURISDICTION AND VENUE ...........................................................................................5

FACTUAL BACKGROUND ................................................................................................6

A.    Happy State Bank................................................................................................. 6

B.    Policies, Procedures, and Agreements Applicable to the Employee Defendants. ............7

      The Handbook. .................................................................................................... 8

      The Ethics Policy. ................................................................................................ 8

      The Acceptable Use Policy. .................................................................................. 9

      The Network Security Policy.................................................................................10

      The Cloud Computing Policy. ................................................................................ 11

      The Privacy Policy. ............................................................................................... 11

      The Mobile Device Policy.......................................................................................12

      The Stock Appreciation Rights Award Agreements.................................................12

      The Restricted Stock and Stock Appreciation Rights Plan.....................................13

      The Executive Nonstatutory Option Agreements..................................................13

C.    The Employee Defendants Acknowledged and Agreed to Be Bound by the Policies and
      Procedures and Their Respective Agreements with Happy Bank.................................15

D.    The Merger Agreement. ......................................................................................15

E.    The Mass Resignation from Happy Bank and Mass Hiring by American State Bank. ...16

F.    American State Bank Quickly Began Servicing Former Happy Bank Customers. .........19

G.    Happy Bank's Initial Investigation Led to this Lawsuit. ................................................ 20

H.    Defendants' Conduct Shows They Are Liable to Happy Bank. ....................................21

Jerry "Bud" Holmes........................................................................................................... 21

Jay House .......................................................................................................................... 35

Channing Baisley................................................................................................................ 42

Drew Phillips ..................................................................................................................... 46

Ross Glenn ......................................................................................................................... 50

Willis McCutcheon ............................................................................................................. 55

Michael Jackson ................................................................................................................ 59

**Jessica Terrell** ................................................................................................ **63**

**Derek Dollahite** .............................................................................................. **66**

**James Sikes** ..................................................................................................... **70**

**ASB** ................................................................................................................. **73**

**CAUSES OF ACTION** .................................................................................. **83**

**First Cause of Action: Violation of Federal Defend Trade Secrets Act** .......................... **83**

**Second Cause of Action: Violation of the Texas Uniform Trade Secrets Act** .................. **91**

**Third Cause of Action: Breach of Fiduciary Duty** ...................................................... **98**

**Fourth Cause of Action: Breach of Contract** ............................................................. **101**

**Fifth Cause of Action: Tortious Interference with Existing Contract** ........................... **104**

**Sixth Cause of Action: Tortious Interference with Prospective Relations** ..................... **105**

**Seventh Cause of Action: Civil Conspiracy** .............................................................. **107**

**Eighth Cause of Action: Knowing and Joint Participation in Breach of Fiduciary Duty** ... **108**

**Ninth Cause of Action: Unfair Competition** ............................................................. **110**

**ATTORNEYS' FEES AND COSTS** ............................................................... **111**

**CONDITIONS PRECEDENT** ....................................................................... **111**

**PRAYER** ....................................................................................................... **111**

## NATURE OF THE ACTION

1.      This action involves the coordinated, mass departure of a group of former Happy Bank employees to launch competing banking operations for a new entrant to the West Texas market. Competition on fair terms is fair game. But Defendants did not act fairly and instead engaged in various types of misconduct, including breach of fiduciary duties, misappropriation of Happy Bank's trade secrets and confidential and proprietary information, unlawful solicitation of Happy Bank's customers and employees, breach of contract, tortious interference with existing contracts and prospective business relations, civil conspiracy, and unfair competition.

2.      Happy Bank is a Texas financial institution that has served the financial needs of its customers for more than 100 years.

3.      The Employee Defendants are former officers of Happy Bank—the very people entrusted with safeguarding Happy Bank's confidential and customer information—who carried out a premeditated, surreptitious, and deliberate scheme to use the access they were given to Happy Bank's confidential information, customers, and employees to prepare a pre-packaged bank to leverage with a new employer.

4.      After the Employee Defendants secretly initiated their plan, they resigned *en masse* and joined one of Happy Bank's competitors—ASB—where they presented a ready-to-use "Bank in a Box" that ASB could immediately run with to establish competing banking products and services, while avoiding crucial upfront risks and costs.

5.      At the time of the mass resignation, ASB had no operations in West Texas.

6.      Yet, within mere months of the Employee Defendants' resignation from Happy Bank, ASB announced or opened new offices in the same areas as Happy Bank—precisely where the Employee Defendants used to work for Happy Bank—and began offering loan and deposit

services to former Happy Bank customers. In October 2022, ASB partnered with NFL quarterback Patrick Mahomes as part of its buildout in the markets of Lubbock, Amarillo, and Plainview—the very markets serviced by Happy Bank's former employees before they joined ASB.[2]

7.      Before filing this action, Happy Bank reviewed information from a forensic analysis of the Employee Defendants' work laptops/computers to look for improper or unlawful actions. That analysis revealed a broad spectrum of suspicious activity, as discussed in Happy Bank's earlier-filed pleadings. As of the filing of this Third Amended Complaint, a substantial amount of document discovery has been completed, which has allowed Happy Bank to refine, revise, and supplement its allegations.

8.      As detailed below, the evidence of Defendants' wrongful actions now includes: extensive efforts to solicit the departure of other Happy Bank employees while the Employee Defendants were still officers of Happy Bank (and thus owed duties of loyalty to Happy Bank); the presence of Happy Bank's confidential information on ASB's email systems; and the transmission of Happy Bank trade secrets directly to high-ranking officers and directors of ASB.

9.      Happy Bank remains committed to the integrity of its business and safeguarding its confidential and customer information. Accordingly, Happy Bank files this amended pleading to address Defendants' conspiracy, protect Happy Bank's customers and the communities it serves, and recover damages and other relief for the harm Defendants caused. Happy Bank seeks

---

[2] *See* BUSINESS WIRE, *American State Bank Partners with Patrick Mahomes to Accelerate National Expansion & Digital Transformation* (Oct. 27, 2022), https://www.businesswire.com/news/home/20221027005210/en/ American-State-Bank-Partners-With-Patrick-Mahomes-to-Accelerate-National-Expansion-Digital-Transformation ("With significant investment in technology, employees, and platform, American State Bank competes with much larger institutions while maintaining the personal customer service of a community bank.").

economic damages, exemplary damages, attorneys' fees, costs, and related expenses. Happy Bank also seeks injunctive relief to enjoin Defendants' continued and/or future use and misappropriation of Happy Bank's confidential information and trade secrets, and for the return of the same.

<b><u>PARTIES</u></b>

10.    Plaintiff Centennial Bank, as the successor-in-interest to Happy State Bank, is a community bank organized under the laws of Arkansas with its principal place of business at 620 Chestnut Street, Conway, Arkansas 72032. Happy State Bank merged into and now operates as a division of Centennial Bank pursuant to a Merger Agreement (defined below) effective April 1, 2022. Pursuant to the Articles of Merger of Happy State Bank into Centennial Bank effective April 1, 2022, "all the property, rights, privileges, franchises, patents, trademarks, licenses, registrations, and other assets of any and every kind and description" of Happy State Bank were transferred to and vested in Centennial Bank. Thus, Happy State Bank is now Centennial Bank, and Plaintiff Happy Bank is a citizen of the State of Arkansas.

11.    Defendant American State Bank is a community bank organized under the laws of Texas with its principal place of business at 102 W. Front Street, Arp, Texas 75750. ASB does not have a registered agent on file with the Texas Secretary of State. ASB may be served through the vice president(s) or branch manager(s) responsible for overseeing the office located at 5202 Old Jacksonville Highway, Tyler, Texas, 75703.

12.    Defendant Jerry "Bud" Holmes is an individual and a citizen of the State of Texas who resides and works in Texas. Mr. Holmes was served with process and appeared in this action. *See* Dkt. 18.

13.     Defendant Jay House is an individual and a citizen of the State of Texas who resides and works in Texas. Mr. House was served with process and appeared in this action. *See* Dkt. 17.

14.     Defendant Channing Baisley is an individual and a citizen of the State of Texas who resides and works in Texas. Ms. Baisley was served with process and appeared in this action. *See* Dkt. 13.

15.     Defendant Drew Phillips is an individual and a citizen of the State of Texas who resides and works in Texas. Mr. Phillips was served with process and appeared in this action. *See* Dkt. 7.

16.     Defendant Ross Glenn is an individual and a citizen of the State of Texas who resides and works in Texas. Mr. Glenn was served with process and appeared in this action. *See* Dkt. 19.

17.     Defendant Willis McCutcheon is an individual and a citizen of the State of Texas who resides and works in Texas. Mr. McCutcheon was served with process and appeared in this action. *See* Dkt. 12.

18.     Defendant Michael Jackson is an individual and a citizen of the State of Texas who resides and works in Texas. Mr. Jackson was served with process and appeared in this action. *See* Dkt. 20.

19.     Defendant Jessica Terrell is an individual and a citizen of the State of Texas who resides and works in Texas. Ms. Terrell was served with process and appeared in this action. *See* Dkt. 9.

20.     Defendant Derek Dollahite is an individual and a citizen of the State of Texas who resides and works in Texas. Mr. Dollahite was served with process and appeared in this action. *See* Dkt. 15.

21.     Defendant James Sikes is an individual and a citizen of the State of Texas who resides and works in Texas. Mr. Sikes was served with process and appeared in this action. *See* Dkt. 8.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action seeks to enforce rights and remedies secured under the federal Defend Trade Secrets Act ("**DTSA**"), 18 U.S.C. § 1836 *et seq.* This Court has supplemental jurisdiction over Happy Bank's state-law claims pursuant to 28 U.S.C. § 1367 because such state-law claims are so related to Happy Bank's claims under the DTSA that they form part of the same case or controversy under Article III of the United States Constitution.

23.     This Court also has subject matter jurisdiction over Happy Bank's claims pursuant to 28 U.S.C. § 1332 because Happy Bank and Defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interests and costs.

24.     This Court has personal jurisdiction over Defendants because they all reside and/or conduct business in the State of Texas and have sufficient minimum contacts with Texas.

25.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Happy Bank's claims occurred in this District. Venue is also proper in this Court under 28 U.S.C. § 1391(b)(1) because at least one defendant resides in this District, and all Defendants are residents of the State of Texas.

## FACTUAL BACKGROUND

**A.    Happy State Bank.**

26.    Happy Bank was founded on January 1, 1908, and has served the financial needs of its customers for more than 115 years. It currently operates more than 60 branches physically located in the State of Texas.

27.    Happy Bank provides a full range of commercial and consumer banking services to its customers, including checking and savings accounts, consumer loans, residential mortgage loans, real estate loans, commercial and business loans, business checking accounts, time deposits, and money market accounts. Lending is Happy Bank's primary business and the key driver of its revenue and profits.

28.    Happy Bank's banking services are intended for and used by customers inside and outside the State of Texas. For example, Happy Bank regularly transacts business in states other than Texas—including in person and by phone, Internet, and mail—in connection with its checking and savings accounts, consumer loans, and commercial business loans, among other products and services used in interstate commerce. Happy Bank presently has numerous out-of-state customers. The confidential information and trade secrets that are the subject of Happy Bank's claims under the DTSA are related to this out-of-state business and services and used by Happy Bank in interstate commerce.

29.    Happy Bank owns confidential and proprietary information that is critical to the success of its business and provides a competitive advantage over competitors that do not have access to such information, including, but not limited to, its commercial advantage in recruiting and retaining employees and in pricing, closing, and servicing complex and higher-risk loans for customers (collectively, "**Confidential Information**"). Happy Bank has expended substantial

time, money, and effort to develop its Confidential Information, and it has taken significant efforts to guard the secrecy of the same.

30.     Happy Bank's Confidential Information at issue in this action includes, but is not limited to, sensitive and proprietary information about Happy Bank's: (1) loans and financial services; (2) customers, including personal identifiable information and financial data related to those customers and their businesses; (3) historical and projected financial performance, profitability, and budgets; (4) employees, including their compensation, financial performance, customers, and pipelines; (5) shareholders; and (6) processes, analyses, templates, presentations, reports, and forecasts used in the course of its business to analyze, price, approve, close, and service all the different types of loans and services that Happy Bank provides.

31.     Happy Bank's Confidential Information not only gives it a competitive edge over others, but it is also subject to strict confidentiality and ethical requirements imposed by Happy Bank's policies and procedures as well as federal and state banking laws, rules, and regulations.

**B.     Policies, Procedures, and Agreements Applicable to the Employee Defendants.**

32.     During the Employee Defendants' employment, Happy Bank maintained a robust set of policies and procedures to protect its Confidential Information and ensure that its employees observed the highest ethical standards of business conduct. In addition to all applicable laws and regulations, these policies and procedures imposed a duty of loyalty on each employee to Happy Bank by requiring strict protection of Happy Bank's Confidential Information and mandating that all business decisions be in the best interest of Happy Bank— without regard to any interest an employee may have that conflicts or interferes in any way with the interests of Happy Bank.

*The Handbook.*

33.     Among other things, the Happy Bank employee handbook (the "**Handbook**") contained policies regarding Happy Bank's ownership of all Happy Bank assets and property, and the return of all Happy Bank assets and property upon an employee's separation from Happy Bank.

34.     The Handbook's Internet access policy prohibited employees from using any third-party email services (*e.g.*, Hotmail, Gmail, or personal Microsoft Outlook accounts) on Happy Bank computers or revealing any Confidential Information using the Internet at any time. The Handbook also expressly stated that any files downloaded onto a Happy Bank system were the property of Happy Bank and that employees were accountable for any breaches of security or confidentiality. The Handbook also required that any Happy Bank property issued to an employee—such as software, computer equipment, databases, and files—must be returned upon an employee's separation from Happy Bank.

*The Ethics Policy.*

35.     Happy Bank's Code of Ethics Policy (the "**Ethics Policy**") required all employees to act in good faith, responsibly, with due care, competence, and diligence, without misrepresenting material facts or allowing the employee's independent judgment to be subordinated. The Ethics Policy further required all employees to act solely in the best interest of Happy Bank, and it prohibited employees from personally taking or usurping any opportunities discovered through the use of Happy Bank's property or information. The Ethics Policy expressly stated that employees owe a duty to Happy Bank to advance Happy Bank's legitimate interests whenever the opportunity to do so arises.

**PLAINTIFF'S THIRD AMENDED COMPLAINT**                                                                Page 8

36.     The Ethics Policy likewise required all employees to use Happy Bank assets only for legitimate business purposes and not for personal benefit, and it prohibited any unauthorized use or distribution of such assets. The Ethics Policy defined "assets" to include all work product, computers and software, customer lists, customer financial records, employee information, unpublished financial data and reports, and other similar matters. The Ethics Policy also expressly prohibited employees from using any Happy Bank property, information, or position for their personal gain or to compete with Happy Bank.

37.     The Ethics Policy contained a confidentiality policy that required all employees to maintain the confidentiality of any confidential information entrusted to them by Happy Bank or by those with whom Happy Bank does business. "Confidential information" is defined in the Ethics Policy as all non-public information that might be of use to competitors of, or harmful to, Happy Bank or persons with whom Happy Bank does business.

### *The Acceptable Use Policy.*

38.     The Employee Defendants were also subject to Happy Bank's Acceptable Use Policy during their employment with Happy Bank, which governed the use of Happy Bank's information resources such as computer systems, emails, the network, and the corporate Internet connection. Among other things, the Acceptable Use Policy expressly prohibited: (1) sharing or disclosing any confidential or restricted data in any manner to anyone that does not have a business reason to have such information; and (2) transferring any confidential or restricted data in an insecure manner.

39.     The Acceptable Use Policy further required the Employee Defendants to take reasonable efforts to avoid accessing network data, files, and information that were not directly related to their job functions. The Acceptable Use Policy made clear that the mere capability to

access certain data did not imply permission to use that access. Employees could use non-bank-owned devices (*e.g.*, personal phones) to receive email and use other approved applications *only if* they were approved by Happy Bank and access to those applications was obtained through Happy Bank's Microsoft Mobile Application Manager.[3]

40.     The Acceptable Use Policy outlined a non-exhaustive list of actions that constituted an unacceptable use of Happy Bank's corporate network. Among other things, the Employee Defendants were forbidden from using Happy Bank's corporate network and/or systems to: (1) engage in activity that was illegal under local, state, federal, or international law; (2) engage in any activity that may cause embarrassment, loss of reputation, or other harm to Happy Bank; (3) access customer and/or employee account(s) for a purpose that was not required or requested for business; or (4) disclose customer or employee account information that was not used for business purposes.

41.     Finally, the Acceptable Use Policy prohibited any peer-to-peer networking or file sharing unless it was on Happy Bank's corporate network and for business use. The Acceptable Use Policy expressly prohibited the use of any personal storage media (*i.e.*, USB devices).

### *The Network Security Policy.*

42.     Happy Bank established and enforced a Network Security Policy for all of its information technology ("**IT**") systems, devices, and accounts—which collectively comprise Happy Bank's corporate network—to ensure the security of Happy Bank's network infrastructure and Confidential Information.

---

[3] Microsoft's Mobile Application Manager/Management is a program that allows companies to manage and protect their data by controlling which applications utilizing such data can be installed and used on their employees' mobile devices. *See Frequently Asked Questions About MAM and App Protection*, MICROSOFT, https://learn.microsoft.com/en-us/mem/intune/apps/mam-faq (last visited May 18, 2024).

43.     Among other things, the Network Security Policy required employees to use: (1) complex and confidential passwords to access computers and user network accounts, which were required to be changed every 90 days and could not be re-used for 10 cycles; (2) dual-factor authentication for any remote access to the network; and (3) screen locks, encrypted hard drives, and valid domain user credentials for all work computers. The Network Security Policy also described five different types of firewalls that Happy Bank deployed to protect the security of its corporate network.

### The Cloud Computing Policy.

44.     Happy Bank's Cloud Computing Policy (the "**Cloud Policy**") was designed to ensure that employees used any cloud computer services in a safe and secure manner.

45.     The Cloud Policy required that all cloud computer services on public servers or information technology services that were not hosted by Happy Bank (*e.g.*, Box, Dropbox, Gmail, Yahoo mail, and personal non-company Microsoft OneDrive accounts) must be reviewed and approved by Happy Bank's IT Architecture Review Committee *before* they were purchased or utilized. If an employee used any cloud computing service to handle restricted or confidential data, additional layers of protection were required, including ensuring the data was encrypted in flight and at rest.

46.     In addition, all cloud computer services were to be used by Happy Bank's employees only to access and review information uploaded by customers. Employees were not to use cloud computer services to transmit or disclose such information.

### The Privacy Policy.

47.     Happy Bank's Privacy Policy outlined Happy Bank's practices regarding the protection of personally identifiable financial information of its customers. Among other things,

the Privacy Policy expressly stated that Happy Bank did not disclose any personal financial information of its customers to any nonaffiliated or affiliated third parties. The Privacy Policy also made clear that Happy Bank protected consumer privacy by granting access to such information only to those employees who have a business reason for doing so.

### The Mobile Device Policy.

48.     Happy Bank's Mobile Device Policy set forth Happy Bank's standards for securing mobile devices, which included company-approved laptops, smart phones, USB devices, flash drives, memory sticks, and other personal data storage media. The Mobile Device Policy required encryption for all mobile devices and expressly prohibited employees from storing bank data on non-bank-provided mobile equipment—including USB devices. The only exception to this prohibition was simple contact information, such as phone numbers and email addresses, stored in an address book on a personal phone.

### The Stock Appreciation Rights Award Agreements.

49.     During their employment with Happy Bank, most of the Employee Defendants (identified more specifically below) also signed one or more Stock Appreciation Rights Award Agreements (the "**Awards**"), in which they agreed to additional policies and procedures in exchange for an award of Happy Bank stock. The stock granted to employees under the Awards was a form of additional compensation for certain employees in recognition of their hard work for—and dedication to—Happy Bank.

50.     The Employee Defendants who signed the Awards expressly agreed not to use, make available, sell, disclose, or otherwise communicate any of Happy Bank's Confidential Information to any person during their employment—other than in the course of the employee's assigned duties and for the benefit of Happy Bank—or at any time thereafter. The Employee

Defendants who signed the Awards also acknowledged that this nondisclosure agreement was: (1) ancillary to an otherwise enforceable agreement; (2) supported by independent valuable consideration as required by the Texas Business and Commerce Code; and (3) essential to protect the relationships and goodwill of Happy Bank.

51.     The Awards expressly provided that if Happy Bank determined an employee had violated the nondisclosure restrictions, then Happy Bank may declare any shares or amounts delivered or paid pursuant to the Awards forfeited without payment or compensation.

### *The Restricted Stock and Stock Appreciation Rights Plan.*

52.     The Awards were also subject to the Happy Bancshares, Inc. Restricted Stock and Stock Appreciation Rights Plan (the "**Plan**"), the terms of which were incorporated by reference into the Awards. Among other things, to further protect Happy Bank and its Confidential Information, customers, and goodwill, the Plan included a nondisclosure provision that prohibited an employee from, directly or indirectly, either during employment or at any time thereafter, using, making available, selling, disclosing, or otherwise communicating any of Happy Bank's Confidential Information to any person other than in the course of the employee's assigned duties and for the benefit of Happy Bank.

### *The Executive Nonstatutory Option Agreements.*

53.     During their employment with Happy Bank, some of the Employee Defendants also signed one or more Executive Nonstatutory Option Agreements (each an "**Option**"), which granted options to purchase Happy Bank stock as a form of additional compensation.

54.     Defendant Glenn signed an Option dated December 1, 2020, which included several restrictions during and after his employment with Happy Bank. First, Mr. Glenn agreed that during the term of his employment and for a period of 12 months following the end of his

employment with Happy Bank, he would not engage in competition with Happy Bank by working for any lending or depository institution within a 50-mile radius of any location of Happy Bank to which he was assigned or from which he performed duties for Happy Bank.

55.     Second, Mr. Glenn agreed that, in exchange for the December 1, 2020 Option, he would not during the 12-month period after his employment with Happy Bank ended, directly or indirectly contact, solicit, induce any Happy Bank customers to (a) reduce or eliminate the business such customer conducts with Happy Bank or (b) enter into any business relationship with Mr. Glenn, Mr. Glenn's new employer, or any third party if such business relationship is competitive with the same or similar business activities that Mr. Glenn carried out for Happy Bank.

56.     Third, Mr. Glenn agreed in the December 1, 2020 Option that while he worked for Happy Bank and during the 12-month period thereafter, he would not directly or indirectly encourage any person working for Happy Bank to leave the employ of Happy Bank to become an employee of any third party that competes with Happy Bank.

57.     Fourth, Mr. Glenn promised in the December 1, 2020 Option that he would not directly or indirectly use, make available, sell, disclose, or otherwise communicate any Happy Bank Confidential Information to any person, other than in the course of his assigned duties for Happy Bank, either during the period he worked at Happy Bank or any time thereafter.

58.     Mr. Glenn stipulated and agreed that the restrictions in the December 1, 2020 Option were ancillary to an otherwise enforceable agreement and supported by independent and valuable consideration. He further stipulated and agreed these restrictions were essential to protect the relationships and goodwill of Happy Bank, and the limitations as to time, geographic

area, and scope of activity were reasonable and acceptable to him and did not impose any greater restraint than reasonably necessary to protect the goodwill and other business interests of Happy Bank.

**C.    The Employee Defendants Acknowledged and Agreed to Be Bound by the Policies and Procedures and Their Respective Agreements with Happy Bank.**

59.    Each Employee Defendant acknowledged and agreed to be bound by, and received annual training for, the aforementioned policies and procedures.[4] Each Employee Defendant also agreed to abide by the terms of his or her respective agreements with Happy Bank.

60.    As shown below, however, the Employee Defendants violated Happy Bank's policies and procedures and/or breached their agreements with Happy Bank.

**D.    The Merger Agreement.**

61.    Pursuant to an Agreement and Plan of Merger (the "**Merger Agreement**"), Happy State Bank merged with and now operates as a division of Centennial Bank. The Merger Agreement closed on April 1, 2022, which resulted in "all the property, rights, privileges, franchises, patents, trademarks, licenses, registrations, and other assets of any and every kind and description" of Happy State Bank being transferred to and vested in Centennial Bank.

62.    The plan to complete the merger was first announced in the fall of 2021. Before then, only a small group of representatives from Happy State Bank and Centennial Bank were made aware of and involved in any discussions about a potential merger. That small group did not include any of the Employee Defendants. Upon information and belief, at least Messrs. Holmes,

---

[4] As noted below, the merger closed on April 1, 2022. Even so, Happy State Bank's policies and procedures remained in force until June 2022, when it completed the conversion process with Centennial Bank. Accordingly, all of Happy State Bank's policies and procedures were applicable to the Employee Defendants at all relevant times.

House, Glenn, and McCutcheon were frustrated that they were not consulted and/or included in discussions about the potential merger.

63.    On October 22, 2021—before the closing of the Merger Agreement—Centennial's parent company filed a Form S-4 with the United States Securities Exchange Commission regarding the Merger Agreement, in which it described salaries paid to certain executives following the merger.[5]

64.    Mr. Holmes—who was at the time a Regional President of Happy Bank—became angry after reading about the merger and the compensation disclosed in the Form S-4. Shortly thereafter, Mr. Holmes met with a member of Happy Bank's board of directors and complained about not receiving additional compensation for himself.

65.    Happy Bank offered Mr. Holmes significant additional compensation after the merger was announced, but he was still unsatisfied. He then crafted a plan for revenge, and over the following months, conspired with other Defendants to secretly solicit dozens of Happy Bank employees to join him at one of Happy Bank's competitors.

66.    After packaging up this ready-to-use "Bank in a Box" based on Happy Bank's Confidential Information, customers, and employees, Mr. Holmes presented it to his new employer—ASB.

**E.    The Mass Resignation from Happy Bank and Mass Hiring by American State Bank.**

67.    Effective Friday, April 22, 2022—three weeks after the Merger Agreement closed—Mr. Holmes resigned and departed Happy Bank immediately. One business day later,

---

[5] Centennial Bank's parent company was required to file an SEC Form S-4 in order to register shares of stock to be issued in connection with the Merger Agreement. *See Form S-4*, UNITED STATES SECURITIES AND EXCHANGE COMMISSION, https://www.sec.gov/files/forms-4.pdf (last visted May 18, 2024).

Mr. Holmes began working out of an office as an employee of ASB, which was a new entrant into the West Texas market. Notably, Mr. Holmes's new office was precisely the same office that Happy Bank had used many years earlier, and it ultimately would become ASB's Lubbock loan production office ("**LPO**") / deposit production office ("**DPO**").[6]

68.     That same day (Monday, April 25, 2022), fourteen additional Happy Bank employees—almost all of whom worked directly for or at the same location as Mr. Holmes— resigned from Happy Bank. Every one of these former Happy Bank employees was immediately hired by ASB and most began working in the same office space as Mr. Holmes. In the weeks that followed, numerous other employees submitted their resignations and also joined ASB. *In total, more than 70 former Happy Bank employees went to work for ASB.*

69.     The speed with which Mr. Holmes and many of the other Employee Defendants began working for ASB reveals the coordinated nature of their scheme—a conspiracy that has only become clearer as discovery has unfolded in this case.

70.     On May 2, 2022—one week after Mr. Holmes resigned from Happy Bank—ASB notified the Texas Department of Banking ("**TDB**") of its intent to establish an LPO/DPO in Lubbock, Texas, at the exact location where Mr. Holmes began working for ASB one business day after his resignation.

---

[6] An LPO is a type of banking facility that conducts loan activities, including origination (i.e., assembling credit information, soliciting or processing applications, etc.), approval, and closing. A DPO is a type of banking facility that may solicit deposits, provide information about deposit products, and assist persons in completing application forms and related documents to open or maintain a deposit account. Although LPOs and DPOs are not considered bank branches, they are often used as a steppingstone to eventually open bank branches. *See, e.g.*, Angel Coker, *Banks capitalize on new deposit office option* (July 18, 2019), BIRMINGHAM BUSINESS JOURNAL, https://www.bizjournals.com/birmingham/news/2019/07/18/banks-capitalize-on-new-deposit-office-option.html ("In addition to the convenience for customers of being able to make deposits and take out loans all in one place, Hill said allowing banks to open DPOs gives them the opportunity to see if there is enough business in that market to justify a full-service branch.").

71.     In June 2022, ASB formally announced that it had opened the Lubbock LPO/DPO to be led by Mr. Holmes, its new Regional President of the Lubbock area—the same position Mr. Holmes had with Happy Bank and in proximity to where he used to work at Happy Bank.

72.     But that is not all. Around the same time, ASB opened additional offices in the same areas as Happy Bank—and former Happy Bank employees worked at all of them.

73.     First, ASB opened an LPO/DPO in Plainview, Texas, led by Mr. McCutcheon and Nancy Stukey, two former Happy Bank employees who worked for Happy Bank in Plainview in the same roles. ASB's Plainview LPO/DPO was located at the same intersection as Happy Bank's Plainview branch. In fact, Mr. McCutcheon signed a lease for that office on behalf of ASB as its "President" on May 3, 2022—less than a week after he resigned from Happy Bank. On May 12, 2022, ASB notified the TDB of its intent to establish an LPO/DPO in Plainview, Texas, to be managed by Mr. McCutcheon as its "Plainview Market President." Within three months, ASB would apply to convert the Plainview LPO/DPO to a new branch.

74.     Second, ASB opened an LPO/DPO in Amarillo, Texas, led by Mr. Glenn, a former Happy Bank employee who worked for Happy Bank as an Executive Vice President in Amarillo. ASB's Amarillo LPO/DPO was located just one street away from Happy Bank's Amarillo branch. Mr. Glenn signed a lease for that office on behalf of ASB as its "Regional President – Amarillo" on May 18, 2022—less than a month after he resigned from Happy Bank. He also signed a personal guaranty for that lease. Less than a week later, ASB notified the TDB of its intent to establish an LPO/DPO in Amarillo, Texas, to be managed by Mr. Glenn as its "Amarillo Market President."

75.     Before the mass resignation from Happy Bank in April 2022, ASB had no presence in Lubbock, Plainview, or Amarillo, Texas.

76.     In connection with these events, and as further detailed below, the Employee Defendants breached their duties to Happy Bank and/or exploited Confidential Information they stole from Happy Bank, providing Defendants with a perfect template and roadmap for ASB to establish LPOs, DPOs, and/or branches. ASB merely needed to unwrap the "Bank in a Box."

**F.     American State Bank Quickly Began Servicing Former Happy Bank Customers.**

77.     Not only did ASB hire more than 70 Happy Bank employees, but it also began offering deposit services and loans to numerous Happy Bank customers.[7] As just one example, ASB was listed as the grantee on several deeds of trust related to properties for a then-Happy Bank customer who was in the process of obtaining loans from Happy Bank for these same properties. These deeds were filed within two months of the mass resignation.

78.     As another example, within a week of the mass resignation, a customer asked Happy Bank for a copy of an appraisal that Happy Bank had paid for in connection with the customer's potential loan request. Upon information and belief, that customer later had one or more loans with ASB, including a loan related to the property for which Happy Bank paid for the appraisal.

79.     The speed at which the aforementioned loans were closed and the deeds of trust were filed shows that the misappropriated "Bank in a Box" proved quite effective.

---

[7] *See* George Waldon, *Despite Challenges, Home BancShares Still Happy with Foray Into Texas* (Feb. 20, 2023), ARKANSAS BUSINESS, https://www.arkansasbusiness.com/article/143378/home-bancshares-still-happy-with-foray-into-texas (noting that during the first three quarters of 2022—which included the mass resignation at the start of the second quarter—ASB's deposits grew from $536 million to $645 million to $874 million, and its staff expanded from 128 employees to 170 and then 217). Notably, the growth of ASB's staff by 89 employees was comprised almost exclusively of former Happy Bank employees.

80.    As detailed below, one or more Defendants effectively stole Happy Bank clients, robbed it of the opportunity to close and/or receive revenue from loans, and utilized its Confidential Information (including its proprietary templates and forms)—which left Happy Bank saddled with costs related to already-executed appraisals and title work, and which deprived Happy Bank of the benefits it bargained for and reasonably expected from the merger transaction. Defendants further weaponized the Confidential Information by using Happy Bank's proprietary templates and confidential loan terms and rates to undercut its profits. Indeed, after the mass resignation, ASB solicited customers for whom Happy Bank had previously completed detailed credit memoranda as part of loan approval processes. As just one example, after one customer received offers from ASB that improved upon Happy Bank's lending terms—which ASB was only aware of due to Defendants' theft—Happy Bank was forced to cut its already-competitive rates to retain the customer, a substantial concession in the environment of rising interest rates.

81.    Moreover, shortly after the mass resignation, Happy Bank encountered several instances where customers asked about loan requests that were in process with Happy Bank and had been serviced by one or more Defendants—yet no such information could be found on Happy Bank's systems.

**G.    Happy Bank's Initial Investigation Led to this Lawsuit.**

82.    After the mass resignation of its former employees and inquiries from its customers about loan status and other matters, Happy Bank realized that the Employee Defendants likely engaged in misconduct, including breaching duties to Happy Bank and improperly copying, transferring, using, deleting, and/or disclosing Happy Bank's Confidential Information.

83.     Happy Bank therefore retained a certified computer forensics firm to analyze its former employees' laptops/computers and determine the extent of any improper or unlawful activity. To evaluate whether data, information, and/or files had been deleted or altered, Happy Bank and its computer forensics firm also analyzed: (1) emails on the former employees' Happy Bank email accounts; (2) logs of documents printed on Happy Bank printers; (3) video recordings from cameras at various Happy Bank offices; (4) the former employees' activity on Happy Bank's internal networks and drives; and (5) other data from Happy Bank's servers. Additional information has also come to light as a result of ongoing discovery in this action.

84.     As discussed below, Happy Bank found significant evidence of wrongful actions by the Employee Defendants, both before and after their resignation from Happy Bank. The evidence gathered to date confirms that Defendants' conspiracy was premeditated, carried out surreptitiously, and deliberately designed to damage Happy Bank. Happy Bank did indeed suffer various damages as a result of Defendants' misconduct and unsafe and unsound banking practices.

85.     The forensic analysis, as well as discovery, is still ongoing as to all Defendants.

**H.      Defendants' Conduct Shows They Are Liable to Happy Bank.**

## <u>Jerry "Bud" Holmes</u>

86.     Mr. Holmes is a former officer and Regional President, Central West, at Happy Bank, which is the second-highest position in Happy Bank's Lubbock lending business. During his 10-year employment with Happy Bank, Mr. Holmes officed out of a branch located on 98th Street in Lubbock, Texas, but he served as the Regional President for seven branches in total—including four in Lubbock and one each in Abilene, Slaton, and Tahoka, Texas.

87.     As Happy Bank's Regional President, Central West, Mr. Holmes was responsible for the development and performance of Happy Bank's Lubbock regional market as well as perpetuating the culture and values of Happy Bank. Mr. Holmes's duties included managing and overseeing all lending functions within the Lubbock regional market, such as loan approvals, loan quality, past-due monitoring and collections, exception monitoring and management, loan pricing, and loan growth. Mr. Holmes was also responsible for all new business development activities for Happy Bank's products, including lending, deposits, treasury management, mortgage lending, investments, and trust products. As an officer and Regional President, Mr. Holmes owed numerous fiduciary duties to Happy Bank.

88.     During his employment with Happy Bank, Mr. Holmes signed several Awards and agreed to be bound by the provisions of the Awards and the Plan, which was incorporated in full into the Awards. Mr. Holmes also signed at least one Confidentiality Agreement that included a nondisclosure provision prohibiting him from communicating, revealing, or disclosing Happy Bank's Confidential Information at any time for any purpose other than the proper performance of his job duties at Happy Bank. Mr. Holmes further agreed in his Confidentiality Agreement that Happy Bank would be entitled to its attorneys' fees and costs in addition to damages if it filed a lawsuit to enforce its rights under the Confidentiality Agreement. Finally, Mr. Holmes acknowledged and agreed to be bound by all of the provisions in the Handbook and Ethics Policy, and he received annual training on the other Happy Bank policies and procedures described above.[8]

---

[8] Mr. Holmes completed his most recent training on Happy Bank's cybersecurity and Internet security policies on February 28, 2022; his most recent training on Happy Bank's Code of Ethics on December 27, 2021; and his most recent training on Happy Bank's information security policies on October 27, 2021.

89.     Mr. Holmes had no express or implied authorization or consent to copy, transfer, delete, and/or take any of Happy Bank's Confidential Information from Happy Bank's computers, systems, or premises. Based on his role and the policies, procedures, and provisions by which he agreed to be bound, Mr. Holmes knew that Happy Bank's Confidential Information was owned solely by Happy Bank, was valuable to Happy Bank, and would be highly useful to Happy Bank's competitors, as it would enable them to compete with Happy Bank unfairly and unlawfully and effectively target and recruit Happy Bank's current and future customers and employees.

90.     Based on the forensic data and other information summarized below, there is significant evidence that Mr. Holmes orchestrated plans to unlawfully obtain, use, disclose, and/or remove Happy Bank's Confidential Information without authorization. In addition, Mr. Holmes breached fiduciary duties to Happy Bank; conspired with other Defendants to undermine Happy Bank's operations; interfered with Happy Bank's existing contracts with its employees, including by soliciting and/or encouraging Defendants House, Glenn, McCutcheon, Jackson, and Baisley to breach their respective contracts with Happy Bank; knowingly participated in the breach of the fiduciary duties of other Happy Bank employees; and interfered with Happy Bank's prospective business relationships with customers and potential customers by causing them to move their business to ASB. Mr. Holmes also breached his contracts with Happy Bank and engaged in unfair competition and unsafe and unsound banking practices—ultimately exploiting these misdeeds to benefit himself and a Happy Bank competitor, ASB, and presumably obtain more favorable compensation.

91.     Even though Mr. Holmes was still an officer of Happy Bank until his resignation on April 22, 2022, Mr. Holmes's actions described herein were not done for the benefit of Happy Bank or at Happy Bank's direction.

92.     Mr. Holmes made little effort to hide his anger after learning about the merger and the compensation disclosed in the Form S-4 filed on October 22, 2021. Although Happy Bank offered him significant additional compensation, Mr. Holmes rejected the offer. Within a few weeks of the merger and his review of the Form S-4, Mr. Holmes also accessed his personal resume on his Happy Bank computer.

93.     While Mr. Holmes was not yet in contact with ASB in late 2021, he was already considering a possible move to another bank at that time. Mr. Holmes engaged in secret negotiations with at least one potential employer in approximately late December 2021 and January 2022. Considering other employment opportunities is permissible. But what is not permissible—and what occurred here—is going far beyond mere preparations to move jobs and instead abusing the trust and access granted by Happy Bank to secretly recruit others and then facilitating those departures through the misuse of Happy Bank's information.

94.     Communications between Mr. Holmes and representatives of ASB started in approximately early March 2022. Beginning at that time and extending through his resignation from Happy Bank on April 22, 2022, Mr. Holmes engaged in a series of actions that breached his fiduciary duties to Happy Bank. These actions included soliciting other Happy Bank employees to leave Happy Bank while Mr. Holmes was still its Regional President, and providing confidential, sensitive, and proprietary Happy Bank information directly to ASB.

95.     Moreover, after Mr. Holmes became an ASB Regional President on April 25, 2022, he continued to commit unlawful actions by knowingly utilizing Confidential Information wrongfully taken from Happy Bank, and by tortiously interfering with Happy Bank's prospective relationship with one or more customers.

96.     Mr. Holmes knew that Happy Bank's Confidential Information would be highly useful to a Happy Bank competitor because it would enable the competitor to hit the ground running. This would be particularly true for a bank like ASB that was looking for a way to boost its new presence in the same markets as Happy Bank. Through the misuse of Happy Bank's Confidential Information, Mr. Holmes and ASB could minimize or avoid the time, effort, expense, and guesswork involved in opening and operating the new LPOs and DPOs. The "Bank in a Box" would allow ASB to immediately open a competing bank right down the street, relying on Mr. Holmes's influence over Happy Bank employees and customers and his divided loyalty while still working for Happy Bank.

97.     On or about March 9, 2022, Mr. Holmes—still then a high-ranking officer at Happy Bank—emailed a spreadsheet entitled "Benefits Matrix" to David Smith, who was at that time acting as an agent for ASB in exploring the possible exodus of Happy Bank officers and employees to ASB. This Benefits Matrix contained, for thirteen Happy Bank employees (including several Defendants), their 2021 Happy Bank base compensation, their 2021 incentive compensation, information about stock options they held, information about Stock Appreciation Rights Award Agreements they exercised, and the stay-on bonus Happy Bank had offered to each if they continued to work for Happy Bank following completion of the merger.

**PLAINTIFF'S THIRD AMENDED COMPLAINT**                                    Page 25

98.     All of this was highly confidential and competitively sensitive information belonging to Happy Bank. Even among Happy Bank employees, information about the compensation paid to employees was available only to a limited group of fiduciaries—namely those directly involved with personnel matters. The receipt of this information by a would-be competitor would be extremely advantageous in luring away officers and employees, and in planning a large-scale recruitment of personnel away from Happy Bank. This is especially true when combined with input from someone in a managerial position, like Mr. Holmes, who had an opportunity to evaluate and convey the skills and contributions of the Happy Bank employees in a way that would be unknown to persons outside Happy Bank.

99.     One day, later, on or about March 10, 2022, Mr. Holmes emailed the same "Benefits Matrix" to Brandon Steele, who was then the Chairman of ASB. Mr. Steele was heavily involved in recruiting Mr. Holmes and other Employee Defendants away from Happy Bank and played a central role in arranging ASB's expansion into Lubbock, Amarillo, and Plainview.

100.    On or about March 14, 2022, Mr. Holmes emailed an updated version of the same document—now also including proposed base and bonus / incentive compensation that many of these same officers or employees would receive at ASB—to Mr. Smith. Mr. Holmes then emailed this same, updated document to Mr. Steele on or about March 16, 2022.

101.    The Happy Bank compensation, incentive, bonus, and options data that Mr. Holmes emailed to Mr. Steele and Mr. Smith was confidential and sensitive information to which Mr. Holmes had access by virtue of his role as Regional President at Happy Bank. Indeed, Happy Bank's forensic analysis and print logs show that Mr. Holmes accessed and printed an internal

Happy Bank document entitled "Employee and Officer Listing 5-21.xlsx" on or about March 9, and again on or about March 11, and again on or about March 16, 2022. This document contained detailed and confidential 2021 compensation information for Happy Bank employees. Upon information and belief, Mr. Holmes accessed, printed, and used confidential Happy Bank compensation information in this document to prepare the spreadsheets that he sent to Mr. Steele and Mr. Smith.

102.    In the following weeks, while still working for Happy Bank, Mr. Holmes participated in a coordinated plan with ASB to arrange for offers to be made to multiple Happy Bank officers and employees that Mr. Holmes identified as targets for recruitment, all with the aid of Happy Bank's Confidential Information. Text messages from Mr. Holmes reveal that by no later than April 15, 2022, Mr. Holmes had secured the agreement of at least Defendants Jackson, House, Terrell, Sikes, Baisley, and Phillips (among other Happy Bank employees) to join him at ASB, and was aware that Mr. Glenn (in Amarillo) and Mr. McCutcheon (in Plainview) would be joining ASB as well. Mr. Holmes informed ASB of these developments as they happened. Mr. Holmes was also involved in arranging initial discussions between ASB and several Defendants in approximately the last two weeks of March and the first two weeks of April. Mr. Holmes's solicitation of these employees to leave Happy Bank while he was still employed with Happy Bank, and his secret orchestration of a large-scale exodus of Happy Bank employees to ASB, was an egregious breach of his fiduciary duties as an officer of Happy Bank, including in particular his duty of loyalty.

103.    On or about April 19, 2022, while still an officer at Happy Bank, Mr. Holmes sent Mr. Steele another email with a "Comp Plan" spreadsheet attached (the "**Comp Plan**"), which

listed 25 then-employees of Happy Bank (or 26 counting Mr. Holmes himself), with three employees listed as "Pending," and eight employees identified as "Others/Possible." As to the other fifteen employees in the spreadsheet, Mr. Holmes provided comprehensive and detailed information, including (as to each employee): (i) social security number; (ii) date of birth; (iii) telephone number and personal email; (iv) information about workspace; (v) incentive and stay-on bonus information for the employee at Happy Bank, and (vi) proposed title, compensation, incentive compensation, sign-on bonus, and stock award rights for each employee at ASB. This information was used as a basis for ASB's preparation and extension of formal offers (including through Mr. Holmes himself) to multiple Happy Bank officers and employees—who then officially accepted the offers, completing the sudden mass exodus from Happy Bank.

104.    Without Mr. Holmes's utilization of his insider knowledge about confidential Happy Bank compensation and personnel information for these employees, including his preparation of the "Benefits Matrix" and "Comp Plan" for ASB, this mass exodus from Happy Bank would not have been possible. This information constituted Happy Bank's trade secrets, and its compilation and use by Mr. Holmes provided him—and ASB—with the perfect roadmap to determine exactly what to offer the employees to solicit them away from Happy Bank.

105.    Unfortunately, this is far from the only Happy Bank Confidential Information that Mr. Holmes provided to ASB.

106.    On or about April 8, 2022, Mr. Holmes met in person with ASB's President and CEO, Kelly Sanders, and an ASB Executive Vice President, Richard Solomon. A few days later, on or about April 11, Mr. Solomon sent Mr. Holmes (and Mr. Sanders) a text message asking Mr. Holmes for details about Happy Bank's "lender origination fee incentive program." Mr. Holmes

responded by texting a photo of a printed copy of the "Happy State Bank 2022 Commercial Lender Incentive Plan." Mr. Holmes said the photo "was the best, most expeditious way to send [this] confidentially"—in other words, to send it without Happy Bank's knowledge.

107.    The Happy State Bank 2022 Commercial Lender Incentive Plan was an internal, confidential, and competitively sensitive document setting forth the details of how Happy Bank provided incentive compensation to certain lenders based upon their performance. It contained specific formulas, factors to be considered, and timing provisions related to when lending employees would be eligible for certain incentives. The features of the program were not, and are not, publicly known, and the program provided competitive advantages to Happy Bank in retaining high-performing lenders and improving earnings performance. It was thus a Happy Bank trade secret, and the transfer of this Commercial Lender Incentive Plan to ASB by Mr. Holmes—who was then still a Regional President for Happy Bank entrusted with full access to its sensitive internal documents—was another egregious breach of his duties to Happy Bank.

108.    Evidence indicates that Mr. Holmes had also discussed this confidential incentive program directly with ASB's Chairman, Mr. Steele, a couple of weeks earlier. On or about March 23, 2022, Mr. Steele told Mr. Holmes in a text message: "FYI I instituted your loan fee program here for our commercial lenders. They loved it." Mr. Holmes responded that he thought this "fee income program will yield dividends down the road [for ASB]" because it had "proven so for us" (referring to Happy Bank), and because the program "serves to counter any bank in the market from stealing a good banker. It's a great retention tool." This exchange reveals that Mr. Holmes had not only provided details of the incentive program to Mr. Steele, but that ASB had already, at a minimum, taken steps to implement the program as its own.

109.    Additional text messages reveal even more transfers of Happy Bank Confidential Information by Mr. Holmes to ASB.

110.    On or about May 17, 2022, after the Employee Defendants had left Happy Bank, Mr. Steele received a text message from Mr. Holmes in which Mr. Holmes asked: "Do you still have a copy of the 10 year spreadsheet that I provided to you *reflecting the annual performance for Happy, Lubbock.* I was starting to work on my presentation and I cant [sic] locate a copy." (emphasis added). Mr. Steele responded by saying, "Yes Kyle McCoy [ASB's Chief Financial Officer] has my hard copy." Upon information and belief, the "10 year spreadsheet" referenced in this exchange is an internal and confidential Happy Bank document, "Lubbock Operations – P and L – 2021" (the "**Lubbock P&L**"). Mr. Holmes printed a hard copy of the Lubbock P&L on numerous occasions while still at Happy Bank, including on or about March 8 and March 16, 2022, which is around the time he was having his initial conversations with Mr. Steele and Mr. Smith.

111.    The Lubbock P&L is a spreadsheet Mr. Holmes created while he was working at Happy Bank, which contains detailed financial information about operations, revenues, profits, and losses from 2012 to 2021 at Happy Bank's Lubbock locations. This information was not and is not publicly available. It would be highly useful to a competitor like ASB seeking to start and grow its own Lubbock branch, and would greatly aid in the financial and operational planning for such an expansion.

112.    The evidence strongly suggests that Mr. Holmes (i) gave the Lubbock P&L to Mr. Steele and ASB in hard copy form in March 2022, before leaving Happy Bank, and then (ii)

utilized this information within ASB in May 2022 after becoming Regional President there, to aid ASB's competitive efforts.

113.    Mr. Holmes's transfer of the Lubbock P&L to ASB, and his use of it at ASB, is another instance of (i) Mr. Holmes's breach of his fiduciary duties to Happy Bank, and (ii) his unauthorized disclosure and use of Happy Bank's trade secrets to assist ASB.

114.    In the months leading up to his resignation, Mr. Holmes also downloaded and opened, accessed, and/or viewed Final Credit Memos that contained significant Confidential Information about then-Happy Bank customers, including, but not limited to, proprietary information regarding Happy Bank's risk ratings for each customer and analyses related to each customer's credit capacity. As such, the information contained in the Final Credit Memos could be exploited by Happy Bank's competitors to accelerate the process to open and approve loans or to make firm offers to customers for such loans. Indeed, upon information and belief, this is precisely what ASB did within weeks of the mass resignation. Some of the customers in these Final Credit memos paid off their loans with Happy Bank and opened loans with ASB.

115.    Information related to at least one of these customers was also missing from Happy Bank's systems after Mr. Holmes's resignation, which required Happy Bank to offer significant concessions to the customer (who was irate at having to resupply the information again to Happy Bank).

116.    On or about April 18, 2022, just three days before his resignation from Happy Bank, Mr. Holmes connected a SanDisk Cruzer Glide USB Device to his Happy Bank work computer. Mr. Holmes maintained a Microsoft OneDrive folder at Happy Bank entitled "bholmes," which contained a large number of confidential and proprietary Happy Bank

documents, including extensive information about Happy Bank customers. Forensic data revealed a last access date and time for almost every document in Mr. Holmes's "bholmes" Happy Bank OneDrive folder only minutes before Mr. Holmes connected the USB drive. This suggested the possibility that Mr. Holmes accessed and copied documents from this folder onto his USB drive.

117.    Production of this USB drive in this litigation has indicated that Mr. Holmes downloaded certain personal documents stored on his Happy Bank computer to the USB drive on April 18, 2022. To date, the produced USB drive has not revealed the presence of non-personal documents from the "bholmes" folder.

118.    Other evidence indicates, however, that Mr. Holmes was aware that further Happy Bank Confidential Information—including information pertaining to customers—was transferred from Happy Bank to ASB.

119.    For example, on April 28, 2022, Defendant James Sikes—one of the Happy Bank employees recruited by Mr. Holmes to ASB—was in his third day of employment with ASB and had been given an ASB email account. On or about that day, Mr. Sikes sent an email from his ASB email account to his personal Gmail account, with the subject "FW: loans to talk to Bud about." This email contains information about ten Happy Bank customers, all of whom Mr. Sikes then apparently considered to be potential ASB customers.

120.    This April 28, 2022 email from Mr. Sikes includes, for various of these customers, information about the customers' Happy Bank loan amounts, the maturity dates for their Happy Bank loans, loan-to-value ratios, collateral for the loans, and, in one case, a reference to an appraisal previously done by Happy Bank. The email also discusses the likely intentions of

various customers with respect to their loans—information Mr. Sikes could have known only through his work at Happy Bank. This information was confidential and highly sensitive, and, upon information and belief, was taken directly from Happy Bank.

121.    Upon information and belief, a number of the customers listed in Mr. Sikes's email subsequently became customers of ASB.

122.    Because the heading for Mr. Sikes's April 28, 2022 email was "loans to talk to Bud about," it is plausible to infer that this shows yet another instance in which Mr. Holmes was a party to the unauthorized disclosure and use of Happy Bank Confidential Information to compete with Happy Bank. Mr. Holmes's participation in the use of Happy Bank Confidential Information concerning these customers' loan amounts, rates, maturity dates, collateral, and appraisals to facilitate the termination of their business with Happy Bank, and the transfer of their business to ASB, also constitutes tortious interference in Happy Bank's prospective business relationships with these customers. If not for Mr. Holmes's and Mr. Sikes's actions, it is reasonably probable that Happy Bank's business relationships with these customers would have continued and would have resulted in more lending activity.

123.    Mr. Holmes was also involved in keeping another potential loan secret from Happy Bank while he was still employed at Happy Bank. While this potential loan was started using Happy Bank resources, it was ultimately closed at ASB.[9]

124.    In short, materials that Mr. Holmes accessed at and took from Happy Bank contained Confidential Information and provided Mr. Holmes and his new employer, ASB, with significant competitive advantages they otherwise lacked, including precise information to:

---

[9] *See infra* ¶¶ 143-153, 165, 174-178 (discussing Customer X (defined below)).

(i) target Happy Bank employees based on their compensation and incentives with Happy Bank; (ii) prepare business plans necessary for LPOs/DPOs and branch applications and support ASB's asset growth; and (iii) target Happy Bank customers based on their loan maturity dates, current interest rates with Happy Bank, and business objectives known to Happy Bank.

125.    Mr. Holmes resigned from Happy Bank effective Friday, April 22, 2022. On the afternoon of Thursday, April 21, 2022, Mr. Holmes revealed to Happy State Bank's CEO, Mikel Williamson, that he was leaving Happy Bank, effective the next day. Yet despite the weeks Mr. Holmes had spent (i) planning this departure, (ii) secretly communicating with ASB, (iii) providing Happy Bank Confidential Information to ASB, and (iv) lining up other Happy Bank employees to resign and join ASB immediately after he did, Mr. Holmes did not tell Mr. Williamson—even in this final meeting—that he would be joining ASB. Indeed, Mr. Holmes led Mr. Williamson to believe that he was not leaving to join a competing bank and said nothing to Mr. Williamson about the other Happy Bank employees he knew would be resigning in short order.

126.    Mr. Williamson, assuming that Mr. Holmes was planning no damaging or disloyal actions toward Happy Bank, even asked Mr. Holmes if he could wait until the following Monday to formally leave, so that Mr. Williamson could be in Lubbock to publicly acknowledge Mr. Holmes's resignation—an offer which Mr. Holmes declined.

127.    On Saturday, April 23, 2022, video footage shows Mr. Holmes removing boxes from Happy Bank's premises, including boxes that appear to contain loose documents and binders of documents. It is extremely unlikely that an employee, even a Regional President like Mr. Holmes, would create and maintain binders of personal information—as opposed to Happy

Bank's Confidential Information—at his office. Accordingly, upon information and belief, Mr. Holmes stole even more of Happy Bank's Confidential Information when he removed boxes from Happy Bank's premises.

128.    Mr. Holmes went to work as the Regional President for ASB and later became the Chairman of ASB. Mr. Holmes began working for ASB on April 25, 2022—one business day after he resigned from Happy Bank—at an office in Lubbock. Less than a week later, ASB notified the Texas Department of Banking of its intent to open an LPO/DPO at the same office to be run by Mr. Holmes.

## Jay House

129.    Mr. House is a former officer, Senior Vice President, and Commercial Lender at Happy Bank. During his nine-year employment with Happy Bank, Mr. House officed out of a branch located on 98th Street in Lubbock, Texas—the same branch where Mr. Holmes had his office—and he reported directly to Mr. Holmes.

130.    As a Commercial Lender, Mr. House was responsible for analyzing loan applications, making loans, generating interest income, monitoring and servicing existing loan customers, making credit decisions, collecting on loans, and marketing Happy Bank's services and products. As an officer and Senior Vice President, Mr. House owed numerous fiduciary duties to Happy Bank.

138.    During his employment with Happy Bank, Mr. House signed several Awards and agreed to be bound by the provisions of the Awards and the Plan, which was incorporated in full into the Awards. Mr. House also acknowledged and agreed to be bound by all of the provisions in

the Handbook and Ethics Policy, and he received annual training on the other Happy Bank policies and procedures described above.[10]

139.    Mr. House had no express or implied authorization or consent to copy, transfer, delete, and/or take any of Happy Bank's Confidential Information from Happy Bank's computers, systems, or premises. Based on his role and the policies, procedures, and provisions he agreed to, Mr. House knew that Happy Bank's Confidential Information was owned solely by Happy Bank, was valuable to Happy Bank, and would be highly useful to Happy Bank's competitors, as it would enable them to unlawfully compete with Happy Bank and effectively target and recruit Happy Bank's current and future customers and employees.

140.    Based on the forensic data and information summarized below, there is significant evidence that Mr. House willingly joined in plans to unlawfully obtain, use, disclose, and/or remove Happy Bank's Confidential Information without authorization. In addition, Mr. House breached fiduciary duties to Happy Bank and knowingly participated in breaches by other employees; conspired with other Defendants to undermine Happy Bank's operations; and interfered with Happy Bank's prospective business relationships with customers and potential customers by causing them to move their business to ASB. Mr. House also breached his contracts with Happy Bank and engaged in unfair competition—ultimately exploiting these misdeeds to benefit himself and procure a job with ASB.

---

[10] Mr. House completed his most recent training on Happy Bank's cybersecurity and Internet security policies on February 2, 2022, and his most recent training on Happy Bank's Code of Ethics and information security policies on October 4, 2021.

141.     Even though Mr. House was still an officer of Happy Bank until his resignation on April 25, 2022, Mr. House's actions described herein were not done for the benefit of Happy Bank or at Happy Bank's direction.

142.     Evidence indicates that Mr. House conspired with Mr. Holmes for several months in 2022 to shop a team of Happy Bank employees to one or more Happy Bank competitors. While taking actions to move an entire lending team from Happy Bank to a competitor and, presumably, divert multiple Happy Bank customers to this competitor, Mr. House continued to use Happy Bank resources to handle deals without keeping Happy Bank apprised of such deals or establishing proper records of them in Happy Bank's systems.

143.     For example, on or about April 6, 2022, Mr. House emailed two people associated with an existing customer of Happy Bank ("**Customer X**") about a new potential loan, copying Defendant Channing Baisley. In this email, Mr. House stated that he had entered Customer X's appraisal request into Happy Bank's systems. Customer X owned a large office complex that had numerous tenant leases. That same day, Mr. House emailed Ms. Baisley and asked her to add the Customer X deal to a tracking spreadsheet. Mr. House and Ms. Baisley were apparently maintaining this tracking spreadsheet in private, because no information about this deal has been found on Happy Bank's shared systems.

144.     On or about April 13, 2022, Mr. House downloaded a zip file[11] from Dropbox that contained leases and related documents for the tenants of the same office complex associated with Customer X. Mr. House also received due diligence information regarding Customer X via

---

[11] Zip or zipped (compressed) files take up less storage space and can be transferred to other computers, including by email, more quickly than uncompressed files.

Dropbox and email, and he instructed others, including Ms. Baisley, to upload that information to Happy Bank's systems. Yet, again, no such information could be found on Happy Bank's systems after Mr. House's resignation.

145.    Upon information and belief, Mr. House deliberately took steps to keep Happy Bank in the dark about the deal with Customer X. On or about April 18, 2022, he failed to mention the deal during a weekly pipeline meeting where Happy Bank employees were supposed to discuss all potential and pending transactions.

146.    Despite keeping the deal secret at the weekly pipeline meeting, Mr. House continued to discuss it privately with Defendants Holmes, Phillips, and Baisley.[12] For example, on or about April 20, 2022, Mr. Phillips emailed Mr. House a comprehensive analysis of the potential transaction with Customer X. This analysis took the form of an Excel workbook, entitled "3. Master Real Estate-C&I," which Mr. Phillips described as an "Updated Model." This "Updated Model" was built upon a proprietary master template, created by Happy Bank, that Happy Bank uses to review, prepare, and evaluate real estate lending transactions. The document that Mr. Phillips sent to Mr. House included detailed financial information related to Customer X, Happy Bank's risk analysis, and terms and pricing for two proposed loans.

147.    On or about April 21, 2022, Mr. House sent this analysis, along with an "expense analysis" spreadsheet for Customer X, from his Happy Bank email address to two people associated with Customer X. On the morning of April 25, 2022, the day of Mr. House's official resignation from Happy Bank, one of these recipients forwarded these same two documents to

---

[12] According to emails, Messrs. House and Phillips and Ms. Baisley also performed a site visit of the office complex on April 7, 2022—while still employed with Happy Bank.

Mr. House's personal email address. Upon information and belief, Mr. House instructed this person to forward these documents to his personal email.

148.    Happy Bank is aware of no legitimate reason for Mr. House to have forwarded this internal Happy Bank loan analysis to Customer X on April 21. Upon information and belief, Mr. House sent the documents to Customer X, and then requested that Customer X send the documents back to Mr. House's personal email address, so that Mr. House could have the documents in his personal possession and then transfer them to ASB without detection by Happy Bank.

149.    On April 25, 2022, less than two hours after resigning from Happy Bank, Mr. House forwarded this same loan analysis from his personal email address to Kelly Sanders, ASB's Chief Executive Officer. Mr. House copied Mr. Phillips on this email. Mr. House thus sent Happy Bank's own internal loan analysis for Customer X directly to the CEO of another bank. Moreover, in doing so, Mr. House also transferred Happy Bank's internal master template for commercial real estate lending, which itself is a confidential document that contains a large amount of confidential and proprietary information about how Happy Bank handles and analyzes real estate lending transactions. Happy Bank's expends significant resources to prepare loan analyses, and they are an important tool in deciding whether to extend a loan. Happy Bank does not allow its loan analyses and loan analysis templates to be distributed externally.

150.    On or about April 26, 2022, Mr. House sent this same internal Happy Bank loan analysis for Customer X from his personal email address to Abbye McKinney, another ASB employee.

151.     This evidence shows that Mr. House took deliberate steps to begin moving Customer X away from Happy Bank while he was still employed by Happy Bank and while he owed duties of loyalty to Happy Bank. Mr. House's actions to transfer Customer X's business to ASB, after beginning the evaluation and processing of the relevant loans at Happy Bank, also constitutes tortious interference in Happy Bank's prospective business relationships with Customer X. Moreover, in carrying out these actions, Mr. House knowingly transferred Happy Bank Confidential Information to ASB.

152.     Mr. House's careful plan to seamlessly transition Customer X from Happy Bank to ASB—which included sending Happy Bank's commercial real estate lending template and its loan analysis for Customer X to ASB's CEO—was ultimately successful. On or about April 27, 2022—two days after Mr. House resigned from Happy Bank—Customer X emailed an attorney and several people at an engineering firm and directed them to start sending information to Mr. House at his personal email address. For some reason, Customer X mistakenly copied the email to Mr. House at his Happy Bank email address.[13]

153.     As further evidence, within just two months of the mass resignation, two deeds of trust were filed in the county records related to the office complex with Customer X listed as the grantor—and ASB as the grantee. These two deeds of trust directly relate to the deal Mr. House was managing for Customer X and confirm that Customer X did indeed become an ASB customer.

154.     Over the course of two weekends before his resignation, video footage shows Mr. House removing boxes of unknown contents from Happy Bank premises—just like Mr.

---

[13] Happy Bank has found at least one other instance where information regarding a customer's loan was emailed to Mr. House's personal email address, in violation of Happy Bank's information-security policies.

Holmes. Upon information and belief, among the materials in these boxes were documents containing Happy Bank's Confidential Information, which Mr. House either intentionally removed or removed without regard to whether he was taking Happy Bank's Confidential Information, in breach of his duties to Happy Bank.

155.    Mr. House resigned from Happy Bank on April 25, 2022—but not before he accessed numerous additional folders related to then-Happy Bank customers. One of these customers later told Happy Bank that he understood from one of the Defendants that his loan requests were much closer to being closed than they actually were. Happy Bank was also unable to find information in its systems related to loans and loan requests for some of these other customers. Upon information and belief, at least some of the customers related to the documents accessed by Mr. House on April 25, 2022, now have loans with ASB.

156.    The wake of Mr. House's misdeeds continued to surface after his resignation.

157.    On May 16, 2022, Happy Bank received an invoice for legal work from March and April 2022 related to a loan request that Mr. House was supposed to be handling. Yet the loan request was never documented in Happy Bank's system, and it appears Mr. House made no effort to close the loan he started—using Happy Bank resources—until *after* his resignation. Upon information and belief, that loan was serviced by ASB and the customer became an ASB customer.

158.    Mr. House went to work as the Senior Vice President, Commercial Lending, with ASB. Mr. House began working for ASB on April 26, 2022—one business day after he resigned from Happy Bank.

## Channing Baisley

159.    Ms. Baisley is a former officer and Portfolio Manager at Happy Bank. During her three-plus-year employment with Happy Bank, Ms. Baisley officed out of a branch located on 98th Street in Lubbock, Texas—the same branch where Mr. Holmes had his office—and she reported directly to Mr. Holmes.

160.    As a Portfolio Manager, Ms. Baisley was responsible for supporting commercial lenders and servicing, monitoring, and developing customer relationships. Ms. Baisley's duties included facilitating the preparation of credit underwriting, analyzing loan requests, assigning loan renewals or new loans to analysts for preparation of loan packages, and assisting commercial lenders in developing and prospecting new business. As an officer and Portfolio Manager, Ms. Baisley owed numerous fiduciary duties to Happy Bank.

161.    During her employment with Happy Bank, Ms. Baisley signed a Bonus Agreement dated July 15, 2021, in which she received a bonus contingent upon her employment with Happy Bank continuing until July 26, 2022. Ms. Baisley promised to repay the bonus should her employment terminate for any reason prior to July 26, 2022. Ms. Baisley also acknowledged and agreed to be bound by all of the provisions in the Handbook and Ethics Policy, and she received annual training on the other policies and procedures described above.[14]

162.    Ms. Baisley had no express or implied authorization or consent to copy, transfer, delete, and/or take any of Happy Bank's Confidential Information from Happy Bank's computers, systems, or premises. Based on her role and the policies, procedures, and provisions

---

[14] Ms. Baisley completed her most recent training on Happy Bank's cybersecurity and Internet security policies on February 14, 2022; her most recent training on Happy Bank's Code of Ethics on January 5, 2022; and her most recent training on Happy Bank's information security policies on October 25, 2021.

she agreed to, Ms. Baisley knew that Happy Bank's Confidential Information was owned solely by Happy Bank, was valuable to Happy Bank, and would be highly useful to Happy Bank's competitors, as it would enable them to unlawfully compete with Happy Bank and effectively target and recruit Happy Bank's current and future customers and employees.

163.    Based on the information summarized below, there is significant evidence that Ms. Baisley willingly joined in plans to unlawfully obtain, use, disclose, and/or remove Happy Bank's Confidential Information without authorization. In addition, Ms. Baisley breached fiduciary duties to Happy Bank and knowingly participated in the breach by other employees; conspired with other Defendants to undermine Happy Bank's operations; and interfered with Happy Bank's existing contracts and prospective relations, including by assisting in the solicitation of Happy Bank customers and potential customers to move their business to ASB. Ms. Baisley also breached her contracts with Happy Bank and engaged in unfair competition—ultimately exploiting these misdeeds for her own benefit and to procure a job with ASB.

164.    Even though Ms. Baisley was still an employee of Happy Bank until her resignation on April 25, 2022, Ms. Baisley's actions described herein were not done for the benefit of Happy Bank or at Happy Bank's direction.

165.    Evidence indicates that Ms. Baisley worked closely with Mr. House and Mr. Phillips in using Happy Bank resources to service the deal with Customer X, described above. On or about April 5, 2022, Mr. House asked Ms. Baisley to save various financial documents related to Customer X to Happy Bank's Z drive, with Ms. Baisley responding that same day that she would do so. On or about April 6, 2022, Mr. House emailed Ms. Baisley to request that documents associated with Customer X be uploaded to "Abrigo," one of Happy Bank's systems.

That same day, Ms. Baisley replied "Done." But this deal has not been found on Happy Bank's systems. Accordingly, upon information and belief, Ms. Baisley either removed this information from Happy Bank's systems or otherwise aided Mr. House and others in keeping the progress of the Customer X deal a secret from Happy Bank. In taking these actions, Ms. Baisley breached her fiduciary duties to Happy Bank and also aided Mr. House in breaching his fiduciary duties.

166.    Additionally, Ms. Baisley wrongfully used Happy Bank Confidential Information related to another customer, ("**Customer B**"). Ms. Baisley was actively working on loan transactions for Customer B during the time period of March and April 2022. For example, in mid-March 2022, Ms. Baisley downloaded an Excel spreadsheet containing financial analyses for all properties related to Customer B, including detailed projections and financial data—all of which constituted Happy Bank's Confidential Information. Upon information and belief, that customer later became a customer of ASB. In fact, a deed of trust was filed in county records that lists this customer as grantor—and ASB as grantee—within a few months of the mass resignation.

167.    Ms. Baisley resigned from Happy Bank on April 25, 2022, and she has failed to repay the contingent bonus she received under the Bonus Agreement. She went to work as an Assistant Vice President, Portfolio Manager, at ASB. Upon information and belief, Ms. Baisley began working for ASB on April 26, 2022—one business day after she resigned from Happy Bank.

168.    After joining ASB, Ms. Baisley continued to misappropriate Happy Bank trade secrets and Confidential Information, making use of these materials to further ASB's competitive efforts. Specifically, on multiple occasions, Ms. Baisley willingly received Happy Bank trade

secrets and Confidential Information sent to her by Mr. Dollahite and used those materials while employed at ASB.

169.    For example, just a few weeks after beginning her employment at ASB, Ms. Baisley received from Mr. Dollahite at her ASB email account numerous emails transferring Excel workbooks that had been created at Happy Bank. Mr. Dollahite had previously transferred these Happy Bank materials from his Happy Bank email account to his personal email account. These spreadsheets contained detailed financial analyses and financial projections for different Happy Bank loan deals, all for Happy Bank customers that Ms. Baisley and other Defendants were seeking to transfer to ASB.

170.    Ms. Baisley would have immediately recognized these documents as belonging to Happy Bank and as consisting of Happy Bank's trade secrets and Confidential Information. She would also have understood that this information was being sent by improper means and without Happy Bank's consent. This information would be very useful to Ms. Baisley and to ASB as they sought to replicate the analysis that Happy Bank had previously undertaken for these loan customers.

171.    A week after this first series of emails, Ms. Baisley again received from Mr. Dollahite at her ASB email account multiple emails containing numerous highly confidential Happy Bank documents. As was true for the first series, this next series of emails consisted of documents that Mr. Dollahite had previously transferred from his Happy Bank account to his personal email account. These documents included detailed Happy Bank borrower credit analyses, Happy Bank loan guarantor analyses, Happy Bank credit memos, Happy Bank credit approval presentations, Happy Bank loan package information, notes handwritten by Mr. House,

and more. For good measure, on at least two occasions, Ms. Baisley re-forwarded to herself emails sent to her by Mr. Dollahite containing confidential Happy Bank credit memos, credit approval presentations, and financial analyses related to Happy Bank customers.

172.    All these documents were also highly confidential to Happy Bank, consisted of Happy Bank trade secrets, and were related to Happy Bank customers that Ms. Baisley and other Defendants were seeking to transfer to ASB. This information would be very useful to Ms. Baisley and to ASB as they sought to replicate the analyses that Happy Bank had previously undertaken for these loan customers. Ms. Baisley was aware that she was receiving Happy Bank trade secrets and Confidential Information by improper means and without Happy Bank's consent, and she knowingly used this information to aid ASB in unfairly competing with Happy Bank.

## **Drew Phillips**

173.    Mr. Phillips is a former officer and Senior Credit Analyst at Happy Bank. During his employment with Happy Bank, Mr. Phillips officed out of a branch located at 98th Street in Lubbock, Texas—the same branch where Mr. Holmes had his office—and he reported directly to Mr. Holmes.

174.    As a Senior Credit Analyst, Mr. Phillips supported Portfolio Managers and Commercial Loan Officers in the origination of new loans and management of the existing loan portfolio by analyzing credit data (*i.e.*, a loan applicant's financial information, potential collateral, and other information salient to credit decisions) to determine degrees of risk in extending credit or lending money to individual or entity customers. Mr. Phillips's duties also included managing the workflow of junior credit analysts and reviewing the analyses prepared by

those credit analysts, including financial statements, in-house spreadsheets designed to quantify a customer's debt-service abilities, and narrative analyses of findings and recommendations for Happy Bank's lenders. As an officer and Senior Credit Analyst, Mr. Phillips owed numerous fiduciary duties to Happy Bank.

175.    Mr. Phillips acknowledged and agreed to be bound by all of the provisions in the Handbook and Ethics Policy, and he received annual training on the other Happy Bank policies and procedures described above.[15]

176.    Mr. Phillips had no express or implied authorization or consent to copy, transfer, delete, and/or take any of Happy Bank's Confidential Information from Happy Bank's computers, systems, or premises. Based on his role and the policies, procedures, and provisions he agreed to, Mr. Phillips knew that Happy Bank's Confidential Information was owned solely by Happy Bank, was valuable to Happy Bank, and would be highly useful to Happy Bank's competitors, as it would enable them to effectively target and recruit Happy Bank's current and future customers and employees.

177.    Based on the forensic data and information summarized below, there is significant evidence that Mr. Phillips willingly joined in plans to unlawfully obtain, use, disclose, and/or remove Happy Bank's Confidential Information without authorization. In addition, Mr. Phillips breached fiduciary duties to Happy Bank and knowingly participated in the breach by other employees; conspired with other Defendants to undermine Happy Bank's operations; and interfered with Happy Bank's prospective business relationships with customers and potential

---

[15] Mr. Phillips completed his most recent training on Happy Bank's cybersecurity and Internet security policies on February 1, 2022; his most recent training on Happy Bank's Code of Ethics on December 27, 2021; and his most recent training on Happy Bank's information security policies on October 28, 2021.

customers by causing them to move their business to ASB. At no time when taking the actions described herein was Mr. Phillips acting for the benefit of Happy Bank or at Happy Bank's direction.

178.    Upon information and belief, Mr. Phillips aided Mr. House and others in keeping the deal with Customer X a secret from Happy Bank—a deal that started at Happy Bank but was not closed until the Employee Defendants started working at ASB. On April 20, 2022—less than a week before Messrs. Phillips and House resigned—Mr. Phillips emailed Mr. House the comprehensive loan analysis related to Customer X, referred to above in the paragraphs related to Mr. House. This "Updated Model" was prepared using a proprietary template, created by Happy Bank, that Happy Bank uses to analyze and evaluate potential commercial real estate lending transactions. It also contained detailed financial information related to Customer X, including terms and pricing for two Happy Bank proposed loans—loans that ASB ultimately closed.

179.    As described above, on April 25, 2022, Mr. House forwarded this document from his personal email address to Mr. Sanders, ASB's CEO. Mr. House copied Mr. Phillips on this email.

180.    Based on his role, Happy Bank's policies and procedures, and his experience in the banking industry, Mr. Phillips knew that Happy Bank's information and analyses related to its customers, including this comprehensive Happy Bank loan analysis, should not have been shared with a Happy Bank competitor. Mr. Phillips also knew that customer information was required to be retained and archived at Happy Bank.

181.    On or about April 26, 2022, Mr. House—now working for ASB—emailed Customer X, Mr. Phillips, and Abbye McKinney of ASB requesting that Customer X send various customer information needed to complete the deal. On or about April 27, 2022, Mr. Phillips sent the comprehensive Happy Bank loan analysis related to Customer X to himself, from his personal email address to his new ASB email address. Mr. Phillips thus was a party to the transfer of this Happy Bank Confidential Information to ASB.

182.    These events indicate that Mr. Phillips took deliberate steps to both service Customer X using the resources of Happy Bank, and simultaneously divert Customer X away from Happy Bank while he was still employed by, and using the resources of, Happy Bank. Mr. Phillips was then involved in closing the transaction at ASB. These actions constituted a breach of Mr. Phillips's fiduciary duties to Happy Bank, improper assistance in Mr. House's breach of his fiduciary duties to Happy Bank, and tortious interference in Happy Bank's prospective business relationships with Customer X. No records of the potential deal with Customer X have been found in Happy Bank's archive or retention systems.

183.    Mr. Phillips resigned from Happy Bank on April 25, 2022. He went to work as a Senior Credit Analyst at ASB, beginning on April 26, 2022—one business day after his resignation.

## Ross Glenn

184.    Mr. Glenn is a former officer and Executive Vice President, Head of Special Assets, at Happy Bank. During his nineteen-year employment with Happy Bank, Mr. Glenn officed out of a branch located on South Taylor Street in Amarillo, Texas.

185.    As Head of Special Assets, Mr. Glenn was in a commercial lending role, and Happy Bank's commercial lenders are responsible for analyzing loan applications, making loans, generating interest income, monitoring and servicing existing loan customers, making credit decisions, collecting on loans, and marketing Happy Bank's services and products. As a member of Happy Bank's Executive Team, Mr. Glenn also had access to additional Confidential Information that not all other Employee Defendants were privy to. As an officer and Executive Vice President, Mr. Glenn owed numerous fiduciary duties to Happy Bank.

186.    During his employment with Happy Bank, Mr. Glenn signed several agreements, including Awards, Options, a Restricted Stock Award Agreement, and a Retention Bonus Agreement. As detailed previously, these agreements included an Executive Nonstatutory Option Agreement dated December 1, 2020, in which Mr. Glenn agreed that (i) for a period of 12 months following the end of his employment with Happy Bank, he would not work for any lending or depository institution within a 50-mile radius of any Happy Bank location to which he had been assigned; (ii) during this same period of time, he would not solicit any Happy Bank customers to enter into business relationships with any other banks; and (iii) while he worked for Happy Bank and for 12 months thereafter, he would not directly or indirectly encourage any person working for Happy Bank to leave Happy Bank. Mr. Glenn also acknowledged and agreed

to be bound by all of the provisions in the Handbook and Ethics Policy, and he received annual training on the other Happy Bank policies and procedures described above.[16]

187.    Based on the information summarized below, there is significant evidence that Mr. Glenn breached fiduciary duties to Happy Bank and conspired with other Defendants to undermine Happy Bank's operations. Mr. Glenn also breached his Option agreement with Happy Bank and engaged in unfair competition—ultimately exploiting these misdeeds for his own benefit and to procure a job with ASB. Although he remained a Happy Bank officer until his resignation on April 25, 2022, at no time when taking the actions described herein was Mr. Glenn acting for the benefit of Happy Bank or at Happy Bank's direction.

188.    Information discovered so far in this action shows that Mr. Glenn was a central part of the plan for ASB to expand into West Texas. Mr. Glenn's role was to be a leader of the ASB Amarillo region, and in this way, he served as a counterpart to Mr. Holmes (who was to head the Lubbock region) and Mr. McCutcheon (who was to head the Plainview or "Southern" region).

189.    Upon information and belief, Mr. Glenn was seriously contemplating leaving Happy Bank to work for a competing bank at least as early as December of 2021, when he sent a text message to Mr. Holmes about the possibility of talking to "other banks."

190.    On or about March 16, 2022, Mr. Glenn was informed that he would be receiving a "Stay Pay Agreement" related to his employment transition to Centennial in connection with

---

[16] Mr. Glenn completed his most recent training on Happy Bank's cybersecurity and Internet security policies on February 7, 2022; his most recent training on Happy Bank's Code of Ethics on February 22, 2021; and his most recent training on Happy Bank's information security policies on October 4, 2021.

the merger. On or about March 21, 2022, Mr. Glenn received his proposed Stay Pay Agreement from Happy Bank.

191.    On March 28, 2022, Mr. Glenn emailed Mikel Williamson, Happy Bank's then CEO, a revised draft of Mr. Glenn's Stay Pay Agreement. Mr. Glenn's edits included removing certain parts of the Agreement, including all of Section 7. This section related to a covenant not to solicit Happy Bank customers or employees for a period of twelve months after leaving employment with Happy Bank. Mr. Glenn indicated in both his markings to the Stay Pay Agreement and in an email to Mr. Williamson that these changes were made "Per [his] discussion" with Mikel Williamson.

192.    On or before March 28, 2022, Mr. Glenn and Mr. Williamson had a conversation during which they discussed Mr. Glenn's future plans in the context of the edits Mr. Glenn proposed to his Stay Pay Agreement. During that conversation, Mr. Glenn conveyed to Mr. Williamson that Mr. Glenn planned to "hang a shingle" after he eventually left Happy Bank and open a consulting business related to borrowers having problem loans with banks—a business which would not have been competitive with Happy Bank.

193.    Based on Mr. Williamson's conversation with Mr. Glenn, and in reliance on Mr. Glenn's representations about his post-Happy Bank plans, Happy Bank sent Mr. Glenn a revised Stay Pay Agreement that incorporated Mr. Glenn's changes, including the deletion of the previous Section 7. Mr. Glenn then executed the Stay Pay Agreement.

194.    Mr. Glenn submitted his notice of resignation from Happy Bank less than three weeks later, on April 19. He officially departed Happy Bank on April 25. Notwithstanding his

representations to Mr. Williamson, Mr. Glenn immediately went to work as a Regional President at ASB on or about April 26, 2022.

195.    This timeline of events reveals that Mr. Glenn either (i) did not speak truthfully to Mr. Williamson in late March 2022 regarding his intentions to pursue a future "consulting business," or (ii) wrongfully failed to advise Mr. Williamson and Happy Bank that these representations were no longer true within, at most, approximately two weeks of making them. Having advised Happy Bank of his intention to "hang a shingle" after eventually retiring from Happy Bank, and knowing that Happy Bank had acted in reliance on this representation, Mr. Glenn had a duty to either act consistently with his representations, or at a minimum, inform Happy Bank promptly that he was exploring the possibility of leaving Happy Bank and going to work for a competitor bank only a short time later. But Mr. Glenn did not inform Happy Bank that he would be going to work for a competitor bank, even when he submitted his notice of resignation on April 19, 2022.

196.    Mr. Glenn's conduct with respect to Mr. Williamson (and Happy Bank) violated Mr. Glenn's fiduciary duties, including those related to good faith, candor, and loyalty.

197.    Mr. Glenn's intent to harm Happy Bank's interests was evident in his communications with Mr. Holmes. On or about April 15, 2022, Mr. Glenn told Mr. Holmes by text message: "I am in!" and "Waiting on you [Mr. Holmes] and I will follow aggressively . . . You are bringing the first 'atomic bomb' and Willis [McCutcheon] and I are bringing the second! I don't believe surrender will follow…but they will clean out their pants!"

198.    On or about April 16, 2022, Mr. Glenn also confirmed to Mr. Holmes that Mr. Glenn had approached members of his Happy Bank staff in Amarillo about the possibility of

joining ASB. This was a further breach of Mr. Glenn's fiduciary obligation not to solicit the departure of other Happy Bank employees while still working for Happy Bank. It was also a direct breach of the terms of his December 1, 2020 Option.

199.    Mr. Glenn also knowingly joined in Mr. Holmes's breach of his fiduciary duties to Happy Bank by coordinating with Mr. Holmes to make sure Happy Bank did not know about the planned mass exodus that Mr. Holmes was organizing—and that Mr. Glenn was helping to organize. Specifically, Mr. Holmes asked Mr. Glenn not to reveal to Happy Bank, upon giving notice of his resignation on April 19, 2022, that he (Mr. Glenn) would be going to work for ASB. Mr. Glenn complied, and deliberately hid from Happy Bank the fact that he was resigning to go to work for a competitor bank. In so doing, Mr. Glenn actively aided Mr. Holmes's orchestration of the mass exodus, and thereby knowingly participated in Mr. Holmes's breach of fiduciary duties.

200.    Less than a month after his resignation, Mr. Glenn signed a lease on behalf of ASB and a personal guaranty for the same. Days later, ASB notified the TDB of its intent to open an LPO/DPO in Amarillo, Texas, at that same location to be managed by Mr. Glenn as its Amarillo Market President.

201.    During the 12-month period after he resigned from Happy Bank, Mr. Glenn further violated his December 1, 2020 Option. First, Mr. Glenn engaged in competition with Happy Bank by working for ASB within a 50-mile radius of the Happy Bank location to which he was assigned and from which he performed duties for Happy Bank. Second, Mr. Glenn contacted, solicited, and/or induced numerous Happy Bank customers to (i) reduce or eliminate their business with Happy Bank and/or (ii) enter into business relationships with ASB. Upon information and belief, Mr. Glenn solicited the business of numerous Happy Bank customers

who subsequently transferred business from Happy Bank to ASB. These customers included several who paid down their loans with Happy Bank early and moved the lending relationship to ASB. Third, Mr. Glenn continued to solicit Happy Bank employees to leave Happy Bank and come to work for ASB, including by hosting a gathering at his home less than a week after his departure from Happy Bank. Present at this event were ASB Chairman Brandon Steele and several invited Happy Bank employees. The purpose of this meeting was to recruit more Happy Bank employees to ASB. Each of the actions described in this paragraph violated the terms of Mr. Glenn's Option agreement, thereby causing damage to Happy Bank.

## <u>Willis McCutcheon</u>

202.    Mr. McCutcheon is a former officer and Regional President of Southern Lending at Happy Bank, the highest position for Happy Bank's Southern Lending business other than the Senior Lending Officer. During his fifteen-year employment with Happy Bank, Mr. McCutcheon officed out of a branch located on Olton Road in Plainview, Texas, but he served as the Regional President for nine branches in total—including branches in Dimmitt, Floydada/Lockney, Hart, Muleshoe, Olton, Plainview, Silverton, and Tulia, Texas.

203.    As Happy Bank's Regional President of Southern Lending, Mr. McCutcheon was responsible for the development and performance of Happy Bank's southern regional market as well as perpetuating the culture and values of Happy Bank. Mr. McCutcheon's duties included managing and overseeing all lending functions with the southern regional market, such as loan approvals, loan quality, past-due monitoring and collections, exception monitoring and management, loan pricing, and loan growth. Mr. McCutcheon also was responsible for all new business development activities for all bank products, including lending, deposits, treasury

management, mortgage lending, investments, and trust products. As an officer and Regional President, Mr. McCutcheon owed numerous fiduciary duties to Happy Bank.

204.    During his employment with Happy Bank, Mr. McCutcheon signed several agreements, including Awards and Options. Mr. McCutcheon also acknowledged and agreed to be bound by all of the provisions in the Handbook and Ethics Policy, and he received annual training on the other Happy Bank policies and procedures described above.[17]

205.    Mr. McCutcheon had no express or implied authorization or consent to copy, transfer, delete, and/or take any of Happy Bank's Confidential Information from Happy Bank's computers, systems, or premises. Based on his role and the policies, procedures, and provisions he agreed to, Mr. McCutcheon knew that Happy Bank's Confidential Information was owned solely by Happy Bank, was valuable to Happy Bank, and would be highly useful to Happy Bank's competitors, as it would enable them to unlawfully compete with Happy Bank and effectively target and recruit Happy Bank's current and future customers and employees.

206.    Based on the forensic data and information summarized below, there is significant evidence that Mr. McCutcheon willingly joined in plans to unlawfully use Happy Bank's Confidential Information, resources, and relationships with customers. In addition, Mr. McCutcheon breached fiduciary duties to Happy Bank; conspired with other Defendants to undermine Happy Bank's operations; and interfered with Happy Bank's prospective business relationships with customers and potential customers by causing them to move their business to ASB. Mr. McCutcheon also breached his contracts with Happy Bank and engaged in unfair

---

[17] Mr. McCutcheon completed his most recent training on Happy Bank's cybersecurity and Internet security policies on February 28, 2022; his most recent training on Happy Bank's Code of Ethics on December 24, 2021; and his most recent training on Happy Bank's information security policies on October 1, 2021.

competition—ultimately exploiting these misdeeds for his own benefit and to procure a job with ASB. Although Mr. McCutcheon remained a Happy Bank officer until his resignation on April 29, 2022, at no time when taking the actions described herein was Mr. McCutcheon acting for the benefit of Happy Bank or at Happy Bank's direction.

207.    Information discovered so far in this action shows that Mr. McCutcheon was another leader in planning ASB's expansion into West Texas. Specifically, Mr. McCutcheon's role was to be the leader of the ASB "Southern" region, based in Plainview, Texas.

208.    Mr. McCutcheon's plan to leave Happy Bank with Mr. Holmes began to take shape on or about March 3, 2022, when David Smith approached Mr. McCutcheon about the possibility of joining ASB. Mr. McCutcheon informed Mr. Holmes by text message that there was "another player" the pair needed to meet. Plans then moved quickly. Within a few weeks, Mr. Smith drafted an email to ASB's Chairman Mr. Steele indicating that Mr. McCutcheon was excited about the opportunity to join ASB. Mr. Smith also identified Mr. McCutcheon as critical to ASB's expansion into West Texas.

209.    On March 31, 2022, Mr. McCutcheon connected a SanDisk 3.2Gen1 USB Device to his work computer. Mr. McCutcheon represented to Happy Bank's IT department that he intended to use this USB to save personal documents from his "wmccutcheon" Happy Bank OneDrive folder. Whether Mr. McCutcheon used the USB to download documents from Happy Bank's computers is currently unknown.

210.    Also in late March, Mr. McCutcheon received information related to a loan request from a then-Happy Bank customer ("**Customer D**"), which contained Confidential Information. Approximately a month later, on the day before Mr. McCutcheon left Happy Bank,

then-Happy Bank employee Brian Palomino (who also became an ASB employee) re-forwarded this same correspondence to Mr. McCutcheon and sent Mr. McCutcheon a copy of Customer D's business plan related to the prospective loan. Customer D later became an ASB customer. Upon information and belief, Mr. McCutcheon (i) took this Confidential Information with him to ASB and used it to obtain business from Customer D for ASB, and (ii) wrongfully transferred the loan opportunity for Customer D, which had begun at Happy Bank, to ASB. Happy Bank's relationship with Customer D benefited Happy Bank financially and would have continued to do so absent Mr. McCutcheon's interference and wrongful actions.

211.    Throughout April 2022, Mr. McCutcheon also assisted Mr. Holmes and Mr. Glenn with planning the mass departure of Happy Bank employees, in violation of his fiduciary obligation not to solicit the departure of other employees while still working for Happy Bank. On numerous occasions, while still a Happy Bank officer, Mr. McCutcheon invited and encouraged other Happy Bank employees to leave Happy Bank and go to work for ASB, and otherwise collaborated with Mr. Holmes and Mr. Glenn in planning and organizing the employee exodus. These actions were contrary to Mr. McCutcheon's fiduciary duties to Happy Bank.

212.    Mr. McCutcheon resigned on April 29, 2022. He went to work as the Regional President, Southern Region, at ASB. Mr. McCutcheon began officially working for ASB one business day after his resignation. In fact, less than a week after his resignation, Mr. McCutcheon signed a lease on behalf of ASB as its "President." ASB notified the TDB of its intent to open an LPO/DPO at that same location less than two weeks later. Upon information and belief, Mr. McCutcheon also participated in capital raises on behalf of ASB almost immediately after he resigned from Happy Bank.

## Michael Jackson

213.    Mr. Jackson is a former officer, Senior Vice President, and Commercial Lender at Happy Bank. During his nine-year employment with Happy Bank, Mr. Jackson officed out of a branch located on 98th Street in Lubbock, Texas—the same branch where Mr. Holmes had his office—and he reported directly to Mr. Holmes.

214.    As a Commercial Lender, Mr. Jackson was responsible for analyzing loan applications, making loans, generating interest income, monitoring and servicing existing loan customers, making credit decisions, collecting on loans, and marketing Happy Bank's services and products. As an officer and Senior Vice President, Mr. Jackson owed numerous fiduciary duties to Happy Bank.

215.    During his employment with Happy Bank, Mr. Jackson signed several Awards and agreed to be bound by the provisions of the Awards and the Plan, which was incorporated in full into the Awards. Mr. Jackson also acknowledged and agreed to be bound by all of the provisions in the Handbook and Ethics Policy, and he received annual training on the other Happy Bank policies and procedures described above.[18]

216.    Mr. Jackson had no express or implied authorization or consent to take any of Happy Bank's Confidential Information from Happy Bank's premises. Based on his role and the policies, procedures, and provisions he agreed to, Mr. Jackson knew that Happy Bank's Confidential Information was owned solely by Happy Bank, was valuable to Happy Bank, and would be highly useful to Happy Bank's competitors, as it would enable them to unlawfully

---

[18] Mr. Jackson completed his most recent training on Happy Bank's cybersecurity and Internet security policies on February 22, 2022; his most recent training on Happy Bank's information security policies on October 25, 2021; and his most recent training on Happy Bank's Code of Ethics on September 28, 2021.

compete with Happy Bank and effectively target and recruit Happy Bank's current and future customers and employees.

217.    There is significant evidence that Mr. Jackson willingly joined in plans to unlawfully use Happy Bank's Confidential Information to help jumpstart ASB's West Texas expansion. In addition, Mr. Jackson breached fiduciary duties to Happy Bank; conspired with other Defendants to undermine Happy Bank's operations; and interfered with Happy Bank's prospective business relationships with customers and potential customers by causing them to move their business to ASB. Mr. Jackson also breached his contracts with Happy Bank and engaged in unfair competition—ultimately exploiting these misdeeds to procure a job with ASB. At no time when taking the actions described herein was Mr. Jackson acting for the benefit of Happy Bank or at Happy Bank's direction.

218.    On or about March 30, 2022, Mr. Jackson exchanged messages with Mr. Holmes about listings for office space in Lubbock that "could give [the group] a place to quickly hit the ground running." Mr. Jackson noted that the floor plan for one option could "dang near fit[] everyone." Mr. Jackson's references to a group that would immediately move into the new office space suggests that he was actively involved in plans and communications to solicit the departure of other employees from Happy Bank. Moreover, text messages from Mr. Jackson in mid-April reveal that he was in contact with Defendants Drew Phillips and Channing Baisley about plans for them to join ASB. These actions show a breach of Mr. Jackson's fiduciary duty not to solicit the departure of other employees while he was still working for Happy Bank.

219.    On or about March 29, 2022, Mr. Jackson sent an email from his Happy Bank email account to his personal email account, attaching a spreadsheet with 2021 year-end

financials and balance sheets for two corporate entities controlled by a customer ("**Customer J**") that later became a customer of ASB. Forwarding Happy Bank customer financial information to a personal email address was a violation of Happy Bank's policies. Moreover, by this time, Mr. Jackson was already engaged in discussions with Mr. Holmes and others about moving to ASB. Upon information and belief, Mr. Jackson later used the confidential customer information contained in this spreadsheet to finalize loans and/or transact other banking business for this customer at ASB.

220.    Similarly, on or about April 14, 2022, Mr. Jackson forwarded to himself a proposed payment plan related to an entity owned by this same customer. Mr. Jackson once again sent this email from his Happy Bank email account to his personal email account. Mr. Jackson later forwarded even more information related to Customer J from his Happy Bank email account to his personal email account. Upon information and belief, Mr. Jackson was transferring this Happy Bank customer-related information to his personal possession so that he could use it once he began working at ASB—and did use it to maintain and facilitate his relationship with this customer at ASB. Upon information and believe, Customer J did become an ASB customer. Happy Bank's relationship with Customer J benefited Happy Bank financially and would have continued to do so absent Mr. Jackson's interference.

221.    Also, in late March 2022, Mr. Jackson emailed a then-Happy Bank customer ("**Customer E**") regarding the customer's interest in bidding in an auction of another Happy Bank customer's property. In response to a question about whether Happy Bank had any debt related to the property, Mr. Jackson stated: "No debt with me." Mr. Jackson's statements constitute a violation of his nondisclosure obligations because he disclosed confidential

information about one customer to another customer without authorization. The customer to whom this Confidential Information was disclosed later had loans at ASB. Happy Bank's relationship with Customer E benefited Happy Bank financially and would have continued to do so absent Mr. Jackson's interference.

222.    In early April 2022, Mr. Jackson emailed three Happy Bank colleagues (all of whom later took positions with ASB) regarding a 90-day extension for three loans related to Customer E. Ninety-day extensions are often used to allow for additional time needed to gather financial information or for the customer's benefit. Here, Mr. Jackson's extension request allowed him to delay action on these loans until after his resignation—and provided him the opportunity to queue up these loan modifications as part of the "Bank in a Box" he helped deliver to ASB. Indeed, these three loans later transferred to ASB, as reflected by deeds of trust listing Customer E as grantor and American State Bank as grantee.

223.    On or about April 20, 2022, Mr. Jackson also forwarded an email chain to his personal email address that included surveys that had originally been prepared for Customer E on March 22, 2022, and sent to Happy Bank. Upon information and belief, Mr. Jackson subsequently transferred these surveys from Happy Bank to ASB to facilitate the transfer of Customer E's business to ASB.

224.    On or about April 22, 2024, while Mr. Jackson was still a Happy Bank employee, Mr. Jackson sent a text message to Messrs. Holmes and House, encouraging Mr. Holmes to immediately send offer letters for other Happy Bank employees to go to ASB. At that time, Mr. Holmes had resigned from Happy Bank and was already working for ASB. Mr. Jackson expressed concern that Happy Bank management was "put[ting] on the charming hard sell to everyone in

the building" (i.e., the location where Mr. Holmes had worked), in the hopes of preventing others from leaving Happy Bank. Through this message and other actions, Mr. Jackson breached his fiduciary duties by encouraging a competitor to undermine Happy Bank's interests and actively and aggressively recruit Happy Bank personnel.

225.    Mr. Jackson resigned on April 25, 2022. Mr. Jackson's formal offer letter with ASB was dated that same day, with a start date of April 27, 2022—two business days after he resigned from Happy Bank.

## Jessica Terrell

226.    Ms. Terrell is a former officer, Vice President, and Commercial Lender at Happy Bank. During her ten-year employment with Happy Bank, Ms. Terrell officed out of a branch located on 98th Street in Lubbock, Texas—the same branch where Mr. Holmes had his office— and she reported directly to Mr. Holmes.

227.    As a Commercial Lender, Ms. Terrell was responsible for analyzing loan applications, making loans, generating interest income, monitoring and servicing existing loan customers, making credit decisions, collecting on loans, and marketing Happy Bank's services and products. As an officer and Vice President, Ms. Terrell owed numerous fiduciary duties to Happy Bank.

228.    During her employment with Happy Bank, Ms. Terrell acknowledged and agreed to be bound by all of the provisions in the Handbook and Ethics Policy, and she received annual training on the other Happy Bank policies and procedures described above.[19]

---

[19] Ms. Terrell completed her most recent training on Happy Bank's cybersecurity and Internet security policies on February 23, 2022; her most recent training on Happy Bank's Code of Ethics on December 29, 2021; and her most recent training on Happy Bank's information security policies on October 26, 2021.

229.    Ms. Terrell had no express or implied authorization or consent to copy, transfer, delete, and/or take any of Happy Bank's Confidential Information from Happy Bank's computers, systems, or premises. Based on her role and the policies, procedures, and provisions she agreed to, Ms. Terrell knew that Happy Bank's Confidential Information was owned solely by Happy Bank, was valuable to Happy Bank, and would be highly useful to Happy Bank's competitors, as it would enable them to unlawfully compete with Happy Bank and effectively target and recruit Happy Bank's current and future customers and employees.

230.    Ms. Terrell nevertheless willingly joined in plans to unlawfully obtain, use, disclose, and/or remove Happy Bank's Confidential Information without authorization. In addition, Ms. Terrell breached fiduciary duties to Happy Bank; conspired with other Defendants to undermine Happy Bank's operations; and interfered with Happy Bank's prospective business relationships with customers and potential customers by causing them to move their business to ASB. Ms. Terrell also engaged in unfair competition—ultimately exploiting these misdeeds for her own benefit and to procure a job with ASB. Although Ms. Terrell was a Happy Bank employee until her resignation on April 25, 2022, at no time when taking the actions described herein was Ms. Terrell acting for the benefit of Happy Bank or at Happy Bank's direction.

231.    Upon information and belief, at least as early as April 14, 2022, Ms. Terrell had discussed a new opportunity at ASB with Mr. Holmes and planned to join him there. Around the same time—with less than two weeks before her resignation—Ms. Terrell printed numerous documents related to a then-Happy Bank customer, including memoranda and borrowing-base reports containing Happy Bank's Confidential Information. After Ms. Terrell's resignation, Happy Bank was unable to find any files related to this customer in its systems—despite the fact

that the customer later told Happy Bank that they had emailed information to one of the Defendants—and Happy Bank ultimately had to reduce the customer's interest rate to keep the loan, a significant concession in the current environment of rising interest rates.

232.   On or about April 18, 2022, Ms. Terrell met in person with a Happy Bank customer ("**Customer G**"). Afterward, she contacted Customer G using her personal, non-Happy Bank email address. That same day, Customer G sent various information related to a potential banking transaction to Ms. Terrell at her personal email address. This same information was already in Ms. Terrell's possession at Happy Bank. But upon information and belief, Ms. Terrell nonetheless asked Customer G to send it to her personal email address, and Customer G later became a customer of ASB.

233.   Upon information and belief, Ms. Terrell asked Customer G to send information to her personal email so that Ms. Terrell could usurp a business opportunity from Happy Bank and use the information to complete the transaction at ASB instead. By arranging for Customer G to send the information to her personal email address, Ms. Terrell was able to later send the information to ASB, and use it at ASB, without having to transfer it from her Happy Bank email address and risk detection by Happy Bank. Upon information and belief, entities associated with Customer G became customers of ASB. If not for these actions, Happy Bank otherwise reasonably expected to continue to benefit from business opportunities arising from its prior relationship with Customer G.

234.   On the day before her resignation, Ms. Terrell accessed files on Happy Bank's system for customers that then moved over to ASB almost immediately after Ms. Terrell left Happy Bank. Upon information and belief, Ms. Terrell used the information from Happy Bank's

records to solicit the customers to ASB and generate business for ASB. Happy Bank's relationship with these customers benefited Happy Bank financially and would have continued to do so absent Ms. Terrell's interference.

235.    Ms. Terrell resigned on April 25, 2022. She promptly went to work as a Senior Vice President, Commercial Lending, at ASB.

## Derek Dollahite

236.    Mr. Dollahite is a former officer and Senior Credit Analyst at Happy Bank. During his seven-plus-year employment with Happy Bank, Mr. Dollahite officed out of a branch located on 98th Street in Lubbock, Texas—the same branch where Mr. Holmes had his office—and he reported directly to Mr. Holmes.

237.    As a Senior Credit Analyst, Mr. Dollahite supported Portfolio Managers and Commercial Loan Officers in the origination of new loans and management of the existing loan portfolio by analyzing credit data (*i.e.*, a loan applicant's financial information, potential collateral, and other information salient to credit decisions) to determine degrees of risk in extending credit or lending money to individual or entity customers. Mr. Dollahite's duties also included managing the workflow of junior credit analysts and reviewing the analyses prepared by those credit analysts, including financial statements, in-house spreadsheets designed to quantify a customer's debt-service abilities, and narrative analyses of findings and recommendations for Happy Bank's lenders. In addition, Mr. Dollahite supervised and managed Happy Bank's builder loan group, which was responsible for analyzing and managing loans for residential and commercial construction. As an officer and Senior Credit Analyst, Mr. Dollahite owed numerous fiduciary duties to Happy Bank.

238.    During his employment with Happy Bank, Mr. Dollahite signed at least one Award and agreed to be bound by the provisions of the Award and the Plan, which was incorporated in full into the Award. Mr. Dollahite also acknowledged and agreed to be bound by all of the provisions in the Handbook and Ethics Policy, and he received annual training on the other Happy Bank policies and procedures described above.[20]

239.    Mr. Dollahite had no express or implied authorization or consent to copy, transfer, and/or take any of Happy Bank's Confidential Information from Happy Bank's computers, systems, or premises. Based on his role and the policies, procedures, and provisions he agreed to, Mr. Dollahite knew that Happy Bank's Confidential Information was owned solely by Happy Bank, was valuable to Happy Bank, and would be highly useful to Happy Bank's competitors, as it would enable them to unlawfully compete with Happy Bank and effectively target and recruit Happy Bank's current and future customers and employees.

240.    Based on the forensic data and information summarized below, there is significant evidence that Mr. Dollahite willingly joined in plans to unlawfully obtain, use, disclose, and/or remove Happy Bank's Confidential Information without authorization. In addition, Mr. Dollahite breached fiduciary duties to Happy Bank; conspired with other Defendants to undermine Happy Bank's operations; and interfered with Happy Bank's prospective business relationships with customers and potential customers by causing them to move their business to American State Bank. Mr. Dollahite also breached his contracts with Happy Bank and engaged in unfair competition and unsafe and unsound banking practices—ultimately exploiting these misdeeds for

---

[20] Mr. Dollahite completed his most recent training on Happy Bank's cybersecurity and Internet security policies on February 17, 2022; his most recent training on Happy Bank's Code of Ethics on November 26, 2021; and his most recent training on Happy Bank's information security policies on October 17, 2021.

his own benefit and to procure a job with a competitor, American State Bank. Although Mr. Dollahite remained a Happy Bank employee until his resignation on April 25, 2022, at no time when taking the actions described herein was Mr. Dollahite acting for the benefit of Happy Bank or at Happy Bank's direction.

241.    Late in the evening on or about April 19, 2022, Mr. Holmes emailed Mr. Dollahite various information relating to the employment benefits offered by ASB. Afterward, that same evening, Mr. Dollahite, via Happy Bank's system, accessed numerous documents and files containing Happy Bank Confidential Information, including documents relating to customer loans. For example, forensic data indicates that Mr. Dollahite accessed three recordings of Executive Loan Committee meetings from 2021 that contained Confidential Information, including detailed financial information about Happy Bank, Happy Bank customers, and Happy Bank's internal workflow for processing loans. As another example, Mr. Dollahite accessed a document entitled "Sample Investment Model – MHC," containing sophisticated proprietary information related to the management of complex construction loans, which were a significant part of Happy Bank's business. Further, the same forensic data shows that Mr. Dollahite accessed the loan applications for multiple Happy Bank customers. Happy Bank maintained this loan-related information on its systems confidentially, as Happy Bank is obliged to do for customer-related information generally. In addition, such information would provide a valuable resource for competing lenders or banks.

242.    Mr. Dollahite did not have any legitimate business reason to view and access the materials described above late in the evening of April 19, 2022, at a time when he knew he would soon be leaving Happy Bank, and just after he had received information about the benefits he

would be provided at ASB. Upon information and belief, Mr. Dollahite (i) accessed these materials in order to transfer Happy Bank Confidential Information to his personal possession and take the information with him to ASB, and (ii) did take such Happy Bank Confidential Information with him to ASB and used it to compete against his former employer.

243.    Mr. Dollahite resigned on April 25, 2022. He went to work as an Assistant Vice President, Senior Credit Analyst, at American State Bank. Mr. Dollahite began working for American State Bank on April 26, 2022—one business day after he resigned from Happy Bank.

244.    After joining ASB, Mr. Dollahite continued to misappropriate Happy Bank trade secrets and Confidential Information, making use of these materials to further ASB's competitive efforts. Specifically, on multiple occasions, Mr. Dollahite emailed Happy Bank trade secrets and Confidential Information to Ms. Baisley for use at ASB.

245.    For example, just a few weeks after beginning his employment at ASB, Mr. Dollahite sent to Ms. Baisley at her ASB email account multiple "investment model" Excel workbooks that had been created at Happy Bank. Mr. Dollahite had previously, and improperly, transferred these Happy Bank materials from his Happy Bank email account to his personal email account in 2019. These spreadsheets contained detailed financial analysis and financial projections for different Happy Bank loan deals, all for Happy Bank customers that Ms. Baisley and other Defendants were seeking to transfer to ASB. Mr. Dollahite knew that these documents belonged to Happy Bank and consisted of Happy Bank's trade secrets and Confidential Information. This information would have been very useful to Mr. Dollahite and ASB as they sought to replicate the analysis that Happy Bank had previously undertaken for these loan customers.

246.    A week after sending this first series of emails, Mr. Dollahite again sent to Ms. Baisley at her ASB email account a second series of emails containing numerous highly confidential Happy Bank documents. As was true for the first series, this next series of emails consisted of documents that Mr. Dollahite had improperly transferred from his Happy Bank account to his personal email account in 2019. These documents included detailed Happy Bank borrower credit analyses, Happy Bank loan guarantor analyses, Happy Bank credit memos, Happy Bank credit approval presentations, Happy Bank loan package information, notes handwritten by Mr. House, and more. Many of these documents contained visible Happy Bank logos and other identifiers.

247.    All of these documents were highly confidential to Happy Bank, consisted of Happy Bank trade secrets, and were related to Happy Bank customers that Mr. Dollahite and other Defendants were seeking to transfer to ASB. This information would be very useful to Mr. Dollahite and to ASB as they sought to replicate the analysis that Happy Bank had previously undertaken for these loan customers. Mr. Dollahite was aware that he was transferring Happy Bank trade secrets and Confidential Information by improper means and without Happy Bank's consent, and he knowingly used this information to aid ASB in unfairly competing with Happy Bank.

## James Sikes

248.    Mr. Sikes is a former officer, Vice President, and Commercial Lender of Happy Bank. During his nearly six-year employment with Happy Bank, Mr. Sikes officed out of a branch located on 66th Street in Lubbock, Texas—and he reported directly to Mr. Holmes.

249.    As a Commercial Lender, Mr. Sikes was responsible for analyzing loan applications, making loans, generating interest income, monitoring and servicing existing loan customers, making credit decisions, collecting on loans, and marketing Happy Bank's services and products. As an officer and Vice President, Mr. Sikes owed numerous fiduciary duties to Happy Bank.

250.    During his employment with Happy Bank, Mr. Sikes signed at least one Award and agreed to be bound by the provisions of the Award and the Plan, which was incorporated in full into the Award. Mr. Sikes also acknowledged and agreed to be bound by all of the provisions in the Handbook and Ethics Policy, and he received annual training on the other Happy Bank policies and procedures described above.[21]

251.    Mr. Sikes had no express or implied consent or authorization to delete and/or remove Happy Bank's Confidential Information from Happy Bank's computers, systems, or premises. Based on his role and the policies, procedures, and provisions he agreed to, Mr. Sikes knew that Happy Bank's Confidential Information was owned solely by Happy Bank and was valuable to Happy Bank.

252.    Mr. Sikes was also a willing participant in plans to unlawfully obtain, use, disclose and/or remove Happy Bank's Confidential Information. In addition, Mr. Sikes breached fiduciary duties to Happy Bank and engaged in unfair competition—ultimately exploiting these misdeeds for his own benefit and to procure a job with ASB. Although Mr. Sikes remained a Happy Bank employee until his resignation on April 25, 2022, at no time when taking the actions

---

[21] Mr. Sikes completed his most recent training on Happy Bank's cybersecurity and Internet security policies on February 24, 2022; his most recent training on Happy Bank's Code of Ethics on December 24, 2021; and his most recent training on Happy Bank's information security policies on October 29, 2021.

described herein was Mr. Sikes acting for the benefit of Happy Bank or at Happy Bank's direction.

253.    During March and April 2022, Mr. Sikes exchanged communications that show his awareness of, and involvement in, Mr. Holmes shopping a team of Happy Bank employees to one or more Happy Bank competitors, including ASB.

254.    On or about April 16, 2022, while still working for Happy Bank, Mr. Sikes accessed a document (the "**Customer Loan Document**") containing Happy Bank Confidential Information. This Customer Loan Document includes specific loan information relating to various Happy Bank customers, including customer names, loan account numbers, loan collateral information, original loan amounts, current loan balances, appraised values, and loan rates, as well as other types of information. Upon information and belief, a number of the customers in the Customer Loan Document later became ASB customers.

255.    Mr. Sikes resigned from Happy Bank on the morning of Monday, April 25, 2022, and went to work as a commercial lender at ASB that same day in the afternoon.

256.    Startling evidence of Mr. Sikes's unauthorized possession and use of Happy Bank Confidential Information after he left Happy Bank appears in an email sent on or about April 28, 2022. Mr. Sikes sent the email from his new ASB email account to his personal Gmail account, with the subject "FW: loans to talk to Bud about." The message contains extensive information about ten then-Happy Bank customers, including information about the customers' Happy Bank loan amounts, maturity dates, loan-to-value ratios, collateral, and, in one case, a notation of an appraisal previously done by Happy Bank. The email also discusses the likely intentions of various customers with respect to their loans. Significant amounts of information in this email are

consistent with information in the Customer Loan Document, which Mr. Sikes had accessed while at Happy Bank just over two weeks earlier.

257.    The information in this April 28, 2022 email belongs to Happy Bank, is confidential and highly sensitive, and was taken from Happy Bank by Mr. Sikes without Happy Bank's authorization.

258.    Upon information and belief, Mr. Sikes and at least Mr. Holmes used the Confidential Information in the April 28, 2022 email to compete against Happy Bank and to procure the business of Happy Bank customers for ASB. Upon information and belief, a number of the customers mentioned in the email became customers of ASB. Happy Bank's relationship with these customers benefited Happy Bank financially and would have continued to do so absent Mr. Sikes's interference and misuse of Happy Bank Confidential Information.

## ASB

259.    The evidence now produced in this case demonstrates wrongdoing not only by the Employee Defendants, but also by the bank that hired them. As recounted above and below, ASB welcomed, encouraged, assisted in, and benefited from the Employee Defendants' misconduct that damaged Happy Bank, including by depriving Happy Bank of the benefits of the merger transaction.

260.    Specifically, ASB knowingly received and used Happy Bank trade secrets without authorization, conspired with and knowingly participated in breaches of fiduciary duties by top Happy Bank officers, and knowingly and improperly interfered with Happy Bank's prospective business relations. ASB's wrongful actions were carried out both through high-ranking ASB

officers, employees, and agents, and through the Employee Defendants themselves after they joined ASB.

261.    ASB acquired numerous trade secrets of Happy Bank, while knowing or having reason to know that the information was acquired by improper means. ASB also used such trade secrets without Happy Bank's consent to further its efforts to compete against Happy Bank. Further, the tortious conduct of the Employee Defendants who wrongfully used Happy Bank trade secrets after becoming employees of ASB is attributable to ASB.

262.    Start with the text message exchange between Mr. Holmes and two top ASB executives on or about April 8, 2022. ASB's Mr. Solomon thanked Mr. Holmes after Mr. Holmes sent a photo of the internal Happy Bank document that described the details of Happy Bank's confidential commercial lender incentive plan. ASB's Mr. Solomon—and ASB's CEO Mr. Sanders, who received the same information—knew or should have known that Happy Bank did not authorize ASB's receipt of this sensitive document. Mr. Holmes expressly said he sent a photo because it was the "most expeditious way to send [it] confidentially" (i.e., to send it without Happy Bank knowing about it).

263.    That, by itself, should have been enough for the ASB executives to know (or at least have reason to know) they were acquiring a confidential Happy Bank lender incentive plan by improper means—that is, through Mr. Holmes's breach of his duty to maintain its secrecy. In addition, any bank executive would understand that the details of another bank's internal incentive compensation structure would be maintained as Confidential Information.

264.    The Happy State Bank 2022 Commercial Lender Incentive Plan was not disclosed to the public; not all Happy Bank employees were aware of the incentive plan details; Happy

Bank took reasonable steps to maintain the confidentiality of the incentive plan; the incentive plan was valuable to Happy Bank's business; Happy Bank developed the incentive plan over time based on effort and experience; and the incentive plan document is not something ASB could have easily obtained through proper means.

265.    The text exchange between Mr. Holmes and Mr. Steele on or about March 23, 2022, reveals that ASB not only willingly received the confidential details of Happy Bank's commercial lender incentive program, but also implemented it within ASB—thus using Happy Bank's trade secrets to further ASB's own competitive interests.

266.    Next, in early March 2022, well before Mr. Holmes left Happy Bank, both ASB's Chairman Mr. Steele and ASB's consultant/employee Mr. Smith received the Benefits Matrix from Mr. Holmes, which, as discussed above, contained extensive confidential information about Happy Bank employees' base compensation and incentive compensation, information about stock options they held, information about Stock Appreciation Rights Award Agreements they exercised, and the stay-on bonus offered to each employee if they continued to work for Happy Bank following completion of the merger.

267.    On or about April 19, 2022, ASB's Chairman Mr. Steele received the "Comp Plan" document from Mr. Holmes. As discussed above, the Comp Plan listed more than 20 then-employees of Happy Bank, and as to most of these employees, it provided comprehensive information including, among other things, compensation, incentive, and stay-on bonus information for the employees at Happy Bank.

268.    A stark difference exists between, on the one hand, receiving some compensation information directly from an individual who is exploring alternative employment, and on the

other hand, receiving a detailed compilation of non-public compensation information for an entire group of prospective employees for the obvious purpose of facilitating the recruitment of those employees from their current employer. ASB and its representatives understood (or should have understood) this difference.

269.    ASB received and used the confidential Benefits Matrix and Comp Plan information to prepare and/or approve offers for ASB to extend to the Happy Bank employees, all the while knowing that Mr. Holmes was still a Happy Bank employee who owed duties of loyalty to Happy Bank.

270.    The Benefits Matrix and Comp Plan are detailed compilations of financial information that Happy Bank keeps secret from the public (and even from most employees within the bank), and this compiled information has independent economic value from not being generally known by others. Thus, the Benefits Matrix and Comp Plan qualify as trade secrets. And ASB misappropriated those trade secrets because its representatives knew (or at least had reason to know) they were acquiring this comprehensive compensation information by improper means—that is, from a person who owed a duty to Happy Bank to maintain the secrecy of or limit the use of this non-public information.

271.    ASB's receipt and use of the Lubbock P&L also establishes its misappropriation of Happy Bank's trade secrets. That is because the spreadsheet contains detailed and compiled financial and business information that Happy Bank carefully guards from public disclosure, and which provides independent economic value from not being known to others. And both Mr. Steele and ASB's CFO knew (or at least had reason to know) they acquired this full-blown, 10-year account of the performance of Happy Bank's Lubbock operations by improper means—

again, from a person who owed a duty to Happy Bank to maintain the secrecy of or limit the use of this information.

272. ASB, through the actions of Mr. Holmes once he became an ASB officer, utilized this Lubbock P&L spreadsheet to assist ASB in its business planning and in its preparations to compete with Happy Bank in the Lubbock market.

273. Trade secret misappropriation also occurred by way of ASB receiving and using the information related to Customer X from Mr. House. It was evident that the information sent by Mr. House to ASB included Happy Bank's loan analysis. ASB knew or should have known that this was Confidential Information prepared within Happy Bank. Even so, ASB willingly received and used the information. Indeed, Mr. Sanders followed up with Mr. House to ask a question about certain information in the document related to the potential transaction with Customer X.

274. Moreover, this information was prepared and presented in a template/form that is confidential and proprietary to Happy Bank, which Happy Bank has developed over time based on effort and experience and which provides Happy Bank with an advantage against competitors in analyzing, underwriting, and closing transactions like that for Customer X. ASB misappropriated this trade secret information because at least ASB's CEO Mr. Sanders knew (or had reason to know) that that a template such as this is maintained as confidential and proprietary, and yet he willingly received it from a person (Mr. House) who had a duty to maintain its secrecy.

275. ASB utilized this wrongfully obtained information in opening loans and establishing a business relationship with Customer X.

276.    Yet another example of ASB's misappropriation of Happy Bank trade secrets is the unauthorized use of information in Mr. Sikes's email with the subject "FW: loans to talk to Bud about." As recounted above, Mr. Sikes sent this email after he began working for ASB, from his ASB email account, which shows that Mr. Sikes was sending the communication as part of his work on behalf of ASB. The email contained detailed information about then-Happy Bank customers, including information about the customers' Happy Bank loan amounts, maturity dates, loan-to-value ratios, collateral, and, in one case, a notation of an appraisal previously done by Happy Bank—all of which qualify as Happy Bank trade secrets. ASB knew (or at least had reason to know) these trade secrets were acquired under circumstances that gave rise to a duty to maintain the secrecy of or limit the use of the trade secrets, and that these trade secrets were transferred improperly to ASB.

277.    Upon information and belief, ASB used the trade secret information in Mr. Sikes's email to open numerous loans with customers.

278.    ASB, through the actions of its employees, committed many additional acts of misappropriation of Happy Bank trade secrets and Confidential Information, making use of these materials to further its competitive efforts. For example: (i) ASB wrongfully received and used internal Happy Bank credit memos, credit approval packages, loan analyses, and other materials as described in paragraphs 168-172 and 244-247 above; (ii) in early May 2022, Mr. House and Ms. Terrell each forwarded to their ASB email accounts additional customer information and analyses that had been prepared at Happy Bank; (iii) ASB received and utilized screenshots of highly confidential Happy Bank customer information that were taken from Happy Bank's internal loan tracking software; and (iv) ASB received and utilized a Happy Bank spreadsheet for

tracking loan draws for Happy Bank loans. All of these documents were confidential to Happy Bank and were secretly transferred to ASB without Happy Bank's knowledge or consent. ASB in turn used these Happy Bank trade secrets and Confidential Information to compete with Happy Bank.

279.    In addition, and remarkably, documents produced by ASB in this litigation reveal that ASB was in possession of a series of photographs of a hard copy of an internal audit of Happy Bank's loan portfolio at the end of 2021. This audit report was highly confidential, included detailed information about Happy Bank's loan practices and potential risks or concerns, and included non-public information about specific customers and loans. This document was distributed only on a very limited basis within Happy Bank. At the present time, Happy Bank does not know who photographed this internal Happy Bank document and transferred it to ASB. But on information and belief, ASB used this stolen information as intelligence in seeking to compete with Happy Bank.

280.    In addition to all of this, ASB's production of documents to date has revealed that it received a host of other confidential, internal documents from Happy Bank, relating both to Happy Bank's business and its customers. For example, found within ASB's possession were multiple financial statements for individuals and businesses that were submitted to Happy Bank; multiple property appraisals provided to Happy Bank for properties that were the subject of Happy bank loans; multiple property environmental assessments that were provided to Happy Bank; borrowing base certificates and promissory notes between customers and Happy Bank; engagement letters between Happy Bank and legal counsel; Happy Bank templates for loan agreements; Happy Bank correspondence with customers; and a spreadsheet containing a non-

public list of Happy Bank shareholders. Upon information and belief, much if not all of this confidential information was taken directly from Happy Bank by departing Happy Bank employees. This information was wrongfully used by ASB to compete with Happy Bank and, in the case of the Happy Bank shareholder list, to be a resource in the effort to raise capital for ASB.

281.    Many of these same events show that ASB conspired with and knowingly participated in breaches of fiduciary duties by top Happy Bank officers. A fiduciary relationship existed between Happy Bank and the Employee Defendants because they were officers of a bank. As a bank itself, ASB was well aware of these duties. Yet, the evidence shows that ASB proceeded to join in breaches of the fiduciary duties owed to Happy Bank by at least Defendants Holmes and House, and possibly others.

282.    One such instance is the text message exchange in which ASB's Mr. Solomon thanked Mr. Holmes for sending the photo of the internal Happy Bank confidential commercial lender incentive plan. ASB's Mr. Solomon—and ASB's CEO Mr. Sanders, who received the same information—knew or should have known that Happy Bank did not authorize ASB's receipt of this sensitive information, and that Mr. Holmes had a duty not to reveal such information. ASB thereby knowingly joined and assisted Mr. Holmes in his breach of his duties.

283.    ASB's participation in Mr. Holmes's breaches of fiduciary duties is also evident with respect to the Benefits Matrix and Comp Plan. ASB received and used this Confidential Information to prepare and/or approve offers for ASB to extend to the Happy Bank employees, all the while knowing that Mr. Holmes was still a Happy Bank employee who owed duties of loyalty to Happy Bank. ASB was well aware that (i) Mr. Holmes was in a key managerial position over Happy Bank's operations in Lubbock, and (ii) Mr. Holmes knew about Happy Bank's

vulnerabilities in the wake of the merger. Knowing these facts and having received what was obviously Happy Bank "insider information" in the Comp Plan and Benefits Matrix, ASB nonetheless charged ahead in concert with Mr. Holmes. ASB thus knowingly participated once again in Mr. Holmes's breaches of fiduciary duties.

284.    The same is true regarding ASB's receipt of the 10-year spreadsheet that Mr. Holmes provided to Mr. Steele reflecting the annual performance for Happy Bank in Lubbock. Mr. Steele's initial receipt of this spreadsheet, and the later receipt by ASB's Chief Financial Officer, rises to the level of ASB knowingly joining in Mr. Holmes' breaches of his fiduciary duties of loyalty and to refrain from disclosing and using Happy Bank's confidential information to compete against Happy Bank.

285.    ASB's participation in breaches of fiduciary duties was not limited to Mr. Holmes. ASB's CEO and credit analysts also knowingly joined in Mr. House's breach of fiduciary duties when they received and joined in the use of the information related to Customer X. By receiving a detailed analysis of proposed Happy Bank loans for Customer X, which Mr. House prepared while working at Happy Bank and using Happy Bank's proprietary analysis template, ASB joined in Mr. House's usurpation of a business opportunity from Happy Bank.

286.    The loan opportunity related to Customer X properly belonged to Happy Bank because work on the transaction began while Mr. House worked at Happy Bank. Happy Bank had the financial and other resources to close the deal and thus take advantage of this business opportunity. Yet ASB seized it by joining in Mr. House's breach of fiduciary duties.

287.    ASB's actions as described in paragraphs 278-280 further demonstrate its participation in breaches of the fiduciary duties owed to Happy Bank by one or more Defendants.

288.    Finally, ASB also tortiously interfered with Happy Bank's prospective business relations.

289.    The loan transaction related to Customer X began while Mr. House worked at Happy Bank, and Happy Bank had the financial and other resources to close the deal. Happy Bank therefore had a reasonable probability of entering into a business relationship with Customer X.

290.    ASB acted with a desire to prevent this business relationship from occurring, or at least with knowledge that interference was substantially certain to occur, when ASB accepted the information relating to Customer X from Mr. House and then worked with Mr. House to use that information to close the deal at ASB. This conduct was independently tortious because, as discussed above, it constituted knowing participation in Mr. House's breach of fiduciary duties and because it involved ASB's misappropriation of Happy Bank's trade secrets. And ASB's improper interference proximately caused Happy Bank to suffer damages equal to at least the lost profits from closing the transaction concerning Customer X at Happy Bank.

291.    Similarly, ASB tortiously interfered with Happy Bank's prospective business relationships with one or more of the customers listed in Mr. Sikes's April 28, 2022 email. Business relationships between these customers and Happy Bank had been established while Mr. Sikes worked for Happy Bank, and Happy Bank was likely to enter into continuing transactions and open and/or renew additional loans for one or more of these customers. Happy Bank had the financial and other resources to close such transactions and had a reasonable probability of entering into additional business relationships with one or more of these customers.

292.    ASB acted with a desire to prevent these business relationships from occurring, or at least with knowledge that interference was substantially certain to occur, when ASB, through Mr. Sikes, used this information to secure business from one or more of these customers to ASB. This conduct was independently tortious because, as discussed above, it involved ASB's misappropriation of Happy Bank's trade secrets. And ASB's improper interference proximately caused Happy Bank to suffer damages equal to at least the lost profits from loans closed by these customers.

293.    ASB's actions as described in paragraphs 278-280 further demonstrate its tortious interference with Happy Bank's prospective customer relationships.

## CAUSES OF ACTION

### First Cause of Action: Violation of Federal Defend Trade Secrets Act
### 18 U.S.C. § 1836
### Against All Defendants Except Jackson and Glenn

294.    Happy Bank repeats, re-alleges, and incorporates by reference the foregoing paragraphs as if set forth fully herein.

295.    The Federal Defend Trade Secrets Act allows "[a]n owner of a trade secret that is misappropriated" to "bring a civil action . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1).

296.    Under the Defend Trade Secrets Act, a "trade secret" includes "all forms and types of *financial*, *business*, scientific, technical, *economic*, or engineering information" when:

(A) the owner thereof has taken reasonable measures to keep such information secret; and

(B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3) (emphasis added).

297.    The Defend Trade Secrets Act defines "misappropriation" expansively, with three broad categories of conduct falling within the statutory definition:

[T]he term "misappropriation" means—

(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(B) disclosure or use of a trade secret of another without express or implied consent by a person who—

(i) used improper means to acquire knowledge of the trade secret;

(ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—

(I) derived from or through a person who had used improper means to acquire the trade secret;

(II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or

(III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or

(iii) before a material change of the position of the person, knew or had reason to know that—

(I) the trade secret was a trade secret; and

(II) knowledge of the trade secret had been acquired by accident or mistake[.]

18 U.S.C. § 1839(5).

298.    Happy Bank owns various trade secrets within the meaning of the Defend Trade Secrets Act, 18 U.S.C. § 1839(3), that are critical to the success of its business and related to financial products and services intended for use in and used in interstate commerce, including,

but not limited to, checking and savings accounts, consumer loans, and commercial loans. These trade secrets include Happy Bank's non-public financial, business, and economic information within the following categories:

    a.   Category 1: Historical loan volumes, funding percentages, fee incomes, and bid information;

    b.   Category 2: Financial conditions and performance by branch and overall, and year-by-year comparisons of the same;

    c.   Category 3: Current loans, including data concerning customer names, account numbers, balances, interest rates, maturity dates, and/or contract expiration dates;

    d.   Category 4: Budgets, loan balance trends, and loan and revenue projections;

    e.   Category 5: Loan and deposit trends and forecasts, including funding percentages, fee incomes, and growth percentages related to the same;

    f.   Category 6: Employees' base salaries, incentive compensation, and recommended compensation increases;

    g.   Category 7: Customers, including their risk ratings, credit scores, financial performance and projections, collateral, guarantors, contact information, and analyses and reports related to all of the same; and

    h.   Category 8: Templates, forms, legal documents, and analyses necessary to analyze, underwrite, close, and service loans and deposits by customers.

All trade secrets in these categories were developed over time using Happy Bank resources.

299. Happy Bank's trade secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of such information. Happy Bank's trade secrets give it a competitive advantage over other banks and financial institutions that do not have access to those trade secrets, including, but not limited to, its commercial advantage in

pricing, closing, and servicing complex and higher-risk loans. Happy Bank's trade secrets are valuable and critical to its business functions and competitive position as a financial institution.

300.    Happy Bank has made and continues to make reasonable efforts to maintain the secrecy of its trade secrets, such as requiring employees like the Employee Defendants to sign contracts with confidentiality and nondisclosure provisions, training them on their confidentiality and nondisclosure obligations, and/or imposing confidentiality and nondisclosure obligations as part of its policies and procedures. Happy Bank also has taken reasonable efforts to maintain the secrecy of its trade secrets through the following actions: (i) maintaining the trade secrets on secure computers and networks with limited access; (ii) prohibiting employees from using external communication and messaging services; (iii) prohibiting employees from storing any bank data, including trade secrets, on non-bank-provided mobile devices, such as USB devices and external hard drives; (iv) requiring employees to routinely review and verify compliance with Happy Bank policies and procedures related to its trade secrets; (v) auditing compliance by its employees; (vi) otherwise restricting employees' use of any trade secrets in any unsecure or unencrypted way; and (vii) maintaining written policies and procedures containing access, confidentiality, and security restrictions.

301.    Happy Bank's trade secrets also provide it substantial economic value that is impaired by their disclosure outside of Happy Bank, such as the dissemination of information related to Happy Bank's internal finances, business analyses, financial templates, employees, customers, and loan details.

302.    The Employee Defendants named above used, received, had access to, and had knowledge of Happy Bank's trade secrets while employed at Happy Bank and under

circumstances giving rise to a duty to maintain the secrecy of such trade secrets. The Employee Defendants also knew from their training and employment practices that Happy Bank considered its trade secrets to be confidential, and they knew—and previously acknowledged in writing— that they had a duty to preserve Happy Bank's trade secrets and protect the same from dissemination or use outside of Happy Bank.

303.    Defendant ASB knew or had reason to know that it acquired Happy Bank trade secrets through at least Defendants Holmes's, House's, and Sikes's breaches of duties to maintain the secrecy of such information. ASB disclosed and/or used trade secrets of Happy Bank without consent, and at the time of ASB's disclosure and/or use, ASB knew or had reason to know that ASB's knowledge of the trade secret was derived from or through a person who owed a duty to Happy Bank to maintain the secrecy of or limit the use of the trade secret.

304.    Defendants misappropriated Happy Bank's trade secrets under the Defend Trade Secrets Act. Among other things, Defendants misappropriated Happy Bank's trade secrets in at least the following ways:

| Paragraphs Cross-Referenced | Defendant | Misappropriation | Categories |
|---|---|---|---|
| 86–128 | Holmes | • Disclosing and/or using Happy Bank's trade secret lender incentive plan;<br>• Disclosing and/or using Happy Bank's trade secret employee compensation information;<br>• Disclosing and/or using Happy Bank's trade secrets about operations in Lubbock;<br>• Using confidential information about customers taken from Happy Bank to help complete loans for those customers at ASB; and<br>• Printing/copying and/or physically taking Happy Bank trade secrets from | 1, 2, 3, 4, 5, 6, 7, 8 |

| Paragraphs Cross-Referenced | Defendant | Misappropriation | Categories |
|---|---|---|---|
| | | its premises. | |
| 129–158 | House | • Disclosing and/or using Happy Bank's trade secret information about Customer X;<br>• Disseminating and disclosing Happy Bank's trade secrets using Customer X as an intermediary step to forward information to an external email account, before sending it to ASB; and<br>• Printing/copying and/or physically taking Happy Bank's trade secrets from its premises. | 3, 7, 8 |
| 159–172 | Baisley | • Disclosing and/or using Happy Bank's trade secret information about Customer X; and<br>• Disseminating, disclosing and/or acquiring Happy Bank's trade secrets in other ways referenced herein. | 3, 7, 8 |
| 173–183 | Phillips | • Disclosing and/or using Happy Bank's trade secret information about Customer X. | 3, 7, 8 |
| 202–212 | McCutcheon | • Disclosing and/or using Happy Bank's trade secret information about Customer D. | 3, 7, 8 |
| 226–235 | Terrell | • Reviewing Happy Bank trade secrets just before leaving Happy Bank in order to transfer information to ASB; and<br>• Disseminating and disclosing Happy Bank's trade secrets using Customer G as an intermediary step to forward information to an external email account. | 3, 7 |
| 236–247 | Dollahite | • Disclosing and/or using Happy Bank's trade secret information, internal workflow documents, and information discussed in Executive Loan Committee meetings; and<br>• Disseminating, disclosing and/or | 3, 7, 8 |

| Paragraphs Cross-Referenced | Defendant | Misappropriation | Categories |
|---|---|---|---|
| | | acquiring Happy Bank's trade secrets in other ways referenced herein. | |
| 248–258 | Sikes | • Disclosing and/or using Happy Bank's trade secret information included in the Customer Loan Document; and<br>• Disclosing and/or using Happy Bank's trade secret information in the April 28, 2022 email "FW: loans to talk to Bud about." | 3, 7 |
| 259–293 | ASB | • Acquiring and using Happy Bank's trade secret lender incentive plan;<br>• Acquiring and using Happy Bank's trade secret employee compensation information;<br>• Acquiring and using Happy Bank's trade secrets about operations in Lubbock; and<br>• Acquiring and using Happy Bank's trade secret information about Customer X;<br>• Acquiring and using Happy Bank's trade secret information contained in Mr. Sikes's April 28, 2022 email; and<br>• Acquiring Happy Bank's trade secrets in other ways referenced herein. | 1, 2, 3, 4, 5, 6, 7, 8 |

305.    No Defendant had any express or implied authorization or consent to use, copy, disclose, disseminate, and/or physically take Happy Bank's trade secrets. Defendants all knew or had reason to know that they had acquired Happy Bank's trade secrets under circumstances giving rise to a duty to maintain the secrecy and limit the use of those trade secrets. Yet, upon information and belief, Defendants have used and disclosed Happy Bank's trade secrets as part of the work for Happy Bank's competitor: ASB.

306.    As a direct and proximate result of Defendants' conduct, Happy Bank suffered and continues to suffer substantial harm, including: (i) loss of business and customers; (ii) loss of

employees; (iii) costs and fees incurred to analyze and determine compliance with regulations and action needed; (iv) costs incurred to replace employees; (v) costs incurred to investigate missing and/or altered data and records; (vi) loss of benefits that were bargained for and reasonably expected from the merger transaction; and (vii) loss of reputation and goodwill. Accordingly, Happy Bank is entitled to an award of actual damages and damages for any unjust enrichment caused by Defendants' misappropriation of trade secrets—including disgorgement of all compensation or other value that Defendants have received, in any form—in an amount more than $75,000 and to be proved at trial. *See* 18 U.S.C. § 1836(b)(3)(B).

307.    Happy Bank is also entitled to exemplary damages and attorneys' fees because Defendants misappropriated Happy Bank's trade secrets willfully, maliciously, and in bad faith. 18 U.S.C. § 1836(b)(3)(C)-(D). The Employee Defendants knew that they owed duties of confidentiality to Happy Bank, including nondisclosure obligations and duties to preserve Happy Bank's trade secrets. ASB was also fully aware of those obligations. Defendants nonetheless misappropriated Happy Bank's trade secrets without express or implied authorization or consent and did so using covert and secretive methods to avoid detection. Defendants' course of conduct demonstrates a premeditated and coordinated decision to use Happy Bank's trade secrets in conscious disregard of Happy Bank's rights, with the deliberate intent to harm Happy Bank by using that information to launch and support the new operations of ASB in West Texas. Happy Bank also seeks injunctive relief to enjoin Defendants' continued and/or future use and misappropriation of Happy Bank's trade secrets, and for the return of the same. *See* 18 U.S.C. § 1836(b)(3)(A).

## Second Cause of Action: Violation of the Texas Uniform Trade Secrets Act
## Texas Civil Practice & Remedies Code, Chapter 134A
## Against All Defendants Except Jackson and Glenn

308.    Happy Bank repeats, re-alleges, and incorporates by reference the foregoing paragraphs as if set forth fully herein.

309.    The Texas Uniform Trade Secrets Act allows the owner of a trade secret to bring an action to recover damages, injunctive relief, and attorneys' fees for misappropriation of the owner's trade secrets. TEX. CIV. PRAC. & REM. CODE §§ 134A.003–.005.

310.    The Texas Uniform Trade Secrets Act defines "trade secret" as follows:

"Trade secret" means all forms and types of information, including *business*, scientific, technical, *economic*, or engineering information, and any formula, design, prototype, pattern, plan, *compilation*, program device, program, code, device, method, technique, process, procedure, *financial data*, or *list of actual or potential customers* or suppliers, whether tangible or intangible and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if:

> (A) the owner of the trade secret has taken reasonable measures under the circumstances to keep the information secret; and

> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

TEX. CIV. PRAC. & REM. CODE § 134A.002(6) (emphasis added).

311.    Under the Texas Uniform Trade Secrets Act, "misappropriation" occurs when the following occurs:

> (A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

> (B) disclosure or use of a trade secret of another without express or implied consent by a person who:

> > (i) used improper means to acquire knowledge of the trade secret;

(ii) at the time of disclosure or use, knew or had reason to know that the person's knowledge of the trade secret was:

> (a) derived from or through a person who used improper means to acquire the trade secret;

> (b) acquired under circumstances giving rise to a duty to maintain the secrecy of or limit the use of the trade secret; or

> (c) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of or limit the use of the trade secret; or

(iii) before a material change of the position of the person, knew or had reason to know that the trade secret was a trade secret and that knowledge of the trade secret had been acquired by accident or mistake.

TEX. CIV. PRAC. & REM. CODE § 134A.002(3).

312.    Happy Bank owns various trade secrets within the meaning of the Texas Uniform Trade Secrets Act that are critical to the success of its business. TEX. CIV. PRAC. & REM. CODE § 134A.002(6). Happy Bank's non-public financial, business, and economic information within the following categories:

> a.  Category 1: Historical loan volumes, funding percentages, fee incomes, and bid information;

> b.  Category 2: Financial conditions and performance by branch and overall, and year-by-year comparisons of the same;

> c.  Category 3: Current loans, including data concerning customer names, account numbers, balances, interest rates, maturity dates, and/or contract expiration dates;

> d.  Category 4: Budgets, loan balance trends, and loan and revenue projections;

> e.  Category 5: Loan and deposit trends and forecasts, including funding percentages, fee incomes, and growth percentages related to the same;

> f.  Category 6: Employees' base salaries, incentive compensation, and recommended compensation increases;

g. <u>Category 7:</u> Customers, including their risk ratings, credit scores, financial performance and projections, collateral, guarantors, contact information, and analyses and reports related to all of the same; and

h. <u>Category 8:</u> Templates, forms, legal documents, and analyses necessary to analyze, underwrite, close, and service loans and deposits by customers.

All trade secrets in these categories were developed over time using Happy Bank resources.

313.    Happy Bank's trade secrets derive independent value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

314.    Happy Bank has taken and continues to take reasonable measures under the circumstances to maintain the secrecy of its trade secrets, such as requiring employees like the Employee Defendants to sign contracts with confidentiality and nondisclosure provisions, training them on their confidentiality and nondisclosure obligations, and/or imposing confidentiality and nondisclosure obligations as part of its policies and procedures. Happy Bank also has taken reasonable measures to maintain the secrecy of its trade secrets through the following actions: (i) maintaining the trade secrets on secure computers and networks with limited access; (ii) prohibiting employees from using external communication and messaging services; (iii) prohibiting employees from storing any bank data, including trade secrets, on non-bank-provided mobile devices, such as USB devices and external hard drives; (iv) requiring employees to routinely review and verify compliance with Happy Bank policies and procedures related to its trade secrets; (v) auditing compliance by its employees; (vi) otherwise restricting employees' use of any trade secrets in any unsecure or unencrypted way; and (vii) maintaining written policies and procedures containing confidentiality, access, and security restrictions

315.    Happy Bank's trade secrets provide substantial economic value that is impaired by their disclosure outside of Happy Bank, such as the dissemination of information related to Happy Bank's internal finances, business analyses, financial templates, employees, customers, and loan details.

316.    The Employee Defendants used, received, had access to, and had knowledge of Happy Bank's trade secrets while employed at Happy Bank and under circumstances giving rise to a duty to maintain the secrecy of such trade secrets. The Employee Defendants also knew from their training and employment practices that Happy Bank considered its trade secrets to be confidential, and they knew—and previously acknowledged in writing—that they had a duty to preserve Happy Bank's trade secrets and protect the same from dissemination or use outside of Happy Bank.

317.    ASB knew or had reason to know that it acquired Happy Bank trade secrets through at least Defendants Holmes's, House's, and Sikes's breaches of duties to maintain the secrecy of Happy Bank's confidential information. ASB disclosed and/or used trade secrets of Happy Bank without consent, and at the time of ASB's disclosure and/or use, ASB knew or had reason to know that ASB's knowledge of the trade secret was derived from or through a person who owed a duty to Happy Bank to maintain the secrecy of or limit the use of the trade secret.

318.    Defendants misappropriated Happy Bank's trade secrets under the Texas Uniform Trade Secrets Act. Among other things, the Defendants misappropriated Happy Bank's trade secrets in at least the following ways:

| Paragraphs Cross-Referenced | Defendant | Misappropriation | Categories |
|---|---|---|---|
| 86–128 | Holmes | • Disclosing and/or using Happy Bank's | 1, 2, 3, 4, 5, 6, 7, 8 |

| Paragraphs Cross-Referenced | Defendant | Misappropriation | Categories |
|---|---|---|---|
| | | trade secret lender incentive plan;<br>• Disclosing and/or using Happy Bank's trade secret employee compensation information;<br>• Disclosing and/or using Happy Bank's trade secrets about operations in Lubbock;<br>• Using confidential information about customers taken from Happy Bank to help complete loans for those customers at ASB; and<br>• Printing/copying and/or physically taking Happy Bank trade secrets from its premises. | |
| 129–158 | House | • Disclosing and/or using Happy Bank's trade secret information about Customer X;<br>• Disseminating and disclosing Happy Bank's trade secrets using Customer X as an intermediary step to forward information to an external email account, before sending it to ASB; and<br>• Printing/copying and/or physically taking Happy Bank's trade secrets from its premises. | 3, 7, 8 |
| 159–172 | Baisley | • Disclosing and/or using Happy Bank's trade secret information about Customer X; and<br>• Disseminating, disclosing and/or acquiring Happy Bank's trade secrets in other ways referenced herein. | 3, 7, 8 |
| 173–183 | Phillips | • Disclosing and/or using Happy Bank's trade secret information about Customer X. | 3, 7, 8 |
| 202–212 | McCutcheon | • Disclosing and/or using Happy Bank's trade secret information about Customer D. | 3, 7, 8 |
| 226–235 | Terrell | • Reviewing Happy Bank trade secrets just before leaving Happy Bank in order to transfer information to ASB; | 3, 7 |

| Paragraphs Cross-Referenced | Defendant | Misappropriation | Categories |
|---|---|---|---|
| | | and<br>• Disseminating and disclosing Happy Bank's trade secrets using Customer G as an intermediary step to forward information to an external email account. | |
| 236–247 | Dollahite | • Disclosing and/or using Happy Bank's trade secret information, internal workflow documents, and information discussed in Executive Loan Committee meetings; and<br>• Disseminating, disclosing and/or acquiring Happy Bank's trade secrets in other ways referenced herein. | 3, 7, 8 |
| 248–258 | Sikes | • Disclosing and/or using Happy Bank's trade secret information included in the Customer Loan Document; and<br>• Disclosing and/or using Happy Bank's trade secret information in the April 28, 2022 email "FW: loans to talk to Bud about." | 3, 7 |
| 259–293 | ASB | • Acquiring and using Happy Bank's trade secret lender incentive plan;<br>• Acquiring and using Happy Bank's trade secret employee compensation information;<br>• Acquiring and using Happy Bank's trade secrets about operations in Lubbock; and<br>• Acquiring and using Happy Bank's trade secret information about Customer X;<br>• Acquiring and using Happy Bank's trade secret information contained in Mr. Sikes's April 28, 2022 email; and<br>• Acquiring Happy Bank's trade secrets in other ways referenced herein. | 1, 2, 3, 4, 5, 6, 7, 8 |

319.    No Defendant had any express or implied authorization or consent to use, copy, disclose, disseminate, and/or physically take Happy Bank's trade secrets. Defendants all knew or

had reason to know that they had acquired Happy Bank's trade secrets under circumstances giving rise to a duty to maintain the secrecy and limit the use of those trade secrets. Yet, upon information and belief, Defendants used and disclosed Happy Bank's trade secrets as part of the work for Happy Bank's competitor: ASB.

320.     As a direct and proximate result of Defendants' conduct, Happy Bank suffered and continues to suffer substantial harm, including: (i) loss of business and customers; (ii) loss of employees; (iii) costs and fees incurred to analyze and determine compliance with regulations and action needed; (iv) costs incurred to replace employees; (v) costs incurred to investigate missing and/or altered data and records; (vi) loss of benefits that were bargained for and reasonably expected from the merger transaction; and (vii) loss of reputation and goodwill. Accordingly, Happy Bank is entitled to an award of actual damages and damages for any unjust enrichment caused by Defendants' misappropriation of trade secrets—including disgorgement of all compensation or other value that Defendants have received, in any form—in an amount more than $75,000 and to be proved at trial. *See* TEX. CIV. PRAC. & REM. CODE § 134A.004(a).

321.     Happy Bank is also entitled to exemplary damages and attorneys' fees because Defendants misappropriated Happy Bank's trade secrets willfully, maliciously, and in bad faith. TEX. CIV. PRAC. & REM. CODE §§ 134A.004(b), 134A.005. The Employee Defendants knew that they owed duties of confidentiality to Happy Bank, including nondisclosure obligations and duties to preserve Happy Bank's trade secrets. ASB was also fully aware of those obligations. Defendants nonetheless misappropriated Happy Bank's trade secrets without express or implied authorization or consent and did so using covert and secretive methods to avoid detection. Defendants' course of conduct demonstrates a premeditated and coordinated decision to use

Happy Bank's trade secrets in conscious disregard of Happy Bank's rights, with the deliberate intent to harm Happy Bank by using that information to launch and support the new operations of ASB in West Texas.

322.     Happy Bank also seeks injunctive relief to enjoin Defendants' continued and/or future use and misappropriation of Happy Bank's trade secrets, and for the return of the same. *See* TEX. CIV. PRAC. & REM. CODE § 134A.003.

### Third Cause of Action: Breach of Fiduciary Duty
### Against All Employee Defendants

323.     Happy Bank repeats, re-alleges, and incorporates by reference the foregoing paragraphs as if set forth fully herein, except insofar as those paragraphs allege misappropriation of Happy Bank's trade secrets.

324.     During their employment, employees owe a fiduciary duty to their employer and are obligated to act in their employers' interests. These fiduciary duties include the following:

   a.   The duty of loyalty and utmost good faith;

   b.   The duty of candor;

   c.   The duty to refrain from self-dealing;

   d.   The duty to act with integrity of the strictest kind;

   e.   The duty of fair and honest dealing; and

   f.   The duty of full disclosure.

325.     Employees are also obligated not to solicit their employer's customers while still working for the employer or solicit the departure of other employees while still working for their employer, among other things.

326.    The Employee Defendants had a fiduciary relationship with Happy Bank by virtue of their employment-related contracts and/or their roles as officers and as agents of a financial institution. Officers of depository institutions, like Happy Bank, owe heightened fiduciary duties to act in the financial institution's best interests because such officers are charged with looking after other people's money. All of the Employee Defendants were Happy Bank officers during their employment with Happy Bank.

327.    Separate and apart from the Employee Defendants' misappropriation of Happy Bank's trade secrets, the Employee Defendants breached fiduciary duties to Happy Bank, including by the following conduct:

      a.   Usurping corporate opportunities that rightfully belonged to Happy Bank; and/or

      b.   Soliciting Happy Bank's customers and employees while still working for Happy Bank.

328.    The Employee Defendants' conduct reveals a gross lack of loyalty, integrity, and candor. It is inconsistent with generally accepted standards of prudent operations for bank officers to undermine the bank's competitive position and subordinate the bank's interests to their own and/or the interests of the bank's competitors. Here, the Employee Defendants' actions created an abnormally high risk that Happy Bank would lose employees and business—and associated income and revenue (e.g., interest on loans)—to ASB, a competitor, at a pace and in a manner that would not occur under ordinary circumstances. And Happy Bank did in fact lose employees and customers and associated income due to the Employee Defendants' actions.

329.    Further, the timing and number of Happy Bank employees who chose to follow Mr. Holmes to ASB can only be explained by Mr. Holmes—a supervisor, officer, and Regional President—acting as a "corporate pied piper" to lure Happy Bank's personnel away before

resigning from Happy Bank. Mr. Holmes's unlawful solicitation is an egregious breach of fiduciary duties owed to Happy Bank. So too was the similar conduct by at least Messrs. House, Glenn, Jackson, and McCutcheon.

330.    As a direct and proximate result of the Employee Defendants' conduct, Happy Bank suffered substantial harm, including: (i) loss of business and customers; (ii) loss of employees; (iii) costs and fees incurred to analyze and determine compliance with regulations and action needed; (iv) costs incurred to replace employees; (v) costs incurred to identify, recover and/or replace missing and/or altered data and records; (vi) loss of benefits that were bargained for and reasonably expected from the merger transaction; and (vii) loss of reputation and goodwill. Accordingly, Happy Bank is entitled to an award of actual damages and damages and/or disgorgement for any unjust enrichment of the Employee Defendants as a result of their breaches of fiduciary duties, in an amount more than $75,000 and to be proved at trial.

331.    Happy Bank is also entitled to exemplary damages as a result of the malicious conduct and self-dealing that the Employee Defendants concealed from Happy Bank. The Employee Defendants' actions evince a specific intent to harm Happy Bank and benefit themselves and/or a competitor of Happy Bank, including by usurping of corporate opportunities that the Employee Defendants knew belonged to Happy Bank and soliciting Happy Bank's customers to send their business elsewhere.

332.    At minimum, the Employee Defendants acted with gross negligence and conscious indifference because: (1) an objective person in the Employee Defendants' position would have perceived an extreme degree of risk to Happy Bank as a result of the Employee

Defendants' conduct; and (2) the Employee Defendants knew of that risk by virtue of their training, industry experience, and/or Happy Bank's policies and procedures.

**Fourth Cause of Action: Breach of Contract**
**Against Defendants Holmes, House, Glenn, McCutcheon, Jackson,**
**Dollahite, and Baisley**

333.    Happy Bank repeats, re-alleges, and incorporates by reference the foregoing paragraphs as if set forth fully herein.

334.    The **Awards** are valid, enforceable contracts between Happy Bank and Defendants Holmes, House, McCutcheon, Jackson, and Dollahite. Each Defendant that signed an Award agreed, among other things, not to use, make available, sell, disclose, or otherwise communicate any of Happy Bank's Confidential Information to any person during their employment—other than in the course of the employee's assigned duties and for the benefit of Happy Bank—or at any time thereafter.

335.    Happy Bank has an additional valid, enforceable contract with Defendant Holmes—namely, the **Confidentiality Agreement**. The Confidentiality Agreement prohibited Mr. Holmes from communicating, revealing, or disclosing Happy Bank's Confidential Information at any time for any purpose other than the proper performance of his job duties at Happy Bank.

336.    Happy Bank has additional valid, enforceable contracts with Defendant Glenn, including Awards, Options, a Restricted Stock Award Agreement, and a Retention Bonus Agreement (the "**Glenn Contracts**"). Among other things, Mr. Glenn agreed in the December 1, 2020 Option that he would not, during the term of his employment and for a period of 12 months following the end of his employment with Happy Bank: (1) engage in competition with

Happy Bank by working for any lending or depository institution within a 50 mile radius of any location of Happy Bank to which he was assigned or from which he performed duties for Happy Bank; (2) directly or indirectly contact, solicit, or induce any Happy Bank customers to (a) reduce or eliminate the business such customer conducts with Happy Bank or (b) enter into any business relationship with Glenn, Glenn's new employer, or any third party if such business relationship is competitive with the same or similar business activities that Glenn carried out for Happy Bank; or (3) directly or indirectly encourage any person working for Happy Bank to leave the employ of Happy Bank to become an employee of any third party that competes with Happy Bank.

337.    Happy Bank has a valid, enforceable contract with Ms. Baisley—namely, the **Bonus Agreement**, under which Ms. Baisley promised to repay her bonus should her employment terminate for any reason before July 26, 2022.

338.    Happy Bank performed, tendered performance, or was excused from performing its contractual obligations under the Awards, the Confidentiality Agreement, the Glenn Contracts, and the Bonus Agreement.

339.    Defendants Holmes, House, McCutcheon, Jackson, and Dollahite breached the Awards by, directly or indirectly, using, making available, selling, disclosing, and/or otherwise communicating Happy Bank's Confidential Information as described herein.

340.    Similarly, Mr. Holmes breached the Confidentiality Agreement by communicating, revealing, and/or disclosing Happy Bank's Confidential Information as described herein.

341.     Defendant Glenn also breached the Glenn Contracts, including the December 1, 2020 Option, by, among other things, the following conduct while he was employed by Happy Bank and/or during the 12 months after his employment with Happy Bank ended: (1) engaging in competition with Happy Bank by working for ASB within a 50 mile radius of a Happy Bank location to which he was assigned; (2) directly or indirectly contacting, soliciting, and/or inducing Happy Bank customers to (a) reduce or eliminate their business with Happy Bank and/or (b) enter into a business relationship with ASB; and (3) directly or indirectly encouraging others working for Happy Bank to leave Happy Bank and become employees of ASB.

342.     Defendant Baisley breached her Bonus Agreement by failing to repay the bonus despite ending her employment with Happy Bank in April 2022.

343.     Happy Bank presented its claim against Defendants Holmes, House, Glenn, McCutcheon, Jackson, Dollahite, and Baisley (the "**Contract Defendants**") upon service of the Original Complaint.

344.     As a direct and proximate result of the Contract Defendants' respective breaches of their contracts, Happy Bank suffered actual damages of more than $75,000 and in an amount to be proved at trial, including: (i) loss of business and customers; (ii) loss of employees; (iii) costs and fees incurred to analyze and determine compliance with regulations and action needed; (iv) costs incurred to replace employees; (v) costs incurred to identify, recover and/or replace missing and/or altered data and records; (vi) loss of benefits that were bargained for and reasonably expected from the merger transaction; and (vii) loss of reputation and goodwill. Happy Bank is further entitled to all stock or other compensation provided pursuant to the Awards and/or Options to the Contract Defendants.

345.    In addition, as a direct and proximate result of Defendant Baisley's breach of her Bonus Agreement, Happy Bank has suffered harm of an amount equal to the bonus.

### Fifth Cause of Action: Tortious Interference with Existing Contract Against Holmes

346.    Happy Bank repeats, re-alleges, and incorporates by reference the foregoing paragraphs as if set forth fully herein, except insofar as those paragraphs allege misappropriation of Happy Bank's trade secrets.

347.    The Awards, Glenn Contracts, and Bonus Agreement, described above, are valid and enforceable contracts.

348.    Defendant Holmes willfully and intentionally interfered with the Awards and Bonus Agreement, without justification, by knowingly soliciting and/or encouraging Defendants House, McCutcheon, Jackson, Dollahite, and Baisley to breach those contracts' terms, including the nondisclosure provisions. Defendants House, McCutcheon, Dollahite, and Jackson breached their respective contracts by directly or indirectly using, making available, selling, disclosing, and/or otherwise communicating Happy Bank's Confidential Information as described above.

349.    Defendant Holmes also willfully and intentionally interfered with the Glenn Contracts, without justification, by knowingly soliciting and/or encouraging Defendant Glenn to breach the Glenn Contracts, including the nonsolicitation and noncompetition provisions. Defendant Glenn breached the Glenn Contracts by, among other things, soliciting Happy Bank customers and employees during and/or shortly after the end of his employment with Happy Bank as described above.

350.    Defendant Holmes also willfully and intentionally interfered with the Bonus Agreement, without justification, by knowingly soliciting and/or encouraging Defendant Baisley

to breach the Bonus Agreement. Defendant Baisley breached the Bonus Agreement by failing to repay the bonus she received.

351.    Happy Bank has been injured as a proximate result of Defendant Holmes's tortious interference by more than $75,000 and in an amount to be proved at trial. Defendant Holmes's actions were unlawful and the result of his malice and/or gross negligence for which Happy Bank seeks to recover exemplary damages.

**Sixth Cause of Action: Tortious Interference with Prospective Relations
Against All Defendants Except Sikes and Glenn**

352.    Happy Bank repeats, re-alleges, and incorporates by reference the foregoing paragraphs as if set forth fully herein, except insofar as those paragraphs allege misappropriation of Happy Bank's trade secrets.

353.    Happy Bank had ongoing business relationships with numerous customers related to loans serviced by Happy Bank—including, but not limited to, letter loan agreements, promissory notes, guaranty agreements, and/or security agreements (the "**Customer Contracts**"). Examples of these contracts include those Happy Bank had with Customers B, D, E, G, and J referenced above, and the customers listed in Mr. Sikes's April 28, 2022 email. There was a reasonable probability that Happy Bank's relationships with these customers would have continued under the existing and/or additional future contracts between Happy Bank and the customers. There was also a reasonable probability that Happy Bank would have entered into a business relationship with Customer X, referenced above.

354.    Defendants willfully and intentionally interfered with the Customer Contracts, without justification, by knowingly soliciting and/or encouraging those customers to cease their contractual business with Happy Bank and/or move their business to ASB.

355.    Defendants ASB, Holmes, House, Baisley, and Phillips also intentionally interfered with Happy Bank's relationship with Customer X by secretly beginning to prepare a loan for Customer X that was intended to close at ASB. These actions constitute independently tortious or unlawful conduct—namely, breaches of fiduciary duties to Happy Bank and knowing participation in those breaches by ASB—that prevented the reasonably probable relationship between Happy Bank and Customer X from occurring.

356.    Defendants ASB, Holmes, House, Baisley, and Phillips acted with a conscious desire to prevent the relationship between Happy Bank and Customer X from occurring, as evidenced by their deliberate actions to keep the deal with Customer X a secret from Happy Bank. Defendants ASB, Holmes, House, Baisley, and Phillips also knew that interference was certain or substantially certain to occur as a result of their wrongful conduct.

357.    At least Defendants ASB and Terrell acted with a conscious desire to prevent Happy Bank's business relationship with Customer G, or at least knew that interference was certain or substantially certain to occur as a result of their conduct, and their conduct was independently tortious and unlawful because it involved breaches of fiduciary duties (including ASB's knowing participation in the same).

358.    Defendants' interference proximately caused Happy Bank injury in the form of lost revenues from ongoing and prospective future business with existing customers, including Customers B, D, E, G, J, X, and others mentioned above. Happy Bank has suffered actual damages and loss as a proximate result, totaling more than $75,000 and in an amount to be proved at trial.

359.    With respect to ASB, the facts showing tortious interference—and specifically the element of ASB's independently tortious conduct—were hidden from Happy Bank until documents were produced in this action in March, April, and May of 2024. These documents indicated that ASB tortiously interfered with Happy Bank's prospective relations, including in relation to (i) Mr. House and Customer X, as alleged in paragraphs 288-290, (ii) Mr. Sikes's list of customer information, as alleged in paragraphs 291 and 292, and (iii) Ms. Terrell and Customer G, as alleged in paragraphs 232 and 233.

### Seventh Cause of Action: Civil Conspiracy
### Against All Defendants

360.    Happy Bank repeats, re-alleges, and incorporates by reference the foregoing paragraphs as if set forth fully herein, except insofar as they allege misappropriation of Happy Bank's trade secrets.

361.    Defendants, who are two or more persons, were members of a common conspiracy.

362.    The object of the conspiracy was to accomplish unlawful purposes and/or to use unlawful means to accomplish lawful purposes, including undermining and interfering with Happy Bank's operations by (i) siphoning off employees and existing and prospective customers and (ii) inducing employees to breach their fiduciary duties to Happy Bank to further Defendants' own success. Defendants collectively had a meeting of the minds on the object of the conspiracy and to engage in a course of action to further their own success at Happy Bank's expense. At a minimum, the consistent pattern of Defendants' course of conduct in advancing the object of their conspiracy—combined with their coordinated action in detracting from Happy

Bank's business and launching and supporting ASB's new, competing operations—demonstrates their meeting of the minds.

363.     Defendants, either directly or through agents acting on their behalf, committed overt acts in furtherance of the object of the conspiracy, including by breaching their fiduciary duties to Happy Bank (or, as to ASB, knowingly participating in certain of the Employee Defendants' breaches of fiduciary duties) and/or tortiously interfering with Happy Bank's prospective relations as alleged above.

364.     Happy Bank has suffered actual damages as a proximate result of Defendants' conduct of more than $75,000 and in an amount to be proved at trial.

365.     Defendants are jointly and severally liable for all acts done by them in furtherance of their unlawful conduct.

**Eighth Cause of Action: Knowing and Joint Participation in Breach of Fiduciary Duty Against Defendants ASB, Holmes, Glenn, House, Baisley, and Phillips**

366.     Happy Bank repeats, re-alleges, and incorporates by reference the foregoing paragraphs as if set forth fully herein, except insofar as they allege misappropriation of Happy Bank's trade secrets.

367.     The Employee Defendants breached fiduciary duties to Happy Bank as described above.

368.     Based on their roles, contractual agreements, and Happy Bank's policies and procedures, the Employee Defendants knew that they each owed fiduciary duties to Happy Bank. ASB also knew the Employee Defendants owed fiduciary duties to Happy Bank as bank officers.

369.     The fiduciary duties the Employee Defendants owed to Happy Bank prohibited them from, among other things, being disloyal to Happy Bank, usurping Happy Bank's

opportunities, soliciting the departure of other Happy Bank employees while still working for Happy Bank, soliciting Happy Bank's customers to send their business elsewhere while still working for Happy Bank, and/or otherwise competing against Happy Bank while still employed by Happy Bank. Yet each Employee Defendant named in this claim knowingly and jointly participated in conduct of other Defendants that breached these duties.

370.    ASB also knowingly and jointly participated in conduct of at least Defendants Holmes and House that breached the fiduciary duties those Employee Defendants owed to Happy Bank. ASB knew through Messrs. Steele, Sanders, and others that at least Defendants Holmes and House were violating their fiduciary duties to Happy Bank—while still working for Happy Bank—by, among other things, soliciting other Happy Bank employees to join ASB and usurping Happy Bank's opportunities. The conduct in which ASB knowingly joined, through Messrs. Steele, Sanders, and others, went well beyond participation in permissible plans to compete, as described above.

371.    Happy Bank has suffered actual damages as a proximate result of the conduct of the Defendants named in this claim, which damages are more than $75,000 and in an amount to be proved at trial.

372.    The Defendants named in this claim are jointly and severally liable for all acts done by them in furtherance of their knowing and joint participation in breaches of fiduciary duties.

**Ninth Cause of Action: Unfair Competition**
**Against All Defendants**

373.   Happy Bank repeats, re-alleges, and incorporates by reference the foregoing paragraphs as if set forth fully herein, except insofar as they allege misappropriation of Happy Bank's trade secrets.

374.   Defendants have engaged in dishonest business conduct that has wrongfully interfered with Happy Bank's ability to conduct its business. Among other things, Defendants breached fiduciary duties and intentionally interfered with prospective business relationships, as alleged above, including by usurping business opportunities and knowingly soliciting and/or encouraging Happy Bank's customers to stop or reduce their business with Happy Bank and/or send their business to ASB.

375.   Defendants Holmes, House, Baisley, and Phillips breached fiduciary duties and intentionally interfered with Happy Bank's prospective relationships with customers, including Customer X, by using Happy Bank resources to secretly gather and prepare materials for transactions that they intended to close at ASB. Further, while still employed at Happy Bank, the Employee Defendants solicited other Happy Bank employees to go with them to Happy Bank's competitor, ASB.

376.   Defendant's interference was wrongful and interfered with Happy Bank's ability to conduct its business.

377.   Defendants' actions have directly and proximately caused commercial damage to Happy Bank in the form of business disruption and the loss of customers, employees, income, and goodwill—in addition to proximately causing Happy Bank to suffer monetary damages of more than $75,000 and in an amount to be proved at trial.

**ATTORNEYS' FEES AND COSTS**

378.    Pursuant to both Chapter 38 of the Texas Civil Practice and Remedies Code and the DTSA, Happy Bank seeks its reasonable and necessary attorneys' fees and costs against Defendants related to its trade secret claims and against the Contract Defendants related to its contract claims.

379.    Pursuant to the terms of Mr. Holmes's Confidentiality Agreement, Happy Bank also seeks its reasonable and necessary attorneys' fees and costs against Mr. Holmes related to his breach of the Confidentiality Agreement.

380.    Happy Bank also seeks its reasonable and necessary attorneys' fees and costs against Defendants based on any other grounds to which it may be entitled to such fees and costs.

**CONDITIONS PRECEDENT**

381.    All conditions precedent to Happy Bank's claims for relief have occurred, have been performed, or have been waived.

**PRAYER**

WHEREFORE, Happy Bank respectfully requests that this Court enter a judgment:

   a.    Ordering that all Employee Defendants are liable for:

     i.    Breaching fiduciary duties to Happy Bank;

     ii.   Civil conspiracy; and

     iii.  Unfair competition;

   b.    Ordering that all Defendants except Jackson and Glenn are liable for violating the DTSA;

   c.    Ordering that all Defendants except Jackson and Glenn are liable for violating the TUTSA;

d.  Ordering that Defendants Holmes, House, Glenn, McCutcheon, Jackson, Baisley, and Dollahite are liable for breaching contractual obligations to Happy Bank;

e.  Ordering that Defendant Holmes is liable for tortiously interfering with Happy Bank's existing contracts;

f.  Ordering that all Defendants except Sikes and Glenn are liable for tortiously interfering with Happy Bank's prospective relations;

g.  Declaring that each Defendant acted maliciously in breaching fiduciary duties (or, as to ASB, knowingly joining in breaches of fiduciary duties), engaging in civil conspiracy, and/or unfairly competing with Happy Bank;

h.  Declaring that all Defendants except Jackson and Glenn acted maliciously in violating the DTSA and TUTSA;

i.  Declaring that Defendants are jointly and severally liable for the damages owed for civil conspiracy;

j.  Declaring that Defendants ASB, Holmes, Glenn, House, Baisley, and Phillips are jointly and severally liable for the damages owed for knowing and joint participation in breaches of fiduciary duties;

k.  Awarding actual, compensatory, and/or consequential damages to Happy Bank in an amount to be determined at trial;

l.  Awarding exemplary damages to Happy Bank in an amount to be determined at trial;

m. Ordering an accounting of all profits, benefits, and/or other compensation provided to or derived by Defendants through their wrongful conduct;

**PLAINTIFF'S THIRD AMENDED COMPLAINT**                                    Page 112

n.  Ordering disgorgement and/or clawback of all benefits, stock, and/or other compensation provided to or derived by the Employee Defendants due to their breaches of fiduciary duties and other obligations to Happy Bank;

o.  Enjoining Defendants from any further use of Happy Bank's trade secrets or Confidential Information and directing Defendants to return the same to Happy Bank or certify destruction of the same;

p.  Enjoining Defendants from unlawfully competing with Happy Bank;

q.  Awarding reasonable and necessary attorneys' fees, costs, and related expenses incurred in bringing and prosecuting this action;

r.  Awarding pre-judgment and post-judgment interest at the highest lawful rates; and

s.  Awarding all such other and further relief that Happy Bank may be entitled to in law or equity.

Dated: July 2, 2024

Respectfully submitted,

*/s/ John Turner*

John Turner
   Texas Bar No. 24028085
   john.turner@haynesboone.com
Jason N. Jordan
   Texas Bar No. 24078760
   jason.jordan@haynesboone.com
Tiffany M. Cooke
   Texas Bar No. 24087340
   tiffany.cooke@haynesboone.com
Tammie Banko
   Texas Bar No. 24116066
   tammie.banko@haynesboone.com
**HAYNES AND BOONE, LLP**
2801 N. Harwood Street, Suite 2300
Dallas, TX 75201
Telephone: (214) 651-5000
Telecopier: (214) 651-5940

-and-

Fernando M. Bustos
   Texas Bar No. 24001819
   fbustos@bustoslawfirm.com
Brandon C. Callahan
   Texas Bar No. 24096175
   bcallahan@bustoslawfirm.com
**BUSTOS LAW FIRM, P.C.**
1001 Main Street, Suite 501
Lubbock, TX 79408
Telephone: (806) 780-3976
Telecopier: (806) 780-3800

**ATTORNEYS FOR PLAINTIFF
CENTENNIAL BANK, AS THE
SUCCESSOR-IN-INTEREST TO
HAPPY STATE BANK**

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that on July 2, 2024, the foregoing document was filed electronically with the Clerk of the Court through the CM/ECF system, which will send a notice of electronic filing to all counsel of record who are deemed to have consented to electronic service.

                                  */s/ John Turner*
                                  John Turner